# EXHIBIT 3

**Hearing Date:  December 14, 2010 at 9:45 a.m. (EST)**

James S. Dittmar *(pro hac vice)*
John O. Farley
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax:  617.523.1231

*Counsel for Diane Currier (Executor*
*of the Estate of Richard Floor)*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LYONDELL CHEMICAL COMPANY, et al., | ) | Case No.: 09-10023 (REG) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE OF THE LB LITIGATION TRUST, | ) | Adv. Proceeding No.: 09-1375 (REG) |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OF DIANE CURRIER (EXECUTOR OF THE ESTATE OF RICHARD FLOOR) IN OPPOSITION TO THE LITIGATION TRUSTEE'S MOTION TO AMEND THE CAPTION OR TO EXTEND THE TIME FOR SUBSTITUTION AND TO SUBSTITUTE** |
| v. | ) | |
| LEONARD BLAVATNIK, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

TIMELINE & SUMMARY OF FACTS ....................................................................3

ARGUMENT ...........................................................................................................6

I.    The Trustee Has Not Satisfied His Burden and His Motion Should Be Denied .......................................................................................................7

    A.    The Burden is on the Trustee to Prove that His Neglect was Excusable ........................................................................................ 7

    B.    The Trustee Proffers No Basis for Allowing This Late Motion ................. 8

    C.    The Trustee Cites as Authority Cases That Do Not Support his Motion ............................................................................................ 11

II.    The Trustee's Proffered Excuses are Inadequate and Should Be Disregarded .............................................................................................12

    A.    Because All of the Trustee's Proffered Excuses Arose After the 90-Day Period, they Are Legally Irrelevant and Should Be Disregarded ..................................................................................... 12

    B.    The Trustee's Claim of Confusion Regarding Currier's Appointment is Meritless............................................................... 13

    C.    Currier did not Consent to Substitution ..................................... 14

    D.    The Trustee Did Not Satisfy Rule 25(a) by Filing the Amended Complaint.......................................................................................... 15

III.    The Equities Favor Dismissal .................................................................16

CONCLUSION .......................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Republic Motor Inns, Inc.,*
   444 F.2d 87 (3rd Cir. 1971) ................................................................................15, 16

*Canfield v. Van Atta Buick/GMC Truck, Inc.,*
   127 F.3d 248 (2d Cir. 1997).............................................................................8, 9, 10

*Dungan v. Academy at Ivy Ridge,*
   No. 06-CV-0908, 2009 WL 2176278 (N.D.N.Y. July 21, 2009) ...........................14

*Jackson v. Broad. Music, Inc.,*
   No. 04 CV 5948, 2006 WL 250524 (S.D.N.Y. Feb. 1, 2006) .................................15

*Jones Inlet Marina, Inc. v. Inglima,*
   204 F.R.D. 238 (E.D.N.Y. 2001) .....................................................................13, 14

*Kaubisch v. Weber,*
   408 F.3d 540 (8th Cir. 2005) ..................................................................................15

*Kyle v. Campbell Soup Co.,*
   28 F.3d 928 (9th Cir. 1994) .......................................................................................9

*Lynch v. U.S.,*
   430 F.3d 600 (2d Cir. 2005)......................................................................................9

*Mich. Self-Insurers' Sec. Fund v. DPH Holdings, Corp. (In re DPH Holdings, Inc.),*
   434 B.R. 77 (S.D.N.Y. 2010)....................................................................4, 6, 7, 12

*Nauman v. Rensselaer Polytechnic Inst.,*
   07-CV-0740, 2010 U.S. Dist. LEXIS 29563 (N.D.N.Y Mar. 26, 2010) ................15

*Pioneer Inv. Servs. Co. v. Brunswick Assocs.,*
   507 U.S. 380 (1993)....................................................................................8, 9, 10, 11

*Saylor v. Bastedo,*
   623 F.2d 230 (2d Cir. 1980).....................................................................................12

*Silivanch v. Celebrity Cruises, Inc.,*
   333 F.3d 355 (2d Cir. 2003)................................................. 1, 3, 6-11, 17

*Smith v. Thebaud,*
   258 F.R.D. 207 (E.D.N.Y. 2009) .........................................................................7, 11

*Staggers v. Otto Gerdau Co.*,
    359 F.2d 292 (2d Cir. 1966) ........................................................................................11, 12

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*,
    246 F.R.D. 143 (E.D.N.Y. 2007) .........................................................................................15

*Unicorn Tales, Inc. v. Banerjee*,
    138 F.3d 467 (2nd Cir. 1998) ...............................................................................................13

*Weinstock v. Cleary, Gottlieb, Steen & Hamilton*,
    16 F.3d 501 (2d Cir. 1994) ...................................................................................................10

*Williams v. KFC Nat. Mgmt. Co.*,
    391 F.3d 411 (2d Cir. 2004) .............................................................. 4, 6, 8, 10, 16-17

*Zeidman v. Gen. Accident Ins. Co.*,
    122 F.R.D. 160 (S.D.N.Y. 1988) .........................................................................................11

## OTHER AUTHORITIES

FED. R. BANKR. P. 9006 ...............................................................................................................7

FED. R. CIV. P. 6(e) ......................................................................................................................9

FED. R. CIV. P. 25(a) .............................................................................1-4, 6-8, 11, 13-16

Mass. Probate Court Rule 16 .....................................................................................................3

Diane Currier (Executor of the Estate of Richard Floor) ("Currier" or the "Executor")

respectfully submits this Memorandum in Opposition to the Litigation Trustee's Motion to

Amend the Caption or to Extend the Time for Substitution and to Substitute (the "Motion").

## PRELIMINARY STATEMENT

The Litigation Trustee (the "Trustee") filed this Motion on November 16, 2010, more

than eight months after his receipt of the Suggestion of Death of Richard Floor (the

"Suggestion"), on March 8, 2010. That is a violation of Rule 25(a) of the Federal Rules of Civil

Procedure ("Rule 25(a)"), which mandates dismissal if a motion to substitute is not filed within a

90-day window, in this case, by June 6, 2010.

There is no real dispute here. The Trustee admits in his Motion papers (i) that he took *no*

*action at all* to comply with Rule 25(a) (much less filed the required motion to substitute) until

*after* the 90-day period had already expired, and (ii) that he has *no excuse* for his failure to act

within the time prescribed by the Rule. These admissions are dispositive. Because he admits

that he "failed to follow the clear dictates of a court rule," and proffers no excuse for that failure,

his neglect is inexcusable as a matter of law, and this Motion must be denied. *See, e.g., Silivanch*

*v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366-70 (2d Cir. 2003) (in the absence of excuse, district

court's allowance of *two-day-late* appeal as "excusable neglect" was a reversible abuse of

discretion, even though delay was short, was due to good faith reliance on a misstatement by

opposing counsel, and caused no prejudice to the non-moving party).[1]

The Trustee nonetheless tries to advance three arguments in support of this Motion. Each

one fails.

---

[1] We respectfully urge the Court to consider the entirety of the *Silivanch* decision (not cited by the Trustee), particularly the court's lucid and detailed discussion of the "excusable neglect" standard at Section IV of the opinion. 333 F.3d at 365-71. Supported by a detailed survey of the relevant law of this Circuit (and others), the court's analysis effectively treats and rejects every argument advanced by the Trustee in support of this Motion.

- <u>First</u>, he claims that his neglect should be excused because he was confused about Currier's status as Executor due to some alleged error at the Middlesex County Probate and Family Court (the "Probate Court"). But he admits that supposed confusion arose only *after* the 90-day window had closed, negating his argument. Confusion arising after the 90-day period has ended obviously cannot excuse inaction during the 90-day period. And, in any case, as the Trustee's own papers, as well as the Declaration of Diane L. Currier (Dec. 7, 2010) (the "Currier Decl.") and the Probate Court documents submitted therewith attest, this excuse is not credible.

- <u>Second</u>, he tries to argue that Currier silently consented to substitution in July 2010. This alleged consent also supposedly took place nearly a month after the 90-day period had expired. The Trustee cannot excuse his inaction during the 90-day period by claiming that Currier consented to substitution nearly a month after the period ended. In any case, this consent never happened and this argument cannot be credited. As she testifies to in her Declaration, Currier obviously did not voluntarily consent, for no consideration, to substitution as a defendant in a multi-billion dollar lawsuit, after the Trustee's neglect had made dismissal with prejudice all but inevitable under Rule 25(a). Indeed, if the Trustee's counsel had believed that Currier consented to substitution in July—during the same time counsel claims he was still trying to determine who the Executor was, and at a moment when counsel was doubtless aware that the Rule 25(a) deadline had passed—counsel would *immediately* have memorialized that consent in writing. Yet there is no record of Currier's consent, because it did not happen.

- <u>Third</u>, he argues that by filing an amended complaint (also many months untimely) he somehow satisfied Rule 25(a). He did not, as a matter of black-letter law.

*   *   *

2

Perhaps because his arguments are so weak, the Trustee rests on histrionics, insisting time and again that his disregard for the Rules must be someone else's fault.[2] He thus omits two important things from his brief: (1) the facts, *i.e.*, a detailed timeline of events; and (2) the law, *i.e.*, any discussion at all of the substantial body of case law applying the "hard line" the Second Circuit takes in interpreting the "excusable neglect" standard for untimely filings. *See, e.g., Silivanch*, 333 F.3d at 368. When the facts are measured against the law, this Motion fails. It is not a close case.

## TIMELINE & SUMMARY OF FACTS

The following timeline summarizes the events relevant to the Trustee's Motion.

- ***February 18, 2010.*** Richard Floor dies. Currier Decl. ¶ 4.

- ***March 4, 2010.*** Currier publicly files with the Probate Court Mr. Floor's will and related papers, naming Currier as the intended Executor of the Estate. Currier Decl. ¶ 5-6; Exs. A, B, C, and D. These documents are public records which anyone can review upon request. *Id*. ¶ 9.

- ***March 8, 2010.*** Suggestion of Death served on Trustee's counsel, starting the 90-day clock under Rule 25(a). Dkt. No. 367.

- ***March 18, 2010.*** Notice of Mr. Floor's death and expected appointment of Currier as Executor published in newspaper per Massachusetts law and related Probate Court order. Notice also explains that under Mass. Probate Court Rule 16, objections must be filed no later than April 8, 2010. Currier Decl. ¶ 11, Ex. G.

- ***April 8, 2010.*** Deadline for filing of objection in Probate Court, per Mass. Probate Court Rule 16.

- ***April 9, 2010.*** Currier appointed Executor via Decree of the Probate Court. Currier Decl. ¶ 13; Ex. F.

- ***Soon After April 13, 2010.*** Currier retrieves from the Probate Court's file for *In re: Estate of Richard E. Floor*, ML-10-P1129EA (Mass. Probate and Family Court) ("*In re Estate of Floor*") a certified copy of the Decree naming her Executor. The certification date is April 13, 2010. Currier Decl. ¶ 14; Ex. I. This removes any doubt that the Decree was in the Probate Court file for *In re Estate of Floor* no later than April 13.

---

[2] He tries to blame the Executor of the Floor Estate, the Middlesex County Probate Court and unnamed employees in its clerk's office, Goodwin Procter LLP, and his counsel's paralegal and secretarial staff. Every single one of his excuses, however, arose after the 90-day period had expired.

- ***June 6, 2010.*** Rule 25(a)'s 90-day period expires. The Trustee admits that as of this date he had taken ***no action of any kind*** in response to Suggestion of Death, much less filed the required motion. *See generally* Declaration of Nancy S. Tinsley (Nov. 11, 2010) ("Tinsley Decl."), Declaration of Sigmund S. Wissner-Gross (Nov. 11, 2010) ("Wissner-Gross Decl."), submitted in support of the Trustee's Motion.

As a matter of law, the inquiry should end with the Trustee's failure to take any action before the 90-day clock had run or proffer any excuse for that inaction in support of this Motion. *See, e.g., Williams v. KFC Nat. Mgmt. Co.*, 391 F.3d 411, 417 (2d Cir. 2004) (if moving party fails to proffer excuse for inaction, granting an *ex post* extension of time to file is not even "within the district court's discretion"); *Mich. Self-Insurers' Sec. Fund v. DPH Holdings, Corp. (In re DPH Holdings, Inc.)*, 434 B.R. 77, 84-85 (S.D.N.Y. 2010) (disregarding proffered events occurring after the expiration of deadline because by definition they cannot excuse failure to act within the deadline). Yet the Trustee focuses the *entirety* of his Motion on events transpiring *after* he had violated Rule 25(a) without excuse. These events are meaningless to the legal analysis and should be disregarded by the Court. *See, e.g., In re DPH Holdings, Inc.*, 434 B.R. at 84-85. That said, we nonetheless set forth a complete timeline, including the Trustee's allegations, for the purpose of responding fully to the Trustee's Motion and providing the Court with a full context within which to evaluate that Motion.

- ***June 10, 2010.*** "On or about June 10," at least four days after the expiration of the 90-day period, an unidentified person at the Trustee's counsel, Brown Rudnick LLP, allegedly asks Ms. Kathy Tinsley, a paralegal, to "determine whether an Executor ha[s] been appointed for the estate of Richard Floor." Tinsley Decl. ¶ 3.

- ***June 10, 2010.*** Also "on or about" June 10, another Brown Rudnick employee tells Ms. Tinsley she was "able to determine that papers had been filed in the Middlesex Probate Court to appoint Diane Currier as Executrix. . . ." Tinsley Decl. ¶ 4. The Trustee admits that he took ***no action*** in response to this information.

- ***July 1, 2010.*** Twenty-five days after the expiration of the 90-day period, a paralegal working for Trustee's counsel allegedly contacts the Probate Court, by

telephone, trying to confirm Currier's appointment, but allegedly is unable to do so. Tinsley Decl. ¶ 5.

- ***July 2, 9 & 23, 2010.*** On July 2, 26 days after the expiration of the 90-day period, the Trustee circulates via e-mail a draft Amended Complaint to counsel for defendants. The draft replaces "Richard Floor" with "[Diane Currier] Legal Representative of the Estate of Richard Floor" in the caption, and replaces "Richard Floor" with "Defendant [Dianne Currier], in her capacity as legal representative of the Estate of Richard Floor . . ." in the description of the defendants in the body of the complaint. He circulates similar drafts on July 9 and 23. Wissner-Gross Decl. Exs. B, C, L (brackets in original).

- ***July 9, 13, 15, 20 & 21, 2010.*** The Trustee circulates via e-mail several drafts of a proposed amended case management order ("Amended CMO"). Wissner-Gross Decl. Exs. D, E, F, G, I, J, K, M. The draft Amended CMOs include "the Estate of Richard Floor" as part of the "Basell D&O Defendants" party group.

  At no time does the Trustee contact Goodwin Procter, Currier, or anyone else, to discuss substitution. *See* Wissner-Gross Decl. ¶¶ 4-5. The Trustee nonetheless argues, based on the draft complaints and CMOs, that Currier voluntarily, silently, and for no consideration, consented to substitution as a defendant in this lawsuit, after the 90-day clock had run.

- ***July 14, 2010.*** Thirty-eight days after the expiration of the 90-day period, the remaining parties (not Currier, who had not been substituted or served) participate in a status conference with the Court. Jim Dittmar of Goodwin Procter states that he represents "six individuals who are board members. . . ." Mem. of Law in Supp. of the Trustee's Mot. to Amend the Caption to Reflect the Substitution of the Executor of the Estate of Richard Floor or, in the Alternative, to Extend Under FED. R. CIV. P. 6(b)(2) the Time for Substitution and to Substitute the Executor Pursuant to FED. R. CIV. P. 25(a), 6 ("Mem.").

  The Trustee argues that this statement somehow equates with tacit "consent," because at that hearing Mr. Dittmar did not "alert" the Trustee to his already weeks-old failure to file a motion to substitute. Mem. 5-8.

- ***July 23, 2010.*** Forty-five days after the expiration of the 90-day period, the Trustee files the Amended Complaint. In the Amended Complaint, he states his "intention . . . to name as defendant the person who shall be appointed the legal representative of the Estate of Richard Floor." Am. Compl. ¶ 55 n.2. The Amended Complaint does not name Currier as a defendant or state that the Floor Estate or Currier had consented to substitution.

- ***August 2, 1010.*** Fifty-four days after the expiration of the 90-day period, the Trustee alleges that he first confirmed Currier's appointment as executor. Tinsley Decl. ¶ 7. The Trustee admittedly does ***nothing*** with this information.

- ***September 24, 2010.*** One-hundred-eleven days after the expiration of the 90-day period, Currier moves to dismiss based on failure to substitute and failure to serve her with process, among other things.

- ***October 7, 2010.*** One-hundred-twenty-four days after the expiration of the 90-day period, the Trustee serves Currier with the Amended Complaint. Currier Decl. ¶ 18. This is the first-ever contact with Currier by the Trustee.

- ***November 16, 2010.*** Two-hundred-fifty-three days after service of the Suggestion of Death, 163 days after the expiration of the 90-day period and 116 days after confirming Currier's appointment as Executor, the Trustee files this untimely Motion.

The timeline speaks for itself. The Suggestion of Death was timely served and Currier was appointed Executor with plenty of time for the Trustee to act. Yet the Trustee waited—admittedly without excuse—until after the 90-day clock had run to even try to learn who the Executor was, much less file the required motion. This unexcused neglect is alone dispositive under binding authority. *See, e.g., Silivanch*, 333 F.3d at 368; *Williams*, 391 F.3d at 417. Then for months thereafter he continued to ignore Rule 25(a), and when confronted with his fatal error, belatedly served Currier with the Amended Complaint (on October 7, 124 days late), then scoured the record for an excuse for his neglect. He has no excuse and his Motion fails.

## ARGUMENT

The law is clear. Under Rule 25(a), after service of a suggestion of death, a party seeking to maintain its claims has 90 days to move to substitute. If a party fails to move, all claims "must be dismissed." Rule 25(a).

As the Trustee concedes, a party seeking to file a motion to substitute after the 90-day period has expired may do so only if it can prove "excusable neglect." Under the excusable neglect standard in the Second Circuit, the moving party cannot prevail unless he presents an adequate excuse for failing to act *within the relevant time period*. *See, e.g., Williams,* 391 F.3d at 417 (if moving party fails to present valid excuse for delay, extension of time to file is not even "within the district court's discretion"); *In re DPH Holdings, Inc.*, 434 B.R. at 84-85. This Rule

is so unequivocal that the Second Circuit mandates denial of untimely motions where the moving party proffers no excuse, even where the delay was in good faith, was as short as two days, and the non-moving party would not be prejudiced.  *See Silivanch*, 333 F.3d at 366-70.

Because the Trustee does not even attempt to explain why he did nothing at all prior to the expiration of the 90-day window, his Motion fails as a matter of law.  Crucially, as noted above, the excuses that the Trustee does offer all arise ***after*** the 90-day period, rendering them irrelevant.  *See, e.g., In re DPH Holdings, Inc.*, 434 B.R. at 84-85 (affirming Bankruptcy Court's denial of motion for permission to file late claim and refusing even to consider proffered excuse that arose after deadline had passed, because by definition it could not excuse earlier neglect). Even if the Court did consider these excuses, however, each is legally inadequate, factually unsupported, and should be rejected.  The Motion should be denied.

## I.     The Trustee Has Not Satisfied His Burden and His Motion Should Be Denied

### A.     The Burden is on the Trustee to Prove that His Neglect was Excusable

The Trustee filed his motion to substitute outside the 90-day window mandated by Rule 25(a).  He concedes, therefore, that this Court must deny his Motion and dismiss his claims unless he can prove that the lateness of his filing was the result of "excusable neglect" under FED. R. BANKR. P. 9006.  Mem. 10.  He also concedes that the burden of proving excusable neglect is his.  *Id*. (admitting that party can only make late motion to substitute "where it can demonstrate excusable neglect."); *see also Harp v. City of New York*, 01 Civ. 6604, 2008 U.S. Dist. LEXIS 58023, at *6 (S.D.N.Y. July 30, 2008) (denying late motion to substitute and stating that "movant must prove good faith and a reasonable basis for non-compliance") (internal citations and quotations omitted); *Smith v. Thebaud*, 258 F.R.D. 207, 209 (E.D.N.Y. 2009) (cited at Mem. 8, 10).

### B. The Trustee Proffers No Basis for Allowing This Late Motion

Whether the moving party has shown excusable neglect is governed by a four-part test articulated by the Supreme Court in *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380 (1993).[3]  Under binding Second Circuit authority, the third *Pioneer* factor—"the reason for the delay, including whether it was in the reasonable control of the movant"—is the most important and is frequently dispositive on its own.  *Silivanch*, 333 F.3d at 366-67.  Unless the movant's proffered reason for the delay is adequate, the remaining three factors must not even be considered:  "the meeting of the other *Pioneer* factors [does] *not* suffice to place an extension decision within the district court's discretion."  *Williams*, 391 F.3d at 417 (emphasis in original).

Here, the Trustee's own papers show that he did *nothing* to substitute any party within the 90-day window provided for by Rule 25(a).  Tinsley Decl. ¶¶ 1-2.  As his own declarations show, the Trustee—represented by an international law firm (of which he is a partner) with more than 200 attorneys practicing in seven offices, and with access to a $25 million litigation fund—knew he needed to formally substitute someone for Mr. Floor under Rule 25(a), nothing prevented him from complying with Rule 25(a), and counsel waited until after the 90-day window had closed to even try to identify a substitute defendant, much less to make a motion.  *See generally* Tinsley Decl.

The Second Circuit has taken a "hard line" in evaluating claims of excusable neglect.  When "the rule is entirely clear, we . . . expect that a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test."  *Silivanch*, 333 F.3d at 367; *see also, e.g., Canfield v. Van Atta Buick/GMC Truck, Inc.*, 127 F.3d 248, 251 (2d Cir. 1997) (affirming dismissal with

---

[3]   The four factors are, "[1] the danger of prejudice to the [non-movant], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith."  *Pioneer*, 507 U.S. at 395.

prejudice of plaintiff's claims due to summary judgment opposition papers being filed 29 days

late, despite attorney's testimony that the untimeliness was due to his inadvertent

misinterpretation of relevant local rule).[4]

       The *Pioneer* test, which in this Circuit is controlled by *Silivanch*, 333 F.3d at 367,

"squarely controls . . . under what circumstances [a late] action or filing [should] be permitted in

a bankruptcy proceeding." *See Lynch v. U.S.*, 430 F.3d 600, 605 (2d Cir. 2005). The Trustee

does not cite *Silivanch* in his papers, and with good reason. In *Silivanch*, the Second Circuit held

that the district court had abused its discretion by finding excusable neglect and permitting an

appeal to be filed only *two days late*, even though the movant had filed the appeal late (i) in

reliance on opposing counsel's erroneous statement in open court that the papers were due on

that date and (ii) due to good faith confusion regarding the status of certain docket entries – both

of which occurred *before* the relevant period had expired. *Silivanch*, 333 F.3d at 366-70. In

reversing the district court, the *Silivanch* court observed that:

> In the typical case, the first two *Pioneer* factors will favor the
> moving party . . . [and the fourth factor, good faith is] rarely . . . at
> issue . . . [D]espite . . . the existence of a four-factor test in which
> three of the factors usually weigh in favor of the party seeking the
> extension, we and other Circuits have focused on the third factor,
> the reason for the delay . . . . We have noted that *the equities will
> rarely if ever favor a party who fails to follow the clear dictates of
> a court rule and held that where the rule is entirely clear, we
> continue to expect that a party claiming excusable neglect will, in
> the ordinary course, lose* . . .

*Id.* at 366-67 (emphasis added) (internal citations and quotes omitted).

---

[4]     "[F]ailure to follow the clear dictates of a court rule will generally not constitute . . . excusable neglect. We are not alone in that view. *See, e.g., Kyle v. Campbell Soup Co.*, 28 F.3d 928, 931-32 (9th Cir. 1994) (holding that where counsel failed to offer a persuasive justification for failing to comply with FED. R. CIV. P. 6(e) and local court rules, there was 'no basis for deviating from the general rule that a mistake of law does not constitute excusable neglect')." *Id.*

Following the dictates of *Silivanch*, courts within this Circuit have time and again denied relief to late-acting parties, even where the delay was minimal, the moving party's error was made in good faith, and there would be no prejudice to the non-moving party. The Trustee points the Court to none of these decisions, which conclusively undermine his Motion. For just one recent example, see *In re Caritas Health Care, Inc.,* 435 B.R. 111, 117-18 (Bankr. E.D.N.Y. 2010). There, the Court rejected a creditor's claim filed just one week late, even though the non-moving party would suffer no prejudice (as the Chapter 11 plan and disclosure statement had yet to be filed), the moving party had acted in good faith, and the failure to timely file was due to an innocent miscommunication between the moving party and his counsel. *Id.* at 114, 117-18 (internal citations omitted) ("[E]ven in the absence of prejudice, [the] motion would fail because, as discussed above, [the movant] received actual notice of the Bar Date and its excuse of law office failure is not a sufficient basis for finding excusable neglect. *Pioneer* does not stand for the proposition 'no harm, no foul.'").[5] Put another way, "[i]t is well established that if a clear deadline is missed due to a law office failure, including inattention or lack of oversight, an extension is not justified." *Id.* (internal citations and quotes omitted). That is plainly what happened here.

Under the standard articulated in *Pioneer*, *Silivanch*, *Williams*, *Canfield*, *Weinstock*, *In re Caritas Health Care* and *In re DP Holdings*, among many other cases, this Motion must be denied.

---

[5] *See also, e.g., Weinstock v. Cleary, Gottlieb, Steen & Hamilton*, 16 F.3d 501 (2d Cir. 1994). In *Weinstock,* the Second Circuit affirmed a district court's refusal to find excusable neglect even though the non-moving party would suffer no prejudice and counsel for the moving party had filed a *timely* appeal, but misinterpreted in good faith a provision of the Federal Rules of Civil Procedure which required him to re-file it at a later date. The Second Circuit affirmed, even though the relevant provision of the Rules had subsequently been amended because it was considered a "trap for the unwary." *Id.* at 502-03.

## C.     The Trustee Cites as Authority Cases That Do Not Support his Motion

The Trustee cannot point to a single case in which a party, like the Trustee, did nothing to attempt to preserve its claims within Rule 25(a)'s 90-day window and the court allowed an untimely substitution.  The handful of cases the Trustee does cite fail to advance his case.

For example, in *Smith v. Thebaud*, 258 F.R.D. at 208-09 (cited at Mem. 8, 10), *acting within Rule 25(a)'s 90-day period*, the moving party "hired a firm of licensed private investigators who conducted a thorough search of public records in Suffolk County and nationwide to locate assets and identify potential distributees of" the decedent.  The moving party also twice informed the Court and all parties that he could not identify a proper substitute, also within the 90-day period.  *Id.*  By contrast, the Trustee admits he did *nothing* within the 90-day period, then apparently had a paralegal ask a another paralegal to make a few phone calls, *after* the 90-day period expired.  Tinsley Decl. ¶¶ 1-7.  The Trustee did not even dispatch anyone to the Probate Court, 2 ½ miles away from his counsel's Boston headquarters, to review the file, which during the 90-day period contained only six documents, four of which identified Currier as the Executor.  Currier Decl. ¶ 10.  Nor did he simply pick up the phone and call Ms. Currier or Goodwin Procter.

In *Staggers v. Otto Gerdau Co.*, 359 F.2d 292, 296 (2d Cir. 1966) (cited at Mem. 8), an opinion decided 27 years before the Supreme Court's controlling *Pioneer* decision, and 37 years before *Silivanch*, the motion to substitute was filed two days late, but was considered timely because the movant had to wait for the permission of a state orphans' court in Maryland prior to filing her motion to substitute in the New York federal district court.[6]  The movant applied for

---

[6]     Courts have rejected attempts to use *Staggers* to justify an untimely motion to substitute when, like the Trustee, the movant took no action during the 90-day period provided for by Rule 25(a).  *See Zeidman v. Gen. Accident Ins. Co.*, 122 F.R.D. 160, 161-63 (S.D.N.Y. 1988) (citing *Staggers* but denying late motion to substitute where plaintiff "did not move to enlarge the time to substitute parties until three months after the expiration of the 90

that permission *within the 90-day period*.  In *Saylor v. Bastedo*, 623 F.2d 230, 235 (2d Cir. 1980) (cited at Mem. 8), the party seeking substitution filed its motion within the 90-day period.  It is not clear what the Trustee hoped to accomplish by citing this case.

## II.  The Trustee's Proffered Excuses are Inadequate and Should Be Disregarded

### A.  Because All of the Trustee's Proffered Excuses Arose After the 90-Day Period, they Are Legally Irrelevant and Should Be Disregarded

The Trustee argues that his neglect should be excused because:  (i) he was confused about Currier's status as Executor, (ii) he for some reason believed that Currier had consented to substitution; and (iii) he filed an Amended Complaint.  All three excuses admittedly arose after the 90-day period had expired.  The Trustee's counsel did not contact the Probate Court until July 1, 25 days after expiration.  Tinsley Decl. ¶ 5.  The first communication with Goodwin Procter that allegedly constituted "consent" (an email from Trustee's counsel of a draft amended complaint) occurred on July 2, 26 days after expiration.  Wissner-Gross Decl. ¶ 4.  The final Amended Complaint was filed on July 23, 2010, 45 days after expiration.  Dkt. 381.  As a matter of law (and common sense) failure to act within a prescribed period cannot be excused by circumstances arising after that period has expired.  *See, e.g., In re DPH Holdings Corp.*, 434 B.R. at 84-85 (affirming Bankruptcy Court's rejection of late-filed claim, and refusing to consider movant's alleged reliance on correspondence sent after the bar date, because by definition it could not excuse earlier neglect).

---

day period" and did not contact surrogate's court within 90-day window); *Harp v. City of New York*, 01 Civ. 6604, 2008 U.S. Dist. LEXIS 58023, at *5-7 (S.D.N.Y. July 31, 2008) (similar).  *Staggers* also relies upon the lack of prejudice to the non-moving party as a paramount factor for consideration, regardless of whether the delay was excusable.  After the *Pioneer, Silivanch, and Williams* decisions, which post-date *Staggers* by decades, this is clearly *not* the standard in this Circuit.

### B.    The Trustee's Claim of Confusion Regarding Currier's Appointment is Meritless

Even if the Court were inclined to consider the Trustee's excuses, despite their arising after the 90-day period, they hold no water.  The Trustee claims that on August 2, 2010, an unnamed Probate Court employee told a Brown Rudnick paralegal, who told another Brown Rudnick paralegal (the Declarant), that "the appointment of Ms. Currier was official on April 9, 2010, but that it had not been docketed in the system until July 23, 2010."  Tinsley Decl. ¶ 7.  Even if this discussion did take place, it remains that the Trustee never verified this fact.  The Trustee's counsel claims that, rather than examining the information contained in the Probate Court file for *In re Estate of Floor*, counsel was entitled to rely solely on information provided third-hand by an unnamed Probate Court employee.  Tinsley Decl. ¶ 7.  Yet all the while, the certified copy of the signed petition authorizing Currier's appointment, attached hereto as Exhibit I to the Currier Decl., was in the Probate Court's files, by no later than April 13.  *See* Currier Decl. ¶ 14.[7]

Finally on this point, even if any alleged confusion regarding Currier's status had arisen during the 90-day period, the Trustee has no excuse for not seeking an extension within the 90-day window.  *See Unicorn Tales*, 138 F.3d at 470; *Jones Inlet Marina, Inc. v. Inglima*, 204 F.R.D. 238, 240 (E.D.N.Y. 2001) (plaintiff can bring motion to extend time for filing motion to substitute if executor cannot be located).  Had the Trustee brought a motion seeking additional time within the 90-day period, such motion would have most likely been granted.  *Id*.  But as the

---

[7]    The Trustee also cannot claim that this Court should excuse his failure to act because Goodwin Procter did not update him regarding Ms. Currier's status.  This argument, like the Trustee's other arguments, is routinely rejected by the courts.  It is settled Second Circuit law that the party filing the suggestion of death does not have to identify the decedent's executor.  *See Unicorn Tales, Inc. v. Banerjee*, 138 F.3d 467, 470 (2nd Cir. 1998) (holding that Rule 25 "does not require that statement [of death] identify the successor or legal representative"); *Jones Inlet Marina*, 204 F.R.D. 238, 239 (E.D.N.Y. 2001) (same).  Through service of the Suggestion, the Trustee received all the notice he needed to begin the process of substitution.

Trustee neglected to do anything within the time allotted by Rule 25(a), his Motion must be

denied.

### C. Currier did not Consent to Substitution

The Trustee argues that, weeks after the 90-day period expired, Currier silently consented

to her substitution and that the Court can, therefore, simply amend the caption to reflect that

silent consent.  Mem. 7-9.

Currier never consented to substitution and the Trustee never asked her to.  Currier Decl.

¶¶ 20-21.  This is an *ex post* justification fabricated by the Trustee to try to excuse his neglect.

Nonetheless, for the avoidance of any doubt, Currier submits herewith a Declaration, wherein

she testifies that she:  (i) has not ever consented to substitution; (ii) was never asked to consent to

substitution; (iii) would not have consented if asked; (iv) was not contacted (through counsel or

directly) by the Trustee at any time between Mr. Floor's death in February 2010 and October 4,

2010, when the Trustee belatedly served her with the Amended Complaint in response to her

motion to dismiss; and (v) did not "participate," as the Trustee repeatedly alleges (Mem. 6-8), in

any hearing or conference with opposing counsel between Mr. Floor's death and the service of

the amended complaint in October, because she had not been served or substituted and was

therefore not a party to this action.  *Id.*  This testimony is unrebutted and dispositive.

Finally on this point, given that the Trustee did nothing to substitute Currier as a party

until November (and did not even serve Currier with the Amended Complaint until October), his

argument that, as early as July 2, 2010, Currier, then a non-party, should have objected to the

Amended Complaint or Case Management Order, cannot be credited.  Mem. 8-9.  As a non-

party, Currier lacked standing to object to either.  *Dungan v. Academy at Ivy Ridge*, No. 06-CV-

0908, 2009 WL 2176278, at *2 (N.D.N.Y. July 21, 2009) (holding that "[a]s non-parties"

persons proposed to be added as defendants "do not have standing to oppose the motion for leave

to amend"); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 246 F.R.D. 143, 146 n.1

(E.D.N.Y. 2007) (holding that "proposed new defendants . . . do not have standing to oppose the

motion for leave to amend because they are not yet named parties to this action").[8]

### D.  The Trustee Did Not Satisfy Rule 25(a) by Filing the Amended Complaint

The Trustee argues that by filing an Amended Complaint, he effectively substituted

Currier.  Mem. 7-8.  The case law is unequivocal on this point.  Rule 25(a) requires the filing of a

timely motion to substitute, not an amended complaint.  *See Kaubisch v. Weber*, 408 F.3d 540,

541-42 (8th Cir. 2005); *Nauman v. Rensselaer Polytechnic Inst.*, 07-CV-0740, 2010 U.S. Dist.

LEXIS 29563 (N.D.N.Y Mar. 26, 2010) (dismissing case with prejudice pursuant to Rule 25(a)

because plaintiff's statement that it planned to move to substitute was not "timely motion to

substitute").  We have been unable to find (and the Trustee fails to cite) a single case in which a

Court authorized substitution under Rule 25(a) solely through the submission of an amended

complaint.

It is telling that the best authority the Trustee could find for this proposition was a 40-

year-old Third Circuit case.  Mem. 8, citing *Anderson v. Republic Motor Inns, Inc.*, 444 F.2d 87,

88 (3rd Cir. 1971).   In *Anderson*, the plaintiff died and a suggestion of death was filed.  *Id.*

Then, *within the 90-day period*, plaintiff's counsel filed a pre-trial statement required under then-

current local practice, stating that the decedent's wife would be substituted as a plaintiff.  *Id.* at

88 n.1.  The defendant filed a responsive submission, also consistent with then-current local

practice, which did not challenge the substitution.  *Id.*  Only later did that same defendant move

to dismiss under Rule 25(a).  *Id.*  Besides being factually dissimilar to the case at bar, the

---

[8]   Goodwin Procter's presence at hearings and conferences with the Trustee's counsel does not equate with Ms.
Currier's "participation."  Mem. 6.  As the Trustee knows, Goodwin Procter represents several defendants.
During these hearings and conferences, Ms. Currier was indisputably a non-party, as she had been neither
served nor substituted.  *See Jackson v. Broad. Music, Inc.*, No. 04 CV 5948, 2006 WL 250524, at *1 (S.D.N.Y.
Feb. 1, 2006).

*Anderson* ruling "emphasize[s] that this is an extraordinary case, and that departure from the requirements of the Federal Rules is not to be permitted routinely." *Id.* at 89. And *Anderson* was decided outside this Circuit, prior to the controlling *Pioneer, Silivach,* and *Williams* decisions. Moreover, neither *Anderson* nor any case citing *Anderson* has held that the filing of an amended complaint satisfies Rule 25(a). The Trustee's reliance on *Anderson* underscores the absence of authority supporting his position.

Finally, the Trustee himself admitted that filing the Amended Complaint did not make Currier a party to this action, when he stated in that same document that "[i]t is the intention of the LB Trustee to name as a defendant the person who shall be appointed the legal representative of the Estate of Richard Floor." Am. Compl. ¶ 55 n.2. If the Trustee believed that the Amended Complaint made Currier a defendant, the Amended Complaint would have named her as a defendant.

### III. The Equities Favor Dismissal

Because the Trustee offers no excuse for failing to make a timely motion, the equity and fairness considerations he submits in support of his motion must be disregarded. *See Williams*, 391 F.3d at 417.

The Trustee's argument that his Motion should be granted because his claims are viable and Rule 25(a) "was not intended to act as a bar to otherwise meritorious actions" (Mem. 8, 10) is wrong. First, Rule 25(a) did not, as the Trustee argues, prevent the Trustee from maintaining any surviving claims against Currier. The Trustee did that to himself. If he had complied with Rule 25(a), there would be no risk of dismissal.

Second, Rule 25(a) *always* acts to dismiss potentially meritorious claims. So does every other time limit set forth in the Federal Rules of Civil Procedure. Thus, the merit of the underlying claims is irrelevant as a matter of law when the court is considering whether neglect

should be excused.  For example, in the *Williams* case, the Second Circuit held that the moving

party's "contention" that his underlying appeal was supported by "good cause" was "of course,

irrelevant since the appropriate inquiry is not whether the underlying claim has merit, but

whether excusable neglect or good cause exists for the failure to file" on time.  391 F.3d at 415.

It is irrelevant here as well.  "We operate in an environment . . . in which substantial rights may

be, and often are, forfeited if they are not asserted within time limits established by law."

*Silivanch*, 333 F.3d at 367.

## CONCLUSION

For the reasons set forth above and in Ms. Currier's Memorandum in Support of Her

Motion to Dismiss the Amended Complaint (Dkt. No. 425), incorporated by reference herein,

Diane Currier respectfully requests that this Court DENY the Litigation Trustee's Motion to

Amend the Caption or to Extend the Time for Substitution and to Substitute.

> Respectfully submitted,
>
> DIANE CURRIER
>
> By her attorneys,
>
> */s/ James S. Dittmar*
> James S. Dittmar (*pro hac vice*)
> jdittmar@goodwinprocter.com
> John O. Farley (JF-4402)
> jfarley@goodwinprocter.com
> GOODWIN PROCTER LLP
> 53 State Street
> Boston, Massachusetts  02109
> Tel.:  617.570.1000
> Fax:  617.523.1231

Dated:    December 7, 2010

## <u>CERTIFICATE OF SERVICE</u>

      I, James S. Dittmar, hereby certify that on December 7, 2010, a copy of the foregoing *Memorandum of Diane Currier (Executor of the Estate of Richard Floor) in Opposition to the Litigation Trustee's Motion to Amend the Caption or to Extend the Time for Substitution and to Substitute*, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system.

                            */s/James S. Dittmar*
                            James S. Dittmar

# EXHIBIT 4

James S. Dittmar *(pro hac vice)*
John O. Farley
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax:  617.523.1231

*Counsel for Diane Currier (Executor*
*of the Estate of Richard Floor)*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>    LYONDELL CHEMICAL<br>    COMPANY, et al.,<br><br>        Debtors. | Chapter 11<br><br>Case No.:   09-10023 (REG)<br><br>(Jointly Administered) |
| EDWARD S. WEISFELNER, AS<br>LITIGATION TRUSTEE OF THE LB<br>LITIGATION TRUST,<br><br>        Plaintiff,<br><br>   v.<br><br>LEONARD BLAVATNIK, et al.,<br><br>        Defendants. | Adv. Proceeding No.: 09-1375 (REG)<br><br>**DECLARATION OF DIANE CURRIER (EXECUTOR OF THE ESTATE OF RICHARD FLOOR) IN OPPOSITION TO THE LITIGATION TRUSTEE'S MOTION TO AMEND THE CAPTION OR TO EXTEND THE TIME FOR SUBSTITUTION AND TO SUBSTITUTE** |

Pursuant to 28 U.S.C. § 1746, Diane L. Currier, being duly sworn, deposes and says:

1.    The facts stated in this Declaration are based on my knowledge and are true and correct.

2.      I am an attorney licensed to practice in the Commonwealth of Massachusetts.  My business address is:  Currier Law Offices LLC, One Liberty Square, Boston, MA 02109.  I was admitted to the Massachusetts bar in 1979, and during my time practicing law I have never been disciplined or sanctioned.  My legal practice focuses on trusts and estate law.

3.      I am the Executor of the Estate of Richard E. Floor.

4.      Richard Floor died on February 18, 2010.

5.      On March 4, 2010, I caused, *inter alia*, the Will of Richard Floor (the "Will"), the First Codicil of the Will (the "First Codicil"), a Petition for Probate of Will Without Sureties ("Petition for Probate"), and a Uniform Counsel Certification to be mailed to the Middlesex County Probate Court (the "Probate Court") located at 208 Cambridge Street, Cambridge, MA, for filing in *In re: Estate of Richard E. Floor*, ML-10-P1129EA (Mass. Probate and Family Court) ("*In re Floor*").  A true copy of the Will is attached hereto as Exhibit A.  A true copy of the First Codicil is attached hereto as Exhibit B.  A true copy of the Petition for Probate is attached hereto as Exhibit C.  A true copy of the Uniform Counsel Certification is attached hereto as Exhibit D.

6.      The First Codicil, the Petition for Probate of Will Without Sureties, and the Uniform Counsel Certification all identify me as the Executor of the Estate.  *See* Exs. B, C, and D.

7.      On March 11, 2010, as required by law, the Probate Court issued a Citation (the "March 11 Citation") ordering that a notice of Mr. Floor's death and my expected appointment as Executor be published in the "Belmont Citizens Herald, Belmont, MA."  A true copy of the March 11 Citation is attached hereto as Exhibit E.

8. The March 11 Citation also identifies me as the petitioning Executor of the Estate. *See* Ex. E.

9. At any time on or after March 11, 2010, anyone seeking to identify the Executor of the Estate could have visited the Probate Court (the Probate Court does not have an electronic system allowing its files to be viewed on-line) and reviewed the case file for *In re Floor*.

10. As of March 11, 2010, the case file then contained four documents (out of six total) identifying me as Executor: (1) the Petition for Probate; (2) the Uniform Counsel Certification; (3) the First Codicil; and (4) the March 11 Citation. Each of these documents were and are public record, and anyone could have visited the Probate Court at any time after March 11, 2010 and viewed or received certified copies of any of these documents.

11. Pursuant to the Citation, I caused a Legal Notice to be published in the Belmont Citizen-Herald on March 18, 2010. A true copy of that publication is attached hereto as Exhibit F. That Legal Notice states that "Diane L. Currier of Newtonville, MA [will] be appointed executrix. . . ." On April 9, 2010, I filed with the Probate Court a Return of Service certifying that I caused the Legal Notice to be published in the Belmont Citizen-Herald. On April 9, 2010, I also filed a Bond of Executor with the Probate Court. The Return of Service is attached hereto as Exhibit G. The Bond of Executor is attached hereto as Exhibit H.

12. Both the Return of Service and Bond of Executor identify me as the petitioning Executor of the Estate. *See* Exs. G and H.

13. On April 9, 2010, the Probate Court allowed the Will and, by decree of the Probate Court, I was appointed Executor of the Floor Estate.

14. On or about April 13, 2010, I caused to be retrieved from the Court a certified copy of the April 9, 2010 Decree. A true copy of the April 9, 2010 Decree, reflecting that it was

certified on April 13, 2010, is attached hereto as Exhibit I. This document was and is a matter of public record, and anyone could have visited the Probate Court at any time beginning no later than April 13, 2010 (the date of the attached certified copy) and received a certified copy of this document.

15.     I have read the Declaration of Kathy S. Tinsley (Nov. 11, 2010), submitted by the LB Litigation Trust's counsel in support of his motion. I understand from that Declaration that an employee of the counsel to the LB Litigation Trust states that a co-worker told her that she somehow "learned" on August 2, 2010 that the Decree reflecting my April 9, 2010 appointment was not "docketed in the system until July 23, 2010." Declaration of Kathy S. Tinsley, ¶ 7.

16.     I do not know what the phrase "docketed in the system" is intended to mean. As I testify above, however, I received a certified copy of the April 9, 2010 Decree naming me as Executor by mail from the Probate Court within a few days of the appointment being ordered. The Decree I received was certified April 13, 2010. In fact, for this particular estate I have requested several copies of the Decree over the past several months and each time the Probate Court has provided me with certified copies with updated certification dates. I have not experienced any problems obtaining documents from the Probate Court related to the file for *In re Floor*.

17.     At no time did anyone representing the LB Litigation Trust contact me to ask whether I was the Executor. If anyone had asked me, I would have informed that person that I was the Executor, as my status as Executor was and remains a matter of public record.

18.     Until October 7, 2010, when a process server served me at my home with the Amended Complaint, I was never contacted by the LB Litigation Trustee or his counsel.

19.     Until November 16, 2010, I was never served with papers seeking to substitute me or anyone else for Richard Floor in the above-captioned matter.

20.     I have never been asked to consent to the substitution of myself or anyone else for Richard Floor in this matter.

21.     I have never consented to substitution, and do not now consent to substitution.

22.     If asked, I would not have consented to substitution.

23.     I did not participate in any of the conferences or hearings identified by the LB Litigation Trustee in his motion papers, as I was not a party to this matter when those events took place.

24.     I did not consent to the filing of the Amended Complaint or any case management order, and was not contemporaneously aware that those events were taking place.

25.     I never received a draft version of the Amended Complaint or any case management order.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 7, 2010.

_____
DIANE L. CURRIER

## CERTIFICATE OF SERVICE

      I, James S. Dittmar, hereby certify that on December 7, 2010, a copy of the foregoing *Declaration of Diane L. Currier (Executor of the Estate of Richard Floor) in Opposition to the Litigation Trustee's Motion to Amended the Caption or to Extend the Time for Substitution and to Substitute*, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system.

                                   */s/James S. Dittmar*
                                   James S. Dittmar

# EXHIBIT A

I, RICHARD E. FLOOR of Belmont, Massachusetts, declare this to be my will, hereby revoking all former wills and codicils made by me.

FIRST: Payment of Expenses. I direct my Executor to pay my funeral expenses and the expenses of administering my estate in all jurisdictions and to charge said expenses to the residue.

SECOND: Tangible Personal Property; Real Estate. I bequeath and devise all of my tangible personal property and real estate to my wife ELIZABETH W. FLOOR if she survives me for thirty days, otherwise I bequeath my tangible personal property per stirpes to my issue who survive me and I direct that my real estate be sold and that the net proceeds from such sale be disposed of as part of the residue. I authorize my Executor to identify the tangible personal property bequeathed by this Article and to determine the proportionality of its distribution if to more than one person, his decisions on all matters connected therewith to be conclusive on all persons interested in my estate. I hope that the recipient or recipients of my tangible personal property will dispose of the same in accordance with my wishes, however made known, but I impose no legal or equitable obligation in this regard.

THIRD: Residue. Specifically refraining from exercising any power of appointment which I may have, I devise and bequeath the remainder of my property (herein called the "residue") to the Trustees of THE RICHARD E. FLOOR TRUST - 2002, under instrument of trust of even date herewith, as amended from time to time, of which I am the Donor and my wife ELIZABETH W. FLOOR and I are now the Trustees, said instrument having been executed and delivered prior to the execution of this will. I direct that the residue be held and administered in accordance with the terms of said instrument, as amended from time to time, commingled with any other property

held by the Trustees thereof. I do not intend to create a testamentary trust of the residue, and I do not require said Trustees to account to any court.

FOURTH: Payment of Taxes. 1. I direct my Executor to pay all estate taxes occasioned by my death and all inheritance taxes on property passing or accruing from me, whether or not said estate and inheritance taxes are attributable to property passing under this will. Except as and to the extent provided in the following sections 2 and 3, I direct that said taxes be charged to the residue without apportionment.

2. Except as provided in the following section 3, if any property of any trust in which I have an interest, other than THE RICHARD E. FLOOR TRUST - 2002, is included in my gross estate for the purposes of any estate tax and in the measure of said tax, I direct my Executor to recover from said property or from the recipients or beneficiaries thereof, the fiduciaries in possession thereof and/or the person or persons receiving the same such portion of the total of all estate taxes paid or payable by my Executor as may be permitted by law.

3. I direct my Executor not to recover estate taxes from any property held in any of the following:

(a) a qualified retirement plan as defined in section 401(a) of the Code, a qualified retirement annuity as defined in section 403(a) or 403(b) of the Code, an individual retirement account as defined in section 408(a) of the Code, or any other retirement arrangement subject to rules similar to the minimum distribution rules of section 401(a)(9) of the Code;

(b) an account established by me under a qualified State tuition program exempt from taxation under section 529 of the Code; or

(c) a trust to which section 664 of the Code applies.

4. To the extent to which the aggregate of (i) any amounts recovered by my Executor pursuant to the provisions of the foregoing section 2 and (ii) my probate estate

2

exclusive of tangible personal property and real estate and any property specifically

bequeathed under this will shall be insufficient to pay all of my debts payable by my

Executor, my funeral expenses, the expenses of administering my estate in all

jurisdictions, any pecuniary legacies under this will and the taxes payable by my

Executor pursuant to the foregoing section 1, my Executor shall from time to time within

five years from the date of my death request the necessary funds therefor from the

Trustees of THE RICHARD E. FLOOR TRUST - 2002.

5. Reference to "taxes" in this Article shall be deemed to include any and

all interest and penalties connected therewith.



FIFTH:  Powers of Executor.  I authorize and empower my Executor, in

addition to and not in limitation of any common law or statutory power, to have and to

exercise the following powers, authorities and discretions, without license of court or

notice to or consent of beneficiaries:

(a)  to retain, purchase and invest in any property, regardless of its
character, its quality, the principle of diversification or any other principle
applicable to investments of fiduciaries, including without limitation all
property owned by me at my death;

(b)  to hold unproductive property, including without limitation
uninvested cash;

(c)  to vote, to give proxies with or without power of substitution and
to exercise other rights of a holder of securities;

(d)  to determine, regardless of probate law and practice, what
constitutes income and principal and the charges to be made against each;

(e)  to make contracts and covenants, to borrow or lend money with
or without security, to sell, exchange, lease, mortgage, pledge or grant
easements over or options with respect to any property, to determine the
terms and manner of doing so and to execute and deliver all appropriate
instruments connected therewith;

3

(f) to maintain, repair, improve, develop, subdivide, partition, change or alter any property;

(g) to impose, amend or remove restrictions on the transfer of any property;

(h) to employ agents, custodians, investment counsel and attorneys, and to pay them reasonable compensation in addition to that of my Executor;

(i) to pay, postpone the payment of, resist, settle, compromise or submit to arbitration any claim or matter in dispute, including tax matters;

(j) to join with my wife ELIZABETH in filing any tax returns and to pay any part or all of the entire tax due without contribution;



(k) to hold property in the name of a nominee or in any other form not indicating any fiduciary relationship;

(l) to make distributions in cash or in kind or in both;

(m) to make or not to make, in whole or in part, elections pursuant to the provisions of section 2056(b)(7), section 2523(f) and/or section 2652(a)(3) of the Code or pursuant to the provisions of any federal or state statutes of similar import which may be in force at the time of my death, whether or not any taxes occasioned by my death or otherwise are increased thereby;

(n) to allocate or not to allocate, in whole or in part, my GST exemption pursuant to section 2631 of the Code, or pursuant to the provisions of any federal or state statute of similar import that may be in force at the time of my death, to any property as to which I am or my wife ELIZABETH is the transferor, including without limitation any property transferred by me or my wife ELIZABETH during my life as to which I did not make such an allocation, as my Executor shall determine without any obligation to make such allocation equally or pro rata to such property;

(o) to refrain from making compensating adjustments to income or principal as a result of elections made or deductions taken on tax returns; and

(p) to make any distributions directly to any beneficiary, regardless of his legal status, to his guardian or, regardless of the amount of said distribution, to any person as custodian for said beneficiary under the

4

Uniform Transfers to Minors Act or the Uniform Gifts to Minors Act of any jurisdiction, or to apply the same for his benefit, any such distribution or application to be a complete discharge to my Executor to the extent of the amount so paid or applied without any receipt.

SIXTH: Limitation of Executor's Powers. Notwithstanding any provisions of this will to the contrary, to the extent to which my wife ELIZABETH from time to time so directs, my Executor shall neither (i) hold as part of the residue any property which does not produce a periodically distributable income consistent with the value of such property and with its preservation, nor (ii) credit any receipts to principal or make any charges against income contrary to prevailing probate law and practice.



SEVENTH: Appointment of Executor. I appoint ROBERT C. POMEROY of Boston, Massachusetts, to be the Executor of this will and the temporary Executor of this will during the period prior to his appointment as Executor. If ROBERT C. POMEROY shall for any reason fail or cease to serve in either capacity, I direct that such person as shall be appointed in writing by the Executive Committee of Goodwin Procter LLP, or any successor to substantially all of the business of said firm, shall serve in said capacity in his stead. Any vacancy in the office of Executor or temporary Executor not filled as hereinabove provided shall be filled by a successor appointed by a writing signed by a majority of those of my wife ELIZABETH and my issue who are living and of legal capacity at the time of said appointment.

EIGHTH: Fiduciary Bonds. I direct that no Executor, whether named herein or subsequently appointed, shall be required to give any bond as such except as required by law, and then only in the lowest permissible amount and without sureties if permitted by law.

5

NINTH:  Liability of Executor.  An Executor shall not be liable for the default of any predecessor Executor or for any error of judgment or law on his own part, but he shall be liable only for his own wilful default.  Any Executor or any firm, corporation or association in or with which he is in any way interested or connected may act as attorney for, deal or contract with and be employed by my Executor, and any Executor may be in any manner interested in or connected with any corporation, association or business in which my estate is directly or indirectly interested, all in the same manner and with the same freedom as though not an Executor and without accountability for any profit, benefit or compensation received in connection with any such action, dealing or relationship, none of which shall be void or voidable.

TENTH:  Guardian ad Litem.  I request and direct that the representation of any persons or interests by a guardian ad litem be dispensed with, to the extent permitted by law, in the allowance or settlement of all accounts of my Executor.

ELEVENTH:  Provision for Descendants.  Except as hereinabove provided, I intentionally make no provision for any of my descendants now living, hereafter born or hereafter adopted.

TWELFTH:  Definitions; Miscellaneous.  1.  As used herein:

(a)  the term "issue" means descendants in any degree, including the first degree, whether or not born of a lawful marriage, by blood or adoption in any one or more generations; provided, however, that a person born out of wedlock shall be deemed not to be the issue of said person's father or father's ancestors unless acknowledged as such by his or her father;

(b)  the term "children" means issue by blood or adoption in the first degree only;

(c)  the term "Executor" means any executor, temporary executor, administrator with the will annexed or temporary administrator with the will annexed appointed to administer my estate;

6

(d) the term "property" means any property, whether real, personal or mixed;

(e) a disposition herein "per stirpes" to the issue of a person shall be deemed to require a primary division into as many equal shares as there are children of such person who are living and children of such person who are deceased with living issue; and

(f) the term "the Code" means the Internal Revenue Code of 1986 and reference to all sections of the Code shall be deemed to refer to such sections of the Internal Revenue Code of 1986 as in effect on the date hereof and/or the corresponding provisions of any subsequent federal tax laws.

2. The descriptive headings of articles hereunder are included for convenience of reference only and shall not be construed to be a part of this instrument or in any respect as affecting or modifying its provisions. Where the context so permits, each of the masculine, feminine and neuter genders shall be deemed to denote the other two genders, the singular to denote the plural and the plural to denote the singular.

I, RICHARD E. FLOOR, the undersigned testator, do hereby declare that I sign and execute this instrument as my last will, that I sign it willingly in the presence of each of the undersigned witnesses, and that I execute it as my free and voluntary act for the purposes herein expressed this ___ day of September, 2002.

_____
Richard E. Floor, Testator

We, the undersigned witnesses, each do hereby declare in the presence of the aforesaid testator that the testator signed and executed this instrument as the testator's last will in the presence of each of us, that the testator signed it willingly, that each of us hereby signs this will as witness in the presence of the testator, and that to the best of our

7

knowledge the testator is eighteen years of age or over, of sound mind, and under no constraint or undue influence.

_____
Witness

_____
Address

_____
Witness

_____
Address

COMMONWEALTH OF MASSACHUSETTS

County of Suffolk

Subscribed and sworn to before me by the said testator and witnesses this 30th day of September, 2002.

_____
Notary Public

My commission expires: 10/25/07

8

# EXHIBIT B

I, RICHARD E. FLOOR of Belmont, Massachusetts, declare this to be the first codicil to my will dated September 30, 2002. I hereby amend my said will as follows:

I.      By striking out Article SECOND thereof in its entirety and substituting therefor the following new Articles SECOND and SECOND-A:

"SECOND: Tangible Personal Property. I bequeath my tangible personal property to my wife ELIZABETH W. FLOOR if she survives me for thirty days, otherwise I bequeath said tangible personal property per stirpes to my issue who survive me. I authorize my Executor to identify the tangible personal property bequeathed by this Article and to determine the proportionality of its distribution if to more than one person, her decisions on all matters connected therewith to be conclusive on all persons interested in my estate. I hope that the recipient or recipients of my tangible personal property will dispose of the same in accordance with my wishes, however made known, but I impose no legal or equitable obligation in this regard.

SECOND-A. Real Estate. I devise my real estate to my wife ELIZABETH if she survives me for thirty days, otherwise I direct that my real estate be disposed of as part of the residue."

II.     By striking out Article SEVENTH thereof in its entirety and substituting therefor the following new Article SEVENTH:

"SEVENTH: Appointment of Executor. I appoint DIANE L. CURRIER of Newton, Massachusetts, to be the Executor of this will and the temporary Executor of this will during the period prior to her

appointment as Executor, and if she shall for any reason fail or cease to serve in either capacity, I direct that such person as shall be appointed in writing by the Executive Committee of Goodwin Procter LLP, or any successor to substantially all of the business of said firm, shall serve in said capacity in her stead. Any vacancy in the office of Executor or temporary Executor not filled as hereinabove provided shall be filled by a successor appointed by a writing signed by a majority of those of my wife ELIZABETH and my issue who are living and of legal capacity at the time of said appointment."

Except as hereinabove provided, I hereby ratify, confirm and republish my said will in all respects.

I, RICHARD E. FLOOR, the undersigned testator, do hereby declare that I sign and execute this instrument as the first codicil to my last will dated September 30, 2002, that I sign it willingly in the presence of each of the undersigned witnesses, and that I execute it as my free and voluntary act for the purposes herein expressed this _14th_ day of _November_ , 2007.

_Richard Floor_
Richard E. Floor

We, the undersigned witnesses, each do hereby declare in the presence of the aforesaid testator that the testator signed and executed this instrument as the first codicil to the testator's last will dated September 30, 2002, in the presence of each of us, that the testator signed it willingly, that each of us hereby signs this first codicil as

2

witness in the presence of the testator, and that to the best of our knowledge the testator is eighteen years of age or over, of sound mind, and under no constraint or undue influence.

Jodi A. Griswold
Witness

Rehoboth, MA
Address

Bridget Horion
Witness

MILTON, MA
Address

3

COMMONWEALTH OF MASSACHUSETTS

*Suffolk* , ss

On this *14th* day of *December* , 2007, personally appeared before me RICHARD E. FLOOR, proved to me through personal knowledge to be the testator of the within first codicil and subscribed, swore and acknowledged that he signed said first codicil voluntarily for its stated purpose, and personally appeared before me the witnesses, *Jodi Griswold* , whose identity was proved to me through satisfactory evidence of identification, which evidence consisted of *personal knowledge* and *Bridget Horion* , whose identity was proved to me through satisfactory evidence of identification, which evidence consisted of *personal knowledge*, who also subscribed, swore and acknowledged that they signed said first codicil as witnesses.

_____
Notary Public

My commission expires

4

# EXHIBIT C

## Commonwealth of Massachusetts

**The Trial Court**

**Probate and Family Court Department**

Docket No. _____

**Middlesex**

Division _____

### Probate of Will With/Without Sureties

| | | | |
|---|---|---|---|
| Name of Deceased | **Richard E. Floor** | Date of Death | **February 18, 2010** |

Domicile at Death    45 Clark Street    Belmont    02478
                     (street address)   (city or town)   (zip)

### Name and address of Petitioner(s):

| Print Name of Petitioner(s) | Residence | Relationship to Deceased |
|---|---|---|
| Diane L. Currier | 47 Trowbridge Avenue Newton MA 02460 | Named Executor |
| | | |

### Heirs at law or next of kin of deceased including surviving spouse:

| Spouse: Print Name | Residence | Check if Applicable | Sign if you assent to the Petition |
|---|---|---|---|
| Elizabeth W. Floor | 45 Clark Street Belmont, MA 02478 | ☐ Incompetent | |

Name(s) of child(ren) including child(ren) of a predeceased child, or if none, parent(s) or if none, sibling(s), or if none, heirs apparent or presumptive:

| Print Name | Residence | Relationship | Check if Applicable | Sign if you assent to the Petition |
|---|---|---|---|---|
| **Amy Floor Parker** | **One Muirfield Road Falmouth, ME 04105** | **Child** | ○ Minor<br>○ Incompetent | |
| **Lucy Floor Douglass** | **19 Sherman Street Belmont, MA 02478** | **Child** | ○ Minor<br>○ Incompetent | |
| **Rebecca Floor Beebe** | **92 Lohse Road Wilmington, CT 06279** | **Child** | ○ Minor<br>○ Incompetent | |

The deceased left a  ☒ will  ☒ and codicil(s)  herewith presented, wherein your petitioner(s) is/are named executor/trix and wherein the deceased had requested that your petitioner(s) be exempt from giving surety on his/her/their bond(s).

The petitioner(s) hereby certify/ies that a copy of this document, along with a copy of the death certificate of the deceased has been sent by certified mail to **MassHealth, P.O. Box 15205, Worcester, Massachusetts 01615-0205**

Petitioner(s) request(s) that the  ☒ will  ☒ and codicil(s)  may be proved and allowed, and that he/she/they be appointed executor/trix thereof  ☐ with  ☒ without sureties on his/her/their bond and certify/ies under the penalties of perjury that the foregoing statements are true to the best of his/her/their knowledge and belief.

CJP 2 (11/09)

Date: March 3, 2010

_Diane L. Currier_
Signature of Petitioner

Date: _____

_____
Signature of Co-petitioner (if applicable)

Date: _March 4, 2010_

_Jennifer Laucirica_
Signature of Attorney for Petitioner

**Jennifer L. Laucirica**
(Print name)

**Goodwin Procter LLP Exchange Place**
(Address line1)                                    (Apt, Unit, No. etc.)

**Boston**                    **MA**      **02109**
(City/Town)                (State)      (Zip)

Primary Phone:    **617.570.8322**

B.B.O. #       **646336**

# EXHIBIT D

Commonwealth of Massachusetts

**The Trial Court**

| Division | Middlesex | | Docket No. |
|---|---|---|---|

**Probate and Family Court Department**

## UNIFORM COUNSEL CERTIFICATION FORM

Case Caption: _____ Estate of Richard E. Floor _____

I am the attorney-of-record for: _____ Diane L. Currier, named Executor of the Estate of Richard E. Floor _____

○ plaintiff ○ defendant ⊙ petitioner ○ respondent in the above-entitled matter.

In accordance with Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) which states in part:

"...Attorneys shall provide their clients with this information about court-connected dispute resolution services; discuss with their clients the advantages and disadvantages of the various methods of dispute resolution; and certify their compliance with this requirement on the civil cover sheet or its equivalent."

I hereby certify that I have complied with this requirement.

_____
(Signature of Attorney-of-Record)

_____
Jennifer L. Laucirica
(Print name)

B.B.O. # 646336 _____

Date _____ 3-4-10 _____

C.G.F.

# EXHIBIT E

| NOTICE OF PETITION FOR PROBATE OF WILL | Docket No.<br>MI10P1129EA | Commonwealth of Massachusetts<br>The Trial Court<br>Probate and Family Court |
|---|---|---|

**In the Estate of:** Richard E Floor

**Late of:** Belmont, MA 02478

**Date of Death:** 02/18/2010

| to all persons interested in the above captioned estate, a petition has been presented requesting that a document purporting to be | Middlesex Probate and Family Court |
|---|---|

to all persons interested in the above captioned estate, a petition has been presented requesting that a document purporting to be

      **the last will and codicil** of said decedent be

proved and allowed and that

Diane L Currier         of Newtonville, MA

be appointed executor/trix, named in the will to serve

Without Surety

Middlesex Probate and Family Court

208 Cambridge Street

Cambridge, MA 02141

(617)768-5800

---

IF YOU DESIRE TO OBJECT THERETO, YOU OR YOUR ATTORNEY MUST FILE A WRITTEN APPEARANCE IN SAID COURT AT:

**Cambridge**

ON OR BEFORE TEN O'CLOCK IN THE MORNING (10:00 AM) ON:

**04/08/2010**

In addition, you must file a written affidavit of objections to the petition, stating specific facts and grounds upon which the objection is based, within (30) days after the return day (or such other time as the court, on motion with notice to the petitioner, may allow) in accordance with Probate Rule 16.

**WITNESS, Hon. Peter C DiGangi, First Justice of this Court.**

Date:    March 11, 2010

*Iria E. DiCristfaro*

Register of Probate

---

### ORDER OF NOTICE

It is ordered that notice of said proceeding be given

by mailing postpaid a copy of the foregoing citation to all persons interested     **Fourteen days**

at least before said return date.

by publishing a copy thereof in **Belmont Citizens Herald**, **Belmont**: publication to be seven (7) days at least before said return day.

It is further ordered that notice thereof be given by delivering or mailing by registered or certified mail a copy thereof to the United States Department of Veterans' Affairs and the Attorney General, if interested, fourteen (14) days at least before said return day.

---

**WITNESS, Hon. Peter C DiGangi, First Justice of this Court.**

Date:    March 11, 2010

*Iria E. DiCristfaro*

Register of Probate

Page 1

# EXHIBIT F

for adults, teenagers, and children ages 6 years and older, at all levels.

For more information, please call 617-484-4696 or visit powersmusic.org.

**Pow-Wow** Registration for Powers Music School's Summer 2010 Pow-Wow program is now open. Pow-Wow is an innovative summer program for children ages 5 to 12 years featuring a hands-on introduction to violin, piano, music and movement, group singing, and arts and crafts. A Counselor in Training Program is also offered for children ages 13 to 15 years.

The program consists of four sessions and each session lasts two weeks. Session 1: June 21 to July 2; Session 2: July 5 to 16; Session 3: July 19 to 30; Session 4: Aug. 2 to 13. All sessions run from 9 am – 3 pm.

Let your child take part in this wonderful summer program that offers total immersion in a musical environment. At the end of each session the children will perform an operetta written by the program's faculty. Registration is available for more than one session. Don't miss out on this fun-filled, summer music program!

For more information, call 617-484-4696 or visit powersmusic.org.

# Legal Notices

414, Plan bid on all items they can supply.

The Board of Selectmen reserves the right to reject any or all bids and to make the award as may be determined to be in the best interests of the Town of Belmont.

BOARD OF SELECTMEN

AD#12201033
Belmont Citizen Herald 3/18/10

---

**FLOOR ESTATE**
**LEGAL NOTICE**
**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court**
**MIDDLESEX Division**
**Docket No. MI10P1129EA**

**NOTICE OF PETITION FOR PROBATE OF WILL**

**In the Estate of:** Richard E Floor
**Late of:** Belmont, MA 02478
**Date of Death:** 02/18/2010

To all persons interested in the above captioned estate, a petition has been presented requesting that a document purporting to be **the last will** of said decedent be proved and allowed and that Diane L Currier of Newtonville, MA be appointed executrix, named in the will to serve Without Surety.

IF YOU DESIRE TO OBJECT THERETO, YOU OR YOUR ATTORNEY MUST FILE A WRITTEN APPEARANCE IN SAID COURT AT: Cambridge ON OR BEFORE TEN O'CLOCK IN THE MORNING (10:00 AM) ON: **04/08/2010.**

In addition, you must file a written affidavit of objections to the petition, stating specific facts and grounds upon which the objection is based, within (30) days after the return day (or such other time as the court, on motion with notice to the petitioner, may allow) in accordance with Probate Rule 16.

**WITNESS, Hon. Peter C DiGangi, First Justice of this Court.**

Date: March 11, 2010

Tara E. DeCristofaro
Register of Probate

AD#12204018
Belmont Citizen Herald 3/18/10

---

SECURITY CARD BIDS
**LEGAL NOTICE**
**TOWN OF BELMONT**
**INVITATION TO BID**

Each bid must be secured by an accompanying deposit in the amount of five (5%) percent of the total of all items bid in the form of a bid bond, cash or certified check, or a treasurer's or cashier's check issued by a responsible bank or trust company payable to the Town of Belmont. A bid bond shall be in a form satisfactory to the awarding authority, with a surety company qualified to do business in the Commonwealth of Massachusetts, and conditioned upon the faithful performance by the Principal of the agreements contained in the Bid.

The bid deposit of the three (3) lowest responsible and eligible bidders will be retained until the specific Contract has been duly executed, and then returned, or if no award is made, then at the expiration of thirty (30) days. All other bid deposits will be returned within five (5) days after the date set for the opening of the bids, Saturdays, Sundays and legal holidays excluded.

The term of this Contract is from July 1, 2010 through June 30, 2011.

The Contractor shall provide all labor and materials in accordance with OSHA standards and regulations. The Board of Selectmen reserves the right to reject any or all bids and to make the award as may be determined to be in the best interests of the Town of Belmont.

BOARD OF SELECTMEN

AD#12201027
Belmont Citizen Herald 3/18/10

---

104-106 PAYSON ROAD
**LEGAL NOTICE**
**COMMONWEALTH OF MASSACHUSETTS**
**LAND COURT**
**DEPARTMENT OF THE TRIAL COURT**



Case No. 420961

To: Karen N. Saunders; Zaven R. Saunders a/k/a Zaven Richard Saunders and to all persons entitled to the benefit of the Servicemembers Civil Relief Act.

William Street, Wellesley, MA 02481 within thirty (30) days from the date of sale. In the event of a typographical error or omission contained in this publication, the description of the premises contained in said mortgage shall control.

Other terms, if any, to be announced at the sale.

**Lewis Lubar, Trustee of The Clover Trust**
Present holder of said mortgage
By its Attorneys,

Kristina A. Yee
Mason & Martin, LLP
Wellesley Office Park
65 William Street
Wellesley, MA 02481
(781) 239-0800

AD#12190164
Belmont Citizen Herald 3/4, 3/11, 3/18/10

---

77 FARNHAM ST.
**LEGAL NOTICE**
**THE COMMONWEALTH OF MASSACHUSETTS**
**LAND COURT**
**DEPARTMENT OF THE TRIAL COURT**



Case No. 420184

To: Robert J. Stoesser; Dorothy L. Stoesser and to all persons entitled to the benefit of the Servicemembers Civil Relief Act. Colonial Savings, F.A. claims to be the holder of a Mortgage property in Belmont, numbered 77 Farnham Street given by Robert J. Stoesser and Dorothy L. Stoesser to Leader Bank, N.A. dated December 23, 2004, and recorded with the Middlesex County (Southern District) Registry of Deeds at Book 44382, Page 294 and now held by the plaintiff by assignmenthas filed with said court a complaint for authority to foreclose said mortgage in the manner following: by entry and possession and exercise of power of sale.

If you are entitled to the benefits of the Servicemembers Civil Relief Act as amended and you object to such foreclo-

---

15.

egistra-
or Pow-
early
rd
March.
Keys for
ik-
s to 5
Kids
oze Eu-
). Pri-
ffered

---

lesires that
be sold at
on for not
HUNDRED
DOLLARS
le made of
to law, and
le appoint-
le ordered
all, or any
Court finds
led, either
n, and be
ler the net
ner as to

ou or your
ppearance
before ten
wenty-First
ay of this

TER C.
e of said
2010

Cristofaro
ate Court

i, 4/11/10

---

municipal
County,
s, repre-
ervices
bids for
installa-
for the
Building
specified
I pm on
ds to be
ervices
Homer
Street.
All bids
sealed
indicate
or NEW
elmont,
the bid-
be indi-

# EXHIBIT G

| NOTICE OF PETITION FOR PROBATE OF WILL | Docket No. MI10P1129EA | Commonwealth of Massachusetts The Trial Court Probate and Family Court |
|---|---|---|

**In the Estate of:** Richard E Floor

**Late of:** Belmont, MA 02478

**Date of Death:** 02/18/2010

| to all persons interested in the above captioned estate, a petition has been presented requesting that a document purporting to be | |
|---|---|
| **the last will and codicil** of said decedent be proved and allowed and that | Middlesex Probate and Family Court 208 Cambridge Street Cambridge, MA 02141 (617)768-5800 |
| Diane L Currier of Newtonville, MA | |
| be appointed executor/trix, named in the will to serve | |
| Without Surety | |

IF YOU DESIRE TO OBJECT THERETO, YOU OR YOUR ATTORNEY MUST FILE A WRITTEN APPEARANCE IN SAID COURT AT:

**Cambridge**

ON OR BEFORE TEN O'CLOCK IN THE MORNING (10:00 AM) ON:

**04/08/2010**

In addition, you must file a written affidavit of objections to the petition, stating specific facts and grounds upon which the objection is based, within (30) days after the return day (or such other time as the court, on motion with notice to the petitioner, may allow) in accordance with Probate Rule 16.

**WITNESS, Hon. Peter C DiGangi, First Justice of this Court.**

Date: March 11, 2010

*Ira E. DeCristofaro*

Register of Probate

## ORDER OF NOTICE

It is ordered that notice of said proceeding be given

by mailing postpaid a copy of the foregoing citation to all persons interested _____ **Fourteen days** _____

at least before said return date.

by publishing a copy thereof in **Belmont Citizens Herald, Belmont**: publication to be seven (7) days at least before said return day.

It is further ordered that notice thereof be given by delivering or mailing by registered or certified mail a copy thereof to the United States Department of Veterans' Affairs and the Attorney General, if interested, fourteen (14) days at least before said return day.

**WITNESS, Hon. Peter C DiGangi, First Justice of this Court.**

Date: March 11, 2010

*Ira E. DeCristofaro*

Register of Probate

Page 1

| **NOTICE OF PETITION FOR PROBATE OF WILL** | Docket No. MI10P1129EA | **Commonwealth of Massachusetts** **The Trial Court** **Probate and Family Court** |
|---|---|---|

## RETURN OF SERVICE

I hereby certify under the penalties of perjury that:

    I have complied with the order of notice by:

    ☐ serving in hand a copy of the citation as ordered.

    ☒ mailing ⊗ certified ◯ registered ◯ postpaid   a copy of the citation as ordered.

    ☒ causing the citation to be published in   Belmont Citizen Herald

    ☐ all other interested persons have assented or received actual notice.

Publication was on March 18, 2010   which was at least  7  ⊗ days ◯ month(s)  before said return day

Date:   4-8-2010       Signature:   *Jennifer Laurin*

# EXHIBIT H

## Commonwealth of Massachusetts
### The Trial Court

**Middlesex**    **Division**    Probate and Family Court Department    Docket No. MI10P1129EA

Bond of  Executor
<br>*(type of fiduciary)*

( x )  **without**

(  )  **with Personal Surety**

(  )  **with Corporate Surety**

Name of Estate  Richard E. Floor

Name and Address of Fiduciary  Diane L. Currier 47 Trowbridge Avenue, Newton, MA  02460

Estimated Real Estate ____ $0.00 ____    Estimated Personal Estate $11,000,000.00

I, the undersigned fiduciary accept appointment as an executor and stand bound (if applicable) to perform the statutory conditions of said bond and declare the above estimate to be to our best knowledge and belief.

Date  March 3, 2010

_____
Signature of Fiduciary – Principal

(complete below only if this is a bond with personal sureties)
We, the undersigned, as sureties, stand bound jointly and severally in the aforesaid penal sum to perform the statutory condition.

Personal Surety's Name and Address _____

_____

Signature _____

Personal Surety's Name and Address _____

_____

Signature _____

The above sureties are in my opinion sufficient.

_____    _____    _____
Signature                                                    Office                                                    City or Town

(complete below only if this is a Surety Company Bond)
We, the undersigned surety company, a corporation duly organized by law under the state of _____ and having a usual place of business in _____

_____
*(Massachusetts address)*

stand bound as surety, in the aforesaid penal sum, to perform the statutory condition.

by _____
Corporate Surety (name)                                        Signature and Title

_____ ,ss.    _____ ,20 _____ examined and approved.

_____
Justice-Assistant-Register-of The Probate and Family Court

# EXHIBIT I

| DECREE ALLOWANCE OF WILL | Docket No. MI10P1129EA | Commonwealth of Massachusetts The Trial Court Probate and Family Court |
|---|---|---|

**In the Estate of:** Richard E Floor

**Late of:** Belmont, MA 02478

At the **Middlesex Probate and Family Court**

on: _____APR 9 2010_____
           (date)

the Honorable *Edward N. Donnelly Jr.* presided.

All persons interested

☒ having been notified in accordance with the law

☐ or having assented and no objections being made thereto:

Middlesex Probate and Family Court

208 Cambridge Street

Cambridge, MA 02141

(617)768-5800

**IT IS DECREED that the** ☒ will ☐ and codicil(s) described in the Petition filed **March 09, 2010**
be approved and allowed as the last will and testament of said deceased, and the said petitioner(s)

    Diane L Currier

    47 Townbridge Ave

    Newtonville, MA 02460

be appointed executor/trix thereof, first giving bond **Without Surety** for the due performance of said trust.

**IT IS FURTHER ORDERED that:**

Date: _____APR 9 2010_____

*Edward F. Donnelly, Jr*
JUSTICE OF THE PROBATE AND FAMILY COURT

---

DATED _____APR 13 2010_____

    I, the undersigned HEREBY CERTIFY that I am the Register of Probate and Family Court in the County of Middlesex, that such as I have Custody of the records of said Court, and I further Certify that the foregoing is a photographic copy of the decree of appointment of the fiduciary, that said fiduciary has given bond as required by the law and that said appointment remains in full force.

    Witness, by my hand and seal of Probate Court of the Commonwealth of Massachusetts, in Cambridge.

*Tara E. DeCristofaro*
Register of Probate

# EXHIBIT 5

Sigmund S. Wissner-Gross
May Orenstein
BROWN RUDNICK LLP
Seven Times Square
New York, NY  10036
(212) 209-4800

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA  02111
(617) 856-8200

*Counsel for Edward S. Weisfelner,*
*as Litigation Trustee of the LB Litigation Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: <br><br> LYONDELL CHEMICAL COMPANY, <u>et al.</u>, <br><br> Debtors. | Case No.  09-10023 (REG) <br><br> Chapter 11 |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE OF THE LB LITIGATION TRUST, <br><br> Plaintiff, <br><br> v. <br><br> LEONARD BLAVATNIK, <u>et al.</u>, <br> Defendants. | (Jointly Administered) <br><br><br> Adv. Pro. No. 09-1375 (REG) |

<u>**DECLARATION OF NANCY S. TINSLEY**</u>

Pursuant to 28 U.S.C. § 1746, Nancy S. Tinsley, being duly sworn, deposes and says:

1.     The facts stated in this Declaration are based upon my knowledge and are true and correct.

2.      I am a paralegal at Brown Rudnick LLP, which is counsel to plaintiff Edward S. Weisfelner, as Litigation Trustee of the LB Litigation Trust, in the above-captioned action.

3.      On or about June 10, 2010, I was asked to determine whether an Executor had been appointed for the estate of Richard Floor.

4.      On that date, I asked my colleague Ann Gilbert, a Legal Executive Assistant at Brown Rudnick LLP, to assist me in researching the appointment and she was able to determine that papers had been filed in the Middlesex Probate Court to appoint Diane Currier as Executrix, but had not yet been approved.

5.      Over the next several weeks, including at least on July 1, 2010 and July 22, 2010, I contacted the Middlesex Probate Court by phone to determine if Ms. Currier's appointment had yet been made, and was told that it had not been.

6.      During the week of July 26, 2010, I made several additional attempts by phone to contact the Middlesex Probate Court, but my calls were not answered.

7.      On August 2, 2010, I was informed by Ann Gilbert that she had learned on that date that the appointment of Ms. Currier was official on April 9, 2010, but that it had not been docketed in the system until July 23, 2010.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on November 11, 2010.                          Nancy S. Tinsley

# EXHIBIT 6

```
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2                                          .
                                           . Chapter 11
3    IN RE:                                .
                                           . Case No. 09-10023 (REG)
4    LYONDELL CHEMICAL COMPANY,            .
                                           . New York, New York
5                        Debtors.          . Thursday, March 10, 2011
     . . . . . . . . . . . . . . . . . 9:54 a.m.
6    EDWARD S. WEISFELNER,                 .
     as LITIGATION TRUSTEE OF THE          .
7    LB LITIGATION TRUST,                  . Adv. Proc. No. 09-01375 (REG)
                                           .
8              vs.                         .
                                           .
9    LEONARD BLAVATNIK, et al              .
     . . . . . . . . . . . . . . . . . .
10
                     TRANSCRIPT OF MOTIONS TO DISMISS
11     MOTION TO AMEND THE CAPTION TO REFLECT THE SUBSTITUTION OF
        THE EXECUTOR OF THE ESTATE OF RICHARD FLOOR; OR, IN THE
12      ALTERNATIVE, TO EXTEND THE TIME FOR SUBSTITUTION AND TO
                     SUBSTITUTE THE EXECUTOR
13             BEFORE THE HONORABLE ROBERT E. GERBER
                   UNITED STATES BANKRUPTCY JUDGE
14
     APPEARANCES:
15
     For the Reorganized
16   Debtors:                   Mark C. Ellenberg, Esq.
                                CADWALADER, WICKERSHAM & TAFT, LLP
17                              700 Sixth Street NW
                                Washington, D.C. 20001
18

19   (Appearances Continued)

20   Audio Operator:            Electronically Recorded
                                by B. Peterson and J. Chien, ECROs
21
     Transcription Company:     Rand Reporting & Transcription, LLC
22                              80 Broad Street, Fifth Floor
                                New York, New York 10004
23                              (212) 504-2919
                                www.randreporting.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
 1   APPEARANCES:

 2   For Edward S. Weisfelner,
     Litigation Trustee:          Sigmund S. Wissner-Gross, Esq.
 3                                May Orenstein, Esq.
                                  BROWN RUDNICK, LLP
 4                                Seven Times Square
                                  New York, New York 10036
 5
                                  Steven D. Pohl, Esq.
 6                                BROWN RUDNICK, LLP
                                  One Financial Center
 7                                Boston, Massachusetts  02111

 8   For Defendants Access
     Industries, et al:           Susheel Kirpalani, Esq.
 9                                Richard I. Werder, Jr., Esq.
                                  Benjamin Finestone, Esq.
10                                QUINN, EMANUEL, URQUHART
                                   & SULLIVAN, LLP
11                                51 Madison Avenue, 22nd Floor
                                  New York, New York 10010
12
     For Defendants Former
13   Lyondell Directors
     and Officers:                John Higgins, Esq.
14                                Eric D. Wade, Esq.
                                  PORTER & HEDGES, LLP
15                                Reliant Energy Plaza
                                  1000 Main Street, 36th Floor
16                                Houston, Texas 77002

17   For Diane Currier,
     Executor of the Estate
18   of Richard Floor:            James S. Dittmar, Esq.
                                  Michael T. Jones, Esq.
19                                GOODWIN PROCTER, LLP
                                  Exchange Place
20                                Boston, Massachusetts 02109

21   For Edward J. Dineen,
     et al:                       Dianne Coffino, Esq.
22                                COVINGTON & BURLING, LLP
                                  620 Eighth Avenue
23                                New York, New York 10018

24   (Appearances Continued)

25
```

```
 1   APPEARANCES:   (Continued)

 2   For Deutsche Bank
     Securities, Inc.:          Jason L. Watkins, Esq.
 3                              BINGHAM MCCUTCHEN, LLP
                                One Federal Street
 4                              Boston, Massachusetts 02110

 5   For Stephen I. Chazen:     Tricia B. Sherno, Esq.
                                DEBEVOISE & PLIMPTON, LLP
 6                              919 Third Avenue
                                New York, New York 10022
 7
     For Alan S. Bigman:        Bill Novomisle, Esq.
 8                              PAUL, HASTINGS, JANOFSKY
                                 & WALKER, LLP
 9                              75 East 55th Street
                                New York, New York 10022
10
     Also Appearing:            James D. Wareham, Esq.
11                              DLA PIPER, LLP
                                500 8th Street NW
12                              Washington, D.C. 20004

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                INDEX

2                                                          Page

3
MOTION TO DISMISS ADVERSARY PROCEEDINGS RELATED          17
4   TO COUNT 4 OF THE AMENDED COMPLAINT
    (Intentional Fraudulent Transfer)

5

6   MOTION OF NELL LIMITED AND LEN BLAVATNIK TO            73
    DISMISS COUNT 2 OF THE AMENDED COMPLAINT

7

8   MOTION OF ACCESS INDUSTRIES HOLDINGS, LLC AND         127
    AI INTERNATIONAL S.A.R.L. TO DISMISS COUNT 12
9   OF THE AMENDED COMPLAINT

10
    DISCUSSION RE:   COUNT 6 OF AMENDED COMPLAINT      158,227
11

12  MOTION OF CERTAIN ACCESS DEFENDANTS TO DISMISS       163
    COUNTS 7, 14, and 18; OR, IN THE ALTERNATIVE, FOR
13  A MORE DEFINITE STATEMENT OF COUNT 18

14
    MOTION TO DISMISS ADVERSARY PROCEEDING/MOTION OF     230
15  DIANE CURRIER, EXECUTOR OF THE ESTATE OF RICHARD
    FLOOR TO DISMISS THE AMENDED COMPLAINT
16

17  MOTION TO DISMISS ADVERARY PROCEEDING/NOTICE OF      261
    MOTION OF BI S.A.R.L. TO DISMISS COUNTS 14 and
18  19 OF THE AMENDED COMPLAINT

19
    MOTION TO DISMISS ADVERSARY PROCEEDINGS, COUNTS 15   281
20  AND 16, ON BEHALF OF ALAN S. BIGMAN, EDWARD J. DINEEN
    AND MORRIS GELB
21

22

23

24

25

1    (Proceedings commence at 9:50 a.m.)

2    (Call to order of the Court.)

3        THE COURT:  Good morning.  Have seats, please.

4    (Pause in proceedings.)

5        THE COURT:  Okay.  We're here on the Lyondell

6    12(b)(6)'s.  We have a lot of work to do, obviously.  Because

7    we have so much work to do, I'm going to try to minimize my

8    interruptions during the course of oral argument.  I will have

9    some comments that I want you guys to focus on at the outset.

10   I'm not going to be lighting up yellow and red lights in front

11   of you, but I do expect people to keep to the time commitments,

12   or we're never going to get done.

13       I do have some preliminary comments that I want

14   addressed in the course of the various arguments that were

15   occasioned by my review of the briefs and related papers.

16       First, on the moving defendants' side, I was surprised

17   at the lack of attention to collapsing doctrine in the opening

18   briefs on several of the motions, which was remedied in part on

19   reply briefs, but which seems to me a backdrop relevant to

20   several of the claims.  I would like the moving defendants to

21   tell me whether they contend that all of the collapsing

22   doctrine law is dead on the one hand, or that it simply doesn't

23   apply here; and of coursed, if it's the latter, why that is so.

24   Both sides -- that was number one.

25       Number two, both sides, but of course especially the

1    moving defendants, speak of the District Judge, Judge Gold's

2    ruling in TOUSA.  There are aspects of the original bankruptcy

3    court level TOUSA decision by Judge Olsen that I had some

4    reservations about, principally with respect to the extent to

5    which, when you put in what I'd call "carve-back language" in a

6    document, so that to the extent it's a fraudulent conveyance,

7    you just say never mind with respect to that aspect, but the

8    criticism by Judge Gold obviously went way beyond that, in

9    areas where I would not necessarily agree with the supplemental

10   criticisms.

11        And one of the areas where you have differences in

12   perspective is on co-borrowing liability.  I want both sides to

13   address whether, when the debtor hocks its assets, subjects

14   them to a security interest to secure a guaranteed liability,

15   and there is either the risk or the certainty that if the

16   company heads south, the hocked assets are going to be on the

17   line, whether that's relevant to a co-borrowing analysis, when

18   you're talking about fraudulent conveyance litigation.  I think

19   at least for those of you who have written the briefs, you well

20   understand my question in that regard.

21        Another issue that comes up, insofar as I understand

22   it, it's in the context of intentional fraudulent transfer

23   exposure, is imputation of the intent of the transferee to the

24   transferor, in the context of a rule, at least a general rule,

25   that it's the transferor's account -- intent, rather then the

1   transferee's that matters.  I want both sides to address

2   whether, if one is trying to get control but doesn't have it

3   yet, to what extent is the imputation of the transferee imputed

4   to the transferor.

5          Turning to the claim against Blavatnik Entities -- and

6   I forgot which one -- for failing to advance on the revolver

7   shortly before the filing date -- I think it's Claim 12 -- I

8   would have thought from my experience in reviewing loan

9   agreements that there are typically covenants or conditions to

10  funding in those agreements that protect the lender from

11  needing to advance funds in the event of a material adverse

12  change in the financial strength of its borrower, which, if

13  similar provisions of that type -- and I understand I described

14  it very loosely -- would have been in that revolver, would have

15  -- I would have thought made the whole issue go away.  So I

16  would like you guys, as a preliminary matter, to explain to me

17  whether such provisions are lacking, so whether it's agreed or

18  at least the terrain upon which this motion will be decided,

19  that there was a duty to lend that was violated.

20         Assuming that there was a duty to lend that was

21  violation, and we're getting into the limitation of liability

22  provisions, then I want both sides to address my colleague

23  Judge Drain's decision in Delphi, both because I think it's

24  very close on the facts, or at least in context, and also

25  because, as I think everybody in this room knows, I care very

1   much about the decisions of my brother and sister bankruptcy

2   judges in this district and the importance of consistency.  And

3   that fact, coupled with my personal respect for my colleague

4   Judge Drain, would cause a Judge Drain decision to be of great

5   importance to me in deciding the viability of Claim 12.

6          On aiding and abetting, in the Luxembourg law context,

7   or the context in which there was discussion as to whether

8   Luxembourg law would apply.  I have twice written in <u>Adelphia</u>

9   <u>v. Bank of America</u> and <u>MagCorp</u>, that I think that on claims on

10  aiding and abetting, as contrasted to internal matters of

11  corporate governance, that you look at grouping of interests as

12  to where the injury was suffered, would be of very great

13  importance.

14         And my tentative, subject to your rights to be heard,

15  would be that the worst injury was suffered and the most

16  important regulatory interest appeared in Texas, where Lyondell

17  Chemical appeared.  And my instinct would be that Texas law

18  should apply to aiding and abetting claims.  But if either side

19  believes that understanding is incorrect, I would like you to -

20  - I'd like you to tell me.

21         It looked like both sides kind of spread their

22  torpedoes and tried to address it under the law of Luxembourg,

23  New York, Delaware, and Texas.  But I have to tell you that,

24  although I have practically no tentatives across the board on

25  these motions, my tentative view is that, on aiding and

1    abetting a tort, breach of fiduciary duty, under restatement

2    principles and two published cases that I personally issued, I

3    would look to Texas law.

4            One last thing, not so important to your oral

5    presentations, but if you give me anything else in writing --

6    and I know I've put a zillion requests or demands on you for

7    presentation of stuff as I go through all of this -- anything

8    that you give me going forward, you've got to use Arabic

9    numerals.  I can't handle any more of these Roman numerals.

10   They're driving me blind, I can't tell them apart.

11       (Laughter.)

12           THE COURT:  I have the same problem with Super Bowls,

13   where, except maybe for Super Bowl III, I can't tell them apart

14   either.  So from now on, we're going to use stuff that I can

15   read, or that makes me less likely to go blind when I read it

16   all.

17           Okay.  Let's get into it.  We have an agreement as to

18   the order of the motions, which is satisfactory to me.  We've

19   got lead counsel.  I'll start taking them.

20           Mr. Kirpalani.

21           Now I know some of you guys, maybe a lot of you guys,

22   but of course whoever is doing the transcript won't, so I'll

23   need introductions as you start speaking.

24           MR. KIRPALANI:  Thank you, Your Honor.

25           MR. WISSNER-GROSS:  Your Honor, there was just one

1    housekeeping matter; it would take about a minute, if I could

2    bring it to your attention.

3           THE COURT:  Oh, yes.  Go ahead.

4           MR. WISSNER-GROSS:  I figure before we start off --

5    and Sigmund Wissner-Gross from Brown Rudnick, for the

6    Litigation Trustee.

7           Before we start all the skirmishing that will take us

8    through the day, I figured I'd start with a positive note, Your

9    Honor, to be able to report to you that the trustee has reached

10   an agreement in principle, we've signed a termsheet, to settle

11   the claims asserted against Deutsche Bank, which is the

12   defendant, I think on one count; it's a claw-back claim on

13   Count 11.

14          The economic terms of that settlement are

15   confidential, but it's anticipated that between executing the

16   settlement agreement, implementing terms, and being in a

17   position to dismiss the claims with prejudice, we're looking at

18   approximately a thirty-day period to get al that accomplished.

19          Jason Watkins is here, representing Deutsche Bank.

20   And Jason, if you have anything to add -- I mean, I just felt

21   that I wanted to report that to the Judge.  We just

22   accomplished that in the last couple of days.

23          THE COURT:  Sure.  Mr. Watkins, do you want to come on

24   up, please?

25          MR. WATKINS:  Good morning, Your Honor.  Jason Watkins

1   of Bingham McCutchen for Deutsche Bank Securities, Inc.

2           Nothing further to add.  Just rise to say that Mr.

3   Wissner-Gross accurately reflected that we have reached an

4   agreement in principle to settle.

5           THE COURT:  Very good.  Okay.  Thank you.

6           Mr. Kirpalani.  Now we have a pretty full courtroom.

7   And also, so I can hear you best, I would like you to keep your

8   voices up and keep the microphone close to you, please.

9           MR. KIRPALANI:  Thank you, Your Honor.  Good morning.

10  Susheel Kirpalani of Quinn, Emanuel, Urquhart & Sullivan, on

11  behalf of the Access-related defendants in this adversary

12  proceedings.  I'm her with my partners Rick Werder and Ben

13  Finestone.

14          UNIDENTIFIED:  Good morning, Your Honor.

15          MR. KIRPALANI:  My partner Rick Werder submitted a

16  letter to the Court on March 9th, with a courtesy copy, I

17  believe and I hope was delivered to chambers yesterday, that

18  outlines the various motions in the order that they are to be

19  heard by order of all of the parties.  I know that the

20  plaintiff also submitted a notice of agenda, but I think for

21  ease of reference, the letter goes in order --

22          THE COURT:  Right.

23          MR. KIRPALANI:  -- of the arguments.  And if Your

24  Honor needs another copy of the letter, I have it.

25          THE COURT:  Well, I thought I had everything, but it

1  seems to have been lost in the papers.  I think I'd like to

2  take you up on that Mr. Kirpalani.  Oh, wait a second.  No.  I

3  do have it.

4          MR. KIRPALANI:  So what we have before the Court today

5  are several motions to dismiss filed by various defendants, and

6  I just wanted to try to help make some sense what exactly is up

7  for consideration from a macro perspective and give Your Honor

8  a little bit of the who's who of my brothers and sisters in the

9  courtroom.

10          The defendants will present arguments on motions to

11 dismiss, roughly half of the counts of the trustee's amended

12 complaint.  Over the last several months, we have coordinated

13 ourselves in consolidated argument on overlapping and related

14 counts as Your Honor had requested.  The defendants have really

15 tried to be judicious and thoughtful on which motions to bring

16 as a 12(b)(6).  We know how busy the Court is, and we know Your

17 Honor's general inclination on 12(b)(6) motions.  And we

18 recognize there are a lot of motions, but there were twenty-one

19 counts in the amended complaint.

20          As Your Honor knows from the recent correspondence,

21 after researching and briefing several motions and teeing them

22 up for argument today, the trustee decided to voluntarily

23 dismiss several claims, but he did it in a way that is somewhat

24 baffling to us.  While we still have numerous motions to

25 dismiss portions of the amended complaint, rest assured none of

13

1    them relates to the heart of what I respectfully submit is the

2    real issue the Court should decide on the evidence of this

3    complaint, which is:  Was Basell's acquisition of Lyondell in

4    2007 a constructive fraudulent transfer?  We know the issues of

5    fact that relate to that, and no one is trying to get out of

6    those claims on a 12(b)(6) motion.

7            These motions are our collective attempt to do away

8    with what we believe are plainly deficient claims, many of

9    which were not even part of the creditors' committee's lawsuit.

10   In order to get the case back to a manageable level for the

11   Court, and to try to step the tide of fees and expenses that

12   all of the defendants have been suffering, these are issues we

13   think Your Honor can clearly decide on the pleadings, looking

14   at the allegations, and accepting them all as true.

15           First up is going to be Count 4; that's the

16   intentional fraudulent transfer claim against the Lyondell

17   directors and officers.  Mr. John Higgins of the Porter &

18   Hedges firm is going to be arguing that one.

19           Next up would be Count 2; that's the intentional

20   fraudulent transfer claim against my client, Nell Limited and

21   Len Blavatnik.  I will be arguing that one.

22           Then we have Count 12, the breach of contract claim

23   that Your Honor mentioned in the opening remarks, related to

24   the failure to fund the Access revolver on the eve of

25   bankruptcy.  That's going to be argued by my partner Rick

1   Werder.

2          Then we have a variety of motions relating to the

3   trustee's Luxembourg law claims.  Taking them as a group, we

4   will be seeking dismissal of Counts 6, 7, 14, and 18 -- I'm

5   struggling with the Roman numerals myself here -- Luxembourg

6   law claims against various Access parties.  My partner Rick

7   Werder is our resident Luxembourger.

8          THE COURT:  Pause, please Mr. Kirpalani.

9          It didn't look to me like Blavatnik was moving against

10  Number 6.  Am I correct?

11         MR. KIRPALANI:  I believe --

12         MR. WERDER:  He is, Your Honor.  He joined in -- in

13  some of the other parties' motions, kind of late in the game

14  after the plaintiffs changed -- made a statement concerning --

15  that we believed affected the asserted basis for liability

16  against him, and I'll explain that when I present the argument.

17         THE COURT:  Okay.

18         MR. KIRPALANI:  Okay.  There may be supplemental

19  argument on these counts by Mike Jones of Goodwin Procter, on

20  behalf of Diane Currier, who's the Executrix of the Estate of

21  the Late Richard Floor.  And then Mr. Jamie Wareham of DLA

22  Piper has reserved time potentially for Alan Bigman, but may or

23  may not make additional argument.

24         Then we have two related motions.  First, there's a

25  motion to dismiss under Rule 25, which would be argued by Jim

1   Dittmar of Goodwin Procter on behalf of Diane Currier, the

2   Executrix of the Estate of Richard Floor; and the second is the

3   trustee's motion to amend the caption related to Ms. Currier.

4         Then we have, Your Honor, the motion to dismiss on

5   forum non conveniens grounds, which is in the alternative to

6   the substantive Luxembourg law motions.  This motion was made

7   in the alternative tot he dismissal of the Luxembourg claims on

8   the merits and expert opinions.  That's going to be argued by

9   my partner Rick Werder.

10        Last, we have two final motions after the Luxembourg

11  claims group, Counts 14 and 19:  Lack of personal jurisdiction

12  over BI S.a.r.l., and the no extraterritoriality under the

13  Bankruptcy Code against that foreign entity, and that would be

14  argued by my partner Ben Finestone.

15        Then we have Counts 15 and 16; these are claims

16  related to the characterization or the recharacterization of

17  the Access revolving loan facility, as equity.  That's going to

18  be argued by Dianne Coffino of the Covington & Burling law

19  firm.

20        That's the agenda, Your Honor, and we're happy to

21  proceed if the Court pleases.

22        THE COURT:  Okay.  Pause for just a second.

23        Mr. Wissner-Gross, do you want to be heard?

24        MR. WISSNER-GROSS:  Yes, just briefly, Your Honor.

25        I do concur on the fact that I think everybody has

1   made really a great effort to try to be as efficient as they

2   can about this process.  But I am constrained to comment on

3   Susheel's comment about something being baffling here.

4         We made a concerted effort, taking into account the

5   number of claims at issue, after the record was completed and

6   discovery was completed on February 28th, to take a second look

7   at the entire record; the law, the briefs, we went to our

8   expert opinions in terms of Luxembourg law, to see what kind of

9   pruning we could do, so that we could hopefully have less on

10  Your Honor's plate.  And there were certain, also, some

11  individual defendants, as to whom we took their depositions,

12  and we came to the conclusion based on the record that a

13  dismissal without prejudice was appropriate.

14        So, as a result of that, as we reflected in

15  communications with Your Honor, we have dropped some individual

16  defendants, and we've indicated that we're not moving forward

17  on certain discrete Luxembourg issues, in an effort to narrow

18  the scope of the case.

19        What is left, however, includes some central claims in

20  the case, such as the intentional fraudulent transfer claims,

21  our core, core claims.  But as in any case, Your Honor, where

22  conduct gives rise to a variety of claims, there are other

23  important claims.  The Luxembourg claims are important, and

24  there are other claims, such as the revolver claims, which

25  arise out of the conduct at issue.

1          So I do want to underscore that the effort we made was

2   to narrow the case -- the claims which we feel all pass muster

3   under 12(b)(6), all should go forward, and to ease the burden

4   of the Court, in terms of the substance and the size and the

5   nature of the motions before you.

6          In terms of who will handle what, my partners May

7   Orenstein and Steve Pohl will be joining me in handling the

8   arguments.  I will handle the response on the motion to

9   dismiss, Count 4.  Ms. Orenstein will handle the argument on

10  the motion to dismiss, Count 2.  Mr. Pohl will respond on the

11  failure to fund, the motion to dismiss, Count 12.  Ms.

12  Orenstein will handle the responses on -- substantive responses

13  on all the Luxembourg motions to dismiss.  I will respond to

14  the alternative argument that's being advanced on forum non

15  dismissal.  And then we throw the ball back to Mr. Pohl, who

16  will handle the trustee's position on the remaining motions.

17          THE COURT:  Okay.

18          MR. WISSNER-GROSS:  Thank you, Your Honor.

19          THE COURT:  Fair enough.

20          Mr. Higgins?

21          MR. HIGGINS:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MR. HIGGINS:  For the record, Your Honor, John

24  Higgins, law firm of Porter & Hedges.

25          Your Honor, I'm also going to be speaking today as

1   part of our effort to coordinate and consolidate and minimize

2   the burden on Your Honor.  We did file the motion jointly with

3   the Covington & Burling law firm and with the Debevoise firm,

4   and so I'll be speaking on behalf of their clients, also.

5          In summary, Your Honor, we represent what we've called

6   frequently the "Former Lyondell Directors and Officers."

7          Your Honor, we had filed a joint motion to dismiss

8   Count 4, which is -- Count 4 is the actual intent to delay,

9   hinder, and defraud claim that was asserted both under 544,

10  548, and unidentified state law by the plaintiffs in this case.

11         What we've tried to do in both our motion and reply,

12  Your Honor, is obviously summarize the applicable law and

13  explain why we believe that the alleged facts set forth in the

14  complaint do not support a claim for relief here today.  The

15  allegations in the amended complaint, which we certainly

16  acknowledge, the Court must accept as true simply for the

17  purposes of evaluating the motion to dismiss.  We've tried to

18  summarize because of the length of the complaint on Pages 3

19  through 5 of our motion, and essentially, if you boil it down,

20  while lengthy and covering some hundred-and-forty-plus pages,

21  basically tell what we believe to be is an implausible story

22  about a third-party company, Access' purchase of Lyondell.  And

23  it wasn't just a purchase, Your Honor; it was a purchase and a

24  merger, which also distinguishes this case by many of the

25  others cited by the plaintiffs.

1          Allegedly, in connection with this purchase, Mr. Dan

2    Smith, who is the former Chief Executive Officer of Lyondell

3    and the Chairman of the Board at the time of the offer to buy

4    the company, allegedly with the assistance of a few individuals

5    referred to in the complaint as the -- or defined in the

6    complaint as the "inner circle," allegedly masterminded some

7    scheme to really, Your Honor, if you distill it down, to really

8    defraud the buyer.  We don't believe there's any allegations in

9    the complaint that there's been any argument that we actually

10   intended to delay, hinder, and defraud creditors, and that is

11   one of the primary focuses of our argument.

12         Secondly, Your Honor, we believe the trustee's story

13   alleges what is, in effect, an implausible scheme that is

14   inconsistent with the facts, and certainly with the

15   participation by the buyer and the lenders that funded the

16   transaction.

17         Lastly, Your Honor, we'll be requesting that the Court

18   go ahead and dismiss the state law claims because, one, the

19   complaint fails to specify under which applicable law the

20   trustee is purporting to sue us, which we believe is a

21   fundamental defect in the complaint; secondly, to the extent

22   the Court were to determine based on the prior filings in this

23   case --

24         THE COURT:  You're talking about on the 544's?

25         MR. HIGGINS:  Yes, Your Honor.

1        Secondly, to the extent the Court were to determine or

2   the plaintiffs stipulate that Texas law does apply, Texas has

3   adopted the Uniform Fraudulent Transfer Act, which certainly

4   mirrors the 548 provisions; and therefore, if the complaint is

5   defective under 548, we believe it's defective under state law.

6        Your Honor, so I don't fail to address the Court's

7   questions, I'm going to take those quickly, if I may, now, and

8   some of these I will address later in particularly the

9   imputation portion of my argument.

10       First, Your Honor, your question -- and I'm going to

11  skip the TOUSA decision, which has been addressed by the Basell

12  side.

13       Your Honor, on the collapsing doctrine, I certainly am

14  not -- we did not spend a lot of time on it in our papers.  We

15  take the position and we recognize that the LBO cases that are

16  published opinions out there certainly stand when evaluating

17  under a lack of consideration component or a badge of fraud,

18  that certainly the courts take the position that the monies

19  paid to the selling shareholders would not be consideration for

20  the debtor.  We don't think it's an issue for today, we think

21  it's -- certainly not on a 12(b)(6).  But standing alone as a

22  simple proposition, we certainly acknowledge that those cases

23  so hold.

24       Skipping down to Your Honor's comments about the

25  imputation of a transferee.  We addressed that primarily in our

1   reply, Your Honor, and focused on the Adler case, which --

2            THE COURT:  Which one, Adler, Coleman?

3            MR. HIGGINS:  Adler, yes, Your Honor, which --

4            THE COURT:  Mishkin v. Ensinger (sic) or -- Ensminger,

5   or something like that?

6            MR. HIGGINS:  That's it, Your Honor.

7            And that is where this domination and control, instead

8   of focusing on the intent of the transferor, you shift and look

9   to the intended transferee.  And the case, Adler, clearly said

10  that the officer must be in a position to control the

11  transferor.

12           What we were trying to point out to the Court and

13  distinguish in this case is that there is nothing in the

14  amended complaint -- and certainly, we think it would be a

15  requirement under the law that, even if you assume that, for

16  example, using Mr. Smith, who was a transferee of merger

17  consideration, that you cannot impute his intent as a

18  transferee to Lyondell, one, because you'd fail the Adler test,

19  there's no evidence of domination and control; and number two,

20  the plaintiffs would have to plead that there was domination

21  and control by Mr. Smith of the board, the ultimate individuals

22  or group of individuals who had to approve the merger.

23           THE COURT:  I'm not fully keeping up with you, Mr.

24  Higgins.

25           MR. HIGGINS:  Yes, Your Honor.

1          THE COURT:  Mr. Smith was the company's CEO.

2          MR. HIGGINS:  Yes, sir.

3          THE COURT:  And I thought the transferor, at least

4   under some theories, is Lyondell Chemical.

5          MR. HIGGINS:  Correct.

6          THE COURT:  So his intent would be imputed to Lyondell

7   Chemical, wouldn't it?

8          MR. HIGGINS:  Not automatically, and not in this

9   particular case, Your Honor.

10         THE COURT:  Under old-fashioned agency principles?

11         MR. HIGGINS:  To the extent it was -- the intent would

12  be imputed to the extent Mr. Smith had the ability to approve

13  the transactions which resulted in the transfers that occurred

14  that we're being sued for.  But as a simple proposition, you

15  can't just simply impute the intent of an officer and a

16  director unless the transaction that was approved was within

17  the course and scope of his authority.

18         By way of example, if Mr. Smith had suddenly directed

19  the sale of an asset of Lyondell, and it was within his

20  authority, corporate authority, in accordance with the

21  applicable bylaws, et cetera, and he approved that transaction

22  for less than fair value or with the actual intent to delay,

23  hinder, and defraud, then you could impute that intent to

24  Lyondell as the transferor.

25         But in this particular case, Mr. Smith did not have

1   the requisite ability to approve the transfer -- or approve the

2   merger, excuse me, which resulted in the transfers and the

3   payments of the merger consideration, as defined by the

4   plaintiffs.  So we do not accept the basic proposition that the

5   plaintiffs throw out there, is you simply look to the president

6   of the company if he had the requisite intent, therefore, now

7   Lyondell is bound by that intent.  We do disagree with that

8   proposition, Your Honor.

9            THE COURT:  Uh-huh.  Continue, please.

10           MR. HIGGINS:  Your Honor, the other thing I wanted to

11  highlight -- and I apologize, some of this is by way of

12  background -- but who are the movants in this particular case.

13  I said generically it was the "former Lyondell directors and

14  officers."  It really needs to be broken down a little bit

15  further.

16           There are ten independent directors, Your Honor, there

17  are nine officers, and there are three subsidiary directors.

18  The three subsidiary directors, Your Honor, I think everybody

19  agrees, didn't approve the merger and had no requisite intent

20  to delay, hinder, and defraud creditors, because they certainly

21  didn't approve the merger.  Out of those officers, Your Honor,

22  there are four that the plaintiffs have defined:  Mr. DeNicola,

23  Mrs. Galvin, Mr. Dineen, and Mr. Philips, as the, quote, "inner

24  circle."

25           Turning back to the actual fraudulent conveyance

1   argument, Your Honor, the key issue here we believe that the

2   Court has got to address is both whose intent and what intent.

3   The whose intent is obviously the transferor.  Who was the

4   transferor in this case?  It was Lyondell.

5        Because the Court -- because the debtor, excuse me,

6   Lyondell, was a corporate entity, the trustee argues that -- as

7   the Court was alluding, that you must look solely to the intent

8   of Lyondell's directors, officers, and/or agents.  On Page 2,

9   in fact, the Trustee claims that the amended complaint" --

10       THE COURT:  Page 2 of the complaint or a brief?

11       MR. HIGGINS:  I'm sorry.  Page 2 of the opposition.

12   And it's not a direct quote, Your Honor.

13       The amended complaint more than adequately pleads

14   intent on the part of Dan Smith and his inner circle of

15   Lyondell management and Lyondell.  And the trust's position we

16   believe is a gross oversimplification of applicable law on this

17   particular point.

18       The transfers, as I said, at issue were the payments

19   of the merger consideration.  The transfers were approved by

20   the Lyondell Board of Directors.  There were ten or eleven

21   board members or independent directors.  This is completely

22   different from most -- almost -- in fact, I would argue all of

23   the cases cited by the plaintiffs.  In this particular case,

24   only the board had the authority to approve the merger, and

25   there are no allegations in the amended complaint that the

1  board took any actions to defraud creditors.  In its

2  opposition, the plaintiffs appear to acknowledge that, and so

3  start to argue a little bit of a shift from the complaint.

4  They allege really two things on behalf of the board:

5         One, that the board had knowledge that the funds would

6  be used to pay the merger consideration.  We don't dispute that

7  proposition, but that does not equate to a finding or a

8  statement or an allegation that the board intended to delay,

9  hinder, and defraud creditors.  It's simply a statement of what

10  was happening factually in this particular case.

11         In addition, Your Honor, we attached as Exhibit B to

12  Mr. Wade's supplemental declaration a copy of the commitment

13  letter, which is referenced in the amended complaint.  The

14  evidence actually shows that what the board was presented with

15  at the time they approved the merger on July 16th, 2007, is a

16  commitment that provides that all of the Lyondell creditors

17  will be paid at closing, comma, except to certain amounts to be

18  agreed upon.  The board believed that the creditors were going

19  to be paid and taken out and satisfied at the time they

20  approved this transaction.  No evidence of intent to defraud

21  creditors.  And as set forth in the amended complaint, I think

22  it's Paragraph 263, Your Honor, approximately $6.7 billion of

23  Lyondell's existing debt was, in fact, satisfied at the closing

24  of the merger on December 20th, 2007.

25         The second argument the trust makes is that the board

1    knew or should have known that the projections were not

2    reasonable.  Your Honor, this incorporates what the cases

3    address as the foreseeability concept.  While in a negligence

4    case, that might be applicable, but as MFS Son, Carco, and

5    several of the other cases we've cited stand for the

6    proposition that a foreseeability concept does not have any

7    place in an actual intent to delay, hinder, and defraud case.

8    It is not relevant to an allegation of actual intent, and it's

9    incompatible with the concept of actual fraud.

10         THE COURT:  Pause, please, Mr. Higgins, because the

11   observation you make would be a no-brainer if liability were

12   based on negligence, or at least I would think it would be,

13   subject to your opponent's right to be heard.  But since

14   recklessness is sometimes deemed to be a satisfactory

15   substitute for actual knowledge, to what extent does your point

16   make if "should have known" is limited going forward to

17   recklessness.

18         MR. HIGGINS:  We believe the same standard applies,

19   Your Honor.  We believe it's still recklessness and still in

20   the negligence context, and we don't believe it applies.  It

21   certainly doesn't apply to a board of directors who's being

22   presented with management projections, when the case law -- and

23   this is not necessarily cited in our papers, but certainly the

24   case law stands for the proposition that a board is entitled to

25   rely upon projections that are presented to management.

1        THE COURT:  Keep going, please.

2        MR. HIGGINS:  Thank you, Your Honor.

3        Your Honor, courts have actually dismissed actual

4   fraudulent conveyance claims under similar facts.  And we

5   cited, and I'll refer the Court to the Elrod decision, which is

6   a recent case that was issued by Judge Shannon in 2010, and it

7   was a motion to dismiss under 12(b)(6); there was an actual

8   fraudulent conveyance count under 548(a)(1)(A).  And in that

9   particular case, the trustee out of the Elrod case sued the

10  transferees to recover certain transfers.

11       The transferees happened to be the two individuals

12  that were in a position to control and operate the company,

13  similar to the allegations against Mr. Smith in this case.  The

14  transferees were also two of the board members.  They had --

15  Elrod also had three independent board members.  And when

16  addressing this, the Court zeroed in on the fact that, while

17  two of the board members were in a position to influence the

18  company; influence its day-to-day operations, there were three

19  independent directors -- and I should back up, Your Honor.

20       The particular transaction at issue did require board

21  approval, as opposed to a transaction that could be in the

22  ordinary course of business.

23       THE COURT:  I would think that most of these big

24  transactions do require board approval.

25       MR. HIGGINS:  Agreed, Your Honor.

1          And in this particular case, the Court noted the Adler

2     domination and control test, and the Court determined, applying

3     that test, that the relevant inquiry is the intent of the

4     entire board of directors that approved the transaction, rather

5     than the two individuals who were allegedly the bad actors in

6     this particular case.  The two bad actors, the Court noted, did

7     not have the authority to approve the transfers.  And the Court

8     determined it had to focus on the three independents, and that

9     there was no evidence of allegations to support the proposition

10    that the two bad actors dominated and controlled the three

11    independents.

12          That's exactly what you have before Your Honor today.

13    There are no allegations in this complaint that Dan Smith, this

14    alleged inner circle, or any of them had any domination or

15    control over the board of directors, such that they could have

16    influenced the approval of this merger transaction.

17          Under Delaware law, as the Court has already noted,

18    any transaction of this magnitude, and particularly a merger,

19    it must be approved by the board.  And therefore, we believe

20    that in order to look at the imputation, you've got to look at

21    the imputation of the board of directors' intent to Lyondell,

22    the transferor, not simply one individual who may be an officer

23    of the company.

24          Your Honor, there's no allegations in the amended

25    complaint that Mr. Smith had the independent authority to

1  approve the merger.  There's no allegations that Smith

2  exercised undue influence to influence or control the board,

3  which would be necessary in order to try to satisfy the

4  domination and control factors in Adler.

5      Turning to the cases briefly, Your Honor, because I

6  think it is important to distinguish what the plaintiffs'

7  position is.

8      The trust does allege in very simple fashion that the

9  Court can simply look to the officer, look to see if the --

10 they have pled that the officer had the requisite intent to

11 delay, hinder, and defraud, and then imply -- and impute that

12 officer's knowledge to the company, the transferor.

13     Let's talk about what they actually allege.  They even

14 go so far -- the inner circle, no allegations.  They only thing

15 they say -- and I'm referring to Page 20 of the opposition --

16 that the individuals who were members of the inner circle, Your

17 Honor, because they were members of the inner circle, it may be

18 inferred that they shared the alleged fraudulent intent with

19 Dan Smith.

20     We propose to the Court that such allegations are

21 certainly insufficient under Rule 9, and that's -- there is no

22 way you can make the next leap to say that you're inferring

23 because they dealt with Dan Smith, that their intent should be

24 imputed to Lyondell, the transferor.

25     I would also note, Your Honor, there are no

1   allegations of intent against the other remaining defendants in

2   this case:  Mr. Gelb, Mr. Hollinshead, Mr. Bayer, or Mr. de

3   Jong; no allegations of intent whatsoever against them.  And as

4   I stated earlier, there are no allegations against the

5   subsidiary directors:  Mr. Cadenhead, Mr. Fontenot, or Mr.

6   Hall.  So you're back to the only people that they even imply

7   that there's the requisite intent on behalf of would be Mr.

8   Smith and the four inner-circle officers.

9           Quickly, Your Honor, turning to the cases relied upon

10  by the trustee to show you how the case is distinguished

11  between this for the imputation to the corporation.  They rely

12  really on two cases:  <u>James River Coal</u> and <u>Anchorage Marina</u>.

13          In <u>James River Coal</u>, Your Honor, the transaction did

14  require board approval, but the director group was comprised of

15  all of the insiders.  So the imputation argument, as best we

16  can tell from reviewing the case, wasn't even really an issue;

17  it was, frankly, a given.  <u>James River Coal</u> relies on three

18  (sic) other cases:  <u>Halpert</u>, <u>Blazo</u>, <u>Roco</u>, and <u>F&C</u>.

19          And in <u>Halpert</u>, it was a family-owned business, and

20  the company collapsed after Ponzi charges were alleged.  Once

21  again, insiders controlled; no issue of imputation.

22          <u>Blazo</u>, they imputed the acts of the chairman of the

23  board, who had already pled guilty to criminal charges, and

24  there was no issue of imputation.

25          <u>Roco</u>, sole proprietorship, no issue of imputation.

1          F&C was an alter-ego case, and they transferred the

2    assets to a corporation where they had interlocking or the same

3    officers and directors on both sides of the transaction.

4          Anchorage Marina, Your Honor, was simply a very small,

5    privately held company, where approval of the transfer by the

6    remaining shareholders were the same as the officers and

7    directors.

8          Once again, all of those cases, Your Honor, in

9    summary, are situations where the insiders, the alleged bad

10   actors, were either controlling or were the only board members

11   that approved the transactions at issue; as opposed to the

12   Elrod case, where we had three independent directors, which is

13   more on point with the case -- the facts before the Court.

14          THE COURT:  What was the factual situation in terms of

15   insider influence on the board in Brendan Shannon's Elrod

16   decision?

17          MR. HIGGINS:  I'm sorry, Your Honor?

18          THE COURT:  You made reference to Brendan Shannon -- I

19   assume you're talking about, when you said "Judge Shannon," my

20   colleague down in Delaware.

21          MR. HIGGINS:  In Delaware, yes, Your Honor.

22          THE COURT:  His Elrod decision.  What was the degree

23   of insider influence over the board or alleged influence over

24   the board in his case?

25          MR. HIGGINS:  I think the answer is, Your Honor, there

1   was no alleged influence or domination or control over the

2   board, and that's why the Court found that there was no

3   evidence to support in the complaint any allegations of

4   control.

5           THE COURT:  All right.  Continue, please.

6           MR. HIGGINS:  Your Honor, as far as the "what intent"

7   portion of the factor, very simply, the Court is well aware

8   that there must be an intent to transfer the assets beyond the

9   reach of creditors.

10          I would only note that in the Actrade case, a case

11  that's cited by us in our papers, Judge Gropper did sort of

12  address similar issues and similar allegations.  And in that

13  particular case, he was very quick to point out that, while the

14  plaintiffs made a -- call it a "compelling argument," of an

15  intent to defraud someone, the Court looked at the facts and

16  said, yeah, in this particular case, the intention to fraud, if

17  anyone, was the buyer, for example, or somebody else on the

18  other side of the transaction.  There was no intent to defraud

19  the creditors.  And the key issue is:  You must allege that

20  there was intent to defraud the creditors.

21          THE COURT:  What was the name of that decision by

22  Judge Gropper?

23          MR. HIGGINS:  Actrade, Your Honor.

24          THE COURT:  Accutrade (sic)?

25          MR. HIGGINS:  A-c-t-r-a-d-e.

Argument                                    33

1          THE COURT:  Okay.

2          MR. HIGGINS:  It's 337 B.R. 791, Your Honor.

3          Your Honor, as far as the "what," in its opposition at

4    Page 21, the trustee attempts to argue that the Court can -- in

5    order to find an actual fraudulent intent count or claim, that

6    the Court can presume fraudulent intent when the natural

7    consequences of the transferor's act was to hinder or delay the

8    creditors' ability to recover.

9          As we previously explained, this overlaps the entire

10   foreseeability argument, which was addressed in the MFS Son

11   case.  This was an arm's length merger, Your Honor, the fact

12   that insolvency alone is insufficient, and we don't believe

13   supports the trustee's position.

14         Your Honor, I would also just quickly note that we

15   spent a lot of time reviewing the cases cited in the

16   opposition.  And to give you an overview, I think -- this is

17   not a case of actual fraudulent intent.  We may have to fight

18   another day on constructive fraudulent transfer, but not

19   actual.  The reason is, Your Honor, the cases of actual

20   fraudulent intent really fall in three categories:

21         You're talking about individuals, typically in a

22   situation where they've got creditors pursuing them or judgment

23   has just been rendered, and they transfer the assets to their

24   brother-in-law for less-than-adequate consideration.

25         You've got Ponzi schemes or criminal cases; Madoff,

1   Dreier, et cetera.

2          And you have small, privately held companies, where

3   assets are transferred for less than reasonably equivalent

4   value, with the intent to defraud creditors, and they're moving

5   the assets out, once again typically when a judgment is about

6   to be rendered.

7          When we reviewed the sixty cases cited by the

8   plaintiffs in their opposition, only thirty-six of them were

9   fraudulent conveyance cases.  When you drill down on those,

10  Your Honor, six are simply constructive fraudulent conveyance

11  cases.  And of the thirty that assert both a 548(a)(1)(A) and a

12  constructive fraudulent conveyance case, sure enough, Your

13  Honor, three are Ponzis, sixteen are closely held companies,

14  three are individuals, and there are only eight corporate

15  cases.  Two of them dealt with Adelphia; Old Carco, where a

16  12(b)(6), an actual fraud, was granted, a big corporate case;

17  Adler, once again a 12(b)(6) motion was granted; Actrade, a

18  12(b)(6); and then a couple of others which had to do with --

19  for example, the Tronox case, Your Honor, where a 12(b)(6)

20  motion was denied, but it was in the context of the company

21  trying to, in effect, ring-fence (sic) some environmental

22  liabilities in connection with a transaction -- a purchase-and-

23  sale transaction.

24         None of the reported cases, Your Honor, involved a

25  situation that you have before you, where a company was not

1  just entering into a transaction that could be called an LBO.

2  What we had here, Your Honor, was a sale of a company and a

3  merger of two companies.

4          The plaintiffs' complaint, when you read it very

5  carefully, continues to make allegations and try to hammer the

6  projections of Lyondell, and saying that Lyondell could not pay

7  the indebtedness that it took on.  It had $7 billion worth of

8  indebtedness pre-merger, it had $20 billion worth of

9  indebtedness post-merger.  Lyondell surely couldn't bear the

10 weight of that debt.

11         What they continue to leave out and fail to sort of

12 point out to the Court is Basell merged with Lyondell, became

13 LBI, and it was the combined enterprise that was going to have

14 to service the debt.  The facts that the plaintiffs cite, Your

15 Honor, are simply not on point, and this is not a case of

16 actual fraudulent intent.

17         We believe -- why would they have amended the

18 complaint to add it at the late date, a year after filing the

19 first complaint?  We think, Your Honor, it's quite simply

20 because we had already filed, and it was fully briefed, a

21 motion for partial summary judgment that we filed back, I

22 believe it was in November of 2009, on the 546(e) safe harbor

23 provisions, to seek to have the Court rule that we had received

24 settlement payment consideration, at least a part of the merger

25 consideration, and that summary judgment -- or a motion to

1   dismiss should be granted on those particular claims.

2           THE COURT:  Pause on that, Mr. Higgins.

3           So much was happening in Lyondell with the banks at

4   that time that I forgot how we decided to leave the then-

5   pending summary judgment motions that didn't involve the banks.

6           MR. HIGGINS:  Where we left it, Your Honor, is that we

7   had the right -- I believe where we left it, is that we had the

8   right to renew it after the -- not until the amended complaint

9   got filed; that we could renewed the motions.  We have not done

10  so.  We have prepared the motion to be refiled.  But now that

11  the case has collapsed between Phase 1 and Phase 2, what we

12  actually will do is expand the motion to pick up some

13  additional payments that were part of Phase 2, that were not

14  included in our motion that we originally filed in Phase 1.

15          THE COURT:  At a later time, to the --

16          MR. HIGGINS:  Yes, Your Honor.

17          THE COURT:  Based on the terrain of this case, after

18  the 12(b)(6)'s have done whatever --

19          MR. HIGGINS:  Correct, Your Honor.

20          THE COURT:  -- they're going to do.

21          MR. HIGGINS:  Correct, Your Honor.

22          THE COURT:  All right.  Continue.

23          MR. HIGGINS:  Your Honor, moving quickly to really our

24  last point, which is the plausibility argument.

25          As the Court is aware, that in order to survive a

1  motion to dismiss, the complaint must state a plausible claim

2  for relief.  And we believe that a careful review of the

3  amended complaint highlights the absurdity of the allegations

4  that have been raised against the Lyondell D&O defendants, and

5  we believe that the claims are not plausible.

6        First, Your Honor, it's not plausible that five of the

7  world's largest banks came in here and blindly accepted

8  projections, we'll say just on the Lyondell side, and loaned

9  approximately twenty to $22 billion without any due diligence,

10  without any effort, without looking at the market, and without

11  testing those projections.  And in fact, the amended complaint

12  highlights that, in fact, they did do due diligence, and in

13  fact, they did run their own sensitivity analyses.  It's just

14  not plausible that they came in here blindly and loaned this

15  amount of money.

16        Your Honor, there were three original arrangers.  Each

17  of them independently made a decision to loan.  ABN joined the

18  lender group in August of 2007.  The plaintiffs continue to say

19  that second quarter results of Lyondell, they were suffering

20  deterioration and they were not meeting their 2007 LRP for

21  second quarter.  ABN came in after those results were public,

22  Your Honor, and still decided to join the group and go forward

23  and loan in the transaction.

24        UBS, the fifth arranger, came in, in October of 2007,

25  when there was no certainty that the loan was going to be

1    syndicated, which undercuts the proposition by the plaintiffs

2    that the intent of the lenders was to simply come in here, loan

3    a bunch of money, collect their transaction fees, and then flip

4    the debt out to the public markets.

5          It's not plausible, Your Honor, that insolvency was

6    certain at the time of the merger.  If it were certain, why in

7    the world would Mr. Blavatnik have risked his billions of

8    dollars of equity investment in Basell, which the plaintiffs

9    acknowledge existed, to merge two companies together that he

10   believed were going to fail?

11         It's not plausible that the Lyondell Board of

12   Directors should have known that the projections were

13   insufficient.  As I said, this was not just a simple sale, Your

14   Honor, or a simple LBO; it was a sale and a merger.

15         It's also important to note, Your Honor, the Board of

16   Directors of Lyondell, when they approved the transaction on

17   July 16th, doesn't even have the Basell projections.  It's a

18   private company, Your Honor.  We don't have access to that

19   information.  How in the world were we -- was the board of

20   directors going to have the requisite intent to delay, hinder,

21   and defraud creditors when they can't even see the projections

22   that the other party to the merger transaction are preparing on

23   their side of the transaction?  It's the buyer's banks that are

24   going to come loan, not the seller's.

25         It's not plausible, Your Honor, also that Mr. Smith's

1   inner circle was complicit in the scheme to defraud.  I would

2   highlight -- and this is picked up in the several of the cases,

3   Your Honor -- it's not plausible that people would come in,

4   participate in the inflation of projections, and then go to

5   work for the merged company.  As set forth in the complaint,

6   Your Honor, Mr. Dineen, who's one of the alleged inner circle

7   members, he's the head of the chemicals division; Mr. Philips,

8   head of the refining division.  They both went to work for the

9   company.  They both forgave receipt of many, possibly millions

10  of dollars of merger consideration and went to work for a

11  company to head up those divisions, and they were going to be

12  responsible for making sure that those projections held true.

13  It doesn't make sense, Your Honor.  Your Honor, also, three of

14  the other defendants:  Mr. Gelb, Mr. de Jong, and Bayer, also

15  stayed on with LBI post-merger.

16        Your Honor, in summary, for this Court to believe that

17  this story is plausible, I'm just going to run through a few

18  factors that this Court would have to believe were all true

19  prior to July 9th.  And July 9th is a key date, Your Honor.

20  July 9th is the date that Mr. Blavatnik --

21        THE COURT:  I assume you mean 2007?

22        MR. HIGGINS:  I'm sorry, Your Honor, yes.

23        That Mr. Blavatnik made his offer to buy the company

24  to Mr. Smith.

25        One, Mr. Smith would have to have improperly -- or

1  ordered the improper inflation of the projections.  Several

2  officers would have had to participate in this conspiracy.

3           Mr. Smith would have to know at the time the

4  projections were being prepared -- which the complaint

5  acknowledges the updated projections by Lyondell were being

6  prepared before the offer was made.  A very important fact,

7  Your Honor.  The projections were prepared before the offer was

8  made, and the offer was actually made by Mr. Blavatnik before

9  he had seen any of the Lyondell projections.

10          Mr. Smith would have to know, Your Honor, that Access,

11 who had a current pending offer to buy Huntsman Chemicals, was

12 going to be topped by Apollo, and that Access would suddenly

13 turn its attention back to the prospect of possibly purchasing

14 Lyondell; he would have to know that in order for all this to

15 be true, Your Honor.

16          The officers would have to mislead ten independent

17 directors.  They would have to have misled the investment bank,

18 they would have to have misled all of the banks, assuming they

19 did no due diligence.

20          Mr. Smith would have to actually even know the

21 structure of the financing that the buyer was going to present

22 to them when the offer was made.  Mr. Smith would have to know

23 what the long-term projections of Basell were going to be,

24 because otherwise, how could he, quote, "reverse-engineer" the

25 projections that were going to fit the combined enterprise's

1   projections in order to know that $48 a share was going to be

2   an appropriate number?

3        And I suppose that, you know, Your Honor, you'd have

4   to conclude that the banks were blindly led into this

5   transaction and did not do any of their own homework.

6        Certainly we take the position that none of these

7   propositions are true, Your Honor, and that the story is not

8   plausible.  And as Judge Gonzalez noted, in a situation where a

9   trust -- or a plaintiff, I should say, is seeking to utilize

10  the ultimate fact of insolvency as a factor to infer intent,

11  the Court can look to the market participants and what they

12  believed at the time and their perception of solvency.  It

13  becomes relevant.

14       THE COURT:  In what procedural context did Judge

15  Gonzalez do that, on a 12(b)(6), a summary judgment, or after

16  trial?

17       MR. HIGGINS:  I believe it was a 12(b)(6).

18    (Counsel confers.)

19       MR. HIGGINS:  Yes, it was, Your Honor.

20       And in that particular case, he summarized that

21  financial institutions and lenders do not make commitments to

22  make these type of investments cavalierly.  And the

23  participation of the lenders, of major, sophisticated financial

24  institutions such as Citibank, Goldman, Merrill Lynch, ABN, and

25  UBS, renders the claim implausible that the merger was approved

1  with the knowledge that it would lead to Lyondell's bankruptcy.

2         Your Honor, in summary, based on the foregoing, we

3  respectfully request that the Court consider dismissal of Count

4  4.

5         THE COURT:  Okay.  Thank you.

6         MR. HIGGINS:  Thank you, Your Honor.

7         THE COURT:  Mr. Wissner-Gross.

8         MR. WISSNER-GROSS:  Your Honor, with your permission,

9  we prepared a very small handout, which is, in sum, portions of

10 the amended complaint, so you don't have to go looking around.

11        THE COURT:  Okay.

12        MR. WISSNER-GROSS:  Here's a -- let me -- actually ...

13     (Counsel confer.)

14        MR. WISSNER-GROSS:  Your Honor, I will agree with Mr.

15 Higgins that many of the arguments he stressed in his argument

16 were actually first made on reply or fully developed reply.

17 And I will also, in all candor, tell Your Honor that I was very

18 tempted to put in a surreply request, leave to do so, but I

19 think that the better judgment was you had enough paper, and

20 we'd leave it for today to address those issues, such as

21 imputation.  His argument essentially -- which I think is wrong

22 as a matter of law -- is basically addressed on reply.

23        But I'd like to just step back for a moment and give a

24 brief bit of context of how we got where we are, because I

25 don't think any of that came through Mr. Higgins' presentation.

1          As Your Honor will recall, when we were before you in

2    2009, we were on a very accelerated track in Phase 1.  There

3    was discovery focused, I think as Your Honor has noted on the

4    FPDs, the financing party defendants, that there were deadlines

5    that we were dealing with in terms of the debtors' need to

6    resolve litigation that -- the STN litigation the trustee had

7    brought.  After there was a settlement and the plan was

8    confirmed, the amended complaint was filed on July 23, 2010.

9          Now I want to stress, and I actually want to emphasize

10   that everything in the amended complaint is based on the record

11   that was developed in Rule 2004 discovery and the Phase 1

12   discovery.  Mr. Higgins comments time and again, "not

13   plausible," "not plausible."  Your Honor, we'll go through a

14   couple of the -- a couple of the allegations in the amended

15   complaint.  This is all drawn from the record.  Many of the

16   allegations we'll talk about, about Mr. Smith's conduct and

17   those of his inner circle, are taken -- literally are taken

18   from emails and documents that were obtained in discovery.

19         However, I think it's also important to underscore

20   that, since we filed the amended complaint, we have received,

21   and I'm advised, approximately 2 million additional pages of

22   documents.  In November and December, there were substantial

23   additional documents produced by the reorganized debtors that

24   fill in some of the pieces as to the scheme that we believe

25   occurred; underscore that there was actually, in fact, as we

 1   alleged, a management scheme directed by Mr. Smith, led by Mr.

 2   Smith, which began in response on May 11th, 2007, when Mr.

 3   Blavatnik filed his thirteen-day.  The scheme is alleged --

 4             THE COURT:  Well, his Williams Act 13(d), did you say?

 5             MR. WISSNER-GROSS:  It was a Schedule 13(d), as a

 6   result of the acquisition of a certain percentage of shared

 7   Lyondell --

 8             THE COURT:  Uh-huh.

 9             MR. WISSNER-GROSS:  -- which -- in which he stated --

10   and this is also in the proxy, and it's in our complaint --

11   that he also had an intention to possibly acquire a majority of

12   the stock of the company.  So the company was clearly put in

13   play.

14             And Your Honor, I'm going to focus on the amended

15   complaint, but I will tell you, I'll come to this at the

16   conclusion of my remarks, that there is such a huge amount of

17   data and information that we've obtained, literally in the last

18   few months, that fills in so many pieces; that for Mr. Higgins,

19   who, for example, represented Mr. Salvin, who's a portfolio

20   manager, who was commissioned by Mr. Smith to cook the

21   projections, we contend -- to say this allegation on plausible,

22   when Mr. Salvin produced on January 28th through Mr. Higgins

23   63,000 pages -- January 28th, 2011, 63,000 pages of documents,

24   and after we pressed and pushed, we got 700 pages of

25   handwritten notes by Mr. Salvin, which included notes that were

1    contemporaneous with events in May, June, and July; that when

2    you --

3              THE COURT:  Of 2007?

4              MR. WISSNER-GROSS:  2007.

5              You put the pieces together, it demonstrates in our

6    view almost conclusively that Mr. Smith directed this

7    refreshing exercise; that it was to be high level, not bottoms-

8    up; that it was result-oriented and so forth.  But all of that

9    is laid out in the complaint, we think in more than

10   requisite detail.

11             Now let's go back, some basic, basic concepts.

12             Mr. Higgins says, well, you can't have imputation.

13   And he focuses a great deal of attention on the board of

14   directors.  The problem with the premise of his argument -- and

15   this is a legal point, Your Honor.  I think you were spot-on

16   when you said, what about old-fashioned agency rules.  In fact,

17   what he does is he cites and he talks about the Adler decision,

18   which was a case where the question in Adler was whether --

19             THE COURT:  Adler, Coleman?

20             MR. WISSNER-GROSS:  Yes.  Whether a --

21             THE COURT:  Adler, Coleman was a case that I took over

22   from Judge Garrity.  I know the general case, but you're

23   talking about what was decided by Judge Marrero, right?

24             MR. WISSNER-GROSS:  Yeah.  I'm talking about the --

25   well, let me just address the specific fact patter that's at

1   issue.  The question, in terms of the cases that are cited by

2   Mr. Higgins, dealt with the following:

3           You have Adler, which was the clearing broker.  And if

4   you can just wait, I can just get to my notes.

5           THE COURT:  Well, it cleared for Hanover Sterling, if

6   I recall.

7           MR. WISSNER-GROSS:  Yeah, for Hanover.  I can't --

8           THE COURT:  Is that the name --

9           MR. WISSNER-GROSS:  Yes, yes.

10          THE COURT:  -- you were --

11          MR. WISSNER-GROSS:  I was looking for Hanover.

12          And Hanover, there was no overlap of employees, there

13  were different employees, different directors, different

14  managers, but Hanover it appeared had some kind of control over

15  the ability to execute the trades through Adler.  And the

16  question that was raised in that -- in the context of that case

17  was whether, where you have a transferee of an unaffiliated

18  company who appears, or at least is contended to have control

19  or -- and domination over the transferor, in this case Adler,

20  whether the intent of the unaffiliated transferee company can

21  be imputed to the transferor.  And the answer -- and that was

22  the three-part test that Mr. Higgins alluded to that's

23  discussed in his papers.  That's not our facts.

24          And we would respectfully submit that if you take a

25  close review of the Adler decision, that that deals with a

1  completely unrelated factual circumstance, where you have a

2  question of a transferee who's an unaffiliated corporation, who

3  allegedly is exercising some kind of control or domination over

4  the transferee -- or transferor, I'm sorry.  That's not our

5  fact pattern.

6          So let's look a little bit at what the complaint

7  alleges.  And Your Honor, I have the PowerPoint before you, or

8  the slides.  I can go through just a couple of pages, just to

9  highlight some of the facts that are alleged in the original

10 complaint.

11         First, on Page 1 -- and these were all referenced to

12 the paragraphs of the complaint -- Access, in August 2006, made

13 an offer to acquire Lyondell for a price range of 26 or $28 per

14 share, which was rejected.  But Access, as we allege, had

15 provided a highly confident letter from Merrill Lynch

16 indicating adequate financing, so -- and this offer was

17 ultimately rejected by the Lyondell Board, which decided to

18 proceed -- this related to the period of time when it was

19 looking to possibly sell or acquire the balance of interest in

20 its Houston refinery.  It was rejected by the board.

21         But the board -- and the board included, as Mr.

22 Higgins said, a number of outside directors.  There were a

23 total, I believe, of eleven.  Mr. Smith is the only insider;

24 he's the CEO, and he subsequently became the chairman, as well

25 as ten outside directors.  They were aware of the effort to

1  acquire Lyondell by Access and Mr. Blavatnik, and aware of the

2  fact it would be fully financed.

3          We note that Lyondell historically had a long-range

4  planning process; and on Page 2, we cited to -- and literally,

5  this is just taken out of Lyondell's own documents -- the long-

6  range plan for the period 2007 to 2011.  This is, according to

7  what we allege in the complaint, and according to testimony,

8  was an effort to do a bottoms-up process --

9          THE COURT:  It was the original long-range plan.

10         MR. WISSNER-GROSS:  Yes, yes.  Approved in December

11 2006.

12         Now it's noteworthy, if you go to the next page, that

13 Lyondell, in the spring -- and we believe it was in late April

14 -- did a rating agency presentation, which supposedly would

15 represent the most accurate, up-to-date outlook by Lyondell.

16 And they did recognize that there was a -- as noted on the

17 third page, that there would be a slight reduction in their

18 outlook for 2007, but the outlook for balance -- rating (sic)

19 remained substantially the same.

20         If you go to Page 4, on May 11th, Mr. Blavatnik files

21 his thirteen-day.  And we've noted the allegations in the

22 complaint, where we've alleged that Mr. Smith directs the

23 information of refreshed EBITDA projections.  And I would note,

24 Your Honor, that this was based on all the discovery took

25 through 2004 and in Phase 1.  We did not have -- and even

1   though I think the complaint more than complies with 9(b),

2   there was a gap in the documentation we had, even when we filed

3   this amended complaint, for what exactly happened from May

4   11th, 2007, when Blavatnik files his 13(d), to June 18th, 2007,

5   when we first saw the first purported refreshed projections

6   delivered by Mr. Salvin to Mr. DeNicola, the CFO of the

7   company, and one of the members of the inner circle.

8            We first got that documentation to help us unravel

9   further the scheme beginning in November 2010.  I pressed

10  further to get additional documents when I first saw it, and we

11  got more in December.  And we got a treasure trove from Mr.

12  Salvin himself, who was with the company until July 2007, only

13  at the end of January 2011.  Mr. Salvin was represented by

14  Porter & Hedges.

15           What we've alleged in the complaint we filed last

16  summer was that, if you look on Page 4, that Mr. Smith

17  determined that he needed to refresh the projections that were

18  in the LRP because they were too low to justify the high price.

19  And that whole exercise began after, only after May 11th, 2007.

20  And I'll represent to you, Your Honor, that the record that's

21  been developed in the last few months confirms that that's

22  exactly the case.

23           And we alleged on Paragraph 146 that there was to be

24  no bottoms-up, plant-by-plant analysis.  That in fact is based

25  on the record we took in discovery, and we've confirmed it to

1  be the case.

2         But there's an -- Mr. Higgins makes a comment, how

3  could Mr. Smith have had some kind of intent to defraud or cook

4  the projections, since the offer is made on July 9th.  And he

5  makes a comment also about the Huntsman deal.  Well, he doesn't

6  mention that, as we note on Page 4, and as we allege in the

7  complaint, that on June 7th, 2007, Mr. Smith has a private

8  dinner meeting with Volker Trautz, the then-CEO of Basell,

9  where, according to Mr. Trautz, Mr. Smith, quote:

10         "-- began negotiating and suggested a price of $48 per

11         share for Lyondell would be justified."

12         Same price that Mr. Blavatnik ultimately offered on

13  July 9th.

14         This was taken -- you know, was this allegation

15  plausible?  Well, this allegation is taken right from Mr.

16  Trautz' email that he sent to Mr. Blavatnik, shortly after he

17  met with Mr. Smith in London.  So you already have, in context

18  in the facts that we had developed before the amended complaint

19  was filed, you have the 13(d) is filed on May 11th; Mr. Smith

20  directs that he's go to refresh the projections, we believe to

21  get to a result-oriented, much higher valuation; and by June

22  7th, Mr. Smith, according to Volker Trautz, has said, you want

23  to acquire us, $48 per share.

24         Now with respect to the Huntsman comment, it's

25  interesting because the Huntsman deal was first announced on

1   June 26th, 2007.  And if you look at Page 5, you'll see that a

2   week before that, Mr. Salvin -- the portfolio manager who's

3   been commissioned by Mr. Smith, who we believe the record shows

4   conclusively, essentially cooked the books or cooked the

5   projections -- by June 18th, Mr. Salvin has come up with his

6   new projections, which he provides to Mr. DeNicola.  And these

7   are for the refining and for EC&D, these do two interesting

8   things:

9         For the refining, we think that -- well, the record

10  certainly reflects that, even though the outside consultants of

11  Lyondell were saying refining is heading into a trough and had

12  a very different outlook, the projections end up being goosed

13  up as much as $2 billion additional for the refining.  And

14  again, Your Honor, this is based on the record developed prior

15  to the filing of the amended complaint.  But there is a

16  treasure trove of additional documentation that's been obtained

17  in the last few months that underscores this to be the case.

18        With respect to EC&D, which is a part of the chemicals

19  division, what happens in the refreshed projections is that,

20  while EC&D in 2007 is plummeting, and will continue to plummet

21  during the balance of the year; it was way off in terms of

22  ultimate performance from the long-range plan, what Mr. Salvin

23  has done is essentially have a reverse-engineered results that

24  it would go up to a high level, and will only come down --

25        THE COURT:  Pause, please, Mr. Wissner-Gross, because

1   I wanted to let you talk for a while.  But Mr. Higgins' main

2   point, or at least the point that is more persuasive -- I'll do

3   my duty, but I don't get real excited on plausibility

4   contentions on 12(b)(6)'s.  His principal point is that you got

5   to impute Smith's intent to the board.

6        And while everything you're saying makes out a claim

7   of fraud of some sort, perhaps trying to defraud Blavatnik,

8   and/or a breach of fiduciary duty, perhaps a pretty strong

9   breach of fiduciary duty, I assume you're going to get to the

10  extent to which he influenced the board or why you don't think

11  what the board was thinking is legally significant.

12       MR. WISSNER-GROSS:  Well, I'll turn to that, Your

13  Honor, right now.

14       As I said earlier, under agency principles, which I

15  think control, the knowledge of Mr. Smith, as well as the inner

16  management, is imputed to the company.  And that proposition is

17  demonstrated in James River, which we cited, where the Court

18  held the -- and I'll just quote from it because I think it's a

19  useful quote:

20            "The fraudulent intent of an officer or director may

21            be imputed to the debtors for the purposes of

22            recovering an intentional fraudulent transfer.  A

23            corporation, being an entity created by law, is

24            incapable of formulating or acting with intent.  Thus,

25            for the purpose of recovering impermissibly

1              transferred corporate, and thereby facilitating

2              creditor recovery, the intent of the officers and

3              directors may be imputed to the corporation."

4         That's a basic principle that is consistent with the

5    law of Delaware, Texas, and New York.

6         In Delaware, for example, Alex v. -- Albert v. Alex

7    Brown, 2005 WL 2130607, makes the same point, noting that the

8    conduct can be imputed and should be imputed to the company.

9         Interestingly, in the Kirschner v. KPMG case, where my

10   friends from Quinn Emanuel were involved, the New York Court of

11   Appeals, in October 2010, at 15 N.Y. 3d 466, made the point

12   even more emphatically, stating, and I quote:

13             "Agency law presumes imputation, even when the agent

14             acts less than admirably, exhibits poor judgment, or

15             commits fraud.  In sum, we have held that all

16             corporate acts, including fraudulent ones, are subject

17             to the presumption of imputation."

18         Similarly, in Texas, FDIC v. Ernst & Young, 967 F.2d

19   160 (5th Cir. 1992), to the same effect.

20         So when I commented earlier than the Adler decision

21   really is off point, it deals with a different factual

22   scenario, the companion to that is that what you have to do is

23   analyze the facts we've alleged in the context of, should the

24   knowledge and conduct of the management be imputed to the

25   company, irrespective for the moment about the knowledge or

1    conduct of the board, and I'll get to that in a moment.  And I

2    think the answer is that, under applicable agency law, the

3    answer is yes.

4           Then you go to the next question, which he raised:

5    Well, what did the board members know?  And I think that the

6    complaint does actually allege in Paragraphs 183, 201, and 213

7    knowledge by the board members.

8           And I do have to stress, at the time we filed the

9    amended complaint, because of the schedule in Phase 1, we

10   hadn't deposed any of the outside directors; we deposed Mr.

11   Smith.  As Your Honor may recall, issues of breach of fiduciary

12   duty relating to the outside directors was deferred to Phase 2.

13   So we really weren't -- we didn't have the time do that

14   discovery.

15          But the complaint does allege specifically that the

16   board members reviewed refreshed projections.  We've alleged

17   that, on July 10th, 2007, Mr. Smith presented those refreshed

18   numbers that we have talked about a little bit to the board.

19   And we have alleged that the board knew or should have known

20   that the refreshed numbers were inflated and unachievable.

21          And as I commented, that it's also clear that the

22   board members knew that, from 2006, that this was going to be a

23   fully financed transaction; that it would be heavy debt

24   incurred.  We have allegations that Mr. Smith himself, I think

25   even days before the 13(d) filing, had made a comment, which in

1   his deposition he said is accurate, quote, "that he had made at

2   a convention in Las Vegas," that if you add on billions of

3   dollars of debt, this company in a down cycle can't survive.

4          And many of the members of the board of directors, as

5   we've learned as we took discovery, had been with Lyondell for

6   years, including at least one or two had been with Lyondell

7   when it went through a severe trough in 2001, '2, and '3.

8          So I think that, to the extent that Mr. Higgins is

9   arguing that these outside directors didn't have any knowledge,

10  we dispute that.  And we think that the complaint makes clear

11  that, independent of the knowledge of Mr. Smith and his inner

12  circle -- which we think should be imputed to the company,

13  irrespective of the knowledge of the board -- that there are

14  more than adequate allegations that the board themselves had

15  knowledge; had knowledge of the basic core facts, which in our

16  view would sustain a claim against the company, even we even

17  had to go through this analysis of looking to the board

18  approval, which we don't think is the right standard that

19  should apply.

20         But even if I were to indulge Mr. Higgins' argument

21  that you have to look to the issue of control -- and I realize

22  Your Honor had raised that as a general comment at the outset,

23  as to what extent should there be an issue as to, I guess an

24  effort to obtain control.

25         The facts are that Mr. Smith was, since 1996, the CEO

1   of the company.  The fact is that -- and this -- again,

2   unfortunately, we hadn't deposed all the outside directors, we

3   didn't have an opportunity in Phase 1.  But the fact is that

4   there was a domination with Mr. Smith, effectively, as to the

5   way this company operated.

6          THE COURT:  Pause, please, Mr. Wissner-Gross, because

7   my comment at the outside of the argument wasn't so much on the

8   time at which you look at Smith's intent because he's on the

9   transferor side, and we had the back-and-forth about how much

10  his intent is imputed to others.

11         But what I was talking about was something a little

12  different, which was that -- and it may be more relevant to

13  when we get to the Blavatnik/Access intent.  But they are, at

14  least in part, on the transferee side.  And I guess what I was

15  trying to get my arms around is at what time I measure various

16  people's intent when we're looking at transferees.  I had

17  assumed, subject to both sides' rights to be heard, that Smith

18  and everybody else are transferor-side people anyhow.

19         MR. WISSNER-GROSS:  Yes, he's a transferor.  Yes,

20  that's correct.

21         THE COURT:  Okay.  Continue, please.

22         MR. WISSNER-GROSS:  So in a nutshell, on the

23  imputation issue, our view is that under settled agency law,

24  the knowledge of Mr. Smith and his confederates gets imputed to

25  Lyondell; for purposes of 548, echoes directly to Lyondell, and

1   you don't have to go through some convoluted analysis of

2   whether he actually exercised control and dominion over the

3   board.

4        If you need to look beyond Mr. Smith and the core

5   management, which was alleged specifically in the complaint,

6   there are allegations in the complaint, I think with requisite

7   specificity, that the board -- the outside board members, were

8   on notice, had knowledge, as well, and you satisfy that

9   standard, as well, if you have to get there.

10       And alternatively, if you have to reach the issue of

11  domination and control, which I don't think you do, I think

12  that's a factual issue.  And I think the record, at least,

13  which we've taken through discovery, has suggested that there

14  was actually control by Mr. Smith over the board's conduct.

15  But I don't think you ever have to get there.

16       I'd like to turn, Your Honor, to a couple of other

17  points that Mr. Higgins focused on.  He made the comment that

18  the creditors were paid off as a result of the merger.  Well,

19  number one, I don't know that that's actually correct because

20  you -- obviously, there was a refinancing of existing debt, but

21  that didn't take care of all the existing creditors.

22       But secondly, and I think more importantly, it's well

23  settled under 548(a)(1)(A) that it applies to both existing and

24  future creditors.  I'd cite to 5 Collier's, Section 548.041.,

25  and Collier's makes that point repeatedly.  So whatever may or

1   may not have happened with respect to the existing lenders

2   whose debt was refinanced, the actual standard is something

3   that is different.  You look to both existing and future

4   creditors.

5           And I think your best evidence is Mr. Smith's

6   admission on the complaint before Mr. Blavatnik acquires the

7   toehold position saying, if I were an unsecured creditor, I

8   wouldn't want to be in a position with that kind of debt being

9   layered onto the company.  He knew that, with the kind of debt

10  being layered on, the company couldn't survive.

11          I'd also note that, notwithstanding the fact that Mr.

12  Higgins went through an analysis of what -- sort of what the

13  cases were on motions to dismiss or not, Adler was after trial.

14  Collier's notes, I think correctly, that the approach under

15  548(a)(1)(A) is purely factual.  The treatise also notes that

16  rarely will the transferor admit to acting with fraudulent

17  purpose; and also comments that, because it requires

18  credibility assessments of witnesses, it shouldn't be applied

19  mechanically.

20          So I think that, while you never get to the imputation

21  theory of Mr. Higgins, in any event, this really is an argument

22  we should be having at trial about the credibility of

23  witnesses, and it's less about the legal standard in terms of

24  imputation, which I think is pretty well settled that the

25  knowledge should be imputed to the company.

1        Let me talk about motive and opportunity, which I

2   think is -- we've briefed, and even in the <u>Old Carco</u> case, the

3   Court there recognized that looking to motive and opportunity

4   is a very helpful proxy for understanding the intent on the

5   part of the party.  In this case, it would certainly be Mr.

6   Smith and his core, core circle.

7        First element of that -- it's a three-part test -- are

8   there facts demonstrated that the defendants had the motive and

9   opportunity to commit fraud?  Well, Your Honor, if you look at

10  the last page of our slide, from Paragraph 263 of the

11  complaint, here's the aggregate consideration Mr. Smith and his

12  inner circle got as a result of the merger.  It's approximately

13  $173 million.

14       Mr. Smith was the CEO and chairman at the time; Mr.

15  DeNicola, the CFO; Ms. Galvin was the General Counsel; Messrs.

16  Dineen and Philips -- Mr. Dineen was the head of chemicals; Mr.

17  Philips head of refining.  Mr. Higgins notes that they

18  continued on, while Smith, DeNicola and Galvin did not, and

19  you're looking at a large chunk of $173 million.  But I think

20  the record reflects that Mr. Dineen and Mr. Philips did

21  participate in the fabricated projections, and they did receive

22  substantial benefit as a result of that.

23       THE COURT:  Dineen and Philips got that total of

24  almost --

25       MR. WISSNER-GROSS:  18.7.

1        THE COURT:  -- 19 million bucks, even though they

2   stayed at the company?

3        MR. WISSNER-GROSS:  My understanding -- and I could be

4   corrected as to -- at least this was based on the proxy

5   materials, and we believe that they received $18.7 million in

6   merger consideration, yes.

7        THE COURT:  Even though they stayed.

8        MR. WISSNER-GROSS:  Mr. Higgins can correct me, but my

9   understanding is that, even though they stayed, this is what

10  they received.

11       THE COURT:  Okay.

12       MR. WISSNER-GROSS:  Second element is, well, for

13  motive and opportunity, did they have -- did the parties have

14  access to private information.  And I think that there is

15  absolutely no doubt that Mr. Smith and his inner circle -- and

16  by the way, when I say "inner circle," you're talking about the

17  entire senior management.  You're talking about the CEO, CFO,

18  General Counsel, and two heads of the major business

19  operations.  So aside from Mr. Salvin, who was a portfolio

20  manager, who was directed by Mr. Smith to cook these

21  projections, you're talking about the entire senior management

22  team involved.  We're not talking about isolated, lower-level

23  employees.

24       As a result, they had complete access to private

25  information.  And again, I'd note that the recent discovery

1   we've taken has underscored this even more greatly.

2          And the third element, as well:  Did they participate

3   in preparing the alleged misleading projections?  Mr. Smith, in

4   his deposition in 2007, during a shareholder litigation (sic),

5   actually bragged that he's the guy who drove -- drove the

6   refining increased projections --

7          THE COURT:  Who was that?

8          MR. WISSNER-GROSS:  -- took credit for it then when he

9   was looking to do the --

10         THE COURT:  Pause, please, Mr. Wissner-Gross.  Who was

11  that?

12         MR. WISSNER-GROSS:  Mr. Smith.

13         And again, I think that we've alleged in the

14  complaint, the amended complaint, based on the record we have,

15  what has, I think, been further underscored by further

16  discovery to be exactly what happened.  Each of these people

17  was involved actively in cooking the projections.

18         There is an alternative test, which Carco, even cited

19  by Mr. Higgins, recognizes.  You can look to recklessness and

20  conscious misconduct.  I think the same facts here more than

21  adequately satisfy that requirement.  Amended Complaint 144 to

22  162 and 183.  Lyondell management knew that it was presenting

23  phony projections.

24         Now if I could comment briefly on Mr. Higgins' comment

25  that, well, how could you find it plausible that all these

1    sophisticated financial institutions could have been duped.

2    Well, Your Honor, again, the amended complaint is drawn from

3    the record.  Here are the facts:

4            On July 14th, a Saturday, 2007, Mr. Smith and his

5    senior management presented to Access and to the lenders

6    involved at the time; Goldman, Merrill, and Citibank, these

7    phony projections.  That was done in the afternoon at Skadden

8    Arps, on Saturday, July 14th.  Mr. Blavatnik had already

9    indicated that he wanted to cut a deal by Monday, or reach a

10   merger agreement by Monday, July 16th.  So you, in essence, had

11   the FPDs -- who we have settled with -- who, as Your Honor may

12   recall from the prior record in the case, were looking to

13   basically make huge fees on financing this and exit, be able to

14   syndicate the deal, who basically did not have effectively any

15   time to do due diligence.

16           Now whether they made a mistake in not doing it or

17   not, that's really not the issue.  From everything I can --

18           THE COURT:  Are you saying this is kind of like the

19   mortgage crisis, where you can dump the economic risk on

20   somebody else?

21           MR. WISSNER-GROSS:  Absolutely.  And that's actually

22   what -- you know, I mean, I think that had we tried Phase 1, we

23   were looking at whether they were consciously attempting to

24   dump the economic risk on others.

25           But that is the record that -- if you look at the fact

1  of the circumstances -- and I'm still constrained because some

2  of the documents are subject to confidentiality.  But I think,

3  as we alleged in the original complaint -- and it's still here

4  in this existing amended complaint -- the attitude of the

5  original lenders was, we're going to be able to syndicate this,

6  make a profit on doing the deal and syndicating it, and we'll

7  hold a very small piece, a residual piece.

8          So I think it's interesting to talk about

9  plausibility.  But as the treatise says, that you really have

10 to look at the facts herein, what we've done is our -- we have

11 an amended complaint that's rooted in what actually happened.

12 And whether Mr. Higgins finds it not to be plausible or not, we

13 go far beyond plausibility because this is -- these are the

14 facts.

15         And on July 16th, the merger agreement is signed.  Now

16 Mr. Higgins says, well, why didn't they try to get out of the

17 deal.  Well, the complaint does allege that there was a gradual

18 unfolding of disclosure.

19         On September 11th, 2007, Mr. Smith finally 'fesses up

20 to Mr. Blavatnik, about a month later Mr. Smith knew this, that

21 Lyondell was way off its third quarter projections and wouldn't

22 come anywhere near its fourth quarter projections.  That

23 information gradually is leaked out or provided to the

24 financing-party defendants.

25         And there was -- you know, as to why it ultimately

1   played out as it did that the financing departments ultimately

2   -- financing-party defendants ultimately do the deal is not an

3   issue that you have to decide on a motion to dismiss.  I think

4   that at trial you'll see that the merger agreement had

5   extremely limited material adverse change provisions.

6   Effectively, they were locked into this deal.  And --

7            THE COURT:  "They" being who, the buyer's side?

8            MR. WISSNER-GROSS:  Yes, the buyer's side.

9            It was -- and a copy of that document has been

10   submitted by Mr. Higgins on -- as part of his motion to

11   dismiss.  But again, that's an issue, I think, for trial.  But

12   they were essentially locked into the deal.  Information

13   gradually was disclosed.

14            And I will say that what we've seen now in the last

15   few months of discovery, it's become very clear to me from

16   discovery I've taken, and that is that the FPDs were never told

17   that Mr. Salvin went through this process that was a tots-down

18   (sic), result-oriented, essentially fabricated effort to come

19   up with a set of projections that would conveniently meet the

20   expectations of the secured lenders and help to facilitate or

21   grease the deal; never disclosed to them.

22            But in any event, I think that if you look at the

23   plausibility standard, you have to measure it against our

24   amended complaint.  And it's based on the record.  And Mr.

25   Higgins may not like the facts, but that's what the record is

1    that was developed.

2            As to the generic issues of the badges of fraud, we've

3    addressed that in our brief.  But I would note that the courts

4    are all over the place.  Actrade, for example, says there are

5    eight common badges, including the financial condition the

6    parties sought to be charged, both before and after the

7    transaction in question.  We think that we would -- even if you

8    have to reach the eight, that the badges of fraud criteria, in

9    lieu of motive and opportunity, which is a -- I think the

10   proper proxy here, we satisfy that.  Old Carco says there are

11   six badges of fraud.  Some courts, such as Saba, have noted --

12   that we cite in our brief -- that even one badge of fraud may

13   be sufficient.

14           Your Honor, I know that Mr. Higgins does talk a little

15   bit more about Old Carco.  I would -- and it's addressed in his

16   reply papers, as are many of his other arguments on imputation.

17   I would just note, for example, in Old Carco, unlike our case,

18   that was a deal that was challenged many years after the

19   acquisition of Chrysler by Daimler; that it -- that there were

20   serious problems in that case as to the efforts by the

21   plaintiffs to analyze only a piece of the transaction; that it

22   didn't involve any of the kind of allegations we're dealing

23   with here, of a fairly elaborate, intricate scheme, we believe,

24   by the CEO, Chairman, and his inner circle.

25           And while that one was addressed -- that case was

Argument                          66

1  addressed on a motion to dismiss, it haws really none of our

2  facts, other than the fact that I think it's interesting; it

3  does observe that you should look to motive and opportunity as

4  an appropriate requisite standard, which we think is satisfied

5  here.

6         A couple of other just odds-and-ends, Your Honor.

7  There was a comment about the Huntsman deal; that Mr. Smith

8  perhaps didn't know about the Huntsman deal.  Well, what we've

9  alleged in the complaint, and I think discovery has shown in

10 the last couple of months and will be established at trial, is

11 that Mr. Smith, even before he heard about the announcement of

12 the Huntsman deal, was exploring the idea of Mr. Blavatnik

13 possibly acquiring both Huntsman and Lyondell; that from the

14 time of the 13(d) being filed, Mr. Smith's mandate was

15 essentially to be ready, be prepared.  He knew the price he

16 wanted, $48 per share.  And the efforts by Mr. Salvin and this

17 inner cadre was all directed to being ready if that offer was

18 made.

19        And ultimately, that offer was made.  And guess what?

20 When the offer was made, what set of projections were given to

21 Access?  Nothing other than these result-oriented, manipulated

22 projections, done very quickly by Mr. Salvin.

23        Your Honor, let me just see if there's any --

24        THE COURT:  Did Smith sell shares in addition to

25 getting golden parachute payments?

1            MR. WISSNER-GROSS:  I believe he has -- there were

2    shares -- and Mr. Higgins will correct me on this -- it was a

3    combination of change-of-control payments and shares, as well.

4    It's alleged in the complaint, and --

5            THE COURT:  The hundred twelve you're talking about is

6    --

7            MR. WISSNER-GROSS:  I think it's --

8            THE COURT:  -- the total that he got in any capacity?

9            MR. WISSNER-GROSS:  It's the combination of both

10   change of control, shares he held; there were phantom shares,

11   it -- we've alleged this in the complaint.  I don't have it in

12   front of me, Your Honor.  But it's broken out into several

13   categories.  But when you add it all up together, it's $112

14   million.

15           THE COURT:  Uh-huh.

16           MR. WISSNER-GROSS:  And obviously, you know, part of

17   the payments are keyed to the price.  So he had 112 million

18   reasons to end up with the result that he wanted.

19           Now they also argue that mister -- and there's a

20   schedule that is attached to Mr. Wade's declaration, which I

21   thought was interesting, where they comment that we had sort of

22   mischaracterized the complaint.  Again, this is on reply.  I

23   would have loved to submit a surreply, but we didn't think it

24   was really indicated.

25           But even if you look just by way of illustration, they

1   cite to the fact that we make a point in our brief that, even

2   before the merger agreement was reached on July 16th, Mr. Smith

3   understood that he would be leaving Lyondell if Blavatnik was

4   acquired -- if Blavatnik acquired Lyondell, and we were

5   criticized, saying, well, that's not referred to in the

6   complaint.

7           Yet, if you look at Paragraph 171 of the complaint --

8   I went back last night to take a look at this again -- you'll

9   see that what we actually alleged is quite clearly that, before

10  the merger agreement, Mr. Smith knew that he wouldn't be

11  offered a position of being CEO.  I know from his deposition he

12  said he really didn't have an intention of staying around.  And

13  he didn't formally announce that he was leaving until a few

14  months later.  And he certainly knew the ramifications, from a

15  change-of-control perspective, what we would get.

16          So I think if you look at our complaint -- and this is

17  in Paragraph 171 -- motive, opportunity, it's all present.  And

18  I think it's, frankly, a very classic kind of situation, in

19  terms of insiders knowing that, if they can do this deal, they

20  obviously have a desire to get the highest price.  On June 7th,

21  as we allege, 2007, Mr. Smith tells Volker Trautz, if you want

22  to buy us, it's $48 per share.  Nine days later, Mr. Salvin

23  submits his internal set of projections, and those are used as

24  the basis of projections that are given to the lenders, given

25  to Access, that are actually ultimately used in the

1   confidential information memorandum, and proceed unchanged.

2          Your Honor, I'm not sure that I have anything else to

3   add.  I don't know if you have any questions.  We obviously

4   have a different view on a lot of the cases.

5          Elrod, for example -- which was, by the way, decided,

6   I believe, on summary judgment, not on a motion to dismiss.  It

7   dealt with a -- aside from the fact that it, I think,

8   misapplied Adler to its facts, had a -- it was a very screwy

9   fact pattern, where I think if you review that case, you'll see

10  that it doesn't bear any resemblance to our situation.

11         In Adler, there were brothers who were -- while they

12  were directors of the debtor, also were acting for a different

13  company, and their own company Elway was allegedly taking funds

14  from the debtor entity in favor of their company through a

15  series of purported restructuring transactions.  The facts

16  there are remarkably different from our case.

17         But in any event, I think the most important take-away

18  is that the Adler three-part test that Mr. Higgins says somehow

19  should apply does not apply.  And if Your Honor concurs that

20  traditional agency principles apply, you go straight from Mr.

21  Smith and his inner circle right up to Lyondell.  They have

22  knowledge.  You have the requisite intent on the part of the

23  transferor.  You're talking about, in terms of hinder, delay,

24  or defraud current or future creditors, all of the elements of

25  548(a)(1)(A) are present.

1          And again, while we have completed discovery, we're

2     here on a motion to dismiss.  And I think we far, far exceed

3     whatever standard is required of us.  Thank you, Your Honor.

4          THE COURT:  Okay.  Mr. Higgins, I'll take brief reply.

5          MR. HIGGINS:  Thank you, Your Honor.

6          Your Honor, first, I just want to simply note that I'm

7     going to assume the Court is going to treat the majority of Mr.

8     Wissner-Gross' arguments as not part of the record because he's

9     acknowledged most of the statements he raised today are from --

10    not from the complaint, but from things that he's alleged have

11    occurred, or documents he's reviewed, or his interpretation of

12    documents that he has received.

13          I'm also a little --

14          THE COURT:  Well, I take it --

15          MR. HIGGINS:  -- upset because this issue --

16          THE COURT:  -- that's true, Mr. Higgins.  But if he

17    has a document that would back that up in an amended complaint,

18    that would at least be relevant to my determination as to

19    whether I get him to replead to put into a complaint something

20    that he's got an email to back up.

21          MR. HIGGINS:  Acknowledged.  And where I was going to

22    end up, Your Honor, I'm assuming that that portion of the --

23    all of that portion of the argument is going to his, at the end

24    of his opposition papers, request for a motion for leave to

25    amend.  It doesn't have to do with addressing the 12(b)(6)

1    motion on the dismissal.

2            Your Honor, certainly, most of those statements were

3    not in the record, is my point.  And more importantly, what the

4    Court needs to review is the amended complaint, not what may or

5    may not exist, based upon counsel's statements today.

6            And I would also note for the record that we would

7    vehemently disagree with almost everything he has said.  There

8    have been new documents produced.  They were produced in

9    response to my document request to Lyondell, not the

10   plaintiffs'.  They had already submitted document requests

11   months ago.  We're the ones that went out and asked for those

12   additional documents.  We believe they support our case and

13   support the proper development of the projections.

14           Your Honor, secondly, on the imputation argument, I'm

15   simply going to point out that Mr. Wissner-Gross fails to

16   address the question.  All of the cases he cites have to do

17   with the situation where the agent must have the requisite

18   legal authority to bind the company, and that's where you go

19   back into the cases that we've relied on.

20           James River, Your Honor, is a situation -- is a case

21   where the Court did not say, you automatically impute; it said

22   the intent of the officers and directors is not always deemed

23   to be imputed to the corporation.  Intent may not be imputed

24   simply -- or merely, excuse me, as a result of a person's title

25   or position.  Once again, referring to Adler.  The directors in

1    that case were all insiders of the debtor.

2            Your Honor, I'm simply going to conclude that there's

3    -- on the badges of fraud, that there's no allegations that the

4    badges of fraud should be applied to the board of directors,

5    once again failing the test.

6            And in conclusion, Your Honor, everything that Mr.

7    Wissner-Gross has basically said would go to the -- some sort

8    of intent to defraud the buyer, and certainly not to an intent

9    to defraud creditors.  Thank you, Your Honor.

10           THE COURT:  Okay.  Folks, we're going to --

11           MR. WISSNER-GROSS:  Your Honor, may I just have thirty

12   seconds?

13           THE COURT:  Yes.

14           MR. WISSNER-GROSS:  I would only add that we stand on

15   our amended complaint.  We think that everything that I said

16   that is in the amended complaint is rooted in the record, more

17   than satisfies the pleading standards.

18           Having said that, Your Honor, on the off chance that

19   Your Honor reaches a different view, which I hope you don't, I

20   wanted to at least set the stage, Your Honor, for indicating

21   that -- and it may be a theme throughout the day -- that there

22   is so much additional quantum of evidence that's been obtained

23   in the last few months, that we should certainly be allowed

24   leave to replead.  I hope we don't have to get to that juncture

25   here, but that would be my closing comment, Your Honor.

1          THE COURT:  All right.  We'll take ten minutes, and

2     then get on to Count 2.  We're in recess.

3       (Recess taken at 11:33 a.m.)

4       (Proceedings resume at 11:56 a.m.)

5       (Call to order of the Court.)

6          THE COURT:  Have seats, please.

7          Okay.  I gather we had some issues with the recording

8     equipment, but we're okay now.

9          Mr. Kirpalani.

10         MR. KIRPALANI:  Okay.  Thank you, Your Honor.  Susheel

11    Kirpalani for Nell Limited and Len Blavatnik, with respect to

12    our motion to dismiss Count 2 of the amended complaint.

13         As Your Honor has already heard in the context of

14    Count 4, the trustee has alleged actual fraud on the part of

15    Lyondell and its senior management team in connection with

16    efforts to market itself and be acquired.  We don't think those

17    allegations meet the test of actual fraudulent intent, to

18    hinder, delay, or defraud creditors.  But for purposes of this

19    motion, let's assume that they do.

20         If one makes that assumption, the trustee's claims to

21    avoid distributions made to or for the benefit of Nell Limited

22    and allegedly Len Blavatnik personally, the so-called "toehold

23    payments," they still fail, Your Honor, because the transfers

24    were made, as the amended complaint alleges, but two Basell

25    entities:  Basell Funding S.A.R.L. and LyondellBasell Finance

1   Company, which was a subsidiary of Basell Funding S.A.R.L.,

2   created to acquire Lyondell.  That company still exists today.

3   The trustee has not and cannot allege actual intent on the part

4   of these Basell-controlled entities.

5         Let's look at what the trustee does allege.  For the

6   most part, today's dispute or this motion will not concern the

7   nature of the allegations or whether he alleged this or that,

8   because there's really no dispute about what he has alleged.

9   It's Lyondell senior management defrauding Mr. Blavatnik.

10  That's essentially what is the allegations of the complaint.

11        Recall, Your Honor, if you will, the merger

12  transaction at issue.  And I sat through much of the Chapter 11

13  proceedings with Your Honor, or watching on, and I'm not sure

14  anyone ever put on a piece of paper just explaining in simple

15  terms, what was this transaction.  So what I did, Your Honor,

16  is I put together some simplified organizational charts of what

17  Basell A.F.S.C.A looked like prior to the merger, and what

18  Basell A.F.S.C.A, which was renamed "LyondellBasell AF S.C.A."

19  on December 20th, looked like right after.  And if I could hand

20  this up, and I'll hand some to --

21        THE COURT:  Yes.

22        MR. KIRPALANI:  -- opposing counsel.

23     (Pause in proceedings.)

24     (Counsel confer.)

25        MR. KIRPALANI:  So if I can just take a second, Your

1    Honor, and walk you through what's on these charts.

2            This transaction, even as described in the complaint,

3    and I think as all of the briefing and -- you know, at some

4    point, Your Honor will see expert reports.  Everything is

5    pretty consistent in how it's described.  There's really no

6    issues of fact relating to that.  It was an acquisition of

7    Lyondell by Basell; Basell, a European petrochemicals company

8    with market capitalization worth billions in its own right.

9            The undeniable story told by the complaint is that of

10   Lyondell defrauding Basell.

11           If we take a look at the chart, if Your Honor would

12   please look at the pre-merger Basell, December 19th, 2007, is

13   the day before the merger; picked that day just as the easiest

14   one, although it includes some entities that were created just

15   for this transaction.  You have at the top Access Industries

16   Holdings, LLC, Delaware, and AI International S.A.R.L., Lux;

17   these Luxembourg flag colors indicate which entities are the

18   Luxembourg entities, and that might be relevant to the other

19   arguments later today.

20           Below that is Nell Limited.  Nell Limited essentially

21   was the holding company of Basell.

22           Below Nell Limited, you have BI S.A.R.L.  BI S.A.R.L.

23   owned the majority of the economics, if not almost all of the

24   economics of Basell AF S.C.A.  But pursuant to S.A.R.L. law, it

25   was governed by a GP, as opposed to a supervisory board.

1          Below AF S.C.A., Basell Funding S.A.R.L.  That was the

2   company that was created long ago when Nell acquired Basell.

3          And then below Basell Funding S.A.R.L., you've got

4   these blue entities:  Basell Holdings B.V., that's the Dutch

5   entity that Your Honor may have heard about during the

6   bankruptcy case that was purposely kept out of the bankruptcy.

7          Below that, the Basell non-U.S. operating subsidiaries

8   and businesses.  And I just -- I highlight on the right there

9   Basell Germany Holdings, only because for the next page it's

10  relevant.  That's the only Basell-side entity of substance that

11  filed for bankruptcy, so I wanted to break it out.

12         And on the left there, I indicated these blue -- other

13  blue entities, or blue-outlined entities.  These are Basell

14  Funding S.a.r.L-owned companies that were created for purposes

15  of setting up the acquisition of this hopefully complementary,

16  synergistic, industrially logical business, Lyondell.  And so

17  those are there.

18         And then if Your Honor could look at the next page,

19  just look at what happened or how it -- how the transaction

20  went through, post-merger LyondellBasell, that's as of December

21  20th, all the way through the petition date.

22         On the top, everything is still pretty much the same.

23  You see some of the shapes here changed to triangles.  The

24  triangles indicate which companies actually filed for Chapter

25  11.  So you've got -- you know, instead of being called Basell

1   AF S.C.A., now it's LyondellBasell Industries AF S.C.A. Instead

2   of being Basell A.F.G.P, it's now called LyondellBasell

3   A.F.G.P.  But still you see the Basell side of the business on

4   the right; the Lyondell side of the business now on the left.

5   Those entities that were acquired ultimately filed for

6   bankruptcy.  On the bottom-left, Lyondell Chemical Company is

7   the one that's obviously the main entity in the caption, and

8   below that the Lyondell operating businesses.  And that's a

9   triangle and a circle because there are some businesses that

10  didn't file, but the majority of those did file.

11          THE COURT:  Pause, please, Mr. Kirpalani.

12          MR. KIRPALANI:  Uh-huh.

13          THE COURT:  Going back to your first chart.

14          MR. KIRPALANI:  Yeah.

15          THE COURT:  The two -- what I guess I had read

16  phonetically when I was doing my prep, is S.A.R.L.

17          MR. KIRPALANI:  Uh-huh.

18          THE COURT:  And I take it from what you say, it's

19  customary to call them "sarls" or something?

20          MR. KIRPALANI:  I don't know, Your Honor.  I call them

21  "sarls."

22          THE COURT:  You call them "sarls."

23      (Laughter.)

24          THE COURT:  To what extent do either of them have

25  assets, other than the stock of whatever is below, the stock or

1    whatever interest?

2              MR. KIRPALANI:  To the best of my knowledge, they are

3    holding companies.  I don't think they have hard assets.

4              THE COURT:  Okay.

5              MR. KIRPALANI:  Okay.

6              THE COURT:  And that's true both pre- and post-merger?

7              MR. KIRPALANI:  Yes, Your Honor.  And you know, I

8    think that's probably true all the way down to Basell Holdings

9    B.V., is the assets of Basell Holdings B.V. are essentially

10   joint venture interests.  Your Honor probably remembers hearing

11   about the danger of putting the Dutch company into bankruptcy

12   because it's got these valuable joint venture interests below

13   that might be terminated, and so there was all sorts of

14   injunctions and things sought against various creditors in

15   Europe.

16             THE COURT:  Okay.

17             MR. KIRPALANI:  That's that entity.

18             Okay.  So the complaint, Your Honor, getting back to

19   the amended complaint, includes allegations of what?  Arm's

20   length negotiations between Dan Smith and Mr. Blavatnik,

21   between Lyondell and Basell; the submission and rejection of

22   several bids; and Basell walking away from the deal to pursue

23   other options, before finally coming back to the table and

24   reaching an agreement to acquire Lyondell.

25             The complaint does not allege that Lyondell and Basell

79

 1   conspired or colluded to defraud creditors; it's quite the

 2   opposite.  The complaint is also clear that the toehold

 3   payments were, as alleged, made by Basell-side entities.  The

 4   two that I mentioned are reflected on the charts:  It's Basell

 5   Funding S.A.R.L., that Luxembourg entity; and LyondellBasell

 6   Finance Company, one of the entities that was used to acquire

 7   the Lyondell business, that was still a Basell entity.

 8         And in Paragraph 270 of the complaint, the trustee

 9   clearly alleges that the transfers were made by these entities.

10   That's what he said, that's what the trustee said.

11         THE COURT:  "These entities" being which entities?

12         MR. KIRPALANI:  Basell Funding S.A.R.L. and

13   LyondellBasell Finance Co.  Okay?

14         So I'm not trying to ask to read facts into the record

15   that aren't in the complaint.  The complaint accurately and

16   properly doesn't just say, the debtors made these transfers.

17   You know, we've seen complaints like that, I'm sure Your Honor

18   has seen those for years.  The trustee said exactly what did

19   happen.  These entities, Basell Funding and LyondellBasell

20   Finance, two entities, separate and above where Lyondell

21   Chemical Company was to come into the organizational picture,

22   made the transfers.

23         The trustee alleges Toehold Payment 1 to consist of

24   Basell Funding purchasing from Nell Limited all of Nell's

25   interest in a company called AI Chemical.  AI Chemical's asset

1  was what?  It was a whole bunch of shares of Lyondell Chemical

2  Company that it bought for $523 million.  So Basell Funding,

3  pursuant to the --

4          THE COURT:  Those were the toehold shares?

5          MR. KIRPALANI:  That was the first piece of the

6  toehold.  There's two toeholds, or two toehold transfers.

7          So we know that in July, Basell agreed -- July 2007,

8  Basell agreed, I'm going to acquire all of the outstanding

9  shares of Lyondell for $48 a share.  And then we know they

10  consummated that in December of 2007, in different ways, some

11  for the public shareholders; some for the Access-owned shares.

12  And for these shares, they said, we're going to accomplish this

13  by buying from Nell, which was the owner of Basell, Nell's

14  Lyondell Chemical stock, which was held through an entity

15  called AI Chemical.  So that's why that transactions was

16  structured that way.  That was for $523 million.  That's

17  Toehold Payment 1 that they seek to avoid.

18          The trustee alleges that Toehold Payment 2 was

19  LyondellBasell Finance, that entity that I pointed to that was

20  created for purposes of making the acquisition, transferring

21  $674 million to Merrill Lynch to settle a swap that they allege

22  was for the benefit of AI Chemical or Nell or Mr. Blavatnik.

23  Essentially, Merrill Lynch had financed one of the toehold

24  positions, and this was a settlement of that swap transaction.

25          The facts as pleaded, though, Your Honor, for purposes

1   of this motion -- I know there's a lot in what I'm telling you.

2   But for purposes of what we need to focus on for this, the

3   facts tell you who the transferors are.

4           The premise of the motion is that the trustee does not

5   allege, as he must, the requisite intent to hinder, delay, or

6   defraud unsecured creditors on the part of the transferring

7   entities; again, Basell Funding S.A.R.L. -- or "sarl" -- and

8   it's subsidiary, LyondellBasell Finance.

9           The underlying legal premise for our motion that the

10  trustee must attribute actual intent to the transferring debtor

11  is not really in dispute.  The trustee must match the actual

12  intent of a certain debtor with a transfer of an interest in

13  that debtor's property.  I say it's "not in dispute," Your

14  Honor because the trustee's opposition brief doesn't challenge

15  this.

16          Rather, what they attempt to do to cure the problem of

17  their complaint is they assert various legal doctrines -- and

18  Your Honor alluded to some of them in the opening remarks --

19  about co-borrower liability.  And effectively, it concedes that

20  if that doctrine does not give -- a co-borrower is not held to

21  have an interest in property just because another entity that's

22  also liable in debt transfers cash, then they've conceded the

23  point that they didn't allege actual intent of the Basell-side

24  entities, and the claims must fail.

25          So the trustee has stuck by his pleading and doesn't

1    contest that it was Basell Funding and LyondellBasell Finance

2    that made the transfers as a factual matter.  But he asks the

3    Court in some newfangled method of collapsing -- which we will

4    get into quite a bit -- to disregard the role of the entities,

5    as if this were some sort of a sham transaction or a true or a

6    classic leveraged buyout by a shell co. merging into the

7    target, nothing else really happening.  That's not what this

8    transaction was.  This transaction was an acquisition by an

9    operating company of a complementary business.

10          And he asserts as a legal matter that the Court should

11   find Lyondell Chemical Company made the transfers,

12   notwithstanding the allegations of his complaint.  Effectively,

13   what he's asking, Your Honor, is to substantively consolidate

14   both Lyondell Chemical Company with LyondellBasell Finance

15   Company and Basell Funding S.A.R.L. -- or "sarl" -- as of

16   December 20th, 2007.

17          So, Your Honor, this is not even a case where people

18   are arguing for substantive consolidation.  Your Honor knows

19   well that substantive consolidation is usually a remedy in the

20   bankruptcy to ensure the fair treatment of creditors.  But it's

21   very rare that you find any court, even courts that have

22   substantively consolidated -- and of course, the Chapter 11

23   case is over; the plan treated the entities as separate.  But

24   just for purposes of taking this exercise through, even when

25   you do substantively consolidate, you don't substantively

1    consolidate retroactively to a pre-petition, non-bankruptcy

2    period a year before.  That's never would be done.  That would

3    be called "alter ego" or "sham."  But that's effectively what

4    they're saying.

5            And so that, if he can get that, then he can premise

6    his fraudulent intent claims and foist the fraudulent intent of

7    Lyondell on the Basell acquirers.  So a target is telling an

8    acquirer, you should pay X for me, because I am worth X.  The

9    allegations of the complaint is the acquirer gets fooled by

10   this and goes ahead and does it.

11           And now the allegation or the argument they're making

12   is that the intent of this target should be imputed to the

13   buyer.  Okay?  And it's two flawed theories that he's coming up

14   with, Your Honor; the trustee, that is.

15           One, it's his radically expansive view of what is a

16   debtor's interest in property, based solely, solely, on co-

17   liability.  That's it.  If I am a co-liable party on bank debt,

18   along with ninety-four other debtors, every transfer of funds

19   from any entity is a transfer of interest and property of mine.

20           THE COURT:  It's not just co-liability, Mr. Kirpalani;

21   it's hocking your assets to secure the co-liability under

22   circumstances which you and Mr. Wissner-Gross are going to

23   argue that hocking the assets was or was not as good as forking

24   them over.

25           MR. KIRPALANI:  I understand, Your Honor, and I'll be

1    happy -- we'll address that point.

2            THE COURT:  All right.

3            MR. KIRPALANI:  The second is what I would call a

4    "loose interpretation" or a "loose reference" to the collapsing

5    doctrine.  And I think that's similar to what Your Honor is

6    talking about, in terms of hocking the assets.  If you are

7    hocking or pledging your assets in exchange for cash, and that

8    cash comes in to you and goes right out, courts have held you

9    can collapse the two legs of that transaction.  Here's the

10   debtor, I pledged all my assets here, I got the cash, but I

11   didn't get to enjoy it, the cash went out there to the

12   shareholders.

13           So in order to not make this artificial, courts have

14   said, you can't say banks, who extended the loans and the cash

15   to the debtor -- a pretty sympathetic view, as courts have held

16   -- I extended cash to the debtor.  Of course, it's reasonably

17   equivalent value, given in exchange for the loan or the

18   obligation that I incurred, the debtor incurred to repay it.

19   And the hocking, the hocking is the transfer, and the

20   obligation being incurred is also part of 548.  It's not -- it

21   would be artificial, courts have held, to not look at a single

22   integrated transaction and say, there's two pieces here, and

23   banks, you knew both sides of this, you knew where the money

24   was going, you knew the debtor wasn't going to enjoy the money

25   after it was done.

1        That's very different, Your Honor, of talking about

2   two distinct corporate entities, and I'll explain why.  It will

3   make sense, Your Honor.  I'll explain why.

4        First, the trustee is arguing that Lyondell had a

5   property interest in the transferred funds, and that's why

6   Lyondell's intent is relevant.  In his briefing, he says it's

7   because it -- because Lyondell was a guarantor or co-borrower,

8   or a co-hocker even, Your Honor, with respect to the merger

9   financing.  But the statute and the case law all reject that

10  argument.  We're crossing corporate lines here.  We're not

11  collapsing two legs of a transaction.  A debtor, did it get

12  value or did not get value when it didn't get to keep and enjoy

13  the cash, that I understand; that's collapsing.  They're

14  saying, because I was co-liable, co-obligated, co-hocked, the

15  cash that Basell transferred, which may or may not have been

16  fraudulent to Basell's creditors, I get it, it's actually

17  fraudulent to me, Lyondell Chemical Company.

18        The Bankruptcy Code, Your Honor, provides relief for

19  obligations that are incurred fraudulently, as well as

20  transfers.  And what the trustee originally alleged in -- or

21  his predecessor alleged, which they have settled, which is

22  fine, is that Lyondell Chemical Company was saddled with X

23  billion dollars of debt, and that it's artificial to even

24  pretend that it got a lot of cash for that debt, and got to

25  enjoy that cash, because they collapsed the transaction.

1     So what's the remedy for that alleged fraudulent

2  transfer?  The remedy is to avoid the obligation owed to the

3  banks and to undue the transfer or the hocking, Your Honor.

4  That's the remedy.  That's one fraudulent transfer claim.

5     If we do that -- if the banks had still been party to

6  this lawsuit, Your Honor, and the trustee brought this claim,

7  he would be alleging that the loans that I became -- Lyondell

8  became liable to repay, and the hocking that I gave did not

9  constitute reasonably equivalent value for what I got; I,

10  Lyondell, go.  So therefore, I, Lyondell, should not have to

11  repay that dept, and I should get title to my assets back.

12  Makes perfect sense.

13     But to then further conclude that, not only do I not

14  have to repay the debt, not only do I not have to keep the

15  hocking out there, I also get the cash back for the benefit of

16  unsecured creditors who never would have had that cash if not

17  for the hocking and the obligation, it's a double-recovery,

18  Your Honor.  It's a double-recovery.

19     And that is the answer to your question from this

20  morning, which I didn't expect to get into.  It goes into a

21  broader issue of whether or not -- you said, is collapsing dead

22  or alive.  It's absolutely alive.  And I've made a living so

23  far representing unsecured creditors' committees.  It's

24  absolutely alive.

25     The issue, though, for this case, for this case, is:

1   Can collapsing be applied to more than just considering one leg

2   of a transaction to a debtor with the use of that cash by that

3   debtor, and saying, no, I'm actually going to collapse two

4   entities together?  Because Lyondell hocked, so did Basell.

5   But whatever Basell paid, Lyondell gets to get.  That's the

6   trustee's argument.  It doesn't make any sense.  There's no

7   case in the land that would support that.

8          The Healthco Court, Your Honor, noted, in rejecting a

9   similar attempt to conflate the property of different debtor

10  entity's estates, that, quote:

11          "There is a separate cause of action with respect to

12          the bank obligation that's incurred, but that cause of

13          action has been settled with the consortium of banks

14          providing financing."

15          Very similar here, Your Honor.

16          Nowhere in the Bankruptcy Code is there support for

17  the trustee's position that collapsing allows you to consider

18  property of the estate or a transfer of interest in property as

19  meaning the exact same thing as incurring an obligation or

20  incurring a lien.  Lien, under Section 101, is also a transfer.

21  The hocking is covered there, Your Honor.  It doesn't mean that

22  cash went from a co-liable party is somehow this debtor's cash.

23  That's the distinction.

24          THE COURT:  Wait.  When you said "this debtor's cash,"

25  meaning --

1          MR. KIRPALANI:  Lyondell Chemical's.

2          THE COURT:  Lyondell Chemical.

3          MR. KIRPALANI:  Right, right.

4          So it can't be that Basell's borrowed, co-liable,

5  under bank debt, Basell borrowed funds, Lyondell borrowed

6  funds.  Basell paid certain parties.  Okay?  But Basell itself

7  did not have any actual intent to defraud anyone.  It was the

8  duped party, if you will.

9          Lyondell, which allegedly was the actually -- the

10  party doing the actual defrauding -- for purposes of this

11  motion, obviously; I don't believe that -- but doing the actual

12  defrauding, that entity, it can't recover the cash that Basell

13  paid.  But then Your Honor would say to me, yeah, but it didn't

14  get any value for the hocking.  Agreed.  So its remedy is avoid

15  the obligation to the banks, avoid the hocking.  No harm; no

16  foul.  Lyondell unsecured creditors are exactly in the place

17  they would have been, absent this horrible transaction.

18          They can't say, I'm not going to repay the banks, I'm

19  going to rescind my transfers, my liens, the hocking, and I'm

20  going to get the cash that another debtor had given.  What

21  about that debtor's creditors, Your Honor?  In the right

22  analysis, what about that debtor, what about Basell's

23  creditors?  And I'm not suggesting that, you know, there is a

24  valid theory for Basell's constructive fraudulent conveyance,

25  but you know, it's alleged, it's part of this complaint,

1   constructive fraudulent conveyance.  We'll deal with that,

2   we'll deal with that at the right time.

3        The issue for this count is simple.  You're alleging

4   this Lyondell Chemical Company defrauded that Basell company,

5   and you want to collect money that Basell paid on the basis

6   that it's Lyondell's property interest because it was co-

7   liable.  Co-liability only matters for purposes of avoiding the

8   obligation because it didn't get any benefit, and avoiding the

9   hocking because it didn't get any benefit.  It doesn't mean you

10  can recover cash that was never in your estate.

11       It's very analogous, Your Honor, to earmarking.  The

12  money was never there to begin with.  It would be a windfall to

13  Lyondell creditors.  They're better off with this transaction

14  having occurred because it got to siphon money away from a

15  Basell side, potentially.  It never had to repay that debt.

16       The case law, Your Honor, discusses whether the funds

17  would comprise property of transferring the debtor's estates if

18  the transfers did not occur.  That's the test set forth by the

19  Supreme Court in <u>Begier v. The IRS</u>.  That's the property of the

20  estate issue that we have here.

21       The trustee's allegations are inconsistent with the

22  notion that, had the transfers not been made, they would have

23  constituted property of Lyondell, available for distribution to

24  Lyondell's creditors.  The case law talks about dominion and

25  control, as giving rise to the interest in property.

1    The trustee doesn't allege that Lyondell had dominion

2   and control over these funds; and had the money not gone out to

3   Nell, it would have been sitting there for Lyondell's

4   bondholders or other lenders or other vendors, et cetera.  That

5   money was never there to begin with.  How could it be there for

6   purposes of a recovery action.

7        THE COURT:  Pause, please, Mr. Kirpalani.

8        MR. KIRPALANI:  Uh-huh.

9        THE COURT:  I take your point, at least until Mr.

10   Wissner-Gross corrects me --

11        MR. KIRPALANI:  Okay.

12        THE COURT:  -- that you're saying the money would have

13   never gone into Lyondell Chemical's "coffers," if I can use

14   that expression, to be available for the general unsecured

15   community.  But if Lyondell Chemical had not hocked, cleaned up

16   its assets to guarantee the bank debt, those assets would have

17   been free for the sharing by the unsecured creditor community,

18   wouldn't they?

19        MR. KIRPALANI:  Absolutely.

20        THE COURT:  Why is that irrelevant if, as I understand

21   you, you're contending that it is.

22        MR. KIRPALANI:  It's a different transfer.  It's

23   relevant to whether or not Lyondell should be on the hook for

24   the obligations and the hocking it did on December 20th, 2007.

25   That cause of action is against the banks.  And ultimately, it

1   turned out to not be on the hook, at least not for the whole

2   amount, because that's how it was settled.  They did come up

3   with a compromise, I'm not criticizing that.  Okay?

4          But the remedy for Lyondell Chemical Company is for a

5   fraudulent transfer -- Your Honor posited, if it was hurt by

6   the hocking, wouldn't the unhocking have benefitted unsecured

7   creditors.  Agreed.  We're not talking about the hocking at

8   this point, though, Your Honor.  We're talking about a cash

9   transfer, not a hocking.  The cash transfer was done by Basell

10  Funding S.A.R.L.  How could Lyondell ever get that cash?

11         But what Your Honor is asking me is a question that

12  would apply, even in the absence of dealing with two separate

13  companies.  Let's assume for a minute, you just had one debtor

14  borrow a lot of money and pay it to its shareholders, a

15  dividend recap of some kind.  Okay.  Let's say Lyondell

16  Chemical Company one day hypothetically did this.  I'm going to

17  hock all my assets, I'm going to take all the cash, and I'm

18  going to funnel it out to creditors.  Under the --

19         THE COURT:  When you said "creditors," you meant

20  shareholders.

21         MR. KIRPALANI:  I apologize.  To shareholders.

22         Under the trustee's theory, okay, and under a broad

23  view of collapsing -- a broad, but I would argue possibly

24  defensible view of collapsing, at least under the existing case

25  law -- this would be the crazy result, if you allowed both the

1   transfer of -- the avoidance of the obligation, the transfer of

2   the liens, and the recovery of the cash.

3          Lyondell Chemical Company, by itself, before this

4   transaction, had its unhocked assets available to satisfy

5   unsecured creditors.  It borrowed, say, a billion dollars, and

6   it hocked its assets for that; didn't get to use the money for

7   anything useful; instead, it just dividended it to its

8   shareholder.  Then it files for bankruptcy.

9          Creditors of Lyondell were hurt by this, right?  The

10  banks get sued.  The banks argue, I gave reasonably equivalent

11  value for the obligation and the hocking because I gave the

12  billion dollars of cash.  How could that not be reasonably

13  equivalent value?  Courts correctly have held, come on, we're

14  going to collapse this, you can't fool me into thinking just

15  look at Leg 1, just look at your piece, we're going to look at

16  what happened to the cash.  And you knew what was happening to

17  the cash, you underwrote this dividend recap, right?

18         So we know, net-net, we collapse.  Debtor Lyondell

19  Chemical, unsecured creditors of Lyondell Chemical, you are not

20  obligated to repay this loan to the banks.  And that hocking

21  that you did that injured you is now avoided.  That's Result 1,

22  that's Result 1.

23         Result 2 is, can the Trustee of Lyondell Chemical

24  Company also go and try and collect the cash back that the

25  banks gave, that didn't belong to Lyondell Chemical before the

1    transaction, for the benefit of Lyondell's creditors -- other

2    unsecured creditors?  We don't have to address that issue, is

3    all I'm saying, Your Honor.  That would be the broadest

4    collapsing that's permitted under the case law, at least to

5    some kind -- some inequitable results.

6           But we don't have to get there because what we're

7    talking about here is a universe away.  We're talking about a

8    separate company, Basell, that did pay for Lyondell, and

9    whether Lyondell can collect that cash for itself.  That's on

10   the constructive fraud part.  But we're going even further away

11   to say, can the intent of Lyondell on this basis actually be

12   imputed now to Basell, which is the real transferor.

13          THE COURT:  Before you get to that point, Mr.

14   Kirpalani -- and forgive me -- is the corollary of what you're

15   saying, in the hypothetical that you posited, which I think is

16   useful for purposes of analysis, that when the bank lends the

17   billion dollars to the debtor, which is used for a stupid

18   dividend, which goes out to the shareholders, the bank, which

19   is giving real value, albeit it an idiotic transaction, for

20   which it's been given the lien, can have its liens avoided, and

21   at least arguably the defenses to payback, but that the

22   shareholders that got fat on this transaction wouldn't have a

23   duty to pay the money back?

24          MR. KIRPALANI:  Well, all I'm saying, Your Honor, is

25   you can't have it both ways.  You can't have it both ways.

1     You know, and I did say, Your Honor, that under

2  existing collapsing cases, and under existing case law,

3  plaintiffs would be entitled to pursue both of those things.

4  They're going to run into problems when it comes time for the

5  effective remedy, Your Honor, I do submit, because you're going

6  to have banks out there saying, wait a minute, I don't a right

7  to get paid back, but the cash comes back into the debtor, this

8  is horrible, I didn't give a gift to the debtor.

9     And so there would probably be some difficult remedial

10  issues.  Quite possibly, a court would fashion an appropriate

11  remedy saying, you know what, we'll avoid the liens, but you'll

12  be an unsecured creditor like everybody else.  You know, that

13  might be a good way or an equitable way to avoid that, we'll

14  avoid the liens, a billion comes back, you're pari passu with

15  everybody else, or maybe you're subordinated one level;

16  something like that could be fashioned.

17     But what I'm trying to explain, Your Honor, is you

18  asked me, is collapsing alive or dead.  I'm trying to tell you

19  that even if you rule in our favor today on this motion, that

20  paradigm case, which is what the Second Circuit called in HBE

21  Leasing, is the paradigm.  We'll still be intact.

22     We're not asking Your Honor to eviscerate twenty years

23  of collapsing case law.  What we're saying is you can't do what

24  the trustee is saying here, which is read my complaint, I came

25  up with an actual fraud theory, Lyondell defrauded Basell, and

1   then say that cash under his own complaint that indisputably

2   came from Basell should go back to Lyondell Chemical, or it's

3   avoidable as to Lyondell Chemical's creditors.  That doesn't

4   work.  You're collapsing two entities.  The remedy for Lyondell

5   Chemical Company is, go get whatever cash you paid out and

6   avoid the obligations that you incurred because you didn't get

7   any benefit for it.

8        But we're on a different prong, that's even -- that's

9   actually a constructive fraudulent transfer analysis, but it's

10  relevant because Your Honor asked about collapsing.  Collapsing

11  generally comes up in the reasonably equivalent value context

12  for this reason, which is the constructive fraudulent transfer

13  concept.  But it's relevant here because what they -- the

14  reason we didn't put it in our opening motion is because

15  collapsing doesn't apply to this fact pattern.  But we're happy

16  to explain why it doesn't apply, and we tried to do that in the

17  reply briefs.

18        They're saying, for an actual fraudulent intent count

19  against Nell, that Lyondell Chemical should be deemed to have

20  the property interest that was transferred.  We're not talking

21  -- they're trying to confuse the Court, Your Honor.  We're not

22  talking about the transfer of the hocking.  What we're talking

23  about is a different transfer; it's the cash.

24        The transfer, the hocking, and the obligations that

25  were incurred, those have been resolved.  You know?  And if the

1  banks were still here, they'd be having to answer for that.

2  You know?  But that's not -- that's not the point of why

3  collapsing doesn't apply to our particular fact pattern.

4        Let's see, Your Honor.  I just came out of order a

5  little bit, but, but I think -- I've covered, I think -- unless Your

6  Honor wants me to go through the cases more on co-liability, it

7  -- there is no case that says simply being co-liable makes it a

8  transfer of your property.

9        The Healthco case rejects arguments like this, saying

10  this is like an indirect transfer.  Since I was obligated under

11  the loan, it's an indirect transfer if payments are made by a

12  co-liable party to someone else.  Again, we're not talking

13  about the hocking.  That transfer clearly was Lyondell

14  Chemical's, and they sued for it, and they settled it.  Fine.

15  We're talking about a different transfer.

16        And the HBE Leasing case, Your Honor, the Second

17  Circuit case, it goes through -- and we quoted it in our brief,

18  and I don't think you need me to read it to you, but I could --

19  it goes through exactly what the paradigm case for collapsing

20  is in this circuit, and it's very similar to the dividend recap

21  type of paradigm that I came up with just standing here.  It's

22  collapsing the otherwise seemingly reasonably equivalent value

23  that a bank gives with the wasted -- wastage of those funds

24  when the debtor gets them in their hands.  But here we have a

25  completely different subject that's never been the subject of a

1    collapsing case, two separate entities.

2           And even the Wieboldt case, which is probably the only

3    case -- I think it's a 1988 Illinois case -- that the trustee

4    could come up with that says, oh, no, you can collapse two

5    different entities.  The entities that are collapsed there,

6    it's a shell co. that was -- that was created specifically for

7    a true, classic leveraged buyout, we don't have that.

8           We've got a Basell entity and an entity that's a

9    subsidiary of that Basell entity, that were created for the

10   acquisition and --

11          THE COURT:  Pause, please.

12          MR. KIRPALANI:  Yeah.

13          THE COURT:  Was LyondellBasell Finance Company a

14   Delaware Corporation, a shell co.?

15          MR. KIRPALANI:  It was an acquisition vehicle, but it

16   was wholly owned by an entity that was very valuable.  So this

17   is not a situation where you have --

18          THE COURT:  That being Lyondell Funding S.A.R.L.?

19          MR. KIRPALANI:  Yes.

20          THE COURT:  It being value because its European subs

21   on that dark-blue part of your chart had value as operating

22   entities?

23          MR. KIRPALANI:  Yeah.  The valuations, Your Honor will

24   hear about it at trial, is over $5 billion of equity value.

25          THE COURT:  Uh-huh.  Continue, please.

1          MR. KIRPALANI:  So all I'm saying is that Wieboldt --

2    the reason -- Wieboldt is the only case.  But the only reason

3    I'm saying that that case is -- even if Your Honor thought it

4    made sense, which we don't -- we think that the Healthco case

5    explains why it doesn't make sense, we think the TOUSA case

6    explains also why it doesn't make sense.  And we think it's

7    inconsistent with the Supreme Court's case in Begier.

8          But if Your Honor said, no, I do think it makes sense,

9    it's easily distinguishable.  We didn't have a shell co.

10   acquisition vehicle that disappeared and became the debtor upon

11   the acquisition that wasn't backed by anything.  This was not a

12   leveraged buyout.  This transaction was a public acquisition of

13   one operating company of another.  That's what the transaction

14   was.  That's even how the complaint describes it.  And it

15   matters for this purpose, because it matters where the money

16   came from, Your Honor.

17         And you know, with respect to --

18         THE COURT:  Well, does it -- if you're trying to

19   decide whether it should be characterized as an LBO or not --

20   and I take your point that it may not matter.  But doesn't any

21   transaction in which a company's assets are liened up and debt

22   is incurred to, in substance, pay for itself have the economic

23   trappings of an LBO?

24         MR. KIRPALANI:  Not really, Your Honor, because it

25   wasn't that Lyondell hocked up its assets in order to pay for

1   itself.  In connection with this transaction, the industrial

2   logic and synergies that were sought to be achieved was going

3   to create a bigger, stronger company.

4          So this wasn't -- the reason why those LBO cases came

5   out the way they did, and there was a lot -- I'm sure Your

6   Honor remembers -- article debates on whether fraudulent

7   transfer law should even apply to LBOs, all that has been

8   settled.  But the reason why there was even a debate is -- or

9   that the issue came up is LBOs don't do anything for the

10  company.  They don't do anything.  As a matter of law -- forget

11  about whether it's reasonably equivalent, what it does, what

12  value Lyondell would get.  As a matter of law, it does nothing

13  other than change who the shareholders' names are.  That's an

14  LBO.  That's not what we have.

15         We have a petrochemicals company saying it would make

16  sense to combine with an oil refining company, and the oil

17  refining company saying, yeah, we think it would make sense,

18  too.  It's different, it's a different rubric.  Lyondell didn't

19  hock up its assets to pay for itself.  Lyondell hocked up its

20  assets, but so did Basell hock up its assets, in order to

21  create a combination of a hopefully better, bigger company.

22  And it's different.  It's a different analysis, Your Honor, I

23  think.

24         THE COURT:  Go on, please.

25         MR. KIRPALANI:  So again, I've already mentioned how

1   the case law that has been approved at least in this circuit

2   deals with collapsing transactions, not collapsing corporate

3   entities.

4           State law, I'll just mention again.  It's in our

5   briefs.  But state law dictates what an interest in property

6   is, what a property interest is; Your Honor knows that, you

7   know, better than I do.  But there's nothing in the allegations

8   of the complaint to suggest that state law should be ignored

9   here.

10          With respect to the other -- I'm going on a bit long,

11  so if I can just address -- they do have a couple of

12  allegations, or at least they say they do, in their opposing

13  briefs that, you know, put aside the whole story of the

14  complaint for a second, put aside that Lyondell duped Basell.

15  There's a theory, and you can find it in our complaint, that

16  Basell also duped Basell; that Basell duped Basell's creditors.

17          How?  In the complaint, and really more so in the

18  opposition brief, they say, there came a point in time where

19  Mr. Blavatnik wanted the deal so badly that he caused his staff

20  to goose Basell's financials.  Probably don't hear much about

21  that because it's really not part of the crux of the complaint,

22  but you threw that in there, you know.  And I guess for

23  purposes of today, I have to accept them, and Your Honor has to

24  accept them as true.  But let's look at what he says.  Because

25  even if you accept the allegations as true, they still don't

1   show Basell's actual intent to hinder, delay, or defraud its

2   creditors.

3          In Paragraph 225 and 207, the trustee alleges that the

4   bank financing for the deal was fully committed.  The reason

5   this is important is because the argument in the brief as to

6   why Blavatnik might have been causing his staff to goose

7   Basell's own financials was to ensure that the banks would stay

8   in the deal.  Okay.  That's in the brief, not in the complaint.

9   What's in the complaint is the bank financing was "fully

10  committed."  That's their words, let's accept those as true.

11         Second he suggests that Mr. Blavatnik acted in a

12  manner of goosing financials, potentially, so that it -- so

13  that Basell or the combined companies could avoid paying higher

14  fees and penalties for the banks' failure to syndicate.

15  Because the deal was fully committed, it was not subject to

16  syndication.  But there's an argument that if it couldn't fully

17  syndicate, it was going to get more expensive, fees had to be

18  paid.

19         Well, these fees weren't to be paid by Mr. Blavatnik

20  personally, Your Honor.  They were going to be paid by the

21  companies, by Basell.  If anything, this demonstrates that, if

22  you accept the allegation as true that the goosing occurred,

23  the intent of that goosing was to protect the other creditors

24  of Basell, and try and ensure that the banks don't gouge the

25  company with fees and companies.  How is that -- that's flatly

1  inconsistent with an intent to hinder, delay, or defraud

2  unsecured creditors of Basell.

3       So I'm saying, even if you took these allegations --

4  which are, you know, scraps in the entire barn here -- if you

5  took those as true -- and that's what they come up with -- it

6  does not prove the point.

7       And I'm not asking Your Honor to go through, you know,

8  an extensive <u>Iqbal</u> type of plausibility.  This one is

9  completely implausible; it's contradicted by the allegations in

10 the complaint, the bank debt was fully committed, and the real

11 reason to do this was to save the company from paying fees and

12 penalties.  That's not an intent to defraud, Your Honor.

13      So plainly, we respectfully submit that the actual

14 fraud allegations that are in this amended complaint don't fly

15 against the Basell transferors.

16      And we would also submit that any effort to replead

17 this would be futile, based on the entire theory of the

18 trustee's case.  Thank you, Your Honor.

19      THE COURT:  All right.  Thank you.

20      Ms. Orenstein, is it?

21      MS. ORENSTEIN:  Yes.

22      Good afternoon, Your Honor.  This is May Orenstein of

23 the law firm Brown Rudnick, and I'll be responding to Mr.

24 Kirpalani's arguments on -- for Count 2.

25      I would submit to Your Honor that, contrary to Mr.

1    Kirpalani's statements, this was the paridigmatic leveraged

2    buyout for which the many cases have now established a settled

3    body of law that remedies are available on behalf of a debtor,

4    both by the claw-back from shareholders and by the avoidance of

5    obligations to a bank.

6            Blavatnik's argument requires us to accept that the

7    toehold payments were different from all of the other merger

8    consideration paid to shareholders on December 20th, 2007.

9    According to Mr. Kirpalani's arguments, even if the payments to

10   public shareholders of Lyondell of merger consideration are

11   recoverable as intentional fraudulent conveyances, the payment

12   to Mr. Blavatnik of the toehold payments is not.

13           The reason that Mr. Kirpalani argues that payment to

14   Nell or to Blavatnik alone should be exempt from the

15   intentional fraudulent -- intentional fraud claim under

16   548(a)(1)(A) is that, rather than receiving his merger

17   consideration from the merger sub, as did every other

18   shareholder, Blavatnik arranged to be paid in a convoluted

19   series of transactions involving multiple Basell entities.

20           Although I would have hoped to spare both myself and

21   Your Honor, this requires me, I think, to go through to some

22   extent the toehold transactions and what they consisted of.

23           Prior to the merger, as Mr. Kirpalani acknowledges,

24   Blavatnik had acquired a personal indirect beneficial ownership

25   in approximately 25 million shares of Lyondell stock.  He held

1    that interest through an entity called "AI Chemical."  Most of

2    those shares --

3             THE COURT:  Which no longer exists.

4             MS. ORENSTEIN:  Correct.  Correct, Your Honor.  Most -

5    -

6             THE COURT:  Unless it's unwound or ...

7             MS. ORENSTEIN:  It's been dissolved.

8             THE COURT:  You have the -- yeah.

9             MS. ORENSTEIN:  It's been dissolved.

10            Most of those shares were acquired pursuant to a post-

11   paid, share-forward transaction that was not settled until the

12   date of the merger.  The toehold shares had a value of 1.2

13   billion, based on the merger price of $48 per share.

14            Had the payment of merger consideration due in respect

15   of the shares owned beneficially by AI Chemical been handled

16   consistently with other shareholders, Lyondell Chemical would

17   simply have paid AI Chemical 1.2 billion.  AI Chemical,

18   presumably, would have used a portion of that amount to pay its

19   outstanding obligation to Merrill Lynch on a forward contract.

20   Blavatnik, as the owner of AI Chemical, would have owed short-

21   term capital gains on the approximately 333 million profit he

22   had earned, due to the increase in the stock price following

23   the acquisition of the toehold shares.

24            Instead, to avoid these capital gains -- and this is

25   alleged quite plainly in the complaint -- the following

1  transactions, among others, took place; all with the apparent

2  purpose and intent, or the effect of moving the payments of the

3  toehold interests offshore.

4         At the time of the merger, Blavatnik contributed his

5  interest in AI Chemical -- which I note does not even appear on

6  Mr. Kirpalani's chart.  He contributed his interest in AI

7  Chemical, a Delaware entity, to Nell, a Gibraltar entity.

8  Thus, Blavatnik swapped his direct ownership of AI Chemical for

9  an indirect interest held through Nell.  Nell took its interest

10 in AI Chemical, subject to AI Chemical's obligations on the

11 Merrill Lynch forward contract, in the amount of $674 million.

12        Simultaneously -- and all of these transactions take

13 place basically simultaneously on the day of the merger --

14 Basell Funding, a non-U.S. entity as Mr. Kirpalani pointed out,

15 using proceeds of the merger financing facility, purchased AI

16 Chemical from Nell for $523.8 million.

17        This payment has to be understood to represent partial

18 payment of the merger consideration, payable by Lyondell in

19 respect of the toehold shares held indirectly by Nell through

20 AI Chemical.  And indeed, the defendants have never denied that

21 the Toehold payments were merger consideration in respect of

22 the toehold shares.

23        THE COURT:  Pause, please, Ms. Orenstein.

24        I mean, I understand your overall contention that the

25 purpose of doing it this way was to avoid the thirty-five

1   percent capital gain.  But help me understand your allegations

2   -- or if they're inferences from your allegations, you can tell

3   me that -- as to why the transaction was structured with this

4   contractual arrangement with Merrill Lynch, instead of just

5   holding the shares at Merrill Lynch, and with rooting what you

6   allege to be consideration for the shares in this way, to keep

7   it offshore, or so that there's never a purchase of stock at

8   all, or what?

9        MS. ORENSTEIN:  The structure of the transaction, as

10  is alleged in the complaint, was tax-driven.  I will have to

11  confess that I don't understand precisely why the impact of the

12  transaction was to enable Mr. Blavatnik to avoid paying capital

13  gains on the 333 million.  It is just my -- just, as I say, the

14  allegations of the complaint, which are well founded on the

15  documentary record, reflect that this structuring of the

16  payment in respect of these shares was done for the intended

17  purpose of avoiding taxation.

18       And beyond that, I really can't address, you know, how

19  it operated that by acquiring an interest that -- by

20  contributing his interest in AI Chemical to Nell, and then

21  acquiring and then becoming an owner indirectly of AI Chemical

22  through Nell, which is a Gibraltar entity, and then having Nell

23  receive the payments.  I must assume that this has something to

24  do with the basis of why the tax treatment was different, but I

25  don't, frankly, understand all of the ins and outs of it.

1          With respect to the second part of your question, is

2   why the shares were held in this Merrill Lynch forward

3   contract, I believe the answer can be readily drawn from the

4   record that this allowed Mr. Blavatnik to defer his payment

5   until such time as he could fund the transaction through the

6   merger financing --

7          THE COURT:  Oh, so you're saying --

8          MS. ORENSTEIN:  -- which is Toehold 2.

9          THE COURT:  -- so he doesn't have to pay for the stock

10  right away, he can pay for it --

11         MS. ORENSTEIN:  Well, I'll explain it to you.  That's

12  actually Toehold 2.  So the transaction that I just described

13  to you, pursuant to which -- bear with me one second, because I

14  -- no matter how many times I go through it, it remains

15  confusing.  So -- okay.  I'm sorry.  I didn't get to -- I

16  didn't get to it.

17         I had gotten up to the point where I had explained the

18  swap, whereby Blavatnik contributed his AI Chemical interest to

19  Nell, and so became -- so then, thereafter, held his indirect

20  ownership interest in the Lyondell shares through Nell.

21         The next step of the transaction is that Basell

22  Funding, a non-U.S. entity, using proceeds of the merger

23  financing, purchased AI Chemical from Nell for 523 million.

24  This payment represents the partial payment of the merger

25  consideration payable by Lyondell in respect of the toehold

1   shares.  We call this payment "Toehold Payment 1."  So that's

2   five hundred and twenty-three -- $523.8 million.

3          The balance of the merger consideration due with

4   respect to AI Chemical's toehold shares was $674 million.  Like

5   Toehold 1, this amount was drawn under the merger financing.

6   LB Finance was the entity that made the draw.  Rather than

7   paying this amount to AI Chemical or to Nell, which indirectly

8   owned AI Chemical, or to Basell Funding, I think -- I believe

9   that was liable in respect of the amount due on the forward

10  contract, LB Finance paid the 674 million directly to Merrill

11  Lynch.  This satisfied AI Chemical's obligation on the post-

12  paid forward contract for the benefit of Nell, and indirectly

13  for the benefit of Blavatnik.  This is the transfer that we

14  refer to in the complaint as "Toehold Payment 2."

15         So if I may try to summarize, of the 1.2 billion into

16  which the toehold shares were converted upon the merger, 523

17  million was drawn from the merger financing and paid to Nell,

18  the Gibraltar entity that was the indirect holder of the

19  shares.  The balance of the merger consideration due in respect

20  of these shares was paid in satisfaction of Nell's obligations

21  on the share forward contract directly to Merrill Lynch for the

22  benefit of Nell.

23         So with that background in mind, I'd like to then

24  discuss the application of collapsing to the transaction.

25         The fundamental flaw in Mr. Kirpalani's approach is it

1    underlooks collapsing analysis.  Collapsing analysis is not a

2    narrow and inflexible doctrine; it is a tool of equity.  As

3    stated in the -- by the Supreme Court in Pepper v. Litton:

4              "In equity, substance will not give way to form, and

5              technical considerations will not prevent substantial

6              justice from being done."

7              As stated by the Second Circuit in Orr v. Kinderhill,

8    a fraudulent conveyance case:

9              "Where a transfer is only a step in a general plan,

10             the plan must be viewed as a whole with all of its

11             composite implications."

12             The Second Circuit has approved collapsing in, among

13   other cases, HB Leasing.  There is nothing in HB Leasing to

14   remotely suggest that it's limited in the way Mr. Kirpalani

15   indicated.  In fact, there's a specific reference in KP -- in

16   HBE Leasing to the "conundrum," if you would call it that, of

17   the double-recovery.  And in that case, the Court in HB Leasing

18   simply says, obviously, we don't permit a double-recovery, but

19   that doesn't mean that the debtor cannot pursue its particular

20   remedies until it obtains a complete recovery.

21             So broken down into the basics -- and I realize we've

22   gone over this before -- the Lyondell acquisition involved two

23   transfers:  Transfer 1 and 2.  Transfer 1 was the transfer of

24   the value of the debtor's assets to the financing parties in

25   the form of a security interest.  Transfer 2 is the transfer,

1    all but simultaneous, of the proceeds of Transfer 1 to

2    stockholders of Lyondell, including Blavatnik.

3         Blavatnik's central argument is that, unless Transfer

4    2 actually flows through the debtor, the value being

5    transferred cannot, as a matter of law, be recognized as a

6    transfer by that debtor, even though it constitutes the

7    proceeds of the debtor's assets, even though the debtor may

8    have also been a co-guarantor with respect to the financing

9    arrangement, and regardless of whether any other indicia of

10   ownership or control exists.

11        I believe Mr. Kirpalani's argument is that, in

12   essence, this is a matter of law.  Thus, according to Mr.

13   Kirpalani's argument, if the proceeds of Transfer 2 are

14   siphoned from one particular debtor through a conduit entity,

15   this defeats any claim to recover Transfer 2 from the

16   transferee.

17        Were Mr. Kirpalani's position correct, structuring to

18   eliminate the possibility of exposure to a claw-back claim

19   would be completely effortless.  All that would be required

20   would be to flow Transfer 2 through a conduit without assets.

21   That conduit would then be the only entity against whom

22   creditors would have recourse, if that transfer was later found

23   to have been constructively or intentionally fraudulent.

24        THE COURT:  And your point is, by the time they see

25   that, the conduit is going to be empty?

1          MS. ORENSTEIN:  The conduit will be empty and -- will

2    be empty, and even if it has some asset value, that asset value

3    will be -- have no -- nothing more than an arbitrary

4    relationship to the amount of funds that flowed through it.

5          Most importantly, neither the cases, nor principles of

6    equity support Mr. Kirpalani's arguments.  Under a collapsing

7    analysis, financing proceeds are property of the debtor, to the

8    extent they represent the value transferred to obtain the loan

9    proceeds.  Regardless of the entity through which Transfer 2 is

10   made, the economic reality remains that value is being siphoned

11   off from the target to its stockholders.

12         Mr. Kirpalani discussed Wieboldt, and he does so

13   because Wieboldt most clearly illustrates the ability of the

14   Court to overlook the distinction between -- you know, between

15   the entities in dealing in a collapsed transaction.

16         In Wieboldt, one entity, an acquisition vehicle,

17   tendered for the shares of a -- I believe a public company, or

18   at least a widely held company.  And then, upon receipt of

19   those shares, made -- that non-debtor entity transferred money

20   to the shareholders.  That was Transfer 2 in that transaction.

21   Although Transfer 2 was not made by the debtors, it was treated

22   as a debtor transfer by the Court because it was funded with

23   the proceeds of a pledge of the debtor's assets.

24         Although Mr. Kirpalani would have you believe that

25   Wieboldt is an outlier case, it is not.  Wieboldt is a seminal

1  case in collapsing analysis, is frequently cited in this

2  circuit and in others as an example; and was cited by the

3  Second Circuit in HBE Leasing, which is particularly

4  significant because HBE Leasing is the Second Circuit's

5  clearest expression of its approval of collapsing -- of the

6  collapsing doctrine.

7         Other cases also cited in HBE Leasing, by the way,

8  also relate to the recovery from shareholders, as opposed to

9  lending parties.  In fact, my notes indicate that there are

10 fifty-two published decisions citing to Wieboldt on the issue

11 of collapsing, including six cases in this circuit, and none of

12 the six cases in this circuit that cite to Wieboldt have done

13 so by criticizing it.

14         In another case that has some factual similarity to

15 ours, or at least illustrates the same point, is Crowthers

16 McCall Pattern, Inc. v. Lewis, 129 B.R. 992.  In Crowthers,

17 which is clearly an LBO case, the purchase price was paid by

18 the merger sub to the target's shareholders.  The target was

19 then merged into the -- merged into the merger sub.

20         In discussing claims against lenders, the Court cited

21 Wieboldt and Tabor, holding that, as in those cases ...

22         "The loans, stock purchases, and repayments at issue

23         were part of one integrated transaction, the ultimate

24         result of which was to impose additional debt of $35

25         million on Crowthers, for which Crowthers Pattern

1    received nothing in exchange."

2         The Court further observed that:

3         "The merger sub served essentially as a conduit for

4         the transfer of the loan proceeds to the target

5         shareholders."

6         I would submit, at this stage of the proceedings, it

7    is not possible to make a determination that the two transferor

8    entities in this case were anything other than conduit entities

9    that were selected arbitrarily for the purposes of the toehold

10   transaction through which merger consideration was flowed, for

11   the purposes of structuring that transaction, so that Blavatnik

12   could have a more favorable tax treatment.

13        With regard to this issue of plausibility, Mr.

14   Kirpalani's argument doesn't make that much sense.  Because why

15   would Blavatnik have used Basell entities if he was only

16   transferring his own value to himself?

17        So I make this point only to point out that we are at

18   the motion to dismiss phase; and that, to the extent that

19   Basell also had some value, and to the extent that its value

20   may have been represented in part with respect to the toehold

21   transfers, those are issues of fact.  The allocation of value

22   of -- are issues of fact.  And I don't believe that those

23   issues can trump the underlying reality that this was a payment

24   of merger consideration which was due from Lyondell to its

25   shareholders.

Argument

1    The trustee also relies on several other collapsing

2 cases in its opposition.  Although Blavatnik attempts to

3 distinguish these cases, I think the Court will find upon

4 examination that each of them involved the court collapsing

5 transactions to determine where a transfer of value occurred.

6    Moreover, each of the cases cited in the trustee's

7 brief illustrate that collapsing is not a fixed and finite

8 doctrine, but a methodology for viewing the economic reality of

9 the underlying transactions that diminish the property of the

10 estate.

11    Mr. Kirpalani also made an argument, which he asserts

12 is based upon Begier v. IRS, which is cited for the principle

13 that property of the estate includes property that would have

14 been part of the estate had it not been transferred before the

15 commencement of the bankruptcy proceeding.  We submit that Mr.

16 Kirpalani and -- or his brief misapplies this principle to the

17 facts of the case.

18    And Your Honor has actually pointed this out with his

19 questioning, but I will mention the issue is, you know,

20 contrary to Mr. Blavatnik's assertions, the toehold payments

21 would have been part of the estate, were it not for the

22 transfers.  This is simply because the residual stockholders'

23 equity was converted into the loan proceeds, in order to pay

24 shareholders.

25    A court considering a remedy under the fraudulent

Argument                                                          115

1    conveyance laws is entitled to treat the proceeds of a

2    transaction as the property of the debtor.  Had Lyondell's

3    equity not been converted into loan proceeds and paid to

4    Blavatnik, it would have been available for Lyondell to satisfy

5    its obligations to its creditors in the form of unencumbered

6    assets.

7            In arguing that the test is not met, Blavatnik

8    incorrectly and illogically focuses on whether the funds

9    withdrawn to pay the toehold payments would have been available

10   for distribution to creditors of Lyondell, had not those

11   payments been made to Blavatnik.  Clearly, if Lyondell had not

12   entered into the merger agreement and procured the approval of

13   its stockholders, the assets of Lyondell and the subsidiaries

14   would not have been leveraged to obtain the toehold payments.

15           Had the Lyondell assets not --

16           THE COURT:  Did you say "to obtain" or "to make"?

17           MS. ORENSTEIN:  To obtain the funds to make the

18   toehold payments.

19           THE COURT:  Uh-huh.

20           MS. ORENSTEIN:  Had the Lyondell assets  not been

21   pledged to secure the merger financing, no funds would have

22   been available to pay the toehold payments, nor would they have

23   been due to Blavatnik.

24           The other cases cited by Blavatnik in his brief do not

25   support the proposition that Lyondell had no property interest

1    in merger financing proceeds and are otherwise factually,

2    legally -- factually and legally inapposite.  In particular,

3    Blavatnik's reliance on Nordberg v. Sanchez, In Re Chase &

4    Sanborn, 813 F.2d 1177 (11th Cir.) is entirely misplaced.

5              In Nordberg, the controlling stockholder had repaid a

6    personal loan from a third party by flowing the proceeds of the

7    loan through his controlled entities.  In Nordberg, the debtor

8    was found not to be a transferror because it was a mere conduit

9    of assets that the Court found had only a tangential

10   relationship to the debtor.

11             In finding that the transfer was not the property of

12   the debtor, the Court explained that the borrowing of those

13   funds and their repayment was done as part of a larger

14   complicated scheme involving numerous transactions among

15   several corporate entities.  The Court observed that:

16             "In this context, the actual connection between the

17             funds and the debtor was quite tangential.  A two-day

18             layover in a special account, then only recently

19             opened, and soon thereafter closed.  The account,

20             moreover, was opened under a name that the debtor no

21             longer used."

22             "Tangential" is the opposite of the connection here

23   between the funds transferred in the toehold payments and the

24   Lyondell debtors.  Here, the funds were the proceeds of a

25   larger credit facility, which involved a pledge of Lyondell's

1  assets and those of its major subsidiaries.  Rather than being

2  merely tangential, the funds or some major portion of the funds

3  were the guts of the debtor's value.

4        If we follow the logic of Nordberg, which is cited by

5  Mr. Blavatnik in his brief, such that the source of the funds

6  determines whether the funds are the property of the debtor,

7  this leads us to Lyondell, not to the transferrors or to

8  Basell, since the assets were the source of the funds.  A

9  Nordberg-influenced analysis of the toehold transfers does

10 nothing to resolve the issue of whether the two transferrors

11 had the property interest in the proceeds of the merger

12 financing.  Instead, it merely raises the issue of whether

13 those entities, like the entities in Nordberg, had any

14 connection whatsoever to the funds that were transferred

15 through them.

16       The earmarking doctrine, which also was mentioned by

17 Mr. Kirpalani, is also not helpful to Mr. Blavatnik's position.

18 The earmarking doctrine, first of all, is unavailable where an

19 unsecured obligation is substituted for a secured obligation.

20 Reading from the -- I'm sorry, the name of the cases is

21 Flanagan; I don't seem to have the cite right here.

22       "The earmarking doctrine will only protect a transfer

23       from avoidance to the extent it did not diminish a

24       debtor's estate.  Where a debtor replaces an unsecured

25       obligation with a secured obligation, the payment is

1      voidable to the extent of the collateral transferred

2      by the debtor."

3          There's simply no relevance of earmarking to this

4  situation.

5          I'll just briefly touch on again -- although I've also

6  already mentioned it -- what I characterize in my notes as

7  "Blavatnik's estoppel argument;" that the trustee should be

8  estopped from arguing that it had a property interest in the

9  proceeds of the merger financing because it had a cause of

10 action for recovery against the lending parties in the case.

11 Blavatnik argues that because the trustee alleges that the

12 debtors did not receive value from the creation of the

13 obligations of the financing parties, that it should not be

14 able to recover the proceeds of those obligations, and that

15 it's sole remedy should be avoidance of obligations.

16         First and foremost, the argument is made without any

17 authority whatsoever.  In fact, in HBE Leasing, upon which

18 Blavatnik relies, the Court instructed that the debtor had

19 alternative remedies against both the initial transferee -- in

20 the case -- in that case, the mortgagee -- and the second

21 transferee, who was the recipient of the proceeds of some of

22 the money obtained as a loan upon the mortgage.  The Court

23 observed:

24         "If the petitioners establish on remand that the

25         transfer to the transferees was fraudulent, they may

1          recover this property from the lender, or if it is

2          shown that the transferees had actual constructive

3          knowledge of the fraudulent scheme from the

4          transferees."

5      In other words, Blavatnik's argument completely

6  ignores collapsing, whereby even though a debtor nominally

7  receives value for the obligation it incurs, that value is

8  immediately transferred to a third party, and the debtor has

9  remedies both against -- both with respect to the obligations

10  and the transferees.

11      Finally, unless the Court would like me to get into

12  it, we have gone through our complaint in our brief, and we

13  have, I think very cogently and plausibly, explained why,

14  having once committed himself to the merger transaction,

15  Blavatnik had crossed the rubicon and had to go forward with

16  the transaction; and rather than bailing on the transaction,

17  instead engaged in a series of transactions and a course of

18  conduct directed to him limiting his losses and exposures in

19  the event of a financial collapse following the merger.

20      THE COURT:  Pause right there, Ms. Orenstein, because

21  it led to a question that I have.

22      Mr. Kirpalani had spoken in his argument, in addition

23  to talking about who the actual entities who paid Blavatnik,

24  that there was a lack of intent on the part of Mr. Blavatnik to

25  defraud creditors.  You had dealt with the -- that contention

1    only very briefly at the end.  Is it your contention that he

2    really did have that intent; or is it your contention that,

3    because the two entities, as part of that tax structuring deal,

4    were conduits, that his intent doesn't make any difference, and

5    that all we look at is the intent of Lyondell; or are you

6    arguing both or neither.

7           MS. ORENSTEIN:  You're giving me a lot of options,

8    Your Honor, but I would go with --

9           THE COURT:  Well, I don't like to ask leading

10   questions unless I'm really on the warpath.

11      (Laughter.)

12          MS. ORENSTEIN:  Yeah, I'm going to -- I'm glad to hear

13   that.  I'm going with the second to the last, which is both.

14          We think that the intent that's attributable to the

15   transfers is properly the intent of Lyondell, because we

16   believe that that property that was transferred --

17          THE COURT:  Because the Blavatnik entities are

18   conduits.

19          MS. ORENSTEIN:  Correct.  Although, I don't know if

20   "conduit" -- not to quibble -- I don't know if "conduit" is

21   exactly the correct term because it's used with very specific

22   meanings with respect to other issues in fraudulent conveyance

23   law.  But I believe that those entities did not have -- were

24   not transferring their own property; that their identity was

25   arbitrary and tangential to the economic sense of the

1   transaction; and that, in some sense, they were vehicles,

2   conduits, et cetera.  So I think that the property is properly

3   understood to be property of Lyondell.  And when a transfer

4   occurs, which a debtor played a critical role, which is the

5   case here, of its own property, that it would proper to

6   attribute the intent of that debtor to that transfer.

7        And I believe -- and I did want to touch on this

8   point.  I think the issue of Lyondell's control over the

9   transfer, it's not the -- control is buy no means the only

10  indicia of a property interest.  But I think here, if you look

11  at the transaction from the point -- from the most relevant

12  point of view, which is immediately prior to the merger

13  agreement being entered into by Lyondell, it's easily seen that

14  Lyondell controlled -- that Lyondell's management and its

15  shareholders held the keys, as it were, to the property value

16  of the Lyondell entities.  And it was only by those entities

17  agreeing to the merger -- in the first instance, the management

18  agreed to the merger; and then, in the second instance, going

19  out to their shareholders to procure the consent of the

20  shareholders -- that the vast wealth of the Lyondell Chemical

21  Company was unlocked for availability for transfer to the -- to

22  the stockholders.

23       But to address your second question, or just to

24  complete the thought about both, I don't think there's anything

25  mutually exclusive about both entities having a fraudulent

1   intent.  I think it's a fair inference from the complaint that,

2   following the execution of the merger agreement, that Blavatnik

3   and others of his advisors understood that his investment in

4   Basell was in tremendous peril, and engaged in certain conduct

5   to minimize his losses in the event that he was faced with a

6   bankruptcy situation.

7          Those transactions included, for one thing, you know,

8   going through with the toehold, which allowed him to capture

9   $333 million of short-term profit from his investment in

10  Lyondell, rather than allowing that money to remain with the

11  company as additional capital, as well as other transactions

12  and extractions of management fees that took place before the

13  merger.

14         So I don't think those intents are mutually exclusive.

15  I don't think there's anything implausible about the inference

16  that can be drawn from the complaint that, after signing the

17  merger agreement and before its consummation, that Blavatnik

18  was aware of the likelihood that the transaction would result

19  in disastrous losses for the creditors of the debtors.

20         THE COURT:  Okay.  Anything else?

21         MS. ORENSTEIN:  No, Your Honor.

22         THE COURT:  All right.  Thank you.

23         MS. ORENSTEIN:  Thank you.

24         THE COURT:  Mr. Kirpalani, I'll take brief reply.

25         MR. KIRPALANI:  Thank you, Your Honor.

1      Everyone always says this, but I say -- I only say it

2    when I mean it.  I will be brief.  Okay.

3      THE COURT:  If you believe it, you'll be the first who

4    ever told me, who did.

5      MR. KIRPALANI:  No, I -- I will assure you.

6      A couple of things to understand from a macro

7    perspective.  A lot of -- everything Ms. Orenstein said that

8    was in the vein of, the toehold payments, payable by Lyondell

9    Chemical Company, Lyondell made the payments through conduits

10   at Basell, this is complete fabrication.  The complaint doesn't

11   even allege that Lyondell Chemical Company was obligated to pay

12   for Lyondell Chemical Company stock.  That's not this

13   transaction.

14      This was Basell, which entered into an agreement in

15   July, that I will buy all outstanding Lyondell shares for $48 a

16   share.  A person can't just stand at the podium and say,

17   without pointing to any allegation in the complaint, the

18   toeholds were payable by Lyondell Chemical Co., so the fact

19   that it was just paid by one of the co-liable parties is

20   irrelevant.  That's just not accurate.  It's not even accurate

21   by just reference to the complaint.

22      Second thing, there's an entire -- there's a little

23   bit of confusion going on here, I think in some of Your Honor's

24   questions and the way they were answered.  There seems to be a

25   presumption on the part of the trustee's counsel that the way

1   the toehold payments were paid was by Lyondell effectively

2   using its asset value to acquire that -- those shares of

3   Lyondell.  That's not the transaction.

4           And in point of fact, if you believe the actual fraud

5   counts as they are, Basell was the asset-rich side, Basell had

6   the equity value.  And what actually happened here was a

7   transfer of equity value from Access, which had billions of

8   equity value in Basell, to Lyondell shareholders.  Because

9   under their theory, Basell was defrauded by Lyondell in order

10  to benefit Lyondell's shareholders.  How can it possibly be

11  that any of the responses counsel for the trustee gave Your

12  Honor can square with that fundamental core concept of the

13  complaint?

14          There's so many different ways I could go through why

15  this type of collapsing makes absolutely no sense.  I'll just

16  give you one simple one that I thought of on the way up here,

17  then I'll be next to done.  Just one more point after that.

18          Could Lyondell avoid Basell's grant of liens?  Has to

19  be no, right?  Basell has to do that.  And guess what?  Basell

20  has a constructive fraudulent conveyance theory to do that.

21          What Ms. Orenstein seems to be saying is that, my

22  clients, you know, through me, are trying to evade or be

23  treated differently from all other shareholders who would be

24  subject to this liability; we're trying to get away with it.

25  It's not true.  We're talking about one count in a complaint,

1  Count 2.

2         We are still on the hook to convince Your Honor why we

3  are not the recipients of constructive fraudulent transfers,

4  and we'll get into a lot of the really over-arching debates

5  here about collapsing and remedies and whether you can do both,

6  get rid of the bank debt, get rid of the liens that you pled,

7  and also get the cash back.  That's not a today issue.  I only

8  mentioned it because Your Honor asked about that and -- at the

9  outset.

10        And what we're focusing on today is:  Can you

11 attribute the complaint's allegations of Lyondell actual fraud

12 to Basell?  You remember the corporate structure.  How it could

13 possibly be that Lyondell Chemical Company fraud down here was

14 attributable to entities up here owned by Basell is beyond me;

15 didn't even have the same management, they weren't created by

16 the same people.

17        And I'll leave you with this, Your Honor.  Taken to

18 its extreme, if you adopt Ms. Orenstein's arguments, if Basell

19 wanted to sue Lyondell for being defrauded -- let's say we

20 accepted the trustee's allegations as true, all of them -- and

21 if Basell or Access or Mr. Blavatnik wanted to sue Lyondell for

22 fraud, it couldn't because Lyondell's actual fraud can be

23 imputed to Basell.  That's their theory.

24        This is just the actual fraudulent transfer count,

25 Your Honor.  There's no attempt here to get out from under the

1   real show.  We're trying to get the complaint back to the real

2   show.  That's it, Your Honor.  Thank you.

3          THE COURT:  All right.  Thank you.

4          MS. ORENSTEIN:  And I'd just like to briefly respond

5   to a couple of points.

6          THE COURT:  Very, very briefly, Ms. Orenstein.

7          MS. ORENSTEIN:  Okay.  I just want to respond to the

8   point where Mr. Kirpalani said there's nothing in the complaint

9   to support that this was a transfer by Lyondell.  And I would

10  just point to those provisions of the complaint that say,

11  pursuant to the merger agreement, which Lyondell entered into,

12  all of the outstanding shares of Lyondell were converted into

13  the right to receive $48 per share.

14         Had not Lyondell management entered into that

15  agreement, that obligation would not have existed and would not

16  have -- and would not have had to have been funded, and it

17  would not have been possible.  And had they not entered into

18  that agreement, the assets of Lyondell would not have been

19  available to fund that obligation.  So it is, in fact, in the

20  complaint.

21         And with respect to the issue of whether or not a

22  grant of liens by these entities could be avoided, the issue,

23  if anything, is one of allocation.  Again, we're here on a

24  motion to dismiss.  This is not a case of all of the value

25  being on the Lyondell side or all of the value being on the

1   Basell side.  But in fact, the far greater share of the value

2   was on the Lyondell side.  It was the more valuable company.

3   It had -- you know, it had greater asset value.  So at most,

4   Mr. Kirpalani is bringing up issues of allocation of the

5   amounts transferred to the different entities.  And that's all,

6   Your Honor.

7           THE COURT:  All right.  Thank you.

8           MS. ORENSTEIN:  Thank you.

9           THE COURT:  All right, folks.  We'll take an hour for

10  a lunch recess, and then we'll resume at a quarter after 2.

11  We're in recess.

12          UNIDENTIFIED:  Thank you, Your Honor.

13      (Luncheon recess taken at 1:16 p.m.)

14                        AFTERNOON SESSION

15      (Proceedings resume at 2:16 p.m.)

16      (Call to order of the Court.)

17          THE COURT:  Have seats, please.

18          All right, folks.  Shall we continue?  Is the next one

19  Count 12?

20          MR. WERDER:  Count 12, Your Honor, yes.

21          THE COURT:  Okay.

22          MR. WERDER:  Rick Werder from Quinn Emanuel for the

23  Access Defendants.

24          THE COURT:  All right, Mr. Werder.

25          MR. WERDER:  This is Count 12, Your Honor, the claim

1    for damages for breach of contract for the alleged breach of

2    the revolver agreement, arising from the failure to fund the

3    revolver right at the end of December of 2008, on the immediate

4    eve of the bankruptcy.

5              THE COURT:  Right.

6              MR. WERDER:  At the beginning of the session this

7    morning, Your Honor asked about covenants and conditions, and

8    there are such covenants and conditions, Your Honor.  We didn't

9    move on them because we thought that, based on the allegations

10   of the complaint, there might be disputed issues of fact over

11   them.  But Section 4.02 of the revolver sets forth the

12   conditions for all credit extensions under the revolver and --

13             THE COURT:  By that, do you mean draws on the

14   revolver?

15             MR. WERDER:  Correct, Your Honor.

16             And Section 4.02(a) refers to the reps and warranties,

17   with certain exceptions, being true and correct at the time of

18   the desired advance --

19             THE COURT:  All right.

20             MR. WERDER:  -- under the revolver.

21             THE COURT:  Let me interrupt you, Mr. Werder.

22             In short, your position is that that's a defense I may

23   see down the road if the claim continues, but you're enough

24   concerned it being an issue of fact, you're not raising on a

25   12(b)(6).

1          MR. WERDER:  Correct, Your Honor.  It's a MAC --

2   there's a MAC provision, among other things, and we didn't see

3   a basis to move to dismiss on the basis of the MAC provision,

4   although we do think that the facts and circumstances that are

5   pleaded in the amended complaint make clear that the allegation

6   of bad faith in not funding the revolver is absolutely untrue.

7          The facts here, Your Honor, are that Access provided a

8   seven-hundred-fifty-million-dollar revolver in March of 2008.

9   It was not drawn upon until October of 2008, when there was a

10  brief need for it.  The revolver was repaid within a very short

11  period of time following the October draw.  And then there was

12  another draw request for the entirety of the revolver that was

13  made on December 30th of 2008, and was declined on December

14  31st of 2008, I believe is the timing.  That's just several

15  days prior to the bankruptcy.

16         It's undisputed, Your Honor, that the terms of the

17  revolver are modeled directly on the bank revolver that was put

18  in place in December 2007, as part of the merger funding

19  package.  The trustee is now seeking unspecified, quote,

20  "damages" for alleged breach of the revolver at the end of

21  December of 2008.  Interestingly, he hasn't provided any expert

22  report on his damages claim, so we don't know exactly what it

23  is, but --

24         THE COURT:  Well, since when do you see expert reports

25  at the time of a complaint is filed --

1        MR. WERDER:  True, Your Honor.  But the expert report

2   deadline is now passed.  I just make that comment in passing.

3        The real point, Your Honor, is that the only

4   allegation in the amended complaint of the alleged consequences

5   of the refusal to fund in December 2008, is contained in

6   Paragraph 311.  And what Paragraph 311 says is that the debtors

7   filed their Chapter 11 case after the draw request was denied

8   on December 31st.  This is clearly an attempt to allege

9   consequential damages.

10        We think it's implausible for various reasons, but

11  that's not what this motion is based on.  What this motion is

12  based on is a purely legal issue, and that is --

13        THE COURT:  This issue, unlike what we heard this

14  morning, Mr. Werder, is a lot easier to understand.

15        MR. WERDER:  Yes, Your Honor.

16        THE COURT:  It doesn't have particularly complex

17  issues, nothing close to what we heard this morning.

18        Where I need help from you is just two things:

19  Talking about the Drain decision --

20        MR. WERDER:  Yes.

21        THE COURT:  -- and -- in Delphi, and whether you

22  acknowledge, as I would think you would, that restitutionary

23  damages are still appropriate.

24        MR. WERDER:  I'll respond directly to those two

25  questions, Your Honor.  And then, unless you have any other

1    questions, I'll sit down.

2           THE COURT:  Okay.

3           MR. WERDER:  Judge Drain's decision in <u>Delphi</u> is

4    consistent with the general principles of New York law, that in

5    order to avoid a damages limitation provision like the one at

6    issue here, the trustee had to plead that the alleged breach

7    was purposefully harmful and amounted to egregious misconduct.

8    Indeed, the phrase that Judge Drain used was "conduct so

9    egregious as to cause one's jaw to drop."

10          THE COURT:  Which was a paraphrase by the New York

11   State cases, or how much of it was beyond the New York State

12   cases?

13          MR. WERDER:  I think it's very consistent with the New

14   York cases, Your Honor.  And in fact, Judge Drain cited many

15   New York cases at considerable detail.

16          And I think the facts of the case are instructive

17   because the case involved a failure to -- an alleged failure to

18   fund exit financing for a bankruptcy plan, and there were

19   several different defendants, as Your Honor is probably well

20   aware.  There was Appaloosa, which was one of the parties that

21   had committed to the exit financing.  And Judge Drain concluded

22   that the limitation on damages in the Appaloosa contract should

23   be avoided because of what he termed this jaw-dropping

24   misconduct that had been alleged against it.

25          And what did he point to?  He basically pointed to an

1   egregious attempt by Appaloosa to avoid its obligations under

2   the funding contract.

3        He said -- pointed to allegations that Appaloosa had

4   taken actions that would have the effect of undermining the

5   debtor's ability to perform the contract.

6        He pointed to efforts to undermine the debtor's

7   efforts to raise debt, to finance their exit from bankruptcy.

8        He pointed to the encouragement of -- or the

9   participation in people -- with people who were engaging in

10  efforts to denigrate the value of the debtors, which was

11  alleged to have occurred in order to prevent the debtors from

12  raising the other exit financing that they needed as a

13  precondition to getting the Appaloosa financing.

14       He pointed to the encouragement of short-selling,

15  which was also done -- allegedly done in order to prevent the

16  debtor from gathering -- from getting the financing that it

17  needed to fund its exit plan.

18       And he pointed to the assertion of what was allegedly

19  a specious claim for $85 million of an alternative transaction

20  fee.  All of that he described as truly jaw-dropping, and said

21  may indeed constitute a bankruptcy crime.  And that is why he

22  avoided the limitation on damages against Appaloosa.

23       There were two other parties that also had similar

24  funding obligations to Appaloosa, that was Harbinger and

25  Pardus.  And as to those two other defendants, Judge Drain

Argument                                                    133

1   concluded that the limitation on damages was fully enforceable

2   under New York law, despite the allegation that the breach that

3   they engaged in was an intentional breach.  In other words,

4   Judge Drain clearly distinguished, as I believe New York law

5   does, between an allegedly intentional breach, and a breach

6   that was malicious, jaw-dropping misconduct sufficient to avoid

7   the limitations.

8          All the trustee has here is a conclusory allegation in

9   Paragraph 311 that the -- or in Paragraph 411, I'm sorry --

10  that Access acted in bad faith in denying the draw request.

11  That allegation, Your Honor, is flatly inconsistent with the

12  trustee's allegation in Paragraph 311 that the draw request

13  made by the debtors -- the soon-to-be-debtors, was a charade

14  that they knew would not be honored.  And it also conflicts

15  with the variety of the other allegations that are made in the

16  amended complaint.

17         THE COURT:  Mr. Werder, have you and your opponent

18  agreed that New York law applies?

19         MR. WERDER:  They haven't contested that, Your Honor,

20  and the contract clearly calls for New York law.

21         THE COURT:  Oh, it has the -- it calls for the

22  application --

23         MR. WERDER:  Yes, Your Honor.

24         THE COURT:  -- of New York law.

25         MR. WERDER:  Yes.

1          THE COURT:  Okay.

2          MR. WERDER:  Now with respect to the only damages that

3   are pleaded in the complaint, the, I guess alleged causal

4   connection between the refusal of the revolver to be funded and

5   the bankruptcy, that's clearly consequential damages that can't

6   be recovered under Section 9.05 of the contract.

7          In their reply papers, although they didn't plead it

8   in the complaint, they say, well, we could recover the fees

9   that were paid in connection with the revolver.  But, Your

10  Honor, I would point to Judge Drain's opinion where he defined

11  "special damages" under New York law as damages that would

12  compensate a plaintiff for something other than the value of

13  the denied performance under the contract.

14         Therefore, I would argue, Your Honor, that their

15  attempt to say, well, we can recover fees, even if we can't

16  recover consequential damages, is an attempt to recover special

17  damages, and therefore is barred by the language of the

18  contract, which includes --

19         THE COURT:  That would really make me raise my

20  eyebrows, Mr. Werder.  I mean, restitutionary damages have

21  historically been regarded as very different than providing

22  injured parties with the benefit of their bargain, haven't

23  they?

24         MR. WERDER:  Well, Your Honor, what I'm saying is that

25  the concept -- the question is:  What is "special damages"?

Argument                                                135

1   And what Judge Drain said in the <u>Delphi</u> case is that special

2   damages are damages that don't go to compensate for the value

3   of the performance that's not rendered; anything other than

4   that is special damages.  An attempt to recover the fees here

5   would be an attempt to recover special damages under that

6   definition.

7           THE COURT:  Uh-huh.  All right.  Let's see what he

8   said about that.

9           MR. WERDER:  Okay.

10          THE COURT:  Obviously, that's counter-intuitive to me.

11          MR. WERDER:  Well --

12          THE COURT:  And it strikes me as being -- I won't use

13  the Yiddish word -- but a little extreme.

14          You're saying that you're off the hook, and your

15  excused from performance, but you're saying in the same breath

16  that you don't even have to give the money back that you

17  secured for providing the promise from which you're asking to

18  be absolved?

19          MR. WERDER:  That is a damage that is precluded by the

20  language of the contract, Your Honor.  If they had covered and

21  had a borrowing cost above the borrowing cost under the

22  revolver, then they would potentially have a damages claim for

23  the cover cost.  But the special damages exclusion covers --

24  covers the fees, I believe, as Judge Drain defined "special

25  damages."

Argument                                                    136

1          So I'm not saying that there's no remedy under this

2     contract.  There is -- there are certain types of damages that,

3     if they were able to prove a breach they could recover.  But

4     the exclusion that is contained in this contract precludes the

5     recovery of both special damages and consequential damages.

6          THE COURT:  Well, you know, Mr. Werder, when I was a

7     lawyer, I used to train my first-year associates in blowing

8     their credibility on minor points.  That contention that you

9     gave me really troubles me.  I understand your more fundamental

10    ones, but -- well, I don't need to debate it with you, I

11    suppose.

12         MR. WERDER:  Okay.  Well, at the very -- at the very

13    least, Your Honor, any claim for consequential damages; i.e.,

14    the claim that they appear to have made in their complaint, as

15    opposed to the claim that they're trying to make in their

16    brief, that the denial of the revolver caused the bankruptcy to

17    occur, and therefore caused damages to occur that they can be

18    compensated for, that claim, at the very least, is covered

19    here.

20         THE COURT:  I understood that from your papers.

21         MR. WERDER:  Yes, Your Honor.  Thank you.

22         THE COURT:  All right.  Thank you.

23         Okay.  For the committee.  Excuse me, the Litigation

24    Trustee.

25         MR. POHL:  Good afternoon, Your Honor.  Steven Pohl

1    from Brown Rudnick for the trustee.

2           I may not be as brief as Mr. Werder, but I certainly

3    will not be anywhere near as long as earlier --

4           THE COURT:  Well, on the more --

5           MR. POHL:  -- and I will try to be --

6           THE COURT:  -- important point, where you've got some

7    difficulties because the company was not exactly the greatest

8    credit risk at the time the company was asking for this draw.

9           MR. POHL:  Okay.  Well, I'll take that first, Judge --

10          THE COURT:  Okay.

11          MR. POHL:  -- and then I'll move to the <u>Delphi</u> matter.

12          So questions of fact:

13          One, the context is this event started in March of

14   2007.  The draw request was December, but the context of the

15   negotiation and entry into the agreement is critical.  March

16   2007.  Our documents, our pleadings, our complaint are clear

17   that at that point in time, the company was near the end of its

18   liquidity.

19          Did I say March of 2007?  I meant March of 2008.

20          Merger closed December 2007.  And every expert report

21   that you've seen from our side of the table has said that they

22   were insolvent at that time, and that they were

23   undercapitalized, and all that is laid out in our complaint.

24   So when we got to March of 2008, it was even worse.  The little

25   liquidity that they had when they closed the deal was almost

1    gone.

2            So now Access comes, apparently to the rescue.  But

3    they show up with this revolver.  At the time, every bank that

4    was involved in the negotiation over what was going to be the

5    upside of the ABL facility that was needed at that time to also

6    address liquidity was that Access or, to use their words, "Len"

7    should put in equity.  That's what this company needs, equity.

8            There's nothing worse than showing the credit markets

9    that the only party willing to provide debt when the company is

10   near the end of its liquidity is the sponsor.  That sponsor,

11   for the lenders, should have provided equity.

12           I raise that, Your Honor, because you're saying to me,

13   how do I address that the company was a bad credit risk in

14   December.  I don't debate that.  The company was a bad credit

15   risk in December.  The company was a bad credit risk in

16   December of 2007, too, when the merger closed.  The company was

17   also a bad credit risk in -- at the end of March 2008, when

18   Access provided the revolver.

19           And they fully admit that what they did was take the

20   secure, the FPDs' credit agreement, which had more than a

21   revolver, revolver term debt.  They yanked out the term debt

22   provisions, they left the revolver.  They almost left

23   everything else the same.  And that's important, and I'm going

24   to get to that point in a minute.  But that has a MAC clause.

25   So what?  In March of 2008, they were out of money.  In

1  December of 2008, they were out of money.  So the question is,

2  was there a MAC, not whether was a bad credit risk in December

3  versus a bad credit risk in March.

4        Let me move -- I'm going to skip over, I think, most

5  of Delphi.  I'm not going to address the restitution question.

6  I will point out a couple of things that are in the pleadings,

7  in the Court's record today.  But I want to address the points

8  that Mr. Werder was making about Judge Drain's findings and the

9  horrific conduct of Appaloosa in that case.

10       THE COURT:  Let me interrupt you for a second before

11  you do, please, Mr. Pohl.

12       Was that a 12(b)(6) context or was that a summary

13  judgment context?

14       MR. POHL:  It was a 12(b)(6) context, but you -- you -

15  - what's the right word -- you knew exactly where I was going.

16  That case is a little bit different.

17       Here, we're before the Court about conduct that took

18  place starting in December of 2007 and before; and then for

19  this narrow context, March time frame, 2008, so now three years

20  ago.  In that -- so we have somewhat of a developed record.  We

21  have a complaint that doesn't have the full record in it.

22       In that case, what they were fighting about was

23  conduct that took place yesterday.  In other words, it was the

24  funding to exit bankruptcy.  It all took place before Judge

25  Drain.  He had arguments before him several different times on

1   the -- I think it's the ECA, the equity commitment agreement,

2   and how that piece of paper fit within the fee letters, and was

3   there a waiver in one and not the other of consequential

4   damages.

5        But he had everything before him.  He was the one

6   guiding the case.  He had the debtor before him every other day

7   saying, we have to close, we have to close, we need this equity

8   rights offering because we also need the debtor.  Without the

9   equity, we don't get the debt, and Appaloosa is doing wrong by

10  us.  And so when he ruled, he had essentially a full record.

11       And you know, one of the points I believe we make in

12  our brief -- but if we didn't, I'll make it now -- is almost

13  every case cited to support the notion that a damage limitation

14  claim should be enough to dismiss a case is when there's a more

15  fulsome record; summary judgment, trial.  And 100 percent of

16  the cases that Access cites to support the notion that a damage

17  limitation claim should be enforced are contracts between third

18  parties, unrelated.  Now whether they're sophisticated or there

19  was undue influence or contract of adhesion, separate question;

20  important, but separate.  Here, all -- they were all completely

21  unrelated.  That's totally different here.

22       And the context of the negotiation, Your Honor, is key

23  to this Court's determination of whether to abrogate that

24  limitation or not.  So let's move to that point.

25       Mr. Werder admitted that the contract that formed the

1    basis for this revolver was the secured credit facility.  I'm

2    not sure I had seen that admitted before.  I only learned it in

3    a deposition a couple of weeks ago.  But I agree with it.  And

4    if Your Honor -- I don't know if Your Honor has that document

5    in front of you, it's an exhibit to --

6            THE COURT:  The underlying credit agreement?

7            MR. POHL:  Yes.  It's an exhibit to Mr. Werder's

8    declaration.

9            THE COURT:  I must confess to you that I didn't drill

10   down in that level of detail --

11           MR. POHL:  Okay.  Well --

12           THE COURT:  -- on some of these documents.

13           MR. POHL:  I won't bore you with having to show you

14   the document, but I will tell you a couple of cites from the

15   agreement, Your Honor.

16           First, for purposes of fees, just to get that on the

17   record, they don't just show up nowhere, they show up in the

18   agreement.  And they're at --

19           THE COURT:  How much are we talking about in the way

20   of fees, by the way?

21           MR. POHL:  Well, by my math, it's somewhere around $12

22   million.  It's made up of two things:  One is clearly in the

23   contract, and that's an unused line fee of about seventy-five

24   basis points that I don't have any reason to think wasn't paid.

25   And from what I understand from reading --

1          THE COURT:  I guess I know now why Mr. Werder wanted

2     to risk his credibility on it.

3          MR. POHL:  Well, I think --

4          THE COURT:  That's a lot of money --

5          MR. POHL:  I think that --

6          THE COURT:  -- 12 millions bucks.

7          MR. POHL:  I think that --

8          THE COURT:  Maybe not in the context of this case, but

9     in many cases 12 million bucks is a lot of money.

10         MR. POHL:  Well, as I read Mr. Werder's reply brief,

11    he doesn't really look to have this Court in his reply brief --

12    he made a different argument today.  In his reply brief, he

13    didn't say boo about how restitution or actual damages couldn't

14    be afforded.  He simply said they weren't pled in our relief

15    claim.  And I think -- and he also said, if he could walk away

16    from this Court today with a bifurcated ruling -- which he

17    really hasn't asked for -- but a bifurcated ruling, where he

18    wins on his consequential special damages, but not on

19    restitution, he'd be very happy.  Because he's at risk for a

20    lot more money in this case than anywhere near 12 million.

21         But my point is about four and a half or so of that

22    would be what I've just described to you as unused line fee.

23    What's not in the agreement, but is in the record, and I don't

24    think it's a debate by anybody, is that there was a separate

25    letter that reflected the commitment fee, a one percent

1    commitment fee of seven and a half million dollars.

2           What I wanted to draw Your Honor's attention to was

3    this notion in the cases that says that the Court's assessment

4    of whether or not to enforce a contractor limitation on

5    consequential damages is -- and the threshold that -- the

6    standard of conduct that the Court should look at, depends on

7    whether the contract was negotiated at arm's length, between

8    third parties, between sophisticated parties.

9           Our argument here is that that clearly wasn't the

10   case.  Access has its fingerprints everywhere.  It is both

11   sides of the transaction.  It is the lender and it is the

12   shareholder that controls Lyondell.  And at every step of the

13   way, when it came time to determine whether this loan would be

14   made, whether equity would be provided, it was Mr. Blavatnik

15   with his henchmen addressing this with Lyondell and telling

16   them what to do.  We're going to give you a loan; okay.

17          Pull off the shelf the revolver from the secured

18   credit facility.  Now let's mark it up.  Yank out the term

19   debt, yank out the word "arranger," yank out letters of credit,

20   and we can -- you know, we can walk before the Court with a

21   black-line and bore you to death.

22          But if you take a look at just the provision that Mr.

23   Werder's client wants you to focus on, 9.05, and find that that

24   was negotiated between sophisticated parties -- forget whether

25   they're related, but between sophisticated parties who had

1   equal bargaining power?  I'd suggest to you that, not even

2   close.

3           Because if you were to look at the secured credit

4   facility and compare it to what's in this document, in 9.05,

5   with this long language, whole page on indemnification by

6   borrowers, and then this section that says, nobody will have

7   liability for special damages?  Well, whoever worked on this,

8   whether it was a lawyer for Access, a lawyer inside Lyondell,

9   or whomever, or a lawyer outside for Lyondell, they don't look

10  very carefully because you can tell that this is a carryover

11  from the secured credit facility.

12          The whole idea -- the reference I'm going to give to

13  Your Honor is to the word "intraLinks."  Okay.  "IntraLinks" --

14          THE COURT:  Interlink?

15          MR. POHL:  "IntraLinks," it's about --

16          THE COURT:  Intra?

17          MR. POHL:  Intra, i-n-t-r-a, links, capital L, i-n-k-

18  s, one word, "intraLinks."  That is an electronic document

19  repository system often used by issuers of debt and their banks

20  to provide online access to the syndicate lender group once

21  they click on confidentiality; due diligence documents,

22  projections, loan documents themselves.  And so there's a nice

23  little protection here for the indemnities in the FPDs' piece

24  of paper that says, no agent/FPD will be liable for anything

25  that the syndicate lenders read on intraLinks.  Well, this

1    section couldn't have been negotiated because it still has the

2    word "intraLinks" in it.

3            THE COURT:  You're saying it's like lawyering by

4    carbon paper?

5            MR. POHL:  Yes.  They -- you know, they just took a

6    form, and they took the economics out, but they didn't

7    negotiate this.  Because Access never needed intraLinks.

8    Access is the sponsor --

9            THE COURT:  I take your point --

10           MR. POHL:  -- the shareholder for the board.

11           THE COURT:  -- Mr. Pohl.  But then the question that I

12   ask from that is, if the origin is in a document that

13   presumably was more of an arm's length transaction; in other

14   words, if it was copied -- people other than me don't remember

15   carbon paper -- but if it was copied from a true arm's length

16   document, does that help or hurt each side's position?

17           MR. POHL:  Well, you're right.  I suppose it could cut

18   both ways, and I'm going to have to argue my way, Your Honor.

19   I think it cuts our way because the notion in those cases that

20   look at a lower standard is that the document was, in fact,

21   negotiated at arm's length between third parties.

22           And what I'm saying here is no one from Lyondell stood

23   up and said to Access or Mr. Blavatnik, you know, forget it

24   man, I'm not waiving special damages, I'm not waiving

25   consequential damages.  They just never read it.  They probably

1  didn't even know what they were doing, let alone having agreed

2  to it.

3       And this has to be viewed from the context, Your

4  Honor, of -- and this is a bit of foreshadowing to, you know,

5  later on today; there's this whole argument on

6  recharacterization -- you know, what if this really should be

7  equity.  Okay?  So how does Your Honor look at that, and how

8  does Your Honor look at, you know, what happens in the context

9  of a breach of this agreement and a loan in December?

10      I mean, if this was supposed to be equity, you know,

11 and it wasn't funded when it was supposed to be equity, do you

12 move to December and say, okay, you know, where is your equity

13 commitment.  And by the way, it's equity.  You don't get a MAC

14 out in an equity deal.  So you know, it just raises many

15 questions which are just not the subject of a 12(b)(6) time

16 frame in this case.

17      I think I did that entire argument without looking at

18 my notes, so if Your Honor would be kind enough to just let me

19 take a quick look --

20      THE COURT:  Of course.

21      MR. POHL:  -- so that I can move along and be

22 finished.

23    (Pause in proceedings.)

24      MR. POHL:  Two more points, Your Honor.  One is -- I

25 won't repeat what's in our moving papers.  We've set forth, you

1   know, any number of paragraphs in the complaint that we think

2   make the case.

3        I'll also point out to Your Honor -- because again

4   we'll have to address this a little later down the road in the

5   recharacterization context.  You know, there's -- there are

6   other -- we think our pleadings are sufficient for a motion to

7   dismiss.  As Mr. Wissner-Gross foreshadowed earlier, there's a

8   lot more in the record.  And just to make sure the Court is on

9   equal grounds with everybody here, you know, this case is a

10  little bit different than most other cases that -- where you

11  show up with, you know, a complaint, after not having had a lot

12  of discovery.  So that cuts both ways.

13       We've had a lot of discovery.  We had it in Phase 1,

14  as against largely the FPDs.  And then we've had, you know,

15  some discovery after we filed this complaint.  But you might

16  remember, you know, Mr. Weisfelner, you know, using the

17  terminology that Mr. Kirpalani was going to sit in the

18  courtroom on his Barcalounger and have popcorn.  Well, that

19  really didn't happen.  You know, while they might have sat

20  around and watched a little bit, they participated throughout

21  Phase 1.  And in Phase 1, they even prepared and submitted

22  expert reports, and they took depositions, and we took their

23  experts' depositions.

24       So everybody in this case knows in detail, that's in

25  this room -- but it's subject to confidentiality -- what

1    happened in April and in March of 2008, when the revolver was

2    first put in place, and in April, when there were discussions

3    about having an initial need.  All of those facts, we think,

4    are germane to the points being raised in this motion and in

5    our defense.

6           And those facts, they're not secret.  They reside in

7    some hundred-and-I-don't-know-how-many-page contention of facts

8    that the creditors' committee filed.  And that's under seal,

9    but everybody in this room has it.  And I suppose you could

10   accuse us for not taking that contention of fact and slapping

11   it onto our complaint, but you know, then it would have been a

12   four-hundred-page-complaint.  So my point is this record is

13   complete.  Your Honor, you know, could take advantage of that

14   because you have it, everybody has it, it's all part of the

15   record.  And my very last --

16          THE COURT:  Well, I'm not sure if I have it, Mr. Pohl.

17   Has it been given to me?

18          MR. POHL:  Yes.  It was filed under seal in connection

19   with the Phase 1 trial.

20          THE COURT:  I see.  Would I be better served if I shut

21   down the courtroom and let you guys argue stuff, so that I knew

22   what, if I let you, could go into a more fulsome complaint,

23   albeit one that would now be under seal and have to be

24   declassified later?

25          MR. POHL:  Well, let me come at that a different way.

1           I suppose if Your Honor was concerned about these

2    motions and had in mind that, you know, some of them you'd be

3    considering granting, and instead would want us to replead, I

4    suppose we could go your route; or we could simply give Your

5    Honor, you know, access, if you will -- no pun intended --

6    easily to the contentions of fact.

7           But you know, there certainly are other facts, as Mr.

8    Wissner-Gross has mentioned, that have come up from discovery

9    since the complaint was filed, or that, like I say, reside in

10   the record of Phase 1, that were not just cut and pasted to

11   make a four-hundred-page complaint.

12          THE COURT:  Uh-huh.

13          MR. POHL:  And so I think that some of these motions

14   make a run at us, to say we haven't said this in the complaint,

15   when they've had for -- this is from November or December of

16   2009, or maybe January 2010, right, when we were at the Phase 1

17   trial, where they have this stuff.  And it's not just Access,

18   it's the D's and O's, you know?  They take runs at us down the

19   road in the second-to-last motion I'll deal with today; you

20   didn't say this, you didn't say that.  Well, it's in spades in

21   the record, Your Honor.

22          And I think I'm going to end with that.  Unless the

23   Court has any questions, I think I've covered --

24          THE COURT:  No, you took care of me as we went along.

25          Mr. Werder, any reply?  Briefly, please.

1          MR. WERDER:  Just very briefly, Your Honor.

2          The statement of facts that Mr. Pohl referenced I

3    assume was the statement of facts that was filed in connection

4    with the Phase 1 proceedings, which had no issues in it, other

5    than the question whether the debtors were solvent in -- as of

6    December 20th of 2007.  I don't recall any facts being set

7    forth in that document with respect to the negotiation of the

8    revolver, which seems to be the big argument that Mr. Pohl is

9    making here, that we need to get into the facts concerning the

10   negotiation of the revolver in order to assess the pending

11   motion.  Well, two things on that, Your Honor:

12          The complaint that was filed well after the statement

13   of facts doesn't say anything about the negotiation of the

14   revolver, it doesn't allege any facts and circumstances

15   concerning the negotiation of the revolver.  What we know about

16   the outcome of the process of putting in place the revolver is

17   that it was cribbed, essentially, from the revolver facility.

18   And the Court will recall that there were various different

19   credit facilities that were put in place by the banks in

20   December of 2007; one of them was a --

21          THE COURT:  It was Huebner's client?

22          MR. WERDER:  Well, he was -- he was one of them, Your

23   Honor, yes.

24          THE COURT:  Uh-huh.

25          MR. WERDER:  He was -- he was the -- they were kind of

1    taking the lead.

2         But there was a one-billion-dollar revolver in

3    addition to all the other components, all the other funding

4    components of the -- of that transaction.  And when this Access

5    revolver was put in place in the spring of 2008, at a time when

6    LyondellBasell was involved in negotiations with its banks, as

7    Mr. Pohl referenced, they took the terms of the arm's length

8    negotiated revolver.

9         And as the Court pointed out, to me, that seems to cut

10   pretty strongly in our favor, that we have commercial terms

11   that were negotiated between arm's length parties.  And I think

12   it probably doesn't strain credulity to suggest that the Court

13   is very familiar with the concept in funding agreements of this

14   kind, whether they're a revolver or some other funding

15   agreement, to have a limitation on consequential and special

16   damages.  They're very --

17        THE COURT:  You know, that gets into an issue, Mr.

18   Werder, that's been under the covers in all of the plausibility

19   arguments that I've been getting in the briefs and -- so far,

20   and I'm likely to get more later.  Yeah, I got experience in

21   that area, because I was a commercial litigator, and I did

22   that.

23        But on something that's a non-discretionary call --

24   because I think on discretion, we're supposed to use the

25   benefit of our experience, we bankruptcy judges.  But on a

1   12(b)(6), which is in theory a pure matter of law, do you think

2   the Supreme Court is telling us in <u>Iqbal</u> that we're allowed to

3   use our personal experience on what's plausible or not?

4        MR. WERDER:  Well --

5        THE COURT:  That would mean that my personal

6   experience would be one thing, and one of my colleagues in

7   another part of the country might be totally different.  I

8   can't believe that there would be two different rules of law,

9   depending on what the judge saw in private practice, or even in

10  his earlier tenure on the bench.

11       MR. WERDER:  Honestly, Your Honor, I'm not necessarily

12  a big fan on <u>Twombly</u> and <u>Iqbal</u> myself.  I've seen them used in

13  contexts where it does seem like the Court is -- you're getting

14  very variable results.  But what I would say for purposes of

15  this motion, <u>Iqbal</u> and <u>Twombly</u> are not relevant to this motion,

16  Your Honor.

17       I mean, what Mr. Pohl is saying is, well, if you got

18  into the negotiation of the revolver, basically what you'd see

19  is that it was a transaction involving affiliates.  Well, that

20  may be true.  But the undisputed facts, I think, are that it

21  was on the same commercial terms as the revolver that had

22  previously been negotiated by the arm's length third parties,

23  number one.

24       And number two, Mr. Pohl doesn't cite any authority

25  for the proposition that the legal standard that Judge Drain

153

1   applied in the Delphi case would be applied in a different way,

2   even if he were able to show that the thing wasn't heavily

3   negotiated because, rather than try to negotiate between

4   affiliates, they took off the shelf the terms that had been

5   previously negotiated between arm's length third parties.

6            So in terms of this motion, I don't think it matters -

7   - Iqbal and Twombly aren't all that relevant.  But in terms of

8   the broader set of motions that are before the court today,

9   Iqbal and Twombly are relevant to some of them.  And you know,

10  frankly, I don't think there's a whole lot of authority that's

11  out there about whether -- how the judge is supposed to apply

12  his own set of particular experiences to deciding a motion

13  based on Iqbal and Twombly in opposition to any other legal

14  issue that the judge has before him.

15           But it is the law of the land.  And frankly, I've -- I

16  mean, we act as plaintiffs, too, as Your Honor knows, and we've

17  had a number of cases where we've come to the conclusion that,

18  you know, we were unhappy about the way that Iqbal and Twombly

19  were applied against us.

20           THE COURT:  There are some that say that judges are

21  supposed to exercise judicial restraint and not to be

22  legislating, and to be following what some might regard as more

23  appropriate, which are principal rules of law, and not doing

24  whatever they feel like in their bellies.

25           MR. WERDER:  Well, we are certainly not advocating

1    that Your Honor or that any other judge does whatever they feel

2    like in their bellies.  I think every motion that we have

3    presented is a motion that is based upon very straightforward

4    legal principles, and including this one.  The basic legal

5    principle underlying this one is that limitations of damages of

6    the kind that are contained in this contract are enforceable,

7    except for every exceptional circumstances, which haven't been

8    alleged here.  That's a very straightforward principle.

9         And you know, I don't want to tread over into the

10   Luxembourg law arguments, Your Honor, but you know, as long as

11   you mention going with your gut, the Luxembourg statute that

12   the trustee wants you to adjudicate in this case, as we'll cite

13   to you in just a moment, is nothing other than a suggestion

14   that you go with your gut.  It's basically a way --

15        THE COURT:  Well, we'll get to that when we get to

16   that.  The problem is one not of plausibility, but of trying to

17   determine what the law is in a jurisdiction where the law is

18   thinner than it is in other jurisdictions.

19        Every time you get out of Delaware -- and I'm

20   telegraphing questions I'm going to be asking both sides later.

21   Every time you get out of Delaware, the law is thinner on

22   matters of corporate governance than it is in Delaware.

23        MR. WERDER:  Certainly, Your Honor.

24        THE COURT:  New York law is thinner than Delaware.

25   Delaware -- excuse me -- Texas law is thinner than New York

1    law.  And I'm just talking about U.S. jurisdictions.

2            And that doesn't mean that a Texas Judge can't decide

3    a matter of Texas law on something which the Texas Court of

4    Civil Appeals, or whatever its highest civil side court is, has

5    ruled on.  Judges do that all the time.

6            MR. WERDER:  Of course.

7            THE COURT:  And although I'll hear argument on whether

8    that's equally permissible for a civil law jurisdiction, that's

9    what I'm going to want your side to address and your opponents

10   to address.

11           MR. WERDER:  Okay.  And --

12           THE COURT:  So -- but I think that however a judge

13   tries to decide an undecided matter of law is analytically

14   different than using his or her life experience to try to reach

15   an adjudication on a legal issue.

16           MR. WERDER:  Well, I think --

17           THE COURT:  Now you're right, I'm not going to

18   disregard what the Supreme Court tells me, but that's what's

19   troubling me, Mr. Werder.

20           MR. WERDER:  Well, but, Your Honor, I think if you

21   look at the various motions that have been filed here, while

22   there are some motions that take conclusory allegations of the

23   complaint and say that Your Honor should find them to be not

24   plausible under Iqbal and Twombly for various reasons,

25   typically reasons that are related to other allegations of the

1    complaint -- and that is -- you know, the sad fact of life is,

2    I think that's what the Supreme Court has said needs to be

3    done.

4           But what I would say, Your Honor, is I don't want to

5    lose sight of the fact that the motions that are before you

6    today are largely not based on, well, is this plausible or is

7    that plausible.  Rather, they're based on things like this

8    motion is based on, and that --

9           THE COURT:  Your point is that Count 12 doesn't

10   require plausibility analysis.

11          MR. WERDER:  Not at all, Your Honor.

12          THE COURT:  I take that point.

13          MR. WERDER:  Not at all.

14          And many of the other motions -- I think the motion

15   that Mr. Kirpalani just argued doesn't have anything to do with

16   plausibility.  I think there are certain aspects of the motion

17   that Mr. Higgins argued, obviously, that do go to plausibility,

18   but there are other aspects of it; the imputation issue, for

19   example, which is purely a legal issue.  So concededly, some of

20   the motions that are before the Court today do present some

21   plausibility issues, and those motions are based upon Supreme

22   Court jurisprudence that says that, you know, you can't come in

23   with just a -- I mean, just by way of example, the allegation

24   that, well, you're in bad faith and -- without the factual

25   underpinnings that show why that allegation of bad faith has

157

1   got some plausibility.  And lots of courts are doing things

2   like that.

3          But I think we -- so I think we have to concede that

4   there is some combination here in some of these motions of

5   asking the Court to look at allegations, largely very

6   conclusory allegations, that under governing law you're not

7   required to credit, to the extent that detailed factual

8   allegations are being -- are required to be credited, and

9   determine whether or not the conclusion that is sought to be

10  drawn from them is plausible.  That is what the Supreme Court

11  instructs.

12         But in, I think, every case in every motion that's

13  presented, there are -- separate and apart from that

14  plausibility analysis, there are very distinct, specific legal

15  principles that we or various of the other defendants are

16  advocating as the basis for dismissal of the count that the

17  motion is addressed to.

18         THE COURT:  Okay.  Thanks.

19         Mr. Pohl.

20         MR. POHL:  I mean it more than --

21         THE COURT:  What this --

22         MR. POHL:  I mean it more than Mr. Kirpalani.  Okay?

23  Thirty seconds.  Just two things, Your Honor.

24         I'll give Mr. Werder the benefit of the doubt because

25  he didn't look at the contentions of fact last night.  I wasn't

1   suggesting there's anything in here about the negotiation in

2   March.  My point was, in April, which was a key time frame,

3   this lays out in spades the kind of conduct that Access

4   undertook in administering the revolver, that's my point.

5            And as to the negotiation, there are deposition

6   transcripts, Your Honor, that are in our pleadings, where we

7   get a little bit of he said/she said, you know, he negotiated,

8   and she said he did.  So that was my point on the contentions

9   of fact and the underlying record.

10           THE COURT:  Okay.  Given how relatively short that

11  argument was, let's go right into the next one.

12           MS. ORENSTEIN:  Your Honor, if I may be heard for one

13  moment before Mr. Werder takes the podium on this motion.  Your

14  Honor noted --

15           THE COURT:  Come to a microphone, Ms. Orenstein.

16           MS. ORENSTEIN:  Okay.  Yes.

17           THE COURT:  You're kind of breaking the procedural

18  rules.  And it isn't that I'm a stickler for rules, but I am a

19  stickler for fairness.  So make it very short.

20           MS. ORENSTEIN:  Thank you.

21           THE COURT:  And I'm telling you now that if it's

22  anything they want to respond to, I'm going to give them that

23  chance.

24           MS. ORENSTEIN:  Certainly, Your Honor.  It is very

25  short.  This is May Orenstein of Brown Rudnick.

1          You did mention earlier that Quinn Emanuel did not

2   brief the Count 6 motion that was asserted against Mr.

3   Blavatnik, and instead purported to have joined other motions

4   that were served with respect to Count 6, allegations made

5   against other defendants.  And we have scrutinized the record,

6   and I just wanted -- and I don't see arguments that are

7   relevant or pertinent to Mr. Blavatnik in the other motions,

8   which Quinn Emanuel has purported to join, and I just wanted to

9   make that observation in advance of the argument, lest our

10  objection to the Court hearing arguments that were not briefed

11  on that count be heard.  And that's it.

12          THE COURT:  Your point being that I don't have

13  anything to determine whether or not Blavatnik is covered under

14  6, or you're saying that without a doubt Blavatnik is covered

15  under 6, but until now, you didn't understand that they were

16  seeking to get Blavatnik out from 6.

17          MS. ORENSTEIN:  No, we understood they purported to

18  join the motion.  The point is they did not brief Count 6 with

19  respect to Mr. Blavatnik, but instead joined the other

20  defendants.

21          The arguments that were asserted by the other

22  defendants, to our mind, do not address any insufficiency of

23  that claim as it would be asserted against Mr. Blavatnik

24  because of the --

25          THE COURT:  So the corollary of that is that, if I

1   were otherwise inclined to dismiss six against Blavatnik, you

2   would want to have an opportunity to be heard first.

3          MS. ORENSTEIN:  Yes.  Yes, Your Honor, and actually to

4   submit briefs and expert opinion with respect to the

5   sufficiency of the claim against Mr. Blavatnik, because none of

6   those issues were addressed in the briefing.

7          THE COURT:  All right.  I understand the issue.

8          MS. ORENSTEIN:  Okay.  Thank you, Your Honor.

9          THE COURT:  Does the other side want to respond to

10  what Ms. Orenstein said, or just have a reservation of rights

11  to be heard on that?

12         MR. WERDER:  Your Honor, Rick Werder from Quinn

13  Emanuel.

14         I said at the outset that we would address that issue

15  in connection with Count 6, and I had every intention of doing

16  that.  I think it will be -- you know, rather than getting to

17  Count 6 out of the order that I intended to present the

18  arguments in, if it's okay with the Court, I'll just address

19  that issue when I turn my attention to Count 6.

20         THE COURT:  Well, I'm not sure if it will be okay with

21  the Court.

22         MR. WERDER:  Okay.

23         THE COURT:  Because my concern is, if I heard Ms.

24  Orenstein right, the terrain upon which both sides have been

25  arguing before a Judge who likes to read briefs is they have

1  been led to believe that they've been led to believe that they

2  didn't need to address that in a brief.  And now they're saying

3  that that premise may be mistaken.

4         MR. WERDER:  I don't --

5         THE COURT:  And I'm not --

6         MR. WERDER:  Yeah, I'm sorry.

7         THE COURT:  -- of a mind to say that you can't join,

8  but I am of a mind to say that before I let either side be

9  adversely affected by something that I'm deciding on my watch,

10 I'm very loathe to do it without giving each side a chance to

11 write on the subject.

12        MR. WERDER:  Understood, Your Honor.  So let me just

13 explain the posture of that under Count 6 then.  Count --

14        THE COURT:  Tell me the posture.  But I got to tell

15 you, my tentative is that before I left anything happen that

16 could affect their rights against your client, even if I don't

17 take oral argument on it, I'm likely to allow each side to put

18 on something on writing -- in writing.

19        MR. WERDER:  Okay.  Well, that -- yeah, we wouldn't

20 object to that, Your Honor.

21        But what -- just so that the Court understands what

22 happened here is various defendants moved to dismiss Count 6,

23 which is a Luxembourg law count.  And Count 6 originally was

24 pleaded against person who were alleged to be members of the

25 supervisory board of LyondellBasell, and it was also asserted

1    against person who were alleged to be the managers of Basell AF

2    G.P., the general partner of Basell.  And Mr. Blavatnik was

3    alleged to be liable there in kind of an uncertain

4    circumstance.

5         But there were motions that were filed by one or more

6    of the supervisory board members.  And as the briefing

7    proceeded, the trustee submitted a brief that said that the

8    supervisory board issues are at the very periphery of Count 6;

9    in other words, they're not particularly pertinent to Count 6.

10   And so at that point in time, Mr. Blavatnik joined, who was a

11   member of the supervisory board, and who's alleged to have been

12   acting in his capacity as a member of a supervisory board.  He

13   joined a previously pending motion by another supervisory board

14   member that said, supervisory board membership is not enough to

15   give rise to liability under Count 6.  That's the procedural

16   posture of Count 6.  Now --

17        THE COURT:  All right.  Here's what we're going to do

18   on this.  This is the easiest thing you guys have given me all

19   day.

20        (Laughter.)

21        THE COURT:  Mr. Werder, I'm going to let you, on

22   behalf of your client, move against Point 6, but you got to do

23   it in writing.  And you're going to give -- sit down or pick up

24   the phone with Ms. Orenstein and agree upon a briefing schedule

25   for them to respond in writing if they want to, just as if it

1   were a separate motion, except that I'll decide after I read

2   the briefs whether it's sufficiently different that I need to

3   have oral argument, or I'm going to decide it on the papers.

4   I'm not going to foreclose you from the opportunity of moving

5   against it, but I got to give them more procedural due process

6   in being heard to address your contentions.

7          MR. WERDER:  That's absolutely fine with us, Your

8   Honor.

9          THE COURT:  Okay.

10          MR. WERDER:  So we'll work that out afterwards.

11          THE COURT:  After you agree upon your schedule, paper

12   it with a stip or consent order which, if it's reasonable, I'll

13   so order.

14          MR. WERDER:  Okay.  So, Your Honor, I'm going to

15   address then three counts of the complaint that purport to

16   assert counts under Luxembourg law.

17          That will be Count 7, which is a claim for tort

18   liability against various persons who were allegedly involved

19   in the management of LBI.

20          Count 14, which, as originally pleaded, sought relief

21   against persons who were involved in declaring three dividends

22   at Basell in 2007, prior to the merger.

23          THE COURT:  Which Basell?

24          MR. WERDER:  Pardon me, Your Honor?

25          THE COURT:  Which of the Basells?

1          MR. WERDER:  Yes, Your Honor.  So if you have your

2    chart there?

3          THE COURT:  Yeah, that's what I was trying to follow

4    along with you.

5          MR. WERDER:  Okay.  So, Your Honor, if you look at the

6    middle of the page, Basell AF S.C.A.

7          THE COURT:  Okay.

8          MR. WERDER:  That's the entity --

9          THE COURT:  And that's in both the pre- and post-

10   chats.

11         MR. WERDER:  Correct, Your Honor.

12         And so in 2007, Basell AF S.C.A. declared three

13   dividends payable to its shareholders, and that shareholder

14   largely is BI S.A.R.L., and there's a separate motion later in

15   the day that relates to BI S.A.R.L. that I won't get into now.

16         But in any event, in May, July, and December of 2007,

17   Basell AF S.C.A. declared dividends payable to BI S.A.R.L. and

18   Basell AF G.P. as its two shareholders.

19         And the complaint originally sought relief against

20   various individuals who were allegedly involved in declaring

21   that dividend based upon Luxembourg law for all three

22   dividends.  They have dropped -- they've done two things in the

23   last couple of days:  They dropped two of the dividends, so now

24   they're only proceeding on the December 2007 dividend, rather

25   than the May and July dividends; and they dropped the claims --

165

1    they had a variety of claims that said, these dividends were

2    not declared in accordance with Luxembourg law, and cited

3    various different provisions, and they've dropped all those

4    claims now and are proceeding solely on a -- basically on the

5    same kind of tort theory that they're proceeding under -- in

6    Count 7.

7            And then we have Count 18, which is the aiding and

8    abetting breach of fiduciary duty count pleaded under

9    Luxembourg law.

10           Your Honor, before I address the specifics of the

11   three different counts, let me try to make a few points, which

12   I think are general in nature, that I think there's largely

13   agreement on between the defendants who are named under the

14   Luxembourg counts and the trustee.  But if there isn't

15   agreement, I'm sure that Ms. Orenstein will point it out.

16           And let me make -- let me make the first point, Your

17   Honor, in reference to this organization chart.  Because the

18   Luxembourg law claims that are being pursued by the trustee

19   here are the claims of Basell AF S.C.A.  That's the -- that's

20   essentially the top holding -- the top Luxembourg holding

21   company for the Basell assets prior to the merger, and then for

22   the LyondellBasell assets after the merger.  And the claims

23   that are being asserted are claims that essentially that

24   entity, Basell AF S.C.A., was mismanaged or that torts were

25   committed against it.

1           "S.C.A." translates loosely into "corporate

2    partnership limited by shares."  That's the -- that's the kind

3    of corporate entity that this company was under Luxembourg law.

4    And just like the U.S. has a corporate -- you have

5    corporations, you have limited liability companies, you have

6    partnerships, et cetera, Luxembourg has various different kinds

7    of corporate entities, one of which is an S.C.A., and this one

8    in particular was an S.C.A.

9           THE COURT:  This -- I'm not looking for your

10   testimony, but I'm looking for some help.

11          MR. WERDER:  Yes, Your Honor.

12          THE COURT:  Is this most analogous to an LLC, the way

13   we think of it in U.S. law?

14          MR. WERDER:  Well, it's probably more analogous, Your

15   Honor, to a limited partnership in certain senses, because --

16   and I'm not sure it's precisely analogous to that.  But

17   basically, what you have is, if you look at this chart --

18          THE COURT:  You have a G.P. and limiteds?

19          MR. WERDER:  The G.P. has unlimited liability.  So the

20   G.P. -- G.P -- "G.P." is "general partner," and the G.P. is the

21   entity that is legally responsible under Luxembourg law to

22   manage the AF S.C.A., and the G.P. has unlimited liability in

23   respect of the management of the -- of the S.C.A.  The G.P. has

24   to own at least one share --

25          THE COURT:  That sounds exactly like a U.S. limited

1   partnership.  Why do they call it corporate, if you know?

2           MR. WERDER:  I have absolutely no idea, Your Honor,

3   why in Luxembourg it's called a -- it is a called a "corporate

4   partnership limited by shares."  As we're told, the Luxembourg

5   lawyers would translate the -- I'm not sure if it's a French

6   word, "S.C.A." or if it's a -- if it's from Belgium; I think

7   it's from either France or Belgium.  But the translation of it

8   is "corporate partnership limited by shares."

9           And essentially what you have is a G.P. entity that

10  has unlimited liability, and that's Basell AF G.P. S.A.R.L. on

11  the chart.  And then you have other shareholders who -- you

12  could have more than one.  Here, there's -- here, there's only

13  one other one, it's BI S.A.R.L.

14          Now the plaintiffs -- the trustee has submitted a

15  Luxembourg law affidavit from a man named Delvaux.  And what

16  Mr. Delvaux says -- and I'm going to quote from him directly

17  because I think it's very pertinent.  He says, quote:

18          "The affairs of a S.C.A. are managed by a general

19          partner."

20          That's at Paragraph 12 of his opinion.

21          And then he says, quote:

22          "Under Luxembourg law, the responsibility for making

23          decisions to enter into transactions such as those

24          described in the amended complaint lies with the G.P.,

25          as manager of the company."

1          That's from Paragraph 22 of his declaration.  And that

2     same statement more or less appears at Page 2 of the trustee's

3     brief in response to the Luxembourg law motions.

4          And then finally what Mr. Delvaux says on this

5     particular topic is that the G.P. can have liability to the

6     S.C.A. for damages for actions taken in the management of the

7     S.C.A. by the G.P.  And that's from paragraph -- Paragraph 14

8     of his opinion.

9          Now looking at these specific entities, the trustee

10    didn't sue the G.P. here, and didn't sue them for reasons that

11    are probably fairly obvious, but one of them is that the G.P.

12    was a debtor in the bankruptcy.

13         But in any event, the entity that is responsible for

14    the management of the S.C.A. under Luxembourg law, according to

15    Mr. Delvaux -- and the other experts all agree with him; I was

16    just quoting Mr. Delvaux, so that there wouldn't be any dispute

17    over the proposition -- the entity that is responsible as the

18    general partner for the management of the S.C.A. has not been

19    sued by the trustee here.  Instead, what the trustee has done

20    is to sue a number of individuals who allegedly had involvement

21    in the management decisions that the G.P. was making.  And

22    we'll talk about some of them specifically in just a few

23    minutes.

24         Now what the trustee's brief admits -- and this is --

25    and this is a quote from the trustee's brief:

1              "There is no Luxembourg Court decision finding

2              liability under a similar set of circumstances."

3         That's from Page 9 of their brief in opposition to the

4    Luxembourg law motions.

5         And our expert, Mr. Arendt, at Paragraph 48 of his

6    declaration, opines to a similar effect.  He says, quote:

7              "Under Luxembourg law, there are no causes of action

8              which are identical or even similar to those asserted

9              by the trustee in the amended complaint against the

10             moving defendants."

11        So what is the trustee now doing?  The trustee, except

12   everybody -- against everybody except Mr. Blavatnik, the

13   trustee originally pleaded in Count 6 that basically a

14   fiduciary duty -- the Luxembourg equivalent of a fiduciary duty

15   claim, that various individuals were involved in the management

16   of LBI, AF S.C.A., and they breached their fiduciary duties,

17   and therefore are liable under Luxembourg law.  Virtually all

18   of that is now swept out the window, and he's proceeding on

19   Count 7, which relies on absolutely the most general possible

20   statutes under Luxembourg law.  Civil Code, Articles 1382 and

21   1382.

22        And those two articles are quoted in their entirety at

23   Paragraph 24 of Mr. Arendt's declaration.  Article 1382, quote:

24             "Any act of man which causes harm to anybody else

25             entails the obligation of the one by whose fault this

1          act has happened to repair the harm."

2          That's the entirety of the statute.  Article -- and of

3   course, this is translated by our expert.  The original statute

4   is not obviously --

5          THE COURT:  But there's no difference between the two

6   sides as to how the language is translated into English?

7          MR. WERDER:  I don't think there's any dispute, but if

8   there is -- I mean, there hasn't been any dispute that's been

9   pointed out.  I think everybody is translating it essentially

10  the same.

11         And then Article 1383, Your Honor, says, quote:

12              "Each person is responsible for the harm it has

13              caused, not only by its acts, but also by its

14              negligence or its lack of prudence."

15         That's the two statutes that -- of Luxembourg law, on

16  which the trustee is now placing principal reliance.

17         We believe, Your Honor, that the law is very clear

18  that the trustee has the burden to prove the substance of

19  foreign law to a reasonable certainty.  And we've cited cases

20  like the Enigma Holdings case, which isn't a this-district

21  case, but I think it's a reasonably held general proposition,

22  and he hasn't done that.

23         Instead, the trustee largely relies on an expert

24  report that, instead of telling this Court what Luxembourg

25  Courts have done with fact patterns like this in similar

1   circumstances, essentially says what he thinks a Luxembourg

2   Court in some instances, quote, "could" do.  I think in other

3   instances perhaps he says what it, quote, "might" do.

4              THE COURT:  Let me tell you what's troubling me, Mr.

5   Werder.

6              MR. WERDER:  Yes, Your Honor.

7              THE COURT:  We've got a Supreme Court of the United

8   States, obviously, that believes in textual analysis, and which

9   has told people, upon which other defendants in this case are

10  going to be relying, that when you have unbelievably broad

11  language in statutes, like in the safe harbors, they're to be

12  construed in accordance with their terms.  That will be

13  something that the Litigation Trustee may have to confront when

14  every financial institution in the United States, and perhaps

15  the world, and shareholder in the United States and the world

16  says, I got a get-out-of-jail-free card because this is a

17  clearing transaction or a settlement transaction.

18             But here, the plain language of that language says

19  that, if you cause damage, you got to pay for it.  Is there an

20  inconsistency here?

21             MR. WERDER:  Well, I think the inconsistency, Your

22  Honor, is that, from the precedents that have been collected by

23  the trustee's experts and our experts, this statute has never

24  been applied -- neither of these statutes has ever been applied

25  to impose liability in circumstances that are even remotely

1    comparable to this one.

2            Now I don't know whether Luxembourg -- I don't know

3    what Luxembourg's principles are, in terms of statutory

4    construction, honestly.  But what I do know is what the trustee

5    says about Luxembourg law.  And what the trustee says about

6    Luxembourg law is that its, quote, "fundamental nature" is,

7    quote, "broad and vague," with, quote, "relatively sparse" case

8    law, quote, "relatively few decisions on issues of corporate

9    law," and no binding precedents.

10           According to the trustee, and according to the

11   trustee's expert, essentially these Luxembourg statutes appear

12   to be an invitation to a Luxembourg Judge to apply the

13   sensibilities of Luxembourg to the facts of a particular case.

14           THE COURT:  You could say the same thing about Idaho

15   law.  But you're saying there's a special rule for foreign law

16   that doesn't apply to U.S. jurisdictions?

17           MR. WERDER:  Well, there certainly isn't any

18   requirement, Your Honor, that if I come into federal court in

19   New York and plead a case based on Iowa law, there's no

20   requirement --

21           THE COURT:  I said Idaho, which I think is even worse

22   than Iowa.

23           MR. WERDER:  Did I say Iowa?

24           THE COURT:  Yeah, but I think --

25           MR. WERDER:  Whichever --

173

1          THE COURT:  -- we agree on the point.

2          MR. WERDER:  Whichever one I -- whichever one I said,

3    it doesn't matter.  There is a specific rule of federal

4    procedure, as the Court well knows, that is applicable to

5    foreign countries' law.

6          THE COURT:  That being 44.1 or something?

7          MR. WERDER:  Correct, Your Honor, 44.1.

8          And one of the propositions that we are advancing,

9    Your Honor, is that, because this Court isn't familiar with the

10   sensibilities of a Luxembourg citizen or a Luxembourg Judge,

11   that this Court shouldn't be making Luxembourg law, and

12   applying Luxembourg law in a way that no Luxembourg Court has

13   ever applied it.  And I'll make that point a little more

14   specifically in connection with the particular counts.

15         Let me turn to Count 7.

16         THE COURT:  Before you do --

17         MR. WERDER:  Yes, Your Honor.

18         THE COURT:  -- a question I'm going to ask both sides.

19         If we were here talking about a U.S. limited

20   partnership, as to which there seem to be some analogs, you got

21   an office building, let's call it "999 Madison Avenue," and

22   it's been run into the ground by its general partner, which is

23   somebody's real estate company, Ajax Real Estate, which is a

24   corporation, and which has guys who manage the corporation.

25         You first, and then when it's the Litigation Trustee.

1   Would the guys who manage Ajax Realty, which is the G.P. for

2   999 Madison Avenue, be personally liable for running that

3   building into the ground?

4            MR. WERDER:  And the -- well, what is its corporate

5   form, Your Honor?  It's a --

6            THE COURT:  Well, I'm assuming that Ajax Realty for

7   this question is a corporation.

8            MR. WERDER:  Okay.

9            THE COURT:  But if the answer would depend on its

10  corporate form --

11           MR. WERDER:  Yep.

12           THE COURT:  -- qualify your answer.

13           MR. WERDER:  Well, I'm not sure that it does.

14  Certainly, if it's a corporation, Your Honor, and the

15  corporation is the general partner -- assuming there isn't

16  something -- and I'm not an expert in partnership law.  But

17  assuming that there isn't something in partnership law that

18  says you can't have a corporation be your general partner, the

19  liable party for mismanagement of the partnership would be the

20  corporation.

21           And I think, under the law of every U.S. jurisdiction

22  that I'm familiar with, it would be the exceptional

23  circumstance in which the partnership that was being managed by

24  a corporate general partnership or a corporate general partner,

25  which was a corporation, would have a direct action against the

1   individual managers, the executives, of the company that's

2   running it.

3           But certainly under Luxembourg law, Your Honor, what

4   we want to -- what I think everyone has agreed to here --

5   especially -- and I think Mr. Delvaux has agreed to it, as

6   well.  What Luxembourg law provides is that, if we look at this

7   org. chart, that this entity, the G.P. --

8           THE COURT:  I can't see which one you're pointing to.

9   Basell AF G.P. S.A.R.L.?

10          MR. WERDER:  Yes, Your Honor.

11          So that's the general partnership that is legally

12  charged under Luxembourg law with managing AF S.C.A.  Now there

13  are managers of Basell AF G.P. S.A.R.L.  Obviously, there are

14  live human beings who are appointed to be the managers of that

15  entity.

16          But I think what everyone is in agreement with at this

17  point, particularly given the decisions the trustee has made on

18  Count 6, I think that -- I think there appears to be fairly

19  general agreement that, at least absent very special

20  circumstance, that the liable party for mismanagement of the

21  S.C.A. is the G.P. and not the manager of the G.P.

22          And I think, Your Honor, if you read Mr. Delvaux's

23  opinion, Mr. Delvaux's opinion makes clear -- now we're talking

24  not so much about mismanagement; we're talking about tort

25  claims under 1382 and 1383.  What Mr. Delvaux's opinion makes

1   clear, I think in reading it -- and I'll quote a couple of

2   passages from it in a moment -- that tort actions in Luxembourg

3   generally do not lie against the managers of a Luxembourg

4   company for actions that they take in managing that company,

5   whether or not the claims are brought by the managed company or

6   by a third party.

7           And so here, what do we have?  We have Basell AF

8   S.C.A., we have the trustee who's been assigned the claim of

9   Basell AF S.C.A., and who is pursuing, in the name of Basell AF

10  S.C.A., essentially, the claims of Basell AF S.C.A. against

11  various individuals.  Some of those individuals were the

12  managers of Basell AF G.P. S.A.R.L.  Others of them had various

13  other roles that they're alleged to have played.

14          For example, they were the managers of BI S.A.R.L.,

15  who's the shareholder of AF S.C.A.; or they were directing the

16  actions of the -- of the managers of BI S.A.R.L. or of Basell

17  AF G.P.

18          And what does Mr. Delvaux say about that situation?

19  What he says is that, when the plaintiff is the managed

20  company; i.e., when the plaintiff is Basell AF S.C.A., he says

21  that the company can have a tort claim under Luxembourg law,

22  and here's his quote.  Quote:

23          "-- but only where the acts or omissions of a manager

24          do not constitute a purely contractual fault; i.e., do

25          not constitute a mismanagement fault or a violation of

1    the company's articles of association or of the law."

2         That's from Paragraph 38 of his opinion, basically

3    saying if I'm the manager of Basell AF G.P., and I pass

4    resolutions, approve resolutions as the manager of AF G.P. that

5    cause AF S.C.A. to take actions, I don't have any liability in

6    tort unless my action is outside the scope of my corporate

7    responsibilities.  And he says it's the same thing for third-

8    party liability, what he says as to third-party plaintiffs.

9         So if, for some reason -- if, for some reason, Basell

10   AF S.C.A. was viewed as a third party, let's say, in relation

11   to either its general partner or its shareholder, so that it

12   was bringing actions against -- Basell AF S.C.A. was bringing

13   actions against persons who had acted on behalf of third-party

14   corporations, what Mr. Delvaux says is, quote, "Under normal

15   circumstances," only the manager's company is liability to a

16   third party, and the manager himself isn't liable.  That's

17   Paragraph 37.  He says corporate managers are liable to third

18   parties only if the actions that they took fell, quote,

19   "outside the scope of their duties as managers."  That's

20   Paragraph --

21        THE COURT:  All right.  Pause, because --

22        MR. WERDER:  Yes, Your Honor.

23        THE COURT:  -- I think I hear what you're saying.  And

24   I guess you're either saying or implying that a corporation

25   called or a business entity called Basell AF G.P. S.A.R.L.

1   would be liable for any damage to Basell AF S.C.A.  But are you

2   saying that there is no human being who is liable for that

3   damage, even though human beings are the ones who caused the

4   problems?

5          MR. WERDER:  Well, what I'm saying, Your Honor -- and

6   obviously, I'm not an expert on Luxembourg law.  I'm saying

7   this based -- for the purposes of this argument, purely based

8   on Mr. Delvaux's opinion.  And Mr. Delvaux's is the trustee's

9   expert.

10         But what I'm saying is -- and based on what Mr.

11  Delvaux says -- is that -- that the live human beings who are

12  associated with and acting for the G.P. entity can be liable to

13  the AF S.C.A. entity only if the actions that they took in

14  their capacities with the G.P. entity fell outside of the scope

15  of their corporate responsibilities or their legal

16  responsibilities as managers of the G.P.

17         So it's a very limited set of circumstances that Mr.

18  Delvaux posits under which the individuals, as opposed to the

19  corporate entity that is legally charged with management, can

20  be responsible.

21         Now it's not 100 percent clear, I don't think, from

22  the complaint, exactly how the trustee is trying to position

23  this.  I think it is clear that all of the actions alleged to

24  have been taken by all of the individuals who are sued in Count

25  7 are actions that were alleged to have been taken in

1   capacities that those individuals had with some other corporate

2   entity, whether it was AF G.P. S.A.R.L. or BI S.A.R.L., the

3   shareholder, which was allegedly directing the actions of AF

4   S.C.A.; and therefore, the individuals who were associated with

5   those various different entities can only have liability, under

6   Mr. Delvaux's approach, if their actions were outside the scope

7   of their duties as managers of the entities that they were, in

8   fact, managing.  And I think --

9        THE COURT:  Well, is that how you construe it, or do

10  you say that it's -- when they're acting for those other

11  entities, they're acting outside the scope of their duties to

12  Basell AF G.P. S.A.R.L.?

13       MR. WERDER:  No, Your Honor, because when they're

14  acting -- well, all of the actions that they took -- the

15  actions that were taken that authorized the transactions here

16  were taken by G.P. S.A.R.L.  That was the entity that had to

17  authorize them.

18       That was the -- so if you look at the merger, for

19  example, the merger transaction was authorized by two things:

20  It was authorized by a resolution of AF G.P. S.A.R.L.,

21  obviously that was signed by the managers AF G.P. S.A.R.L.

22  And it was authorized -- and I'm talking about on the Basell

23  side now -- it was authorized by a resolution of Basell -- of

24  BI S.A.R.L., the shareholder.  And obviously people signed that

25  resolution, as well.

1        And what Mr. Delvaux's opinion is saying, I believe

2   very clearly, is that the individuals acting for BI S.A.R.L.,

3   the individuals acting for G.P. S.A.R.L. can be liable only if

4   their actions were outside of the scope of the -- their duties

5   as managers of G.P., as managers of BI S.A.R.L.  That, I think,

6   is pretty clearly what it says.

7        But regardless whether you view the company, AF

8   S.C.A., as the managed company or as a third party in relation

9   to those various corporate entities, it really doesn't matter.

10  Because what Mr. Delvaux has said is that the standing for

11  imposing individual tort liability on persons who are acting on

12  behalf of a company is the same, essentially, whether or not

13  it's the company or some third-party stranger to the company

14  seeking to impose that liability on them.

15       And I think the defendants essentially admit this --

16  the plaintiffs essentially admit this in their brief; that in

17  order to be actionable in tort, the action has to be outside

18  the scope of management duties.  That's from their brief at

19  Page 15.

20       Now if you look at the complaint, the complaint

21  doesn't allege that any defendant acted outside the scope of

22  his management responsibilities and duties.  Relying on Mr.

23  Delvaux, and in particular relying on Paragraph 45 of Mr.

24  Delvaux's opinion, the trustee argues, he tries to argue I

25  should say, that a Luxembourg Court, quote, "could find" that

1   managers who approve a poorly funded merger acted outside the

2   scope of their duties as managers, so that they could be

3   subjected to tort liability.

4          If you scour Mr. Delvaux's opinion, Your Honor, you

5   will find no authority for that proposition, other than Mr.

6   Delvaux's say-so.  He cites nothing for it.  And in fact, he

7   cites two precedents in connection with this issue at Paragraph

8   10 of his opinion.  And one of those cases -- the cases involve

9   two different fact patterns.  One involved allegations that a

10  corporate manager was engaged in misappropriation from his

11  corporation, essentially was engaged in looting; and the other

12  involved allegations that the corporate managers who were

13  sought to be made defendants authorized very large investments

14  by a company in a precarious financial condition, which sounds

15  pretty darned familiar with the allegations in this case.

16         And what Mr. Delvaux's opinion says at Paragraph 10 is

17  that, in both of those cases, the Luxembourg Courts or the

18  precedents that he cites concluded that the acts that were

19  complained of constituted alleged mismanagement and fell within

20  the scope of management duties, not outside the scope of

21  management duties.

22         So basically, what we have, Your Honor, is that we

23  have, I think, more or less agreement on the proposition that,

24  under Luxembourg law, tort liability is going to lie against

25  someone who's acting on behalf of a Luxembourg corporate-type

Argument

1  entity only in situations where the actions that they took were

2  outside the scope of their duties to that entity.  And what we

3  have is a totally unsupported assertion by Mr. Delvaux that a

4  Luxembourg Court could find that the approval of this merger

5  fell outside the scope of management responsibilities, an

6  opinion that is 180 degrees in conflict with the only two

7  precedents that Mr. Delvaux cites.

8          We believe, Your Honor -- and to wrap up on Count 7 --

9  this Court should not accept an assertion that approving a

10  merger wasn't within the scope of management's responsibility.

11  It's unsupported by any precedent.  It's certainly flatly

12  contrary to any U.S. corporate law principles that any of us

13  might be familiar with.

14          And it's clear based upon Mr. Delvaux's opinion, and

15  it's clear based on Mr. Arendt's opinion, that this Court, in

16  order to find that the approval of a poor decision on a

17  corporate transaction like a merger fell outside the scope of

18  management responsibilities, would have to be making brand-new

19  Luxembourg law.

20          Now I mean, the Court can do that, I suppose, I mean

21  just like it -- as you say, you can familiarize yourself with

22  Texas law or Iowa law or Idaho law, and you can familiarize

23  yourself with foreign law.  But I think, Your Honor, there is a

24  fundamental difference between trying to familiarize yourself

25  with foreign law and trying to familiarize yourself with Texas

1    law or Idaho law.  And that is that -- that, you know, it -- we

2    are fifty different states, and we do have different laws in

3    the different states.  But there's a lot of commonality, and

4    there's a lot of common experience that goes into construing

5    that.

6              And respectfully, we just don't have -- you know, you

7    don't have -- judges here -- you know, we -- it -- when you're

8    talking about, well, what -- essentially, I mean if you think

9    about it, there's an eerie prediction (sic) about what a --

10   which is what it is, right?  Because there isn't any precedent.

11   So essentially what the trustee's case is asking Your Honor to

12   do is to make an eerie prediction about what a Luxembourg Court

13   would do in circumstances where you're not going to be able to

14   find any precedent that supports liability on these facts.

15   That's what the -- effectively, what the -- what the -- what

16   the trustee's claim is asking you to do.

17             And it's not asking you to make an eerie prediction

18   like, you know, if I'm a District Court sitting in New York,

19   and I've got a New York case coming up in front of me, and I

20   was a New York lawyer, well, maybe I have a lot of experience

21   with it.  It's a totally foreign country where, respectfully,

22   you know, we don't know what Luxembourg Judges think, how they

23   think, how they look at various sets of facts and

24   circumstances.

25             And you know, with a statute -- a set of statutes

1   that's as open-ended as these, we believe that judicial

2   restraint, which Your Honor referred to a little bit earlier,

3   counsels in favor of not creating Luxembourg law out of whole

4   cloth when there's no precedent that can be cited.

5          Now somebody could come in and say, well, there's, you

6   know, thirty-five times when Luxembourg Courts have analyzed

7   similar fact patterns, and in thirty of them they did this, and

8   in five of them they did this.  Well, that's a different story

9   than what you have here.  Basically, what the trustee is

10  telling you -- what the trustee's expert is telling you is that

11  we don't have any of that precedent, there isn't such

12  precedent, and it's not binding, in any event, even on a

13  Luxembourg Court.  And the precedents that he doesn't cite are

14  contrary to his opinion, to the conclusion that he wants drawn.

15         Those are my comments specifically on Count 7.  Now I

16  want to turn to Count 14, Your Honor.

17         Count 14 is a claim, as I said at the outset of this

18  argument, that relates to -- relates now to the declaration --

19  to a distribution that Basell AF S.C.A. made in December of

20  2007, and it made it to its shareholder -- mostly to its

21  shareholder BI S.A.R.L., with a tiny little fraction of it also

22  going to its general partner Basell AF G.P. S.A.R.L.

23         And who are the defendants that are moving here?

24  Well, I guess first of all what I should say is dividends that

25  are declared -- the dividends that were declared by Basell AF

1    S.C.A., there's a two-step process -- there's probably more

2    than a two-step process, but the last two steps of the process

3    involve two things:  One, they involve the general partner

4    passing a resolution that says, declare this dividend.  And

5    then they also involve the shareholder passing a resolution

6    after the general partner has resolved that essentially accepts

7    the dividend that -- or the distribution that management has

8    decided to declare.

9         Now who are the defendants that we're talking about in

10   Count 14?  We've got Alex Blavatnik, who's Len Blavatnik's

11   brother, and we have Peter Thoren.  And those two gentlemen are

12   being sued here.  How are they being sued?  They don't appear

13   anywhere on this chart.  They are the managers of BI S.A.R.L.

14   So they're the guys who, as the managers of BI S.A.R.L., signed

15   board resolutions approving the -- and I say "approving," that

16   I'm taking the allegations of the complaint for that purpose

17   because I think it's more in the line of accepting the

18   distribution that was declared by management.  But they signed

19   the resolutions on behalf of the shareholder.  And that is the

20   only capacity in which they are sued.

21        So what is the claim based on?  The claim is based on

22   the fact that the controlling shareholder of AF S.C.A. passed a

23   resolution approving a dividend declared by its sub -- that's

24   the claim -- and that these two individuals in their capacity

25   as the managers of the shareholder were actually the two guys

Argument                                                    186

1   that signed that resolution.

2          Now the trustee cites no case, absolutely no case

3   under any country's law for the proposition that managers of a

4   parent shareholder can be found liable to the wholly owned

5   subsidiary, or largely wholly owned subsidiary, for dividends

6   declared by the subsidiary and paid to the parent.  I think

7   it's absolutely clear, Your Honor, that if we were in the U.S.

8   -- you talked about Delaware a moment ago, under the <u>Trenwick</u>

9   decision in Delaware, this claim would go nowhere, because the

10  managers of the parent don't owe any duties to the subsidiary.

11  And I think that's -- I think that's pretty clear.

12         Now what does Mr. Arendt say about this with respect

13  to Luxembourg law in Paragraph 46?  He says, quote:

14              "There is no statutory remedy available under

15              Luxembourg law that would allow a subsidiary company

16              to sue the managers of the parent and shareholder for

17              an action taken by the subsidiary and approved by a

18              shareholders' resolution."

19         We may hear otherwise, but I think I've looked at Mr.

20  Delvaux's opinion pretty carefully, and I don't see anything

21  conflicting with that in Mr. Delvaux's opinion.

22         What does Mr. Delvaux argue?  Mr. Delvaux's opinion on

23  Count 14 spent most of the time that he covered Count 14

24  arguing that these distributions, these dividends were somehow

25  made in violation of particular statutory requirements under

1   Luxembourg law for the declaration of the dividend.  And

2   particularly, he cited corporation law or company law Article

3   72-1 and 72-2.

4         Now the trustee has dropped those claims, so the

5   trustee is no longer here contending and intending to prove

6   that these distributions violated -- just like in Delaware,

7   Luxembourg has various requirements -- various things that need

8   to be ticked off as to-dos before you can make a distribution

9   and -- like in any U.S. jurisdiction, they have the same kind

10  of thing.

11        So at one point in time earlier in the case, the

12  trustee was saying that I'm going to claim and I'm going to

13  prove that those dividends didn't comply with dividend law in

14  Luxembourg.  Now he's not, he dropped those claims.  Instead,

15  he's going purely on what he calls his "tort theory."

16        Now that's a problem, I think.  I mean, Mr. Delvaux

17  does argue that, quote -- well, I won't get to the quote yet.

18  He argues that there could be tort liability for, quote:

19        "-- wrongfully participating in the decision to

20        approve the distribution in breach of Luxembourg law."

21        But where are we now?  Now we're in a situation where

22  the trustee has dropped the claim that the distribution that

23  he's suing on was made in violation of Luxembourg law, and he's

24  going totally on a general tort theory.  So Mr. Delvaux's

25  opinion no longer supports the proposition that there could be

1    tort liability.  We think he was dead wrong and he didn't cite

2    any precedent for it anyway.  But because the predicate for his

3    opinion that there could be tort liability was that there was a

4    violation of corporate law, company law, and that predicate has

5    gone away, there isn't any basis for his opinion.

6            THE COURT:  To what extent does the complaint allege

7    that, in addition to signing for it on behalf of the recipient,

8    those two guys had some kind of causal effect on the sub

9    issuing the dividend?

10           MR. WERDER:  Not one word, Your Honor.  Not one word.

11           THE COURT:  All right.  Continue.

12           MR. WERDER:  They were -- they're obviously -- this is

13   obviously a fairly complex corporate family.  Mr. Kirpalani, in

14   putting this document together that you have up in front of

15   you, had some dotted lines above the Nell entity.  There's a

16   family of companies that intercede between Nell and Access

17   Industries Holding Company.  But there isn't any allegation

18   that these guys did anything other than they signed the

19   resolution as a shareholder.

20           THE COURT:  To take the money.

21           MR. WERDER:  Pardon me?

22           THE COURT:  To take the dividend --

23           MR. WERDER:  To --

24           THE COURT:  -- as contrasted to causing the dividend

25   to be --

1          MR. WERDER:  Well, they signed a resolution that

2    approved the dividend as a shareholder, Your Honor.  So the

3    shareholder -- the shareholder -- the G.P. approved the

4    dividend, and then the shareholder approves the dividend, and

5    these are the two guys that signed the resolution on behalf of

6    the shareholder approving the dividend, as alleged in the

7    complaint.

8          THE COURT:  Well, take the U.S. analogy -- and I

9    recognize that U.S. analogies may take us only so far.  If I'm

10   a shareholder of Procter & Gamble stock, and Procter & Gamble

11   issues a dividend, I have no role in life in approving Procter

12   Gamble's decision to issue the dividend.  Maybe if Procter &

13   Gamble wants me to sign a receipt, I'm obligated to do that.

14         What I'm trying to get my arms around is:  Is the role

15   of the shareholder that gets the dividend no more than -- as

16   you describe it under Luxembourg law, merely signing a receipt,

17   or is it something that involves some kind of influence over

18   the analog to Procter & Gamble giving the dividend in the first

19   place?

20         MR. WERDER:  Well, Your Honor, there's no allegation

21   of influence over on the part of these two gentlemen.  But I

22   think, for purposes of this motion, what we should accept as

23   true, given the allegations of the complaint, is that there was

24   -- that a shareholder resolution was required to complete the

25   process of declaring the dividend.

1            THE COURT:  Uh-huh.

2            MR. WERDER:  And we're perfectly happy to accept that

3    as true for purposes of this motion because it's not the

4    shareholder that's being sued here; rather, it is the persons

5    who were acting on behalf of that S.A.R.L. entity, who Mr.

6    Delvaux's opinion makes clear can't have liability, either to

7    the company that they own or to a third party, unless somehow

8    their actions went outside the scope of their corporate

9    responsibilities.  And signing a corporate resolution obviously

10   does not go outside the scope of corporate responsibilities,

11   Your Honor.

12           THE COURT:  That being your Claim 7 argument.

13           MR. WERDER:  It's the same -- it's the same argument,

14   Your Honor, because now, given what they've dropped out of

15   Count 14, the -- Count 14 is relying on exactly the same

16   Luxembourg law statutory predicate, 1382 and 1383, as was

17   relied upon in Count 7, yes.

18           THE COURT:  All right.  Continue.

19           MR. WERDER:  Your Honor, finally, turning to Count 18.

20           The Court indicated in the comments this morning that

21   its tentative conclusion was that --

22           THE COURT:  This is the aiding and abetting --

23           MR. WERDER:  Correct, Your Honor --

24           THE COURT:  -- breach of --

25           MR. WERDER:  -- this is -- this is the --

1    THE COURT:  -- fiduciary duty.

2    MR. WERDER:  -- the aiding and abetting count,

3  correct.  And that's pleaded against various Access entities,

4  essentially.  So if you look at this chart, if you look at the

5  chart that you've got, either the pre-merger or the post-merger

6  chart, Access Industries Holding, LLC, which is way up the

7  chain of ownership there, is one of the entities that's

8  allegedly aiding and abetting a breach of fiduciary duty here.

9    Now respectfully, Your Honor, your tentative

10  indication this morning was that Texas law ought to apply to

11  that aiding and abetting claim.  And I don't see how that

12  conclusion could be supported, Your Honor --

13    THE COURT:  I'm trying to get my arms around where the

14  injury was suffered.

15    MR. WERDER:  Okay.  Well, Your Honor, let me -- let's

16  walk through it then.  Okay?  Because the -- what's the -- the

17  aiding and abetting that is alleged to have occurred here is

18  who was being aided and abetted.  Well, it's the people who

19  were named as the defendants in Count 6, which has now largely

20  been dropped, right?  And the people who were named as the

21  defendants in Count 6 were allegedly liable under Count 6 for

22  breach of fiduciary duty to who, to which entity?  To Basell AF

23  S.C.A.

24    THE COURT:  Yeah, I understand that.

25    MR. WERDER:  Okay.

1          THE COURT:  And in Adelphia, the guys who were guilty

2    of the breaches of fiduciary duty, who were the Rigases --

3          MR. WERDER:  Yes, Your Honor.

4          THE COURT:  -- were liable to Delaware corporations.

5    But Adelphia's headquarters was in Coudersport, Pennsylvania,

6    and Pennsylvania had the locus of not wanting -- most wanting

7    to avoid injuries to people whose businesses were in the State

8    of Pennsylvania.

9          MR. WERDER:  Got it, Your Honor.  So I think I

10   understand where you're coming from now, and I think I can

11   address that very directly, and I can address it very directly

12   in the following way.

13         THE COURT:  Oh, and by the way, in MagCorp, we have a

14   similar situation, except there, if I recall correctly the

15   principal location of the business was just off the Great Salt

16   Lake in Utah.

17         MR. WERDER:  Right.

18         THE COURT:  And I forgot whether MagCorp was a New

19   York corporation or a Delaware corporation, but I'm pretty sure

20   it wasn't a Utah corporation.

21         MR. WERDER:  Right.  Your Honor, but here's the thing

22   about this claim, I think, that maybe distinguishes it from

23   what you just described in those -- in Adelphia and the other

24   case, and that is that the -- the entity that was owed the

25   fiduciary duties, and that was supposedly harmed is obviously a

1  Luxembourg company.

2           And what's the decision that's being challenged?  It's

3  the decision by the Luxembourg company to acquire a Texas

4  company, a Texas-based company, in what turns out to be --

5  alleged to be an ill-fated transaction.  But the duties that

6  were owed -- I mean, Basell, as Mr. Kirpalani pointed out, was

7  a significant European entity.  And it had an enormous European

8  headquarters located in the Netherlands.  And so when you see

9  Basell Holdings -- Basell Holdings B.V., Netherlands here, that

10 is the holder of all the productive assets of the Luxembourg

11 company.  So --

12          THE COURT:  Point --

13          MR. WERDER:  So --

14          THE COURT:  Point taken.  But query then whether the

15 corollary of that is I should be looking at Dutch law.

16          MR. WERDER:  You know, Your Honor, it may be Dutch

17 law, but respectfully, I don't think it's Texas law, because

18 the Texas company comes to the party as a result of the

19 decision to -- the alleged breach of fiduciary duty by the

20 managers and persons involved in the management of the

21 Luxembourg company.  And those entities, those persons didn't

22 owe any fiduciary duties to that Texas company until whoever

23 was on the board after the merger obviously did.  But in

24 approving a Luxembourg company with a Netherlands headquarters'

25 entry into a merger with a Texas company, I mean, who can they

1  say was harmed?  It's got to -- the breach of fiduciary duty --

2  the harm from the breach of fiduciary duty can't be harm to the

3  acquired company.  It has to be harm to the preexisting

4  company.

5      THE COURT:  You're saying that there is no violation

6  of any duty to anybody within the State of Texas until the

7  merger has been completed.

8      MR. WERDER:  Yes, Your Honor.  And the harm that flows

9  -- the breach of fiduciary duty was a breach of fiduciary duty

10 allegedly owed to the acquiring company.  Now we don't think

11 the -- you know, there's going to be allegations, and we don't

12 have to worry about them now, about, well, the extent to which

13 the acquiring company was harmed.  But to the extent that the -

14 - I mean, the acquiring company being harmed -- even after the

15 merger, it was headquartered, not in Texas.  It's headquartered

16 in Texas now.  Lyondell was based in Texas.  They've moved

17 their -- you know, they still actually have their headquarters

18 in -- in the Netherlands, although their CEO and their general

19 counsel and their top management, I think are located in Texas

20 now.  But that wasn't the case at the time of the merger.  At

21 the time of the merger, the CEO was Volker Trautz and he was

22 based on Hoofddorp, Amsterdam.

23     THE COURT:  Close off the circle.  When, with respect

24 to the merger, were the payments that relate to the aiding and

25 abetting claims made?

Argument                                                    195

1          MR. WERDER:  Well, they were made as part of the

2     closing of the merger, I take it, Your Honor.

3          I mean, I think -- I think what the -- I think what

4     the aiding and abetting count is alleging is that --

5     particularly focused on the managers of G.P., that somehow

6     Access aided and abetted their breach of fiduciary duty to AF

7     S.C.A. by facilitating the merger transaction.  So I'm assuming

8     that the actions that are alleged to be the underlying

9     violation for purposes of Count 18 are those actions that have

10    now been largely dropped in Count 6, which involve the approval

11    of the merger, the -- you know, and it was all part of the

12    closing, where funds were taken down, funds were spent, et

13    cetera, on or about December 20th of 2007.

14         But to the extent, for purposes of this claim, we're

15    going to focus on locus of harm, then I think you've got to

16    focus on the harm to the entity that they allegedly owed the

17    duty to, which is the Luxembourg corporation, the Luxembourg

18    limited partnership by share, corporate partnership by share,

19    which had most of its operations based or headquartered in the

20    Netherlands.

21         Now why did we argue for Luxembourg law here?  Well,

22    we argued for Luxembourg law because the trustee argued for

23    Luxembourg law.  When we go back to last summer and we started

24    presenting the possibility of these motions to dismiss to Your

25    Honor when we first discussed the amended complaint, Mr.

1   Wissner-Gross sent a letter to the Court that's attached as

2   Exhibit 2 to my September 24th, 2010 declaration.  And I'll

3   take just a -- I know I'm kind of running on here, but at Page

4   6, Your Honor, New Count 18 asserts claims under Luxembourg

5   law.  That was the trustee's position.

6           And why did he say that?  I think he said that because

7   he recognized that the alleged breaches of fiduciary duty that

8   were supposedly aided and abetted were breaches of fiduciary

9   duty owed to a Europe-based company, a Luxembourg-based

10  company, with the vast majority of its operations in Europe,

11  and not in the United States.

12          And as a result of the approval of that action,

13  Basell, pre-merger Basell may have been harmed, I don't know.

14  But we can accept it as true for now.  But pre-merger, at the

15  time that that decision was approved, it had nothing in Texas

16  to speak of.  It might have -- it might have had a plant in

17  Texas, but it didn't have significant aspects of its operations

18  in Texas.  It largely wasn't a U.S. company at all.

19          And the rationale for the merger was to seek to drive

20  it towards becoming a global company, with a significant base

21  of operations in the United States, in existing to the

22  preexisting operations that it had in Europe, and through joint

23  ventures in the Middle East.

24          And I'm not sure, Your Honor -- with all due respect,

25  I think the tentative conclusion is really a conclusion that

1   ought to be rethought, in my respectful opinion.  Because our

2   position is completely consistent with what the trustee himself

3   told the Court last summer, when he said he wanted to file this

4   claim.

5          Now I'm not sure the result is any different, by the

6   way, because the underlying breach of fiduciary duty claims

7   have now been tossed away.  The alleged breach of fiduciary

8   duty that the Access entities supposedly aided and abetted was

9   breach of fiduciary duties by the supervisory board members and

10  by the -- largely by the G.P. managers.  Well, those claims are

11  -- those claims are gone.  So now we have a situation where the

12  trustee is arguing that you, Access, aided and abetted breaches

13  of fiduciary duty that I'm not pursuing anymore.  That's the

14  situation that we have right now.

15         And it's undisputed, Your Honor, that Luxembourg law

16  does not have a breach of fiduciary duty claim.  That is agreed

17  by Mr. Arendt, that's agreed by --

18         THE COURT:  You mean an aiding and abetting --

19         MR. WERDER:  Aiding and abetting doesn't exist under

20  Luxembourg law.

21         And now so what does the trustee say in his brief?

22  Well, yeah, I said it was aiding and abetting, I said it was

23  under Luxembourg law, I titled it aiding and abetting, but you

24  know, the facts -- you know, I could allege a direct liability

25  claim against Access for its role in the -- in the merger.

1          And you know, I got to just say in closing, Your

2     Honor, that the idea that we're going to -- we're going to

3     amend our complaint and take a count that was an aiding and

4     abetting count of somebody else's breach of fiduciary duty and

5     try to turn it in briefing into a direct cause of action

6     against a bunch of corporate entities way up the corporate

7     chain is -- I mean, that just -- to me, that just smacks of

8     utter unfairness.

9          And the discovery is over.  The fact discovery is

10    over, I should say.  The trustee has put in our expert reports;

11    we're busily working on our expert reports now.  We're working

12    towards an October trial date.  And this kind of goes more

13    generally towards the idea of, well, you know, amend the

14    complaint again.  It's just too late.

15         You know, honestly, Your Honor, he filed his original

16    complaint in '09, he had massive discovery.  They filed a -- he

17    filed a -- the trustee filed a massive amended complaint in the

18    summer of last year.  All of the parties in this room and

19    others have been engaging in a mountain of documentary

20    production, depositions, working on experts.  We're planning to

21    go to trial in this case in October.  And that's the schedule,

22    and Mr. Wissner-Gross has been very insistent that nothing

23    happen to the schedule to upset that potential trial date.

24         And so the idea that, you know, now, well, I didn't

25    get it right in my amended complaint, I alleged aiding and

1   abetting, but you know, it's really direct liability under

2   Luxembourg law, and so off to the races.  I just think the

3   Court ought to reject that.

4          Look, these Luxembourg law claims are leverage claims,

5   respectfully.  And I say that without any -- you know, implying

6   any malice.  They're claims that are peripheral to what this

7   case is really about.  And it's the same point that Mr.

8   Kirpalani made this morning.  They ought to be thrown out.

9          And you know, we did -- we made a motion on forum non

10  conveniens, which is slated for later in the day.  I'm really

11  prepared to stand on our papers on that, rather than argue that

12  separately, Your Honor.  Because I think that based on the

13  briefing, based on their own expert opinion, this Court ought

14  to dismiss the Luxembourg claims under 12(b)(6).

15         And you know, if you're not inclined to do that, I do

16  think that you ought to seriously consider the forum non

17  conveniens motion, but I'll stand on my papers on that, given

18  how long I've taken arguing the substance of it, unless there's

19  something specific that you want me to address about the forum

20  non aspect.

21         THE COURT:  No, you really don't need to.  I

22  understood the contentions on each side there.

23         MR. WERDER:  Okay.  Thank you, Your Honor.

24         THE COURT:  All right.

25         MR. WERDER:  I apologize for taking so long.

1          THE COURT:  Okay.  But what I need to do is now take a

2   ten-minute break.  I want to try to stay sharp here.

3          After we finish that, then I'm going to want to do a

4   stop-look-and-listen on how much more we need to do, so I can

5   make a decision as to whether people are better served to go

6   into the evening on the one hand, or to resume early tomorrow

7   on the other.  Talk about that with your colleagues during the

8   break.

9          We're in recess.

10     (Recess taken at 4:06 p.m.)

11     (Proceedings resume at 4:15 p.m.)

12     (Call to order of the Court.)

13          THE COURT:  Have seats, please.

14          UNIDENTIFIED:  We're missing at least one, Your Honor.

15          THE COURT:  I have a preliminary matter to address

16   before we take responsive argument.  I want to wait until Mr.

17   Werder is back.

18          UNIDENTIFIED:  Mr. Werder is here.

19          THE COURT:  Oh, you are here.

20          MR. WERDER:  Yes.

21          THE COURT:  Oh.  You're just waiting what, for people

22   in the bleachers?

23          MS. ORENSTEIN:  No.  Mr. Wissner-Gross is not here.

24          THE COURT:  All right.  I'd rather wait for him, as

25   well.

1          (Pause in proceedings.)

2          THE COURT:  All right.  Well, here's the question,

3    folks.  By my math, looking at the estimates of time in Mr.

4    Werder's letter, we have between two and a half and three hours

5    left to go in the way of oral argument, in terms of people's

6    estimates of what they think they want to take.

7          I am able to go into the evening, within limits.  I

8    don't think that on issues of this character I should be

9    working until 1 a.m. again, like we did on the first night of

10   the case.  I am available for completing the arguments tomorrow

11   morning, if you'd prefer that.  But if you prefer working into

12   the evening until maybe 7 or 8, I am okay with doing that.

13         Out of fairness to you guys, I think I need to only go

14   for as long as I can stay sharp.  But I don't think that is

15   necessarily a problem.  I don't stay sharp as late into the

16   evening as I used to, when I was a lawyer.

17         Do you folks have a preference?  Obviously, if people

18   are willing to waive oral argument on some things, such as the

19   Rule 25 motion, that makes life simpler.  I think, if the

20   trustee's side is likewise willing to waive argument on forum

21   non, that saves us half an hour, since I think I already heard

22   Mr. Werder waiving argument on that, that might be a step in

23   the right direction.  And I'll hear from both sides, starting

24   with you, since you're up, Mr. Wissner-Gross.

25         MR. WISSNER-GROSS:  I think on Rule 25, if the movant

1   is prepared to submit, we're prepared to submit on Rule 25.  I

2   know --

3         MS. ORENSTEIN:  Well, we are the moving --

4     (Counsel confer.)

5         MR. WISSNER-GROSS:  No, what I meant is -- I'm sorry.

6   There are cross-motions on that.  There's a motion to dismiss

7   and a motion to amend.  We're prepared to submit on both.

8         MR. DITTMAR:  Well, I normally like to know how the

9   horse race ends before I bet.

10        THE COURT:  I'm not going to tell you how the horse

11   race is going to end.

12     (Laughter.)

13        THE COURT:  You got to wait for the race.

14        MR. DITTMAR:  If -- could you --

15        THE COURT:  Can you come to a mike?

16        MR. DITTMAR:  I'm sorry, Your Honor.

17        THE COURT:  It makes it -- and identify yourself, of

18   course.

19        MR. DITTMAR:  Yes.  Jim Dittmar, Goodwin Procter, for

20   Diane Currier, Executor of the Estate of Richard Floor.  I was

21   going to argue the executor's side of two cross-motions.

22        I think -- could I ask this without being impertinent?

23   If the Court feels perfectly comfortable with deciding those

24   two motions on submissions only, then I'm prepared to waive.  I

25   am prepared to argue, and I would keep within the designated

1    fifteen minutes, I know that.

2            THE COURT:  I am comfortable.  But you know, you

3    talked about wanting to know how the race is going to come out.

4    I think my inclination is, on something like this, that the

5    chances of me blowing away their whole claim on a Rule 25 issue

6    are pretty slim, Mr. Dittmar.  So if you want to try to argue -

7    -

8            MR. DITTMAR:  Then I think I'd like my --

9            THE COURT:  -- to talk me out of that inclination,

10   then you may want to continue to hold onto your right for oral

11   argument.

12           MR. DITTMAR:  I'd like to hold onto my right to the

13   oral argument.  Thank you.

14           MR. WISSNER-GROSS:  We tried, Your Honor.  That was a

15   half an hour.

16           On the forum non, since my friend Mr. Werder, I think,

17   did a sort of crossover argument addressing that, I'm happy --

18   if he wants to submit, that's fine, but I think I need a couple

19   of minutes to address what I think things that Ms. Orenstein

20   otherwise would address, and I'll try to be concise on the form

21   nons.

22           But generally, from our perspective, we're happy to go

23   for a few hours.  I think the remainder of the motions are more

24   discrete, and hopefully people can stay within the limits

25   rather than expand.  And my sense is that --

1    THE COURT:  I'll acknowledge that I share the

2    responsibility for the extra time.  I mean, obviously, I'm

3    asking a lot more questions than I told you guys I would.

4        MR. WISSNER-GROSS:  But I think that, from our

5    perspective, we're happy to go for a couple of hours, see if we

6    can finish.  We know some people have to travel to other

7    cities, and it might make it easier for them to leave this

8    evening.  But other than suggesting how we might streamline for

9    the other side, I don't know what the other side's preference

10   is.

11       THE COURT:  All right.  Then my inclination would be

12   to do stop-look-and-listen after a couple of hours.  But let me

13   ask one last question before we do that.

14       Does rearranging the arguments help anybody get out of

15   town and home?

16       MR. HIGGINS:  There's no problem on our side, Your

17   Honor.

18       THE COURT:  Mr. Pohl, you've got to go up to Boston?

19       MR. POHL:  I've got 7 and 8, and -- but I can get home

20   tonight, even going out of JFK, at 10:45, so I'm flexible.

21       THE COURT:  All right.  Then let's just move on,

22   folks.

23       Responses to the Luxembourg claims.  Ms. Orenstein.

24       MS. ORENSTEIN:  Good afternoon, Your Honor.

25       Okay.  As part of his discharge of his duties in this

1  case, the trustee analyzed, with the assistance of Luxembourg

2  counsel, claims and causes of action available under Luxembourg

3  law against the managers and offers of Basell and its general

4  partner.

5        Having engaged in this legal analysis, a number of

6  Luxembourg claims found their way into the amended complaint.

7  Although a larger number of claims were stated in the amended

8  complaint, the trustee has voluntarily dismissed certain of

9  those claims.

10       Most notably, these claims are the mismanagement

11  claims asserted against individual members of the general

12  partner, based upon their role in the mismanagement of Basell

13  and their contribution to the damages that resulted.

14       After carefully considering the views of the trustee's

15  expert, as well as those of the experts of the other parties,

16  the trustee was persuaded that the assertion of the Luxembourg

17  company law claims against the individual general partners

18  would require the Court to resolve a novel issue under

19  Luxembourg law, which was whether the failure of the general

20  partner to appoint an individual representative of the G.P.

21  could result in the personal liability of the G.P. managers as

22  an exception to the general rule that such persons would not be

23  liable for their conduct.  For this and other reasons, those

24  claims against the G.P. managers were voluntarily dismissed by

25  the trustee.

Argument

1    Whatever the technical difficulties posed by those

2    claims, the trustee believes, and does so on the basis of

3    Luxembourg counsel, that the managers and fiduciaries of Basell

4    can and should be held to account for their wrongdoing under

5    Luxembourg law.  The remaining Luxembourg law claims, all but

6    one of them are in fact tort claims, as Mr. Werder explained.

7    The parties' experts, as Mr. Werder very effectively

8    illustrated, are in accord with respect to the basic elements

9    of Luxembourg tort law.  Luxembourg tort law is found in two

10   provisions of the Civil Code, 1382 and in 1383.  Any person may

11   be held liable under the provisions of those -- of those

12   articles where they have caused a harm, or where they have --

13   their harm is -- where their harm was caused by a wrongdoing,

14   and where an element of proximate cause is shown.

15   Where the parties' experts' views differ is whether,

16   at this stage of the proceedings, on the basis of the

17   complaint, a determination can be made by the Court whether the

18   alleged conduct falls within the scope of the defendants'

19   contractual duties, and accordingly cannot be the basis of an

20   action in tort.

21   In his opinion -- although Mr. Werder read quite

22   extensively from Professor Delvaux's opinion, he omitted

23   certain parts.  He omitted the part where Professor Delvaux

24   affirmatively states that a determination as to whether the

25   conduct falls within or without their duties can be made on the

1    pleadings.

2             According to Professor Delvaux, in order to identify

3    whether certain acts or omissions are within the scope of the

4    contractual relationship, that contractual relationship and all

5    of the terms must be established.

6             If the Court will recall, the Luxembourg claims were

7    part of Phase 2 of these proceedings, and these motions to

8    dismiss are the first proceedings that have been held regarding

9    these claims and the action.

10            Okay.  Just to go on to the issue with respect to

11   which the experts appear to diverge on the potential liability

12   of G.P. managers under tort law.

13            Professor Delvaux describes the concept of willful

14   attitude, for which the term "dol" under Luxembourg law is

15   used, where, according to Professor Delvaux, a person acts with

16   willful attitude or "dol", his conduct may constitute

17   wrongdoing outside the scope of the duty of a manager.

18   Professor Delvaux writes in Paragraph 45 of his declaration:

19            "Those who approve the merger cannot ignore that the

20            share price was too high, and that the merger approval

21            was based on inaccurate economic projections.  For

22            those reasons, a Luxembourg Court could find that

23            their behavior was constitutive of a willful attitude

24            or 'dol,' and constituted acts falling outside of the

25            scope of the managers" -- "of their duties of

1          managers."

2          According to Mr. Werder, this opinion of Professor

3   Delvaux is undercut by two citations in Professor Delvaux's

4   declaration, found at Paragraph 10 of that declaration in which

5   a Luxembourg Court apparently found that conduct constituting

6   the looting of assets of a corporation and the investment of

7   the assets of a corporation in a speculative investment

8   constituted mismanagement.

9          However, those decisions, there's not enough

10  information given with respect to those decisions on which to

11  base the argument which Mr. Werder made that the Court in those

12  cases even considered whether those same conduct -- that same

13  conduct could have constituted, under other circumstances, a

14  tort.  So he's just taking those decisions out of context as

15  proof of the possibility -- as proof of the impossibility that

16  the conduct alleged in our complaint can possibly constitute a

17  tort under Delaware -- under Luxembourg law.

18         I'd next just like to make a few points about Count

19  18, which is the breach of fiduciary duty claim.  I think Mr.

20  Werder was relying on that letter, characterizes the trustee as

21  having made an about-face about the nature of those claims.

22         Those claims are asserted in the complaint under a --

23  under a heading, "Aiding and Abetting, Breach of Fiduciary

24  Duty," and under that, in parenthesis, is "Article 1382 and

25  Article 1383 of the Luxembourg Civil Code and Applicable State

1   Law."

2          So there was never any about-face.  The trustee always

3   conceived of those cases as being, if Luxembourg law applied,

4   to be in the nature of a -- of a direct, primary tort with

5   respect to the conduct alleged; or alternatively, if those

6   claims were found to arise under applicable state law, to be

7   based on breach of fiduciary duty.

8          Those claims remain viable regardless of whether

9   they're asserted under Luxembourg law, or under state law, for

10  the simple reason that the fact that, for reason -- okay.

11         Stepping back, the trustee continues to have at least

12  one viable breach of duty claim under Luxembourg law, and that

13  is the one asserted against Mr. Blavatnik as Count 6.  But even

14  to the extent that the trustee is precluded for standing

15  reasons from asserting other breach of fiduciary duty claims or

16  -- I take that back -- from asserting certain mismanagement

17  claims that arise under Luxembourg law against the general

18  partner by reason of the fact that the general partner is a

19  debtor in these proceedings, the ability of the trustee to

20  assert claims against the primary tort feasor does not preclude

21  or in any way undercut the viability of the claims against

22  third parties that the trustee has for aiding and abetting that

23  tort feasor, or for engaging -- for aiding and abetting that

24  tort feasor, or engaging in activities in participation with

25  that tort feasor which constitute tort under Luxembourg law.

1    So in other words, it is not a predicate to that claim

2 that the trustee have or prosecute mismanagement claims under

3 Luxembourg law, although the trustee does in fact intend to and

4 has a viable mismanagement claim against Mr. Blavatnik under

5 Luxembourg law, based upon his conduct as a fiduciary of the

6 S.C.A.

7    With regard to the dividend claims that were discussed

8 earlier, I think that Mr. Werder has not characterized the

9 opinion of Mr. Delvaux with complete accuracy.  With respect to

10 that opinion, he suggests that Professor Delvaux's opinion that

11 the declaration of those dividends could constitute a tort was

12 predicated on those dividends also being a violation of

13 Luxembourg statutory law.  But I think if Your Honor were to

14 review Professor Delvaux's opinion, it would be apparent that

15 what he is saying is something entirely different.

16    Count 14, which is the dividend law, as narrowed by

17 the trustee, is now based on a distribution in the amount of

18 100 million Euros, made by Basell on December 7th, 2007, less

19 than two weeks before the merger closing.  As Mr. Werder

20 pointed out, these distributions were made to BI S.A.R.L.,

21 alleged to be the sole shareholder of LBI.  The trustee

22 narrowed those claims based on those distribution and is now --

23 those distributions, and is now asserting them -- and is now

24 asserting Count 14 solely under Articles 1382 and 1383 of the

25 Luxembourg Civil Code.

1        Count 14 is not, as Mr. Werder's argument seems to

2   suggest, a claim for the return by the shareholders of an

3   improper distribution.  Rather, it seeks damages from all

4   persons whose wrongful participation in the approval and making

5   of the distributions resulted in harm to the company.

6        Under Article 3282 (sic) and Article 1383, the

7   particular corporate positions held by the defendants that

8   caused the harm are not determinative of their liability.  I

9   respectfully refer the Court to Paragraph 57 of the Delvaux

10  opinion, of the Delvaux declaration, in which he explains this

11  concept.  He concludes, based on his analysis, that the

12  allegations of the complaint, if true, support a claim under

13  Luxembourg law.

14       If the Court has no other questions, I'd like to cede

15  the podium to my partner, who I think -- who will address some

16  of the aspects of Mr. Werder's oral argument that were more

17  directed to issues of forum non conveniens than other

18  arguments.

19       THE COURT:  Just one thing before you do, Ms.

20  Orenstein.  Mr. Werder told me about four times, saying

21  respective -- "respectfully" before he said it, that whatever

22  law applied to the aiding and abetting, it wasn't Texas.  I'm

23  wondering if he made some decent points in that regard.  Do you

24  want to respond?

25       MS. ORENSTEIN:  I will say that we were very much

1   aware of the issue when we were drafting the complaint -- when

2   we were drafting the complaint, and we were on the fence about

3   it.  And ultimately, where we came out was that the elements of

4   the claim, regardless of whether they would be asserted under

5   state law, Texas law, New York law, Delaware law, et cetera, or

6   Luxembourg, were essentially the same.  And we, for that

7   reason, did not reach a conclusion.

8          I have to say that, having listened to Mr. Werder,

9   that his arguments that the foreign jurisdictions where these

10  corporations operated and held assets would have a substantial

11  interest in the harms and injuries that resulted in the breach

12  of fiduciary duties or the mismanagement conduct of the

13  fiduciaries of those corporations.  So I'm not necessarily --

14         THE COURT:  You're not making a big deal of me

15  sticking to that tentative.

16         MS. ORENSTEIN:  No.  That would be for you, Your Honor

17  --

18         THE COURT:  Okay.

19         MS. ORENSTEIN:  -- to stick to -- to make a big deal

20  about.  Okay.

21         THE COURT:  Okay.

22         MR. WISSNER-GROSS:  Your Honor, I guess I would

23  probably be addressing more of the forum non motion.  I don't

24  know.  Rick, are you planning on submitting on that?  Because

25  if you are, it might be logical then to address, otherwise I

1    can wait until after the Rule 25 motion --

2              THE COURT:  I thought I heard Mr. Werder to say that

3    he was prepared to submit on forum non.

4              MR. WERDER:  Yes, Your Honor.  I do have one or two

5    very brief points in response to Ms. Orenstein, but I am

6    prepared to submit on the forum non.

7              THE COURT:  Does that help you, Mr. Wissner-Gross?

8              MR. WISSNER-GROSS:  Yes.  Your Honor, would you prefer

9    to have Mr. Werder respond to Ms. Orenstein?  Because I'm going

10   to address primarily the forum non issues.

11             THE COURT:  Why don't we button up on fiduciary and

12   other duties under Luxembourg law, invite you to get in

13   whatever reply you think you need, Mr. Werder, which given how

14   brief -- relatively brief Ms. Orenstein was, you're going to be

15   likewise, and then I'll let Mr. Wissner comment -- Mr. Wissner-

16   Gross -- I keep doing that, I apologize -- on the next point he

17   wants to raise, which I gather is forum-non-related.

18             MR. WERDER:  Thank you, Your Honor.  Really just two

19   points, and they will be quick.

20             Point number one, Ms. Orenstein references Mr.

21   Delvaux's opinion that there isn't a such thing as a "motion to

22   dismiss" in Luxembourg.  In our reply brief, we cited the Court

23   to a number of authorities that make clear that, since the

24   Luxembourg law claim is being brought in a U.S. Court, that

25   U.S. procedural rules with respect to motions to dismiss are

1   applicable.  And we cited a number of cases where motions to

2   dismiss have been granted on issues of foreign law under

3   12(b)(6).  That's point one.

4           Point number two, with respect to Count 18, Ms.

5   Orenstein appears to be trying to argue that, well, they always

6   thought it was a direct liability claim rather than an aiding

7   and abetting claim.  That's completely inconsistent with the

8   letter that they submitted to the Court last summer before they

9   filed a complaint, where they said it was an aiding and

10  abetting claim under Luxembourg law.  It's completely

11  inconsistent with the title of the count, which says "aiding

12  and abetting," and it's completely inconsistent with the

13  substantive paragraphs that are -- that follow the heading of

14  Count 18, all of which indicate that liability is premised on

15  aiding and abetting the alleged breaches of fiduciary duty by

16  the G.P. managers, rather than on any sort of a theory of

17  direct liability by the Access entities.

18          Those are the points I wanted to make, Your Honor.

19  Thank you.

20          THE COURT:  Okay.  Thank you.

21          Mr. Wissner-Gross.

22          MR. WISSNER-GROSS:  Thank you, Your Honor.

23          Turning to the forum non issue, and just completing a

24  little bit of the thought that had been articulated by Ms.

25  Orenstein, first, these issues were not addressed, as Your

1   Honor will recall, in Phase 1.  You had told us, as to these

2   kinds of issues, they're Phase 2 issues at the time, and we're

3   addressing them now.

4           And I think, as I'm listening to the discussion today

5   and Your Honor's questions, is I think a perfect illustration

6   of where there becomes a degree of additional clarity as we

7   argue the points.  And to the extent that there is a need to

8   replead some of these claims, I think contrary to my friends on

9   the other side, the issues of potential liability of these

10  defendants for Luxembourg violations is fairly significant for

11  a number of reasons.  And I think that we should have an

12  opportunity, at a minimum, if Your Honor is inclined, to agree

13  with Mr. Werder on any of his arguments, to have leave to

14  replead.

15          And what I'd like to do is address some very practical

16  points.

17          First, one thing you haven't heard is who are the

18  movants.  And I went through and did a little bit of tally on

19  that.  Who are the movants who are arguing that, to the extent

20  that we should press these points, they should be pressed in

21  Luxembourg?

22          The movants include Mr. Blavatnik, who has -- who is

23  based here and in London.

24          It includes Philip Kassin, who is a former senior

25  Access executive, who at the time of the bankruptcy lived in

1    New York, and I believe he lives in New York still.

2           Mr. Thoren has been identified, who is an executive at

3    Access, and from my understanding, he was deposed recently, and

4    based on his comments it appeared that he lives in New Jersey.

5           Alex Blavatnik was also a defendant, apparently lives

6    in Florida, has a house in New York.

7           Access Industries Holdings, LLC and Access Industries,

8    Inc., are defendants to some of these claims, based in New

9    York.

10           Diane Currier, the Executrix of the Estate of Mr.

11   Floor, based in Boston.

12           Mr. Bigman, our understanding, although he's no longer

13   with the company, I believe he lives in Houston.

14           And Nell Limited is a Gibraltar entity, but it's

15   controlled by Mr. Blavatnik.

16           So on a -- you know, when you normally are looking at

17   these issues on a forum non basis, you either have a foreign

18   plaintiff that's coming here to forum-shop, or you have a

19   situation with the claims, in terms of the actual conduct at

20   issue involved, witnesses that are overseas or in a foreign

21   jurisdiction.  And the Court makes a very practical

22   determination that it would be more sensible for the claims to

23   be pursued overseas.

24           This, actually -- there is nothing in the record here

25   that suggests that.  In fact, I think to the extent that any of

217

1   these claims are either dismissed without prejudice, or for

2   argument's sake, if a forum non motion were granted, you have a

3   situation where a Luxembourg Court would have zero familiarity

4   with this case.  There is absolutely -- other than the fact

5   that we have legal issues that maybe have to be adjudicated on

6   Luxembourg law, you have no nexus whatsoever.

7        The other side has argued in their forum non motion,

8   well, there's a cooperation agreement that was signed.  Well, I

9   went back and looked to see, for the reorganized debtor, how

10  many of the current employees were witnesses here in

11  depositions; there were one or two, or two or three.  Most, if

12  not all of the key witnesses at any trial, on issues that would

13  impact the Luxembourg claims, either involve the FPDs, who are

14  no longer parties, involve former employees, involve nobody in

15  essence who, from what we can see, who really would be based in

16  Luxembourg.

17       The same moving parties are also part -- Mr.

18  Blavatnik, Access, Nell, AI International, BI S.A.R.L., they're

19  all defendants on -- as I understand it, defendants on other

20  claims, as well.

21       And while Mr. Werder did comment that we are eager to

22  try the case in October, the only thing he neglected to say is

23  he's told me he's eager to try it, as well, and wants a prompt

24  adjudication.

25       So I'm not sure, on a practical level, that anything

1   would be done, in terms of expediting this case, if any portion

2   of it were severed and we have to go to Luxembourg.  On the

3   other hand, from what I can see -- and I've been combing the

4   record on this -- I think, in essence, the entire basic factual

5   predicate in this case is going to be tried, whether or not the

6   Luxembourg claims are ultimately part of this case.

7          So my point, Your Honor, is that -- and I'll talk a

8   little bit further, briefly, about the forum non elements --

9   that, at worst, we should be given an opportunity, if Your

10  Honor is inclined, to agree with the other side about the way

11  certain of these claims were pled, to be able to replead them.

12         And I don't think it would involve any delay at all.

13     It doesn't require any further discovery.  There is -- we

14  have an issue with Nell, which Mr. Werder and I are working out

15  a date for Nell.  But it doesn't require any further discovery.

16         And in terms of the factors in terms of forum non --

17  and I'll just briefly address this.  This case is in this

18  jurisdiction, in this courthouse before Your Honor, because Mr.

19  Blavatnik made a decision to file for bankruptcy in this

20  jurisdiction.  Mr. Weisfelner, as trustee, stepped into the

21  shoes of obviously the prior litigation because of a decision

22  that Mr. Blavatnik had made to file his bankruptcy in this

23  jurisdiction.

24         Mr. Weisfelner, under the case law that's been cited

25  in our papers, deserves full deference to his selection of

1  forum.  He's not a multi-national corporation of the sort that

2  the other side has argued in their papers.  He's not even the

3  equivalent of a shareholder derivative plaintiff.  He resides

4  in New York.

5           The trust itself has limited funds.  Your Honor is

6  aware from the approval of the confirmation plan that there was

7  seed money provided under that plan.  So to force the trustee

8  to have to go to Luxembourg to start all over again with

9  respect to pursuing Luxembourg claims, with all due respect, I

10 think is an undue burden on the trustee.

11          In terms of the public and private factors, all of

12 those factors, save one, are clearly supportive of the

13 trustee's position.  Compulsory process, here, but not there.

14 Judicial economy, nothing is saved by starting over there.

15 This Court has this case and has had it in these proceedings

16 for two years.

17          In terms of the only issue that I see that they've

18 been able to identify, that is that Mr. Werder has taken the

19 position that there's a lack of authority for some of the legal

20 relief that's being sought.  And I -- as I've listened to this,

21 I -- it seems to me that there's a practical solution to this;

22 and that is, since Your Honor is going to end up hearing the

23 evidence on all of the underlying facts, regardless if the

24 Luxembourg claims are here or not, there are going to be at

25 least two other opportunities for Mr. Werder to advance his

1    position.

2            And there may be a practical way for Your Honor to

3    have a much more informed basis of making an assessment

4    yourself as to the Luxembourg claims and Luxembourg law; and

5    that is either on summary judgment, having the two experts come

6    in who have submitted declarations, and they can be subject to

7    cross-examination and question --

8            THE COURT:  Wait.  On summary judgment?

9            MR. WISSNER-GROSS:  Either on summary judgment,

10   because they're testifying on forum law, and testifying --

11   coming in and testifying on forum law, or --

12           THE COURT:  Has that been done?  I have -- I may have

13   had matters of foreign law once or twice over my career, but I

14   don't think I've ever seen cross-examination on a summary

15   judgment motion --

16           MR. WISSNER-GROSS:  Well, my point is --

17           THE COURT:  -- in any context.

18           MR. WISSNER-GROSS:  -- in terms of -- on an issue of

19   foreign law, where the question is, what is the foreign law,

20   because they're coming in as an expert on explaining to Your

21   Honor what the foreign law, we'd be prepared to stipulate, and

22   I don't see any reason why it couldn't be done; or at trial.

23           As I said, I think that the evidence you're going to

24   hear across the board is -- it's not going to be impacted one

25   way or another, whether or not these claims are in.  On the

1  other hand, Your Honor would be able to develop a complete

2  record.

3           We have explored with Luxembourg counsel about how

4  cases are tried in Luxembourg.  And I think that, to avoid

5  cost, the burden, the expense for the trustee to have to start

6  from scratch in Luxembourg, I think the sensible thing is to

7  allow the trustee every opportunity of fully developing the

8  record and these claims.  And if Your Honor at the trial in

9  October were to conclude that, based on the evidence, you feel

10  that these claims, at least the determination of how Luxembourg

11  law would apply these claims, are best determined in

12  Luxembourg, it could be addressed at that time, and I don't

13  think with any prejudice or additional expense to the other

14  side.

15           So, Your Honor, if you reach the forum non argument or

16  motion, I don't think that, save for their argument about this

17  issue of a novel legal issue, that any of the elements that are

18  present have been -- in fact, we looked at, in terms of all

19  their cases, virtually every case they cite, or most of them

20  involve a complete, outright dismissal, the Court says, you

21  should take the whole case to another jurisdiction; or if it's

22  a subset of a case, the Court is able to compartmentalize and

23  know that it has the essence of the case here, and that portion

24  that's dismissed is severable.  Here, as a factual matter,

25  everything is interrelated.  So I don't know that there's any

1    judicial efficiency in severing out and dismissing the

2    Luxembourg claims.  Thank you, Your Honor.

3            THE COURT:  All right.  Under the circumstances, given

4    how long you spoke, Mr. Wissner-Gross, I got to give Mr. Werder

5    a chance to reply, if he wants to.

6            MR. WERDER:  Thank you, Your Honor.  And really just

7    probably two points.

8            Point number one is that much of what Mr. Wissner-

9    Gross argued goes to personal jurisdiction of various of the

10   defendants on the Luxembourg count, and nobody is disputing

11   that the defendants are subject to personal jurisdiction here.

12           What I didn't hear in Mr. Wissner-Gross' argument is

13   any response to the fundamental, almost rhetorical question

14   that I posed, and that is:  Why is it that these defendants

15   should be potentially subject to, and have to defend Luxembourg

16   law counts in this court when it is conceded that there's no

17   Luxembourg case that's ever imposed liability on these

18   circumstances, and there aren't any precedents that this Court

19   can look to?

20           We're not saying that -- we're not trying to limit his

21   proof, really.  What we're trying to do is to avoid a situation

22   where this Court, which -- and maybe I'm making an assumption,

23   but I assume this Court has about as little familiarity with

24   the culture and legal history and mores of Luxembourg as I do.

25   And the idea that this Court ought to be declaring new

1   Luxembourg with -- you know, maybe you have a little bit more

2   than I do.  But if -- assuming that the Court had as little

3   knowledge about the culture, mores, and legal history of

4   Luxembourg as I do, the notion that this Court ought to be

5   making new Luxembourg law on these facts, I don't hear any

6   response to that.

7            THE COURT:  All right.

8            MR. WERDER:  Thank you, Your Honor.

9            THE COURT:  Thank you.

10           MR. WISSNER-GROSS:  Thirty -- can I say something,

11  Your Honor?  Just thirty seconds.

12           THE COURT:  Okay.

13           MR. WISSNER-GROSS:  There is no reason why Mr.

14  Werder's concern can't adequately be addressed at trial.  He

15  doesn't really disagree that we're going to go through all the

16  same underlying facts.  So that rather than Your Honor having

17  to make decisions of this nature on declarations, we have a

18  chance to test the statements of these experts, like any other

19  expert, and they can be subject to cross-examination, and Your

20  Honor can make that determination at that time.

21           So we can avoid the possibility that we in fact may be

22  correct that -- that there is a basis under the statute and

23  under the practice in Luxembourg that liability can be found

24  here, and that we don't have to be running off, having to file

25  a case in Luxembourg, and start all over in a case where there

1  have been millions of documents produced, et cetera.

2          So I just don't hear from the other side how, from a

3  judicial efficiency point of view, and from a practical point

4  of view, there's any prejudice to the other side if this issue

5  isn't addressed at trial, when Your Honor will have a chance to

6  have these foreign law experts before you, and you can make

7  that decision at that time.

8          THE COURT:  Uh-huh.  One last question, both sides,

9  unless you agree.  What language do they speak in Luxembourg?

10         MS. ORENSTEIN:  I think most people are French-

11 speakers, but there are also -- there are others that --

12         MR. WISSNER-GROSS:  Well, we've spoken to them in

13 English.

14         MS. ORENSTEIN:  Well, it's interesting.  Our counsel

15 will speak to us in English --

16         THE COURT:  Pull a microphone close to you, please,

17 Ms. Orenstein.

18     (Counsel confer.)

19         THE COURT:  And yes, rise.

20         MS. ORENSTEIN:  Our counsel generally speak to us in

21 English.  But I notice that, amongst those counsel, they have

22 either a very distinct French accent, or what sounds to me sort

23 of like a Dutch accent.  So I think they're speaking some form

24 of Flemish or a Belgian language.  So I think there are two

25 languages that are spoken in Luxembourg.

1      THE COURT:  Uh-huh.

2      MR. WISSNER-GROSS:  But they have spoken to us, we

3  deal with them in English.

4      MS. ORENSTEIN:  We deal with them in English.  No,

5  they're fluent --

6      THE COURT:  The lawyers speak to you in English?

7      MS. ORENSTEIN:  Yes, the lawyers speak English

8  fluently.

9      THE COURT:  And do the judges, also?

10      MS. ORENSTEIN:  I have no personal knowledge of the

11  judges speaking English.

12      THE COURT:  Mr. Werder?

13      MR. WERDER:  Certainly their opinions are not written

14  in English, Your Honor; statutes are not written in English;

15  and whether they speak English or not, I've never actually

16  talked to a Luxembourg Judge.

17      THE COURT:  Uh-huh.

18      MR. WERDER:  With the Court's permission, I --

19      THE COURT:  I mean, I'm thinking of it as a two-way

20  street.  I assume most of the evidence in this case is in

21  English.

22      MR. WERDER:  Well, much of the evidence is in English,

23  Your Honor, but the -- I mean, with respect to the Luxembourg

24  law claims, the articles, the operative corporate documents of

25  the Luxembourg companies are not written in English; they are

1    translated in English.

2              THE COURT:  I assume, Mr. Werder, that the American

3    defendants who you're representing and your colleagues are

4    representing mainly speak English.

5              MR. WERDER:  No doubt about that, Your Honor.

6              THE COURT:  Thank you.  Okay.

7              And I assume that, in the context of whatever they did

8    in this case that the creditors' committee is complaining

9    about, the defendants on these Luxembourg claims were mainly

10   speaking English.

11             MR. WERDER:  I believe that to be true, yes.

12             THE COURT:  All right.  Thanks.  Anything else?

13             MR. WERDER:  Yes, Your Honor.  I just wanted to

14   briefly address the notion that we ought to kick the can down

15   the road and address this issue at trial.  Because I don't

16   think Mr. Wissner-Gross offers any hope that there's going to

17   be additional Luxembourg precedent that's going to be brought

18   to bear at trial that hasn't been brought to bear here.

19             So basically, what I think he's talking about is,

20   well, we can have a battle of the experts, where his expert

21   presumably is going to come in and render an opinion that's

22   consistent with the opinion that he offered, which is

23   unsupported say-so that a Luxembourg Court could do X, Y, or Z,

24   in an environment where no Luxembourg Court ever has done X, Y,

25   or Z.

Argument                                                        227

1          So I just don't see -- I mean, I recognize that it's -

2    - that going to Luxembourg would not be terribly convenient for

3    the parties, in the sense of most of the forum non factors,

4    which is why really our argument is premised on the fact that -

5    - that -- and supported by case law, I believe, that the idea

6    that, in uncharted waters of Luxembourg law, this Court ought

7    to be the first one declaring liability under some particular

8    Luxembourg statute is not -- is not a risk that our clients

9    ought to be subjected to.

10          THE COURT:  Okay.

11          MR. WERDER:  Thank you, Your Honor.

12          THE COURT:  Next motion.

13          MR. JONES:  I'm sorry.  Your Honor, if I may --

14          THE COURT:  Microphone, please, and identify yourself,

15    please.

16          MR. JONES:  Michael Jones of Goodwin Procter on behalf

17    of Diane Currier, the Executor of the Floor Estate.  I just

18    have a few brief comments with respect to the motion that

19    preceded the forum non conveniens discussion.  We were listed

20    for a very supplemental argument, and if I could just take --

21          THE COURT:  Sure, go ahead, Mr. Jones.

22          MR. JONES:  Thank you.

23          Your Honor, what you just heard the trustee do with

24    respect to Count 6 was concede that they were unable to

25    overcome a corporate form argument made by the Estate of Mr.

1    Floor and similarly situated defendants.

2         And if I could put that in context, what it involved

3    is an affidavit from our expert, who provided that, for a

4    successful mismanagement claim against an individual manager,

5    the trustee would first need to pursue Basell G.P., and prove:

6    One, mismanagement or breach of the S.C.A.'s articles or

7    Luxembourg company law by Basell G.P.; and two, that the S.C.A.

8    has suffered a damage resulting from such mismanagement or

9    breach.  It's only then that the S.C.A. -- or I'm sorry -- it's

10   only then that a manager of the G.P. entity could even

11   potentially be held liable under relevant Luxembourg company

12   law.

13        It's alongside this multi-part standard that you have

14   to consider the standard discussed by Mr. Werder earlier.  Mr.

15   Werder said that, essentially, a manager or other fiduciary

16   cannot be held liable for tort claims under Luxembourg law,

17   where there is not an allegation of an extra contractual

18   conduct.

19        With respect to Mr. Floor and with respect to Mr.

20   Bigman, the complaint provides only two allegations of fact,

21   and they are:  One, that as G.P. managers, Mr. Floor and Mr.

22   Bigman approved the merger on December 20th, 2007; and two,

23   that they approved a distribution as G.P. managers.  That's it.

24   There is nothing further beyond those factual allegations for

25   the trustee to hang their hat on.

1          So I would caution the Court not to allow an end-run

2    on the corporate form of Luxembourg company law, and allow the

3    trustee to voluntarily dismiss the mismanagement claim, only to

4    try to sneak it in as a tort claim, where it's the exact same

5    conduct that is being challenged.

6          THE COURT:  Okay.  Thank you.

7          MR. JONES:  Thank you.

8          THE COURT:  Desire on the part of the trustee to

9    respond?

10          MS. ORENSTEIN:  I believe that we've already explained

11    our position regarding the availability of tort liability,

12    irrespective of the official status of the party charged, based

13    upon whether the conduct of that party was willful and included

14    the characteristic of "dol," which under Luxembourg law

15    includes intentional misconduct.  So I have no further comments

16    with respect to -- with those remarks.  Thank you.

17          THE COURT:  Okay.  Letter.

18          My letter indicates a desire by Paul Hastings to be

19    heard for five minutes in supplemental argument.

20          MR. NOVOMISLE:  Thank you, Your Honor.  Bill Novomisle

21    from Paul Hastings on behalf of Alan Bigman.

22          THE COURT:  Your last name again, please?

23          MR. NOVOMISLE:  Novomisle.

24          THE COURT:  Novomisle?

25          MR. NOVOMISLE:  But this is going to be -- Novomisle.

1        THE COURT:  Thank you.

2        MR. NOVOMISLE:  This is going to be very quick.

3        I think that all of the arguments already made apply

4   equally to Mr. Bigman, and I have nothing to add on top of

5   that, so we're willing to waive our time.

6        THE COURT:  Very well.

7        MR. NOVOMISLE:  Thank you.

8        THE COURT:  Ms. Orenstein, I assume you'll do

9   likewise.

10        MS. ORENSTEIN:  Absolutely.

11        THE COURT:  Are we now up to the Rule 25?  Is there

12   anybody who didn't have a chance to weigh in on the Luxembourg

13   counts?

14     (No verbal response.)

15        THE COURT:  Okay.  Rule 25.  Is that Mr. Dittmar?

16        MR. DITTMAR:  Yes.

17     (Pause in proceedings.)

18        MR. DITTMAR:  Thank you, Your Honor.  Jim Dittmar,

19   Goodwin Procter, representing the Executor of the Estate of

20   Richard Floor, Diane Currier.

21        The argument that I'm presenting today and that we

22   have briefed is simply that the claims against Diane Currier,

23   as Executor of the Estate of Richard Floor, should be

24   dismissed, and the trustee should not be permitted to

25   substitute by pleading amendment Ms. Currier for Mr. Floor, or

1    to get an extension of time in order to substitute -- file a

2    motion to substitute here because of noncompliance with the

3    time constrictions of Rule 25(a).

4            The law underlying this motion is quite simple.  The

5    federal rules, of course, apply in this adversary proceeding.

6    Rule 25(a) deals with substitution of parties upon death.  It

7    provides that, on death, the Court may substitute an

8    appropriate authority, such as an executor, for a decedent.

9    But it also provides that, if a motion to substitute is not

10   filed within ninety days of service of notification of death,

11   then the Court must dismiss the claim.

12           Rule 6(b) -- Rule 6 all together, which provides for

13   timing of motions, and 6(b) allows for extension, is of course

14   applicable.  And the deadline for a motion may be extended for

15   good cause.  The only applicable subdivision of 6(b) that comes

16   into play here, since there has been no motion made before the

17   deadline set by Rule 25(a), is if there is excusable neglect.

18           Now that's the core legal framework.  The facts are

19   quite simple, and I will, at the end, hand up a very simple

20   time line for you, but I'd like to talk first, because I'm

21   going to introduce two parts of the time line at different

22   points in my remarks.

23           Richard Floor was a defendant in the original

24   creditors' committee proceeding.  He died on February 18 of

25   2010.  On March 8, 2010, a suggestion of death, the old-

1  fashioned form, was served on all parties to the litigation,

2  including the creditors' committee, in whose shoes or from whom

3  the trustee's claim springs.

4       On April 9, 2010, the Massachusetts Probate Court

5  issued a decree appointing Diane Currier as the executor.  We

6  now don't call it "executrix" in Massachusetts.  It's one of

7  our -- one of our few modernizations, I suppose.  So on April

8  9, she was appointed by decree.  That decree, by the way, is a

9  public record.  You can walk into the Probate Court Registry in

10  Middlesex County and pick it up.

11       In addition, on June 6th, most importantly, on June

12  6th, 2010, ninety days from the date of service of the

13  suggestion of death came and went.  There had been no motion

14  filed to substitute by the trustee and no other action

15  whatsoever taken by the trustee to preserve any claims against

16  Richard Floor upon the occasion of his death.  No action

17  whatsoever by the time of the expiration of the ninety days

18  provided in Rule 25(a).

19       In November, November 16, the trustee filed the cross-

20  motion here, a motion to amend the caption to simply

21  substitute, in effect, the Executor for Richard Floor; or in

22  the alternative, a motion to extend the time to file a motion

23  to substitute, kind of trying to get back into the Rule 25(a)

24  process and Rule 6(b) process.  This motion itself was filed

25  almost two months after the motion that I'm standing before you

1   to argue, the motion to dismiss on grounds of noncompliance

2   with Rule 25(a).

3          The central issue, I submit, Your Honor, on deciding

4   whether or not to grant the motion that I'm advocating or --

5   and deny the motion of the trustee, or vice-versa, is whether

6   there has been excusable neglect for the trustee's failure to

7   secure an extension -- a substitution or some other relief by

8   the ninety-day time period running in June -- or on June 6th,

9   2010.

10          There was no action to secure substitution before June

11   6th, the ninetieth day.  There was no contact whatsoever, and

12   this is conceded by the papers that the trustee has filed; no

13   contact whatsoever made with the Massachusetts Probate Court to

14   determine who the executor was, if the executor had been

15   appointed.  Nobody has shown that they went over to the

16   courthouse, or even -- or even telephoned, as they put into an

17   affidavit by a triple-layer --

18          THE COURT:  Mr. Dittmar --

19          MR. DITTMAR:  -- I think totem pole hearsay --

20          THE COURT:  -- I've been sitting quietly --

21          MR. DITTMAR:  Yes, sir.

22          THE COURT:  -- listening.

23          MR. DITTMAR:  Uh-huh.

24          THE COURT:  You're articulating as an excusable

25   neglect issue is one of a couple of possible ways of

1   articulating it.  But another is the inference that they

2   suggest that I might draw that you were hanging back without

3   telling people, and that they got the notice late.  I didn't

4   hear you say anything about you picking up the phone or sending

5   a piece of paper to your opponent to tell them that the clock

6   was starting to tick, either.

7        MR. DITTMAR:  That's correct, Your Honor.  Although we

8   did, we did circulate the suggestion of death.  So we put them

9   -- we put the trustee on notice of Mr. Floor's death in early

10  March, which is what starts the ninety days running.

11       But your question that we lay low, it's -- it is not

12  under the rules the obligation of counsel for the decedent or

13  the decedent's estate or the executor for the decedent to

14  notify the adverse party in litigation that the representative

15  of the estate has been appointed by the appropriate orphans

16  court or probate -- in our -- in Massachusetts, the Probate

17  Court.  That's just not where the burden of duty lies.

18       I would suggest a more appropriate question -- with

19  all due respect, Your Honor, and I understand why you would ask

20  me the question.  But the more appropriate question is:  Why

21  didn't the trustee pick up the phone and call me?  The trustee

22  never did that.  And to -- in fact, all the way through the

23  filing of our motion and then the filing of their motion, the

24  trustee didn't pick up the phone to find out anything about the

25  appointment of the executor.

1          In addition, the fact of the appointment is reflected

2   in a decree of the Probate Court.  As the affidavit of the

3   executor indicates, that is a matter of public record.

4          Now the trustee has an affidavit by a paralegal,

5   saying that she told an assistant to call the Probate Court,

6   and the assistant told the paralegal, according to the

7   paralegal, that somebody at the Probate Court said the

8   appointment hadn't been made, at a time when it had been made,

9   or that it wasn't on the docket, at a time when the decree with

10  an embossed seal could be had for paying the nominal fee if you

11  walked into the registry of the Probate Court.  Brown Rudnick,

12  counsel for the trustee, is a Boston-based firm, at least

13  originally.  They're operating this case out of New York, it

14  appears.  They're a Boston-based firm.  All they had to go was

15  go two and a half miles to Cambridge, East Cambridge and go

16  into the Probate Court.

17         I think, with all due respect, there's no duty on the

18  -- on the decedent's interests to help a claimant against the

19  decedent.  And I would say, as far as counsel is concerned, I

20  can't see how I or my colleagues could be under an obligation

21  to make sure that a party asserting a claim adverse to a client

22  of mine perfects that claim.  In fact, I would dare say I would

23  think that's probably inconsistent with my ethical obligations

24  to my client, as long as I'm under no other type of a duty to

25  make the disclosure or make the notification.  And there isn't

1   any such --

2          THE COURT:  I don't think, Mr. Dittmar, anybody is

3   accusing you of an ethical violation by concealing this

4   information from your opponent.  But the issue is whether your

5   opponent, having not had the benefit of accurate information

6   and with you evidently having decided that you don't have a

7   duty to share it with him, being able to avail himself of

8   excusable neglect.

9          MR. DITTMAR:  Well, there's nothing that the trustee

10  did within the ninety days, nothing at all.  The reported trip

11  over -- or I'm sorry, not "trip" -- the reported phone

12  conversation or a series of phone conversations between legal

13  assistants at Brown Rudnick and the Probate Court registry

14  officials didn't start until after the ninety-day period had

15  expired.

16         The other activities that the trustee points to:  The

17  circulation of an amended complaint before the filing of an

18  amended complaint, the circulation of a CMO, or an amended CMO,

19  not -- which the trustee relies upon, none of those things

20  occurred before the ninety days had run.

21         THE COURT:  When, with respect to the time that the

22  Probate Court decree was entered, did you or your associates or

23  your paras find out it had been entered?

24         MR. DITTMAR:  I don't remember, but I'm perfectly

25  willing to concede that it must have been within a matter of

1    days to two weeks.

2              THE COURT:  Of the time --

3              MR. DITTMAR:  Before --

4              THE COURT:  -- that it was entered.

5              MR. DITTMAR:  I'll put it this way, let me put this

6    way.  I am quite certain it was before the ninety-day deadline

7    expired.

8              THE COURT:  Uh-huh.  Continue, please.

9              MR. DITTMAR:  Okay.  Now the law that governs how to

10   handle defaults in meeting time deadlines under the federal

11   rules, in this circuit, is extraordinarily rigorous and tough.

12   The lead case, we cited, we brief it at some length, the

13   Silivanch case, which in turn relies on the earlier Second

14   Circuit Hooper case, and have their ultimate basis, other than

15   in the rule language, in the Supreme Court's Pioneer case.

16             But the Silivanch case articulates that this circuit

17   takes a, quote, "hard line" on rule deadlines, such as --

18   exactly as Rule 25(a).  And the Court, the Second Circuit, says

19   in that opinion that a party missing a deadline in the ordinary

20   course should expect to lose, because it is tough to prove an

21   adequate reason.  And without an adequate reason for the

22   default in meeting the time deadline, there is no excusable

23   neglect.  And the Silivanch case itself, it was not a 25(a)

24   case, but there's interrelated authority on rules -- on rule

25   deadlines and the applicability of Rule 6 to all of them, and

1   the excusable neglect standards -- excuse me -- apply to all of

2   them.

3            The Court in the <u>Silivanch</u> case was dealing with the

4   failure to meet an appeal deadline by two days, based upon good

5   faith, absence of prejudice.  And in fact, the party that

6   missed the deadline relied upon a representation by counsel for

7   the adverse party of when the calculation of the appeal

8   deadline occurred.  And notwithstanding all of those

9   circumstances, <u>Silivanch</u> -- this is at the Court of Appeals --

10  said the trial court's allowance of the late filing was an

11  abuse of discretion.  It is a tough, hard line in the Second

12  Circuit; hard line, even though there is latitude for district

13  court, or in this case bankruptcy court discretion.

14           There is -- I do want to stress this.  There is no

15  case, no case that we've been able to find -- and we've done a

16  lot of research on this -- or that the trustee has cited -- and

17  it's obvious that the trustee had done a good bit of research,

18  under Rule 25(a), or any other rule deadline, where excusable

19  neglect for missing the deadline has been found, where no

20  action initiated by the party that missed the deadline had

21  taken place prior to the deadline.

22           There are cases where extensions have been granted,

23  where a party comes before the Court and says, I can't figure

24  out who's the right party, some 25(a) cases; I can't figure out

25  if the executor has been appointed, I can't figure out who the

1   representative is, or various other things like that; I'm sort

2   of information, extension granted.  That application, prior to

3   the passage of the deadline, saves the day.  There was none of

4   that here, none of that whatsoever.

5        I also want to address what I think may be a layering

6   on the excusable neglect standard, but perhaps it's a different

7   argument all together.  Much of the trustee's briefing argues

8   in the locution of consent; that the executor, by her own

9   action or inaction -- a question you raised, does she have a

10  duty to help the other side out; I say no.  Does her counsel

11  have a duty?  I say no.  There's no case -- there's no judicial

12  decision that says yes.

13       But the trustee seems to argue that there has been

14  consent because of the circulation that started in early July

15  of a draft amended complaint, the circulation that started a

16  little bit later in July -- I think I have the order of the two

17  right -- of the CMO, the draft CMO or amended CMO, to get the

18  organization of Phase 2 better in line, and then the filing of

19  an amended complaint itself on July 23.  And the argument is

20  that, by doing nothing, the executor or her counsel or the

21  executor and people whose conduct is attributed to her

22  consented to a late substitution.  For a number of reasons,

23  that has no merit.

24       Let me give you several conceptual or analytical

25  reasons why that has no merit.

1          First, the concept is of consent.  Consent is

2    agreement.  Consent is agreement.  There is nothing in the

3    record that would constitute the manifestation or evidence of

4    the manifestation of assent by the executor to a late filing of

5    a substitution to preserve a claim against her that had

6    previously been asserted against her decedent.

7          In litigation, of course we have ways of manifesting

8    assents to procedures, including deviations from the normal

9    procedure.  We have stipulations.  We have joint submissions,

10   which each side agrees with the other.  We have motions that

11   are assented to or non-opposed.  And at all events, we expect

12   to see these things in writing when they are dispositive or

13   cure a disposition of one party's rights.  We have none of

14   that.  In fact, there's all together a failure by the trustee

15   to ever communicate.

16         And I recognize, Your Honor has asked the question,

17   you know, who's got the responsibility for that.  And that may

18   be where you end up having to make a decision.  But I would

19   submit, as I have said before, there's no case law saying it's

20   the executor's obligation.  And I would say it's contrary to

21   the interests of the executor; and hence, therefore her

22   lawyer's duty, and it's contrary to the interests of the

23   beneficiaries of the estate; and hence, contrary to the

24   fiduciary obligations of the executor to tell these people, who

25   may be asleep at the switch, that they're asleep at the switch.

1   Oh, you know, you got to act quickly, you've got to act quickly

2   to preserve the claim, so that I can tell -- I can tell the

3   widow and the three children of Mr. Floor that I've managed to

4   keep a claim against their estate and their inheritance alive?

5   I'm sorry.  But I just don't think, Your Honor, that that works

6   logically or in authority.

7          And then, as for the specific conduct, an amended

8   complaint and draft was circulated before filing.  But there's

9   no -- that -- by reading it and not in some way opposing the

10  filing doesn't amount to consent, as in consent to the claim

11  being asserted and prosecuted.  Otherwise, why are all these

12  people in this courtroom?  We're all here on motions to

13  dismiss.  We all went through the same process.

14         Now I remember Your Honor exhorted the parties to

15  talk, and for the defendants to raise concerns, challenges, so

16  that -- to the complaint as it's being revised over a period of

17  time before eventual filing, because you said you wanted the

18  trustee to be able to put its best foot forward.  I think that

19  was the terminology that you used.  And the practical concern

20  that you were addressing is that you didn't want to have a

21  round of motions to dismiss, rule on them, and then have

22  motions for leave to amend or arguments about why you ought to

23  amend.  In fact, you've done that today, and I -- you know, we

24  all expect that.  That's good administration of justice.

25  That's trying to avoid inefficiencies.

1    But that is -- that's a different purpose than the

2  purpose Rule 25(a) serves.  I didn't have anything to tell the

3  trustee to make his pleading a sound pleading from a 12(b)(6)

4  motion.  The only thing I could have said is, hey, buddy,

5  aren't you watching your deadline.  It's a different thing.

6  You cannot say, I submit, that the review of the amended

7  complaint somehow constitutes a waiver of the right that had at

8  that point matured on June 6th, under Rule 25(a), under the law

9  of this circuit.

10    The second thing, the CMO in draft.  The CMO, by, you

11  know, going along with the CMO -- first of all, at the time, I

12  was representing, in addition to the executor, I was

13  representing five other parties.  I was looking at the CMO,

14  just the way all these other defense counsel were, and

15  plaintiffs and the trustee's counsel, from a case management

16  standpoint, an efficiency standpoint, an organization -- a

17  process organization standpoint.  No one -- a case management

18  order is not an instrument dispositive of rights.  So the fact

19  that that went along cannot count against the executor.

20    And the fact that she filed a complaint in July, late

21  July, July 23, which named as one of the parties legal

22  representative of the Estate of Richard Floor, with a footnote

23  saying, I understand -- the trustee understands that Diane

24  Currier is going to be the -- is going to be the executor, but

25  has not yet been named the executor.  Our response to that was

1   to file a motion to dismiss in September.

2            So there's nothing that can constitute, I would

3   suggest, consent, conceptually or applied to the specific

4   items.  And in any event, all of these -- all of these actions

5   or all of these courses of conduct that the trustee says

6   somehow amount to consent, or maybe if they're a species of

7   excusable neglect, they occurred long after -- long after the

8   rights of the trustee had been lost by his own neglect to meet

9   the deadline.

10           Now possibly, possibly the trustee is arguing a waiver

11  kind of argument.  I'm going to try to cover all the bases.  Is

12  it another instance of excusable neglect or a manifestation of

13  excusable neglect?  Not if it comes after the deadline.  Is it

14  consent?  Not if it has none of the manifestations of consent,

15  not under the particular circumstances of the procedures in

16  this case.

17           Is it a waiver?  Well, a waiver is -- you know, we all

18  learned in law school, the known -- the intentional

19  relinquishment of a known right.  Is there anything that looks

20  like an intentional relinquishment of a known right?  If

21  anything, Your Honor is a little suspicious that I played too

22  cute by half, or the executor played too cute by half, which I

23  submit is the only thing we could do, consistent with our legal

24  responsibilities to others.

25           And maybe, maybe there's a theory of estoppel.  But

1   what did we do?  We didn't do anything.  You got to base

2   estoppel on a misrepresentation, or at least an action that has

3   communication.  We didn't do anything that has communication

4   that suggests we consent to a late filing.  And at all events,

5   there's no prejudicial reliance.

6          So for all of those reasons, the course of events that

7   started up with the circulation of the CMO draft and the

8   circulation of the amended complaint draft can't suffice to

9   retrieve the claim on some theory of consent.

10          Now the case law is interesting.  First of all,

11  there's a strong body of case law under Rule 25(a) and 6(b)

12  that says -- and especially under 6(b) because there's a larger

13  body of excusable neglect law there because it covers all of

14  the different deadlines in the federal rules.  There's

15  authority that says, when you have to act by motion, you have

16  to act by motion.  You can't use something else as a substitute

17  for a motion, as a quasi-motion, as a pseudo-motion and comply

18  with your obligation.  And in any event, there was nothing done

19  before the deadline.

20          And there is no case, no case that we have been able

21  to find in all of our research, and there's no case that's been

22  cited by the trustee under Rule 25(a), finding an implied

23  consent to substitution, and in this case an implied consent to

24  late substitution, based upon the opposing party's continuing

25  participation in an ongoing lawsuit.

245

1          It may seem draconian, Your Honor.  And I'm not here

2     flippantly arguing, as though there's some moral rectitude on

3     my side of the case.  There is legal right on my side, my

4     client's side of this argument, and legal duties on her part

5     and her counsel's part that support that.  And there is a clear

6     violation, clear violation of a rule deadline in a circuit

7     which says it takes a hard line on those violations.

8          I'd like to hand up my time line to you, Your Honor.

9          THE COURT:  Yes.

10    (Pause in proceedings.)

11         MR. DITTMAR:  Thank you, Your Honor.

12         THE COURT:  All right.  Responding for the trustee.

13         MS. ORENSTEIN:  May Orenstein of Brown Rudnick, Your

14    Honor, for the trustee.

15         As explained in our papers, we believe that Ms.

16    Currier waived any objection and consented to her substitution

17    for Mr. Floor by consenting to both the filing of the amended

18    complaint and the amended CMO.

19         Counsel for Ms. Currier is being extremely

20    disingenuous to suggest that he did nothing.  In fact, he was

21    an active participant in the process pursuant to which the

22    parties discussed with each other the contents of the amended

23    complaint, pursuant to which the trustee at that time invited

24    commentary to the amended complaint, and which amended

25    complaint contained the following language -- which amended

1   complaint contained in the caption "The Estate" -- "The Legal

2   Representative of the Estate of Richard Floor, Deceased," and

3   had a footnote which stated:

4            "Upon information and belief, although not yet

5            formally appointed, Diane Currier will be named as the

6            Executrix of the Estate of Richard Floor.  It is the

7            intention of the LB Litigation Trust to name as

8            defendant the person who shall be appointed the legal

9            representative of the Estate of Richard Floor."

10           During July of 2010, the parties negotiated an amended

11  case management order.  The trustee at that time circulated

12  drafts, or the trustee or perhaps the other -- the defendants

13  in the case circulated drafts of the proposed amended CMO on

14  July 9th, July 13th, July 15th, July 20th, and July 21st.  In

15  each of these drafts, the Estate of Richard Floor was included

16  amongst the defendants.  The amended case management order

17  identified each of the parties in the action and grouped them.

18  The amended case order stated that, quote:

19           "The parties will be grouped in the following five

20           groups, each a party group for purposes of

21           administering the amended case management order."

22           Among the five party groups were, quote, "the Basell

23  D&O Defendant Group."  The applicable definition of that group

24  in the amended CMO is as follows:

25           "The Basell D&O Defendant Group shall refer to Simon

1              Baker, Alan Bigman, Lynn Coleman, Betrand Duc, the

2              Estate of Richard Floor, John Fisher Gray, and Dawn

3              Shand."

4              On July 14th, the parties' counsel participated in a

5     status conference with the Court concerning the proposed

6     amended complaint.  At the conference, counsel for Goodwin

7     Procter represented to the Court that he appeared on behalf of,

8     quote, "six individuals who are board members."  Later in the

9     hearing, the same counsel stated:

10             "I agree about the expectation we will reach an

11    agreement and that will allow for the filing of an amended

12    complaint in short order, and the agreement on the terms of the

13    comprehensive CMO."

14             Addressing another attorney at the status conference,

15    the Court stated:

16             "If they're going to do an amended complaint anyway,

17    have you identified that perceived deficiency to your opponent

18    and suggested to them that they put their best pleading

19    forward."

20             The executor did not during the status conference --

21    although it is now his position that as of that time, the

22    period had already run.  He said absolutely nothing.

23             On July 21st, 2010, the defendants reported to the

24    trustee, based on having conferred with all of the other

25    defendants presumably, that all defendants listed in the

1   amended complaint, which Your Honor will now understand

2   included the Estate of Richard Floor, had agreed to its terms,

3   including the Estate of Richard Floor.

4          So we submit, Your Honor, that, whether this was a

5   consent or whether this was a waiver, it nonetheless was a

6   substitution for a formal motion for the substitution of the

7   estate in lieu of the late Mr. Floor.

8          In considering whether or not the fact that the -- a

9   formal motion was not made within ninety days following the

10  substitution (sic) of death, I would like to briefly remind the

11  Court of the context in which the initial suggestion of death

12  was filed.

13         The suggestion of death was filed during the period

14  when the prosecution of the committee action, for all practical

15  purposes, was in abeyance, when the focus of the committee, as

16  well as the other parties, was on the settlement of the

17  litigation and confirmation and implementation of plan -- of

18  the plan.  The suggestion of death was filed when it was

19  contemplated by all that the committee's standing to continue

20  to prosecute the action would be terminated, and the claims

21  would be prosecuted by its successor, a trustee who, at that

22  time, was yet to be appointed.

23         On March 6th, 2010, the debtors filed the third

24  amended plan of reorganization, incorporating the terms of the

25  proposed settlement with the settling defendants and providing

1   for the assignment of the non-settling defendants' claims to

2   the LB Litigation Trusts.  These claims included the claims

3   asserted against Mr. Floor.

4          On April 30th, the plan became effective.  Pursuant to

5   the terms of the plan, the LB Litigation Trust agreement and

6   the confirmation order, the LB Litigation Trust was established

7   to pursue the claims assigned to the estates to the trust,

8   pursuant to the settlement.  Unfortunately, during this very

9   active period for the committee and its counsel, counsel to the

10  committee did not focus on the requirements of Rule 25(a), and

11  the ninety-day statutory period commenced by the suggestion of

12  death filed by Goodwin Procter ran on or about June 8th.

13         However, if those claims were commenced and new now by

14  the trustee, they would not be time-barred.  So the relief that

15  is being sought here is, indeed, extremely draconian.  The

16  estate is asking that, by virtue of this technicality of the --

17  that claims that are still timely must be dismissed with

18  prejudice against the trustee.

19         Not only -- based on the foregoing particularly,

20  stipulation to the amended CMO, Currier should be deemed to

21  have consented to her substitution and waived any objection

22  based on the trustee not having filed a timely formal motion

23  for substitution.

24         This is not a case where something abstruse and

25  peculiar is being imputed to the counsel for the estate.  I

1    think any counsel not acting in an entirely disingenuous

2    manner, upon seeing the CMO including the Estate of Richard

3    Floor as a party, would have said, we reserve our rights with

4    respect to that -- with respect to the substitution because the

5    deadline has passed.  But there was no such communication at

6    all during that time, until the -- until the defendant filed

7    its motion to dismiss on 25(a) grounds.

8         In response to these facts, if Your Honor would spend

9    time reviewing the submission by counsel to the executor,

10   counsel -- Currier argues that she should not be held

11   responsible for the actions taken by her counsel because she

12   was not contemporaneously aware of her counsel's participation

13   in the negotiation of the CMO.

14        THE COURT:  Say that again slower, please.

15        MS. ORENSTEIN:  I'm sorry.  Counsel -- Ms. Currier has

16   submitted a brief in this -- a brief in this -- in connection

17   with this motion and has, in conjunction with that brief,

18   submitted an affidavit.  In that affidavit she argues that she

19   should not be held responsible for the actions taken by Goodwin

20   Procter on her behalf because she was not contemporaneously

21   aware of those actions.  Based on the -- and in her affidavit,

22   she declares that she did not consent to any case management

23   order, notwithstanding that her counsel did, in fact, consent

24   to that case management order.

25        According to Ms. Currier in her affidavit, she did not

1    participate in the July 14th, 2010 court conference concerning

2    the proposed amendment -- proposed amended complaint, and

3    suggests that her counsel did not participate on her behalf,

4    either.  She writes:

5         "As the trustee knows, Goodwin Procter represented

6          several defendants."

7         But counsel for Goodwin Procter has stated that he

8    appeared on behalf of six individuals who are board members.

9    Goodwin Procter represents Lynn Coleman, John Fisher Gray, Dan

10   (sic) Shand, Bertrand Duc, Simon Baker, and the sixth board

11   member represented by Goodwin Procter was Richard Floor.

12        Whatever Ms. Currier's counsel was thinking, we are

13   not in a position to know that today.  But under New York law,

14   Currier is bound by her counsel's actions.  "Where a relation

15   of attorney" -- and I'm reading now from New York Jure (sic).

16        "Where a relation of attorney and client exists, the

17         client is bound, according to the ordinary rules of

18         agency, by the acts of his or her attorney within the

19         scope of the latter's authority or apparent

20         authority."

21        Currier does not argue that Goodwin Procter was not

22   her counsel.  Therefore, under New York law, Currier is bound

23   by Goodwin Procter's actions on her behalf.

24        Currier argues that her participation through counsel

25   should not be deemed evidence of her consent to substitution as

1  a party, because when such participation occurred, she was not

2  a party.  Neither case cited by Currier in support has anything

3  to do with the question of whether a course of participation in

4  litigation should be deemed consent to party status.

5        Currier also appears to be arguing that her

6  participation in the litigation cannot constitute consent or

7  waiver because it occurred after ninety days had run from the

8  suggestion of death.  However, we think that her participation

9  required her to reserve her rights at that point.  The very

10 nature of a waiver is it may occur after a right has already

11 lapsed.

12       Currier also argues that a letter or other writing of

13 consent was necessary to effect consent.  We believe that her

14 counsel's consent did occur in writing in the form of his

15 consent to an amended case management order naming the Floor

16 Estate as a defendant and the consent to the amended complaint,

17 both of which, of course, were filed with the Court.

18       Currier also argues that Rule 25 necessarily requires

19 a formal motion, and that under no circumstances can the mere

20 filing of an amended complaint constitute a consent to

21 substitution.  But this is not the normal situation of a mere

22 filing of an amended complaint.  Had it not been the case that

23 the defendants consented to the filing of an amended complaint,

24 then in that case the trustee would have had to move for leave

25 to file an amended complaint with the Court.  All of the

1   parties waived that and consented to the filing of the

2   complaint, which had as its consequence that the Estate of

3   Richard Floor, rather than Mr. Floor himself, was substituted

4   as a party in the action.

5           In arguing that consenting to an amended complaint

6   naming the successor party cannot be sufficient to effect a

7   change in the party, Currier relies primarily on a case

8   Kaubisch v. Webber, 403 F.3d 540 (8th Cir. 2005).  We think, in

9   fact, this case illustrates the opposite.

10          In Kaubisch, the plaintiff proposed to the defendants

11  that they stipulate to an untimely amendment of the complaint,

12  and every defendant rejected the proposal.  The Court did not

13  rule that a formal motion was required under Rule 25.  Instead,

14  the Court examined the record to determine if it would be

15  proper under the circumstances to conclude that the defendant

16  consented without formal motion.

17          Given the fact that every defendant in that case had

18  refused to consent to the amended complaint, the Court held as

19  a factual matter that the plaintiff's argument that the

20  substitution had occurred with consent, or that objections had

21  been waived was unsupported by the record.  This is the exact

22  opposite of what happened here.  Here, in contrast, counsel

23  consented to the filing of the amended complaint, reflecting

24  the substitution of the new party.

25          Currier's citation to other cases are not helpful.

1   For example, <u>Nauman v. Rensselaer Polytechnic Institute</u>.  In

2   <u>Nauman</u>, one year after the filing of a suggestion of death,

3   counsel stated that he intended to file a motion to substitute.

4   He never did, and the Court dismissed the action.  Such fact

5   patters have absolutely nothing to do with this case.

6           Bottom line, Currier, while apparently already serving

7   as an executor of the Floor Estate consented through counsel to

8   the filing of an amended complaint that named the Executor of

9   the Floor Estate as a defendant.  She consented to amendments

10  to the case management order naming the estate as a defendant,

11  and she participated through counsel in a status conference on

12  the amended complaint.  Substitution absent a formal motion is

13  proper here, and the caption should be amended accordingly.

14          In the alternative, the Court should formally

15  substitute Currier for Floor.  Whatever doubt about the effect

16  and timing of Currier's participation in the litigation, there

17  is no doubt that, if an extension and formal substitution were

18  still required here, under the case law applying Rule 25, such

19  substitution is not only within the discretion of the Court,

20  but clearly should be ordered here.

21          The purpose of the rule has been accomplished.  The

22  Second Circuit has explained that the purpose behind Rule 25 is

23  to establish a flexible mechanism for providing notice, so that

24  an estate can plan with finality and assets can be distributed

25  and the estate wound up.

1        Counsel's Currier (sic) served as counsel for Floor,

2   as was aware that the claims against him had not been settled,

3   and that the trustee had been appointed to pursue the non-

4   settling claims.  He would have also been aware that those

5   claims were not abated by the death of Mr. Floor, and that the

6   trustee had every intention to pursue those claims.  Thus,

7   there is no question as to whether or not the estate was on

8   notice as to the existence of these claims and the likelihood

9   that the trustee intended to prosecute them against the estate.

10       The notice issue also explains the different treatment

11  of plaintiff's substitution cases noted in the -- versus

12  defendant substitution cases noted in the case law.  For

13  example, in Smith v. Thebaud, 258 F.R.D. 207 (E.D.N.Y. 2009),

14  the Court noted that in that case, in which -- that -- in which

15  -- unlike the case at Bar, in which a substitution would be

16  allowed, in cases within this circuit where substitution has

17  been denied, the claims dismissed as a result, it was the

18  plaintiff who had died.  In other words, when a plaintiff dies,

19  there is a fundamental question about whether the litigation

20  will continue.  When the defendant dies, that is not generally

21  the case.

22       Here, as set forth above -- here, as I've said, there

23  was not even a question as to whether the claims against

24  Floor's estates would be dropped.

25       Moreover, Rule 25's excusable neglect standard is

1  easily satisfied here.  There is not a single standard for

2  excusable neglect in this circuit that is equally applicable to

3  all procedural issues.  Courts have made clear that Rule 25 was

4  not intended to act as a bar to otherwise meritorious actions;

5  and furthermore, that notwithstanding the mandatory language --

6  and now I'm quoting from the -- from Smith v. Thebaud, 258

7  F.R.D. 207, quote:

8          "Notwithstanding the mandatory language in Rule 25(a),

9          the District Court has considerable discretion in

10         addressing the timing of substitution in the event of

11         the death of a party."

12      The same Court says that extensions of time are

13  granted where, quote/unquote:

14         "-- excusable neglect is demonstrated and the opposing

15         party does not suffer prejudice."

16      There is absolutely no prejudice here.  As I said

17  earlier, were the trustee to commence this claim anew, it would

18  not be time-barred.

19      In her opposition, Currier devotes a substantial

20  effort to describing the manner in which she believes excusable

21  neglect would be applied here.  In support of the argument that

22  this circuit requires a hard line as with respect to the

23  excusable neglect standard, she cites several cases in her

24  brief.  None of the cases cited involve Rule 25.  In fact,

25  Currier does not cite any Rule 25 case in which the Court

1   applies the hard-line standard that she argues should apply

2   here.

3          As applied in the Rule 25 context, the excusable

4   neglect standard is flexible and affords courts considerable

5   discretion, requiring only that the movant show, one, a

6   reasonable basis for noncompliance with the time specified; and

7   two, good faith.

8          I think that both of those elements are amply

9   demonstrated in our papers.  The efforts that were made on the

10  part of our staff to ascertain the identity of the executor are

11  -- there's really no reason to question them.  And to now in

12  hindsight say that other efforts could have been made is

13  besides the point.  The relevant paralegals were told that the

14  information was not yet available, and it was in fact docketed

15  at a much later time.

16         The discretion that is afforded to a court in its

17  administration of Rule 25 is attributable to the legislative

18  history of the rule.  The rule was amended for the specific

19  purpose of allowing for substitution to appear in a more -- to

20  occur in a more flexible manner.

21         As the Court stated in Zeidman, 122 F.R.D. 160:

22         "Whether an action should be dismissed for failure to

23         comply with the ninety-day time limit lies within the

24         sound discretion of the District Court.  In making

25         this determination, the Court is mindful of the

Argument                                         258

1          underlying purpose of Rule 25(a)(1), which is to allow

2          flexibility in substitution.  To effectuate this

3          purpose, the rule should be liberally interpreted."

4          Currier's brief discussion of Rule 25 cases makes only

5  a cursory effort to address this.  Her analysis in particular

6  of Thebaud is limited to an effort to distinguish the case on

7  the facts.

8          Ultimately -- and this is highly significant --

9  Currier is unable to cite a single Rule 25 case in which a

10  motion to extend the time for substitution of a defendant made

11  after ninety days is denied.  Currier's reliance on Zeidman and

12  Harp is unavailing.  Both plaintiff-substitution cases -- both

13  were plaintiff-substitution cases, rather than defendant-

14  substitution cases.  In addition, in Zeidman, the Court found

15  that there would be prejudice to the substituted party, while

16  here Currier can identify no prejudice.  Rule 25's excusable

17  neglect standard is easily satisfied here.

18          And I think my partner Sig Wissner-Gross would like to

19  add that it's not accurate, what Mr. Dittmar stated about the

20  trustee making no effort to contact the -- to contact counsel

21  following the motion to dismiss.  In fact, Sigmund, do you want

22  to get up and ...

23          MR. WISSNER-GROSS:  Very simply, I did contact his

24  partner and said I thought, in light of their participation in

25  the CMO and the amended complaint and their silence in response

Argument                                                           259

1    to Your Honor's question as to if anyone had any issues, that I

2    urged them to withdraw the motion, and obviously they didn't

3    consent.  That's all, Your Honor.

4              THE COURT:  All right.

5              MS. ORENSTEIN:  Does Your Honor have any questions?

6              THE COURT:  No.

7              MS. ORENSTEIN:  Thank you.

8              THE COURT:  I've heard plenty on this.

9              MR. DITTMAR:  Yes.

10             THE COURT:  You have two minutes to reply, if you need

11   it.

12             MR. DITTMAR:  Could I reply back here in a loud voice?

13             THE COURT:  No, because I have a microphone recording

14   system.

15             MR. DITTMAR:  Ah, yes.

16        Your Honor, I'm content with my opening argument,

17   except I'd like to point out that the Harp case, the Kaubisch

18   case, the Nauman v. Rensselear case, and the Zeidman -- or

19   Zeidman -- case all involved failure to act within ninety days,

20   that my sister, I think, overlooked.

21             THE COURT:  All right.  Next motion.

22             MR. KIRPALANI:  Your Honor, if I just may address the

23   Court.  The next -- the last two motions are -- one is for --

24   by my client BI S.A.R.L., which my partner Ben Finestone would

25   argue, deals with extraterritoriality and lack of personal

1    jurisdiction.  It's kind of a heavy motion.

2           And the last one is a motion by various parties,

3    dealing with the recharacterization arguments for the Access

4    revolver, and Dianne Coffino of the Covington firm is going to

5    be arguing that.  We'd like to take them out of order, and then

6    perhaps see how much time is left and how Your Honor feels

7    after that.  It may be that we'll come back in the morning and

8    take Your Honor up on the suggestion if that's better for the

9    Court.

10          THE COURT:  Mr. Pohl, do you object to his game plan -

11   -

12          MR. POHL:  Well --

13          THE COURT:  -- or did you want to be heard on

14   something else?

15          MR. POHL:  I guess my point is it's convenient for

16   him, but my -- from my perspective, if we're going to go

17   forward now, I'd love to be able to do both, so I can also go

18   home.  If we're not going to go forward, then I'll sleep over.

19   But to do one and not the other is just satisfying one hand and

20   not the other.

21          MR. KIRPALANI:  It wasn't done intentionally.  I

22   forgot that Mr. Pohl mentioned he's handling personally both 7

23   and 8, I just forgot that.

24          Your Honor, it's up to you.  It's ten to 6 --

25          THE COURT:  Well, we'll do them both.

Argument                                              261

1          MR. KIRPALANI:  Okay.

2          THE COURT:  I did not think that the territoriality

3    motion was, or at least should be as heavy as you articulated

4    it, Mr. Kirpalani.

5       (Laughter.)

6          MR. KIRPALANI:  Well, I just meant it deals with

7    issues we haven't yet discussed today, that's all.

8          THE COURT:  We'll stick to the original order.  Does

9    anybody want or need a break, or shall we just keep going?

10         MR. POHL:  If we can have ten minutes, then from my

11   perspective, I think one hour should cover both these motions,

12   if I could have ten minutes before we start.

13         THE COURT:  All right.  Let's do that, ten-minute

14   recess.  We'll resolve at six o'clock.

15      (Recess taken at 5:52 p.m.)

16      (Proceedings resume at 6:03 p.m.)

17         THE COURT:  Have seats, please.

18         Okay.  Let's continue.

19         MR. FINESTONE:  Good evening, Your Honor.  Benjamin

20   Finestone, Quinn, Emanuel, Urquhart & Sullivan, on behalf of BI

21   S.A.R.L.

22         THE COURT:  Okay, Mr. Finestone.

23         MR. FINESTONE:  Your Honor, this is BI S.A.R.L.'s

24   motion to dismiss Counts 14 and 19 of the amended complaint.

25   Both of those counts concern factually one remaining

1   distribution from Basell AF S.C.A. to BI S.A.R.L.  This

2   distribution occurred in December of 2007, as alleged, prior to

3   Basell's acquisition of Lyondell.

4            The motion to dismiss, Your Honor, is based on two

5   independent legal grounds.  With respect to Count 14 and 19,

6   the motion to dismiss is grounded in a lack of -- asserts a

7   lack of personal jurisdiction over BI S.A.R.L., and the motion

8   to dismiss also alleges that -- that with respect to Count 19,

9   that Congress did not intend Section 548 of the Bankruptcy Code

10  to apply extraterritorially to a transfer such as this one.

11           Before I go on, Your Honor, if you have before you

12  still the organizational chart that Mr. Kirpalani --

13           THE COURT:  Yeah, I got it.

14           MR. FINESTONE:  I just want to be clear that you've

15  identified the entities that I'll be talking about.  I won't be

16  discussing a lot.  But do you see Basell AF S.C.A. in the

17  middle of the chart?  And it's majority shareholder BI

18  S.A.R.L.?

19           THE COURT:  Uh-huh.

20           MR. FINESTONE:  Okay.  Your Honor, with respect to the

21  first basis, lack of personal jurisdiction, as an initial

22  matter, I just want to be clear about this; that the trustee is

23  not alleging personal jurisdiction as a matter of minimum

24  contacts or a systematic presence in the United States.  I

25  think the parties agree if personal jurisdiction is established

1    here, it's established based upon --

2            THE COURT:  I assume it's specific jurisdiction for

3    shooting a bullet over a state line.

4            MR. FINESTONE:  No, it's -- point taken, Your Honor.

5    It concerns alter ego, it concerns mere department, and I'll

6    get right to it.  Our bottom line is that, particularly in view

7    of the significant discovery that the trustee has had in this

8    case, both during the Chapter 11 cases that were pending before

9    Your Honor, during Phase 1 of the adversary proceeding, and

10   that have continued up until the end of February, we think that

11   the allegations in the complaint fail to satisfy a prima facie

12   standard; and that, in view of the discovery, that certainly

13   under any preponderance of the evidence standard.

14           We're not talking about implausibility here, Your

15   Honor; we're talking about conclusory allegations that, even if

16   given the chance to prove, there are no facts in the complaint

17   that, if proven, satisfy -- or establish an alter ego or a mere

18   department claim.

19           The conclusory statements are in Paragraphs 33 and 34

20   of the complaint.  They basically state that Blavatnik operated

21   BI S.A.R.L. as an alter ego; and then, secondly, they state

22   that they operate -- that Blavatnik -- that Nell Limited

23   controlled BI S.A.R.L., and that therefore it functioned as a

24   mere department.

25           And I just want to be clear, Your Honor.  I mentioned

1    that --

2            THE COURT:  Do we agree that the allegation is the

3    money went through BI S.A.R.L. and ultimately to Blavatnik or

4    one of his other entities?

5            MR. FINESTONE:  We agree that that's the factual

6    allegation.

7            THE COURT:  And you're contending that that doesn't

8    establish jurisdiction?

9            MR. FINESTONE:  Yeah.  Your Honor, I'm contending that

10   an equity distribution from one Luxembourg entity to another

11   Luxembourg entity falls woefully short of anything that the

12   cases have shown to justify alter ego or mere department.  I

13   mean, throughout the complaint -- there are no allegations of -

14   - of disrespect to the corporate form.  There's no allegations

15   of Blavatnik signing checks on behalf of BI S.A.R.L.  There's

16   no allegations of even sharing office space.

17           I think, if you look through the opposition, all that

18   the opposition argues is overlapping directors.  And in the --

19   it's a -- in the case that we cite called Mayatextil, now-

20   Justice Sotomayor made the meaningful point that the existence

21   of common directors and officers is normal business practice --

22   is a normal business practice of a multi-national corporation.

23           Other than that, if you look through the complaint --

24   or pardon me, if you look through the opposition, they point to

25   emails referenced in the complaint that indicate that various

1    members of the affiliated entities use the pronoun "we" in

2    discussing the potential acquisition of Lyondell.  And I think

3    that it's rather unremarkable, particularly if you look at the

4    org. chart, the fact that each of those entities would have

5    some indirect or direct interest in this target company.

6    That's just a common cause of the organization.  That's not

7    alter ego, Your Honor, and it's not -- it's not mere

8    department.

9         The cases that are cited in their brief, they talk

10   about complete disrespect of the corporate forms.  They talk

11   about -- they talk about commingling funds, and they talk about

12   a fraudulent purpose.  And I think the complaint is utterly

13   devoid of those sort of allegations.

14        Your Honor, the -- I -- the trustee also asks for

15   additional discovery to further establish, but I think that

16   there is no grounds for that here, when they've had significant

17   discovery.  All of the case law in our brief and in their brief

18   talks about submitting supplemental affidavits, submitting

19   deposition testimony, and we've seen none of that here, Your

20   Honor.  All we see is relying on the complaint, and the

21   complaint's discussion of the distribution as a matter of fact.

22        The trustee deposed Peter Thoren, one of the managers

23   of BI S.A.R.L.  And I don't want to be ponderous, Your Honor,

24   but I just want to run through four or five questions that were

25   asked at that deposition, because he was targeted like a laser,

1   the trustee was targeted like a laser on seeking to establish

2   alter ego, seeking to establish mere department, and yet we've

3   seen nothing that supplements the complaint.  The questions

4   asked:  What type of corporate records does it maintain,

5   starting with BI S.A.R.L.; what was the function of that

6   entity; did BI S.A.R.L. hold meetings, corporate meetings; and

7   did Len Blavatnik ever instruct you to approve any particular

8   resolution on behalf of BI S.A.R.L.

9           So, Your Honor, these were things that they've been

10  seeking to establish through discovery, but they haven't filed

11  anything to supplement the complaint.  And the complaint, in

12  and of itself, is nothing more than the conclusory statements.

13          The Second Circuit in <u>Jazini</u>, in that case, there was

14  a similar -- there was a similar complaint filed.  It had

15  conclusory statements that asserted -- that asserted personal

16  jurisdiction.  The Court found that there was no -- that there

17  was no prima facie showing of personal jurisdiction, however,

18  and wouldn't allow the entity jurisdictional discovery to try

19  and establish it further.  The Second Circuit stated:

20          "It would require the federal courts to conduct

21          substantial jurisdictional discovery over foreign

22          corporations, a practice in which they have not

23          hitherto engaged."

24          And the Second Circuit went on to state that:

25          "The rules governing establishment of jurisdiction

1            over such a foreign corporation are clear and settled,

2            and it would be inappropriate for us to deviate from

3            them or to create exception to them because of the

4            problems plaintiffs may have in their meeting their

5            somewhat strict standards."

6       And that's 143 F.3d 186.

7       So, Your Honor, we -- all he's rested on is the

8  complaint, and we don't see anything in the complaint that

9  establishes mere department and alter ego.  Your Honor is very

10 familiar with alter ego and mere department allegations, and

11 the complaint is utterly void of them.

12          THE COURT:  All right.  Thank you.

13          MR. FINESTONE:  Your Honor, can I address the second

14 basis for the motion?

15          THE COURT:  Yes.

16          MR. FINESTONE:  The extraterritoriality.

17          The second basis, Your Honor, is that this transfer,

18 again, from the Luxembourg entity Basell AF S.C.A. to BI

19 S.A.R.L., as alleged in the complaint, was from one Luxembourg

20 entity to another Luxembourg entity.  It was approved by the

21 managers of BI S.A.R.L.  There are no facts in the amended

22 complaint that indicate that the center of gravity of this

23 transfer was anywhere else other than Luxembourg.

24          Based on the complaint, accepting all the facts as

25 true, this is, in our view, clearly an extraterritorial

1   transfer.  So given that, given that conclusion, what the case

2   law tells you as step two of that conclusion --

3          THE COURT:  Where were the human beings who did this?

4   I thought that we had established before that the human beings

5   were not physically in Luxembourg.

6          MR. FINESTONE:  Well, it's not alleged in the

7   complaint, Your Honor.  I mean, we can look at --

8          THE COURT:  Well, help me.  Tell me where they were.

9          MR. FINESTONE:  I don't think that we're submitting

10  evidence in it right now, I mean --

11         MR. WERDER:  Your Honor, I think it's fair to assume

12  that they were not in Luxembourg; that they were probably in

13  New York at the time that they signed -- although one of them

14  may have been in Florida at the time he signed.

15         MR. POHL:  Is this tag team?

16         THE COURT:  Mr. Pohl, I permit tag teams in this

17  courthouse all the time.  All I want is the information to do

18  my job.  I think Mr. Werder just gave it to me, and I think he

19  advanced the ball when he did that.

20         Back to you, Mr. Finestone.

21         MR. FINESTONE:  Your Honor, I'd just like to address,

22  I think the law is clear, this Court in Maxwell, as affirmed by

23  the District Court, and left effective by the Second Circuit,

24  is clear that, if the transfer is extraterritorial, which based

25  upon the complaint we submit that it is, then there's nothing -

1    - there is nothing in the Bankruptcy Code, there's nothing in

2    Section 548, and there's nothing in the legislative history for

3    the Bankruptcy Code that would serve to rebut that presumption

4    that the Supreme Court has stated, that the Bankruptcy Code is

5    not supposed to apply extraterritorially.

6           The trustee cites to the <u>French</u> case, it's a case from

7    the Fourth Circuit, but it's based upon a premise that's been

8    rejected by the Second Circuit.

9           I know you're familiar with the law, Your Honor, so I

10   won't dwell on it, but I do want to make one point.  They're

11   not going to be able to rebut the presumption, that's clear

12   from the case law.  So their primary argument would be that

13   this transfer was, in fact, not extraterritorial.  And the way

14   they're going to make that argument is say, don't look at the

15   transfer, we clearly didn't allege anything about the transfer

16   being extraterritorial in the amended complaint, so let me

17   direct you to the merger, the merger transaction.  And this was

18   all intertwined in the merger, and the merger was negotiated in

19   New York.

20          I concede that, Your Honor, that in the amended

21   complaint, the merger and all of those meetings, many of them

22   as such, many of them took place in New York.  But the <u>Maxwell</u>

23   case by Judge Brozman is clear that the focus -- and the focus

24   of the case law in determining whether there is any -- in

25   determining whether the transfer has a center of gravity that

1   is domestic is on the transfer, it's on the regulated conduct.

2           And in that case, the transfer happened subsequent to

3   an asset sale; an asset sale that occurred in the United

4   States.  And the plaintiffs argue, well,1 look at the asset

5   sale, clearly these proceeds that were the subject of the

6   transfer, that occurred in the U.S., and the Bankruptcy Court

7   rejected that point, and the District Court affirmed that

8   rejection.  They said, look, the focus is on the transfer.

9           We don't think that you -- we think that you need to

10  just look at the dividend here.  The Maxwell standard was --

11  the Maxwell standard was the component events of the transfers.

12  In French, the standard was the participants' acts, targets,

13  and effects involved in the transaction in issue.  The Maxwell

14  Court stated that:

15          "If the sale of the subsidiaries had constituted the

16          challenged conduct, then the conduct could be said to

17          have occurred in U.S.  But it is not the sale of the

18          subsidiaries which is challenged, it is the subsequent

19          transfer of the proceeds."

20          So we think that's directly analogous to the argument

21  that the trustee is making here; that, in fact, what you need

22  to do is look at the merger.   And all of the allegations in

23  their complaint that they will -- that they will point to will

24  go to the merger, because there's nothing in there about BI

25  S.A.R.L.  If you go from the facts to the counts, the entire

1    meat of the complaint, you don't see any allegations about BI

2    S.A.R.L.

3         Finally, Your Honor -- and I'll wrap up -- policy

4    considerations such as effects to U.S. creditors, that was also

5    rejected by the Maxwell Court.  It's simply not a sufficient

6    basis to rebut the presumption that the Supreme Court set

7    forward in Aramco and in Morrison.  The District Court

8    similarly held that:"

9              "Any unfairness to MCC's remaining creditors does not

10             suffice to demonstrate Congress' intent that Section

11             547 apply to extraterritorial transfers."

12        Your Honor, in sum, we believe that the dividend is

13   clearly extraterritorial, and that the case law is clear that

14   there's nothing -- that there's nothing in the Bankruptcy Code

15   or its legislative history to rebut that presumption.

16        THE COURT:  All right.  Thank you.

17        Mr. Pohl.

18        MR. POHL:  Thank you, Your Honor.  Steven Pohl again

19   from Brown Rudnick for the trustee.

20        I think where I'll start, Your Honor, is the chart.  I

21   think this was very helpful to get this today because the last

22   and only version that we ever got of a chart like this we

23   received under a strict confidentiality limitation.  So let's

24   just go through --

25        THE COURT:  Wait.  Somebody claimed confidentiality on

1   the chart?

2            MR. POHL:  Early on in the case, yes, we received a

3   highly confidential org. --

4            THE COURT:  "Highly" confidential?

5            MR. POHL:  It was either highly or it was

6   confidential, but it remained under the protective order from

7   then until today.  It's in my folder here, but I wasn't going

8   to take it out.  I don't need it, because this is more useful,

9   and there's other information in the record, Your Honor, which

10  will fill out this story.  And again, I fear doing this without

11  my notes, but I'm going to start without them.

12           What you just heard --

13           THE COURT:  I would prefer if you just talk in --

14  don't read from your notes or read your argument.

15           MR. POHL:  What you just heard, not only on this

16  motion, but from Mr. Kirpalani and from Mr. Werder, is that BI

17  S.A.R.L. -- that's the -- that's the company that was entitled

18  to the dividend.  It is the shareholder that executed a

19  corporate resolution accepting or declaring the dividend after

20  the company below it, or to the right, the manager, did the

21  same.  And that's alleged to be extraterritorial.  That's Lux.

22  company to Lux. company, case over.

23           Well, we've all seen all the contacts that these shell

24  companies -- and I think that Mr. Kirpalani acknowledged that

25  these companies in the chain that don't have operations,

1    they're shell companies, nothing more than that.

2         The managers at Basell AF G.P. S.A.R.L., the four

3    managers that are first responsible for declaring the dividend.

4    Alan Bigman.  You've seen a lot of Mr. Bigman.  He was Mr.

5    Blavatnik's right-hand man when it came to being the CFO of

6    first Basell, and then LBI.

7         Alex Blavatnik, also an officer of Access, Len's

8    brother, lives in Florida.

9         Peter Thoren, EVP at Access, in New Jersey or in New

10   York.

11        And most importantly, Your Honor, that no one has

12   mentioned all day long, is Mr. Baker, who's first name I

13   forget, but he is the figurehead.  He's the guy over in, either

14   in Luxembourg or somewhere overseas, that signs these consents.

15   And when he was deposed, what did he say?  I didn't exercise my

16   discretion, I didn't exercise any judgment, when Access asked

17   me to sign something, I did it.

18        Okay.  So now let's further the story.  Is this all

19   extraterritorial?  Is it Lux. to Lux., notwithstanding the U.S.

20   people involved?

21        Well, what you weren't told, and we learned this in

22   one of our depositions after the motion papers were filed --

23   although I'll admit I do believe that the paperwork underlying

24   it was produced earlier, but it came up in connection with the

25   deposition of one of the managers here -- is that,

1   notwithstanding that BI S.A.R.L. was entitled to the dividend,

2   never got the dividend, never saw the dividend.

3          In fact, there's a piece of paper that is signed by

4   Basell Funding S.A.R.L.  They're below the line.  Signed by who

5   else?  Peter Thoren.  What does he say?  That dividend that

6   you're going to send up, Mr. Basell Holdings B.V., you know

7   that was declared to BI S.A.R.L., forget about that, send it

8   somewhere else.  Where?  Well, Your Honor, now we're in the

9   dotted lines.

10          Remember Mr. Kirpalani said, oh, there's some more

11  entities there, but I didn't put them in for whatever reason?

12  Well, there's important entities missing there, and the key one

13  is the recipient of the money:  NAG Investments, LLC.  What is

14  that?  I believe it's either just under Access or just under

15  Mr. Blavatnik.  But it's a Delaware limited liability company.

16          And the money, did it go from Lux. to Lux.?  No, based

17  upon our information.  Did it immediately go tot he U.S.,

18  somehow, to Mr. Blavatnik?  I don't know.  Who knows how many

19  U.S. accounts he has, maybe none.  But what the letter says is,

20  send that money to NAG, and it's going to start in Germany, and

21  it's going to land in London.  So Lux. has nothing to do with

22  it.  A Delaware LLC does have something to do with it.

23          I think that fleshes out a little bit more about

24  whether it's U.S., whether it's Lux./Lux., whether it's

25  extraterritorial.

1        I just want to bring the Court back, if you will, Your

2   Honor, to the beginning of the case, only to remind Your Honor

3   that this is not the first time we're hearing about these

4   dividends.

5        Okay.  If Your Honor remembers the so-called "2015

6   injunction hearings," that was quite a while ago, but that was

7   early in your Chapter 11 case.  And --

8        THE COURT:  Is that the one that I was criticized so

9   much for entering?

10       MR. POHL:  Well, we didn't criticize you, but ...

11       THE COURT:  No, I'm sure the creditors' committee --

12       MR. POHL:  Maybe some others did.

13       THE COURT:  -- didn't, but I think the enjoined

14  parties --

15       MR. POHL:  Yes.

16       THE COURT:  -- were a little upset that I would be

17  doing something to --

18       MR. POHL:  Yes.

19       THE COURT:  -- prevent them from going after European

20  assets, if I recall --

21       MR. POHL:  And I don't raise that --

22       THE COURT:  -- and/or forcing European entities to

23  file insolvency proceedings.

24       MR. POHL:  I don't raise that for purposes of

25  addressing, you know, what your powers were at that time.  But

1   members of that family of creditors up at LBI, which was the

2   issuer of the 2015's, you might remember, the noteholders, as

3   well as the U.S. folks that had guarantees up at the parent

4   company?  They were clamoring because they said, you can't do

5   that unless LBI is going to either submit to jurisdiction or we

6   get some protection on these pre-bankruptcy transfers.

7           So what Your Honor said is, well, if I'm going to

8   listen to the debtors here, I'm going to need a tolling

9   agreement, and I'm going to need information.  And what you

10  received from Cadwalader is a piece of paper that said, these

11  are all the distributions that went out from Basell, pre-merger

12  Basell, and it included, you know, all these dividends that

13  went to, quote/unquote, "Access and its affiliates."  No

14  mention of BI S.A.R.L.

15          Then there was a tolling agreement that was entered

16  into.  And while I admit that, you know, Quinn Emanuel is

17  clearly smart enough to cover its tracks, and there was a

18  jurisdictional protection there, there was still never a

19  mention of BI S.A.R.L.  It was simply Access signing the

20  stipulation on behalf of itself and all of its subsidiaries or

21  affiliates, just the way it treats the flow of money up the

22  chain.

23          So we've learned in recent discovery, Your Honor,

24  about Mr. Baker, his figurehead status.  We've learned about

25  where the money went.  We have a pending deposition notice and

1    discussions with Quinn Emanuel on a deposition for Nell; Nell

2    being the parent of BI S.A.R.L., which we think could shed a

3    little bit more light.

4            I'm not going to go through what we've put in our

5    papers, Your Honor.  I think we've covered enough by way of

6    allegations.  If Your Honor doesn't think we have enough, we'd

7    like a chance to take a little bit more discovery like we're

8    talking about with Nell.

9            So we've talked about all the facts, all the

10   allegations and legal arguments on alter ego and on mere

11   department.  I'm  happy to rely on what's in our papers.  The

12   goal in these cases is to reach an equitable result, and we

13   think reaching an equitable would require BI S.A.R.L. to be

14   here, based upon who it is, where it is in the chain, and where

15   all the other people around it live and reside.

16           With respect to 548, we'll rely on our papers, Your

17   Honor.  The French case, the Midland case, they're a little bit

18   different.  But the Midland case is a bankruptcy court case in

19   California; the French case is a Fourth Circuit case.  And I

20   don't agree that what the Second Circuit said undercuts the

21   holding in French.  And when Access tries to utilize -- BI

22   S.A.R.L., excuse me.  When Quinn Emanuel tries to utilize the

23   2006 case out of California, the bankruptcy case, that case

24   wasn't a battle about whether it was or was not

25   extraterritorial.  It was agreed in that case and stipulated

278

1  that it was extraterritorial.  So we think this one is not.  So

2  whether 548 applies extraterritorially or not, which we think

3  it does, this case is not an extraterritorial case.

4          And with that, Your Honor, unless you have any

5  questions, I will rest.

6          THE COURT:  Well, thank you.

7          Reply?

8          MR. FINESTONE:  Very briefly, Your Honor.

9          THE COURT:  Yep.

10          MR. FINESTONE:  Benjamin Finestone, Quinn Emanuel, for

11  BI S.A.R.L.

12          Your Honor, everything that he said is outside of the

13  amended complaint.  As defendants we're forced to accept

14  everything that's in that complaint as true.  We think it's

15  only equitable that his assertion of personal jurisdiction be

16  held to the same standard.

17          With respect to personal jurisdiction, there is

18  nothing in that complaint that you normally see for alter ego

19  or mere department cases, and there's nothing in that complaint

20  about the transfer that would indicate that the transfer is, in

21  fact, not -- anything but extraterritorial.

22          He can get up here from the podium and argue, and talk

23  about deposition transcripts.  But each one of the motion to

24  dismiss cases that we cited in our briefs talked about the

25  failure to file any -- any additional affidavits or any

1   additional deposition transcripts.  And it's not -- it's not

2   that it's an evidentiary hearing.  But the case law allows them

3   to file additional facts, to be treated as allegations and to

4   be treated as -- and considered under a motion to dismiss.

5          But for him to get up here and just argue facts, and

6   this is what happened last week at the deposition, and

7   therefore that makes the transfer extraterritorial, I don't

8   think that that's -- I don't think that's acceptable, and it's

9   clearly outside the amended complaint.  And that's what we

10  think -- that's what we think, on a motion to dismiss, needs to

11  be assessed here and needs to be considered here.

12         And then, from there, the next request they could make

13  would be like, well, fine, please, Your Honor, grant us

14  additional discovery.  And we think that it's too late for

15  that, Your Honor.  They've had Rule 2004 discovery, they've had

16  Phase 1 discovery, they've had Phase 2 discovery.  They needed

17  to show something here to establish either personal

18  jurisdiction or establish that this transfer is domestic.  And

19  it's not in the amended complaint, and there's nothing else

20  filed before Your Honor, so ...

21         THE COURT:  On a 12(b)(2), to dismiss for lack of in

22  personam, it's usually so obvious that we don't need to.  But I

23  can take evidence on that by affidavits or otherwise, can't I?

24         MR. FINESTONE:  I think you can, and I think -- and I

25  think they should be held to the preponderance of the evidence

1   standard, if they had submitted any evidence.  But they

2   haven't.

3           THE COURT:  Any further points, Mr. Finestone?

4           MR. FINESTONE:  No, nothing, unless Your Honor has any

5   further questions.

6           THE COURT:  No.  Mr. Pohl, if it's limited to what Mr.

7   Finestone said in his most recent remarks, I'll let you speak.

8           MR. POHL:  I only have one thing to say, Your Honor.

9   If the Court desires more from us, we will be happy to submit

10  an affidavit, further limited briefing with the facts, within

11  seven days, Your Honor.

12          THE COURT:  All right.  Are we -- yes, ma'am.

13          MS. COFFINO:  Up last, Your Honor, if you're ready.

14          THE COURT:  On the final motion, you mean.

15          MS. COFFINO:  On the final motion.

16          THE COURT:  Okay.  Anybody, before we get onto the

17  final motion?

18      (No verbal response.)

19          THE COURT:  Okay.  Let's go to the final one.

20          MS. COFFINO:  Thank you.  Dianne Coffino from

21  Covington & Burling.

22          THE COURT:  Was that Casino?

23          MS. COFFINO:  Coffino, with two F's, C-o-f-f-i-n-o.

24          THE COURT:  Sure, go ahead, Ms. Coffino.

25          MS. COFFINO:  Thank you, Your Honor.

1          Your Honor, I'm charged with arguing the motion to

2     dismiss Counts 15 and 16.  We represent Ed Dineen, whose name

3     has been mentioned a couple of times today.  But this is a

4     joint motion by Covington on behalf of Mr. Dineen, Paul

5     Hastings on behalf of Mr. Bigman, and Porter & Hedges on behalf

6     of Mr. Gelb.

7          Each of these individuals were members of the post-

8     merger Lyondell Chemical Company Board of Directors.  These

9     counts that are now asserted against them -- and I should

10    mention, I believe Access has joined in our motion, to the

11    extent that it seeks dismissal of Count 15, which is the

12    recharacterization count.

13         These claims are relatively new vintage.  They first

14    appeared in the amended complaint that was filed at the end of

15    July.  Prior to the filing of that complaint, the trustee had

16    restricted himself to moving against Access on a claim of

17    preferential transfer; he sought to recover the repayment of

18    the loan as a preference on account of antecedent debt.  And of

19    course, you heard a lot today about the breach of contract

20    claim, in which he claims that Access breached the contract by

21    refusing to lend, as it had obligated itself to do at the end

22    of December.

23         I'm going to try to be very brief, Your Honor, because

24    you are very familiar with recharacterization claims; you wrote

25    a decision on it in <u>Adelphia</u>, on a motion to dismiss, in fact.

1   Recharacterization is --

2          THE COURT:  Do we agree that the <u>AutoStyle</u> factors are

3   what I look at --

4          MS. COFFINO:  Yes.

5          THE COURT:  -- the ones I articulated in <u>Adelphia</u> and

6   --

7          MS. COFFINO:  Yes.

8          THE COURT:  -- I think it was the Sixth Circuit

9   articulated in <u>AutoStyle</u>.

10         MS. COFFINO:  Yes.  I think it's a common-sense

11  evaluation.  The inquiry is all about intent, but the <u>AutoStyle</u>

12  factors are definitely the guidelines for that.

13         Now I'm just going to briefly summarize the few

14  allegations that do exist in the complaint about the Access

15  revolver, and I think a lot of it is undisputed.

16         In March, Access Industries, Lyondell Chemical, and

17  Basell Finance -- as the two last entities were borrowers and

18  Access obviously was the lender -- entered into this credit

19  agreement.  It was a seven-hundred-and-fifty-million-dollar

20  unsecured loan.  It was modeled, as counsel has said, on

21  Lyondell's existing credit agreement with its existing bank

22  group.

23         I'm glad he mentioned that.  We actually mentioned

24  that in our papers because we believe that fact cuts in our

25  favor, and in favor of dismissal.  They don't challenge that

Argument                                                    283

1   the agreement contains all the customary terms of lending:

2   Borrowing terms, interest rates, repayment terms of interest

3   and principal, you know, remedies for breach, events of

4   default, and termination provisions and a fixed maturity date

5   eighteen months out.

6          Lyondell disclosed all this immediately in its SEC

7   filings, and throughout the year.  In every SEC filing, they

8   included the Access revolver among their other debt instruments

9   in their public filings.  And they also disclosed that it was

10  modeled on their existing bank group loan, the revolver.

11         Now at the time that the Access revolver was put into

12  place, Lyondell was negotiating with its lenders; it was doing

13  two things:  It had an option to increase its borrowings by

14  $600 million under the ABA facility, and it elected to exercise

15  that option.  It also increased the ABA facility by about $500

16  million; it increased the commitment under that.

17         Not much is said about the Access revolver after that,

18  until October, when Lyondell draws down on it.  It draws down

19  $300 million, and over five days, I think, in three tranches

20  they paid back the entirety of the loan.

21         Now in their papers, the trustee chastised us for

22  placing too much emphasis on the documentation.  The complaint

23  really doesn't go into any details on what the documentation

24  said.  But in their papers, they acknowledge that it contains

25  all these terms, but they say, well, we place way too much

1   emphasis on the documents.  But we do that, Your Honor, because

2   that's what the recharacterization cases do.

3           The first three AutoStyle factors:

4           Was there a debt instrument?

5           Are there terms for interest rates and interest

6   payments and repayment of principal?

7           Is there a fixed maturity date?

8           Those are the three --

9           THE COURT:  I understand that, Ms. Coffino.

10          MS. COFFINO:  Yeah, yeah.

11          THE COURT:  But I understand your opponents principal

12  point on rechar. to be that, at the time that the loan was

13  made, nobody in his right mind would make a true loan, and that

14  that's one of their important points why it's closer under the

15  AutoStyle factors than you're giving it credit for; that, and

16  of course who's making the loan.  Do you think I'm

17  mischaracterizing their contentions?

18          MS. COFFINO:  I think that they are alleging that the

19  company was inadequately capitalized at the time that the loan

20  was made.  That allegation is clearly in the complaint.  They

21  say that no one would make a loan.  But that's not a fact,

22  that's a speculation.  There is no allegation -- in their

23  papers, they say Lyondell couldn't cajole another lender to

24  make a loan to them.

25          Well, there's no facts to that effect in their amended

1   complaint, that Lyondell went out and tried to get a loan and

2   couldn't get it.  In fact, Lyondell was right in the midst of

3   borrowing another $600 million from its existing bank group.

4          And there's nothing under the AutoStyle factors or any

5   other case that says it has to be exactly the same terms, or

6   that it has to be from a disinterested lender.  In fact,

7   AutoStyle says exactly the opposite.  You don't have to go get

8   a new lender to lend you money.  If your existing lenders are

9   willing to upsize their obligations to you, then that's

10  evidence that someone is going to lend to you.  So I don't

11  think it's exactly as they said it is.

12         And I think you'll hear a lot today about what you can

13  infer from the fact that Lyondell didn't borrow until October.

14  They want to make something nefarious out of that, and they're

15  going to probably tell you, as they said in their briefs, that

16  Mr. Blavatnik didn't let them borrow.  There are no facts in

17  the complaint.

18         But even if they had alleged actual facts -- you know,

19  they're very fond of emails and documents and -- and

20  correspondence -- there's nothing in the complaint about this.

21  They're just inferring it from the fact that it took until

22  October for Lyondell to borrow.  Now this was their most

23  expensive facility.  It was unsecured.  The rate was a little

24  higher.  You know, it's normal not to borrow under your most

25  expensive facility until you need to.

1    But even if they were right about all this inequitable

2  conduct that they put in their brief, this is not about

3  equitable subordination, Your Honor.  They're confusing the two

4  concepts.  It's about whether this credit agreement, from the

5  get-go, was intended to be a loan.  Did the parties intend to

6  be -- this to be a loan?

7    Their complaint also says that Mr. Blavatnik was asked

8  over and over again to put in equity, in addition to the $5

9  billion in equity he contributed when he contributed Basell to

10  this structure, and he refused.  The only thing he was willing

11  to do was a loan.  He was willing to agree to terms, like the

12  third-party lender terms, but he was only willing to do a loan.

13  That's evidence of intent.  It's not about equitable

14  subordination.

15    The borrowing in October was essentially an overnight

16  borrowing, and it's very common in revolvers to borrow to meet

17  cash needs, cash comes in, you repay it.  There's nothing

18  nefarious about that.

19    And there's nothing -- the reason they say you should

20  disregard the papers is they say that Lyondell didn't comply

21  with the paper, with the document, the credit agreement.  But

22  they point to no provision and say, oh, that provision said X,

23  and they did Y.  Simply doesn't exist.

24    THE COURT:  Pause, please, Ms. Coffino.

25    MS. COFFINO:  Uh-huh.

1            THE COURT:  Because one of the reasons that I'm more

2    interested in this argument than the two that preceded it is

3    because I think it's closer, from both sides' perspective.

4            But while I well take your points, I'm wondering if

5    they're of the type that I should be deciding on a 12(b)(6), or

6    whether they're better considered on either summary judgment or

7    after trial.  Can I get your views on that, please?

8            MS. COFFINO:  Sure.  I think there's ample basis here

9    to dismiss.  They have an obligation to do more than conclusory

10   allegations, even if we weren't under Twombly and Iqbal.  If we

11   were in the pre-Twombly period, they still cannot base a claim

12   on conclusory allegations.

13           And they have not -- they have not alleged a

14   meaningful set of AutoStyle factors.  In Adelphia, you

15   dismissed under 12(b)(6) the recharacterization claim because

16   of that very reason.  In order to make out a claim for --

17           THE COURT:  Correct, Ms. Coffino.  But you know, I

18   remember my cases.

19      (Laughter.)

20           MS. COFFINO:  I'm sure you do, better than me, I'm

21   sure.

22           THE COURT:  And in Adelphia, the creditors' committee,

23   which I thought was well counseled, didn't even try to satisfy

24   the AutoStyle factors.  And I drew the inference that they were

25   good enough lawyers, that if they had something to tell me on

1  AutoStyle, they would.

2          MS. COFFINO:  Well --

3          THE COURT:  And if I'm not mistaken, also, the loans

4  in Adelphia were made by genuine third-party banks, rather than

5  what we have here.

6          MS. COFFINO:  That's right, the loans in Adelphia were

7  made by third-party banks.  But the fact that an insider makes

8  a loan doesn't mean that it's not a genuine loan, Your Honor,

9  and --

10         THE COURT:  Correct.  But that would be why you would

11  possibly win at summary judgment and at trial.

12         MS. COFFINO:  Uh-huh.  But I --

13         THE COURT:  Unless you think I'm being unfair to you.

14         MS. COFFINO:  Well, I think there's a basis for

15  dismissal, and I think that there's a clear basis for dismissal

16  here, because there are clear credit agreements.  It's not a

17  situation -- there are two scenarios in which courts do

18  disregard these credit agreements, and neither is applicable

19  here.

20         The first scenario is similar -- well, it's the one

21  that Judge Bernstein faced in the Musicland case, where Best

22  Buy had loaned lots of money to an affiliate; and two years

23  later, when they were about to sell the company to Sun Capital,

24  they then papered it as a loan.  Cold Harbor is like that,

25  Lexington Oil is like that.  It's all about, you know, yes, you

1  have a document, but it wasn't contemporaneous; it was done

2  after the fact to make it look like something that it wasn't.

3      Here, we have a credit agreement that was fully, you

4  know, documented and put into place six months before any loans

5  were drawn under it.  So there's no question about that.

6      And the second instance in which courts do ignore, or

7  at least don't give a lot of credence to a credit agreement as

8  a loan, is when it contains a lot of features that are equity-

9  like, when the credit agreement gives -- for example, gives

10 management control to a lender, or when it -- a note is issued

11 in the context of redemption of a note, and the rights on

12 default are just conversion back into stock.  Those are equity

13 features.  No one is claiming that the Access revolver has any

14 of those features.

15     So I think it's very compelling here that, you know,

16 based on the allegations of the complaint, that we have a valid

17 credit agreement that was entered into contemporaneously.

18     So again, they really are not alleging what they did

19 to diverge from the loan agreement, except in one case, and I

20 want to address that.

21     That case -- they alleged in -- not in their -- again,

22 not in the complaint.  If we're looking at the four corners of

23 the complaint, it doesn't mention the terms of the loan

24 document, it doesn't talk about interest.  But in their papers

25 in response to our motion, they assert that the parties didn't

1   comply with the interest repayment terms.

2          The kindest thing I can say about that, Your Honor, is

3   that it's not true.  The terms of the loan agreement said that

4   interest would be due five business days after the end of the

5   quarter in which a draw was made.  Well, that happened to have

6   been probably around the 8th or 9th of January, of 2009.  And

7   we all know Lyondell was before you at that point, Your Honor.

8   It couldn't make the interest payment.  It was required by law

9   not to pay any pre-petition debts.  I mean, had they done so,

10  the committee would have been before you, you know, as quick as

11  can be, and you would have never permitted that to happen.

12         So it's not that they didn't comply with the

13  agreement.  The interest wasn't due until the time that they

14  were in bankruptcy.  And in fact, Lyondell scheduled fees and -

15  - in its schedules earlier in the case, before anybody was

16  thinking recharacterization.

17         I mean, if you look at their -- the argument this

18  morning, they're seeking to recover $12 million in fees from

19  Access under a loan document.  It's pretty inconsistent with

20  saying that was equity.  I mean, no one is arguing that that

21  stuff wasn't paid.

22         Just to go on -- I don't want to belabor all of the

23  points because you know them very well.  You know, again, the

24  loan agreement was unconditional, it had to be repaid.  You

25  know, there's nothing in it that said, oh, no, you can defer

1   until you're -- you know, you're experiencing sunny times and

2   you have a lot more cash flow.  They had an option to pay it at

3   maturity, but they also had the option to pay it down right

4   away.  It was right in the agreement.

5           There's no subordination here.  I have addressed the

6   ability to obtain financing from outside lenders, so I don't

7   want to belabor that point.  But there are a lot of cases like

8   <u>Celotex</u> and <u>BHS&B Holdings</u>, and <u>Daufuskie Island</u>.  They all

9   say, it doesn't have to be the same -- you know, it doesn't

10  have to be new lenders, it doesn't have to be the same terms.

11          Use of the funds.  Funds were not used to acquire

12  capital assets, they couldn't be under the loan agreement; they

13  could only be used for working capital.  Again, indicia of debt

14  weighs against recharacterization.

15          And I think that the trustee agrees with us that the

16  sinking fund element really isn't relevant here.  This isn't

17  funded by a bond indenture; it's a revolver.

18          I'm going to rest on my papers with respect to the

19  dividend portion of our argument.  The dividend claim is --

20  really rises and falls to some degree with the

21  recharacterization claim.  If the recharacterization claim

22  falls, so does the dividend claim.  But there are independent

23  bases for -- even if you were to find there was a basis here

24  for recharacterization -- to dismiss the dividend claim.

25          First of all, Section 174 of the Delaware Code

1   contains a negligence or willfulness standard for directors.

2   No allegation, Your Honor, zero allegation in the complaint

3   that these directors had any involvement whatsoever in the

4   borrowing in October or the repayment in October.  There's no

5   allegation that the board had an involvement.  How do you make

6   out negligence and willfulness if you can't even allege, after

7   a year and a half of discovery, that the board considered this?

8           Now they'll argue, well, the boards don't have to make

9   a formal resolution on a dividend to be responsible.  But the

10  boards have -- the board has to do something.  You know, it's

11  not about a formal resolution for a dividend, but they have to

12  approve the transfer, they have to be involved some way, and

13  they weren't.  There's no allegation, so there's no basis for a

14  dividend claim here.

15          And I'll just reserve some time at the end.

16          THE COURT:  Sure.

17          MS. COFFINO:  Thank you.

18      (Counsel confer.)

19          MS. COFFINO:  Can I just say one thing before?

20          THE COURT:  Absolutely.

21          MS. COFFINO:  I'm sorry.  I want to address one thing

22  that was argued before in connection with the breach of

23  contract claim.

24          You know, there is an allegation -- an assertion --

25  it's not in the complaint, again -- that this document wasn't

1   negotiated.  Well, again, it's not in the complaint.

2           But what I really object to is Mr. Pohl standing up

3   and telling Your Honor that no one at Lyondell even looked at

4   this document before signing it.  There's no basis for that

5   remark.  It's not in the complaint.  If they had a basis for

6   it, it would have been in the complaint.

7           Karen Twitchell was the treasurer of this company.

8   They had seven hours of deposition with her, and if they needed

9   more, they could have asked before discovery closed.  There's

10  just no basis for counsel making a statement like that to you.

11  Thank you.

12          THE COURT:  Okay.  Mr. Pohl.

13          MR. POHL:  Thank you, Your Honor.  Steven Pohl again

14  for -- from Brown Rudnick for the trustee.

15          First, counsel is right.  We made a mistake on the

16  interest payment, and we apologize for that.

17          Second, I'm not sure why even the topic of equitable

18  subordination is coming up.  We don't claim that here, we don't

19  need to prove it here, so I'm not going to address that.

20          Third, like I mentioned earlier with respect to Access

21  -- and I think I also mentioned it at the time of the earlier

22  argument -- the D's and O's were also participants in all of

23  Phase 1.  They've seen what is presently filed under seal in

24  the form of the creditors' committee's contentions of fact.  As

25  our papers say for this motion, we believe that what we've

1    alleged in the complaint is more than sufficient.

2            The paragraph numbers, Your Honor, that are most

3    relevant to this are in Section 4 of our complaint, starting at

4    Page 97.  We go through unreasonably small capital at

5    Paragraphs 230, 273 and four.  We go through the leverage

6    issues at 281 to 283.  And we go through the post-merger

7    liquidity failure at 288 through 295.

8            Admittedly, as I've said before, Your Honor, there is

9    more in the contentions of fact, and there is more that we've

10   learned in discovery since the filing of the amended complaint.

11           THE COURT:  Pause, please, Mr. Pohl, because I take

12   your point about you picking out the allegations that fit your

13   view of the world on the AutoStyle factors, just like I accused

14   Ms. Coffino of choosing the ones she did.  And it certainly

15   seems to me that, on this lay of the land, some of the factors

16   go in each direction.

17           But I thought that the targets of Claims 15 and 16, in

18   each case, were post-merger directors, and you seem to be

19   saying something to the contrary.

20           MR. POHL:  No, no, no.  These are post-merger

21   directors that are the targets of the illegal dividend claim.

22           The recharacterization claim does two things, Your

23   Honor:  One, it permits a claim -- if it's recharacterized, it

24   permits a claim under Delaware law against the post-merger

25   Lyondell directors for the repayment of the October 2008

1   advance.

2          THE COURT:  Because although they may have thought

3   they were paying back a loan, you're saying that because it's

4   equity, they were in essence providing a dividend on equity.

5          MR. POHL:  Correct.

6          And the second thing it does -- and that's why Access

7   has joined in the motion, is that we all know that Access is

8   the subject of a three-hundred-million-dollar preference count

9   because of that repayment in October.  What the

10  recharacterization would do is provide an alternative ground

11  for recovery of that $300 million in the form of --

12         THE COURT:  Because it would no longer be antecedent

13  debt, it would be just no obligation at all.

14         MR. POHL:  It would be a fraudulent transfer, a

15  dividend.

16         So I agree with Your Honor, and that's what my notes

17  said.  Some of these factors go one way, and some go the other

18  way.  But in our view, a formalistic review of those factors

19  out of context doesn't help.  And in our view, the ones that

20  count the most should be the ones that run to the facts on the

21  ground back in March of 2008, when this was put in place.

22         And we've said that in our pleadings.  It was a time

23  when there was an extreme shortfall in liquidity, a massive

24  crisis.  The LBO lenders were distressed, and that word is an

25  understatement, that they were "distressed."  They made demands

1  for equity to be put in by the sponsor, who just closed the

2  deal three months earlier.  What does that tell you about the

3  state of affairs?

4         What I didn't have at the time the complaint was filed

5  was the deposition testimony, which I've been accused for

6  spouting in the record, and I won't, Your Honor.  But we have

7  deposition testimony very much on point of the views of a

8  Lyondell supervisory board member, at the time of the revolver

9  being put in place, March 2008, whether he thought or not that

10 a loan like this could be obtained from a third party.

11        And so what was going on in March of 2008, and what

12 hat was Access wearing?  Were they coming in as a third party

13 to make a loan, or were they coming in as a private -- did they

14 have the hat on of a private equity sponsor looking to save the

15 transaction that they just, you know, undertook $20 billion of

16 debt.

17        And I would submit that that's the key set of factors

18 that the Court should look at, not was it a piece of paper that

19 looks like debt.  No argument from us.  It's a piece of paper

20 that looks like debt.  Did it have an interest rate?  Of

21 course.  Did it have a maturity date?  Of course.  My God, they

22 took the form that was used by somebody else, and they made it

23 for this.  Of course they made it look like debt, that's not

24 the point.  How did they treat it?  And before getting into, is

25 it something that one would consider, as an outside looking at

1   this, that a third party would provide?

2         I mean, the Court will have at trial, or at summary

3   judgment stage, all of the information it needs to assess the

4   credit-worthiness of this company in March of 2008.  But Your

5   Honor has seen -- well, maybe Your Honor hasn't looked at the

6   expert reports because you never had to, you know, come to

7   trial, but you know, they're on record a year and a half ago.

8   And they go through in spades what the situation was at

9   Lyondell, what the credit rating agency said about Lyondell.

10  So all that runs to whether a third party would have provided

11  funds at that time.

12        And Ms. Coffino is right, you know, we don't have in

13  this complaint some of the comments made by Access, you know,

14  when they were scrambling around to get money in that time

15  frame.  It's in the contentions of fact, we can supplement.  I

16  admit it's not in the complaint.

17        So in our view, first, you look to see whether it's

18  arm's length.  And we think that what I -- I believe what I

19  talked about in the earlier motion addresses that.

20        The courts also look to the identity of interests

21  between the lender and the shareholder.  And we say -- we would

22  consider that to be a pretty significant point, Your Honor,

23  based upon the circumstances of what was going on in March

24  2008.  You had an equity owner, and it's the one that put the

25  money in, flat out, you know, on all fours,.

1          The rest of these factors, Your Honor, I've admitted

2    to the Court that I don't have any debate about whether the

3    form was there.  It's just whether it was carried out as a

4    revolver.  Like any third party, could Lyondell pick up the

5    phone or submit a piece of paper to Access and say, give me the

6    money, or were they put through a different drill; was it

7    treated differently?

8          I don't need to go anymore through the various, you

9    know, factor numbers on under-capitalization and no alternative

10   financing.  I've mentioned to Your Honor that there is

11   subsequent deposition testimony.

12         And I would agree with Ms. Coffino that I'm happy to

13   rest on our argument in our papers on the dividend.

14         And lastly, there are a few other factors at the end

15   that I don't think anybody has necessarily mentioned, that, you

16   know, do come our way, and that has to do with, you know, the

17   security for advances.  You know, there was no security.

18         And my last point, just to address this notion that

19   other debt was provided at that time, the ABL facility was

20   upsized to $600 million -- by $600 million, because the company

21   was out of the liquidity that it was projecting to have right

22   after the merger closed.  That upsizing was a pretty

23   significant negotiation, it's laid out in the complaint, and

24   that six-hundred-million-dollar increase came at a massive cost

25   to the debtor, and it was secured, and it was secured by the

1   best assets, receivables and inventory.

2          And the fact that that was put in place should have no

3   bearing on whether or not the company could get debt at that

4   time.  The question is whether the company could get debt like

5   Access provided.  And that was an unsecured revolver behind $20

6   billion of secured debt.  Thank you, Your Honor.

7          THE COURT:  Before you sit down, please, Mr. Pohl.

8   Remember Count 12?  I assume that if it was a contribution of

9   equity, there would be no contractual duty to lend more.  I

10  assume this is an argument that's in the alternative?

11         MR. POHL:  This argument here on recharacterization,

12  yes, is in the alternative to Count 12.

13         THE COURT:  Okay.  Ms. Coffino, I'll take brief reply.

14         MS. COFFINO:  I only have a couple of points, Your

15  Honor.

16         Your Honor, I'm not going to stand here and lose

17  credibility with you; that's the last thing I'd want to do, and

18  say that they don't allege that Lyondell was inadequately

19  capitalized.  But I do find it odd that a company that is

20  alleged to have no liquidity in March -- which we will -- the

21  evidence will show what the evidence will show -- survived

22  until October without having to draw on this line.

23         There's no allegation in the complaint that it was

24  breaching its covenants, it was going to be in default under

25  its existing loan documents, that it wasn't paying its

1   creditors as they come due.  So there's a little inconsistency

2   in compatibility in these allegations.

3        But the reason why I think this should be dismissed

4   under 12(b)(6) is because, as you've said, you need a

5   meaningful set of AutoStyle factors.  And the AutoStyle factors

6   that do cut their way, the allegation about inadequate

7   capitalization, the allegation about the insider status, almost

8   every case I've read said, put those two together, and it's

9   still not enough.

10       And if we rule that it's enough to be an insider loan

11  at a time when the company was inadequately capitalized, no one

12  will ever lend to an affiliate again, if it was that simple to

13  recharacterize.  And the cases we cite are in our briefs, but

14  they include Hedged-Investments, Dornier Aviation, and

15  AutoStyle.  So the few factors that do cut their way are not

16  enough under the cases.

17       Secondly, the only other point I want to reach is, you

18  know, we do need to look at the four corners of this complaint.

19  I hear a lot about these contentions of fact filed under seal,

20  but if they thought they had enough here, they should have put

21  it in their complaint.  So I'm a little skeptical about, you

22  know, what else they have.

23       We've had a lot of discovery.  This was not a claim

24  that was filed, you know, in '09.  This was a claim that was

25  filed in 2010, after an awful lot of discovery.  And you know,

1    how many bites of the apple do you get?  They've already had

2    two.  Thank you, Your Honor.

3           THE COURT:  All right.  Thank you.

4           Okay.  Are we done, folks?

5           MR. KIRPALANI:  Yes, Your Honor.

6           UNIDENTIFIED:  Yes, Your Honor.

7           MR. KIRPALANI:  I believe so.

8           MR. WISSNER-GROSS:  Yes, Your Honor.

9           THE COURT:  All right.  I'm not going to surprise you

10   when I say that I'm taking this all under submission.  It's a

11   little after seven o'clock.  Hopefully, you can make your

12   flights.

13          Thank you very much, folks.  We're adjourned.

14          COUNSEL:  Thank you.  Thank you.

15      (Proceedings concluded at 7:01 p.m.)

16                                  *****

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2          I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter.

5

6

7    _____   March 14, 2011

8    Coleen Rand, AAERT Cert. No. 341

9    Certified Court Transcriptionist

10   Rand Reporting & Transcription, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25